|  |  |
|---|---|
| | ) **United States District Court** |
| | ) **Northern District of Illinois** |
| **JOHN DOE,** | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| **THE BOARD OF TRUSTEES OF** | ) |
| **NORTHERN ILLINOIS UNIVERSITY;** | ) |
| | ) |
| Defendant. | ) |

## COMPLAINT

Plaintiff, John Doe ("Plaintiff"), by his attorneys Pissetzky & Berliner, LLC, and for his Complaint against The Board of Trustees of Northern Illinois University ("NIU") respectfully alleges as follows:

## THE NATURE OF THIS ACTION

1.      This case arises from actions taken and procedures employed by NIU and its administrators concerning allegations made against Doe, a male student enrolled at NIU in 2016, in two matters: (i) allegations of nonconsensual sex with Jane Roe ("Roe"), a woman not enrolled as a student at NIU on April 17, 2016; and (ii) a false allegation of Doe using cocaine in a fraternity house on September 17 or September 24, 2016.

2.      As a result of the procedures employed by Defendant and the actions taken by Defendant and its employees, Defendant caused Doe great damage in that he suffered humiliation and a loss of good reputation; his academic future is damaged and uncertain; and the monies spent by Doe and his family, as well as the time Doe devoted to his education at NIU, are now wasted.

3.      Due to the damages suffered by Doe, he now brings this action against Defendants for Defendants' violation of Title IX of the Education Amendments of 1972, and violations of Doe's due process rights pursuant to 42 U.S.C. § 1983.

4.      Doe is a natural person, citizen of the United States and a resident of Illinois.

5.      Doe was enrolled as a student at NIU for the 2015-2016 academic year, and he lived in his fraternity house during that time.

6.      Doe enrolled in the 2016-2017 academic year for the fall semester, his last semester, but was forced to withdraw in October of 2016, due to the actions of NIU and its administrators.

## JURISDICTION AND VENUE

7.      Defendant is a public university located in DeKalb County, Illinois and accepts federal financial assistance. Therefore, this Court has personal jurisdiction over Defendant.

8.      Federal question and supplemental jurisdiction are proper pursuant to 28 U.S.C. 1331 and 28 U.S.C. 1367.

9.      Venue for this action properly lies in this district pursuant to 28 U.S.C. 1391 because Defendant is located within this judicial district and a substantial part of the events or omissions giving rise to this claim occurred in this judicial district.

## PLAINTIFF'S RELATIONSHIP WITH DEFENDANT PRIOR TO THE ALLEGATIONS GIVING RISE TO THIS COMPLAINT

10.      Before the allegations against Doe in 2016, Doe was familiar to Defendant and its administrators because one of Doe's fraternity pledge brothers passed away from excessive drinking at a party and hazing event in 2012. Exhibit A.

11.     Doe was not involved in the planning of or executing the hazing.

12.     Doe became president of his fraternity in 2015. Administrators and staff, particularly Brian Glick ("Glick"), the Associate Director for Student Conduct, repeatedly interviewed, emailed, and harassed Doe concerning what staff believed to be the fraternity's wrongdoings throughout the year.

13.     This included requiring Doe to appear in Glick's office and answer questions about allegations levied against his fraternity brothers. As a result of these meetings with Glick, Doe lost time he could have committed to other extracurricular activities, class time, and studying. Exhibit A.

14.      Staff and administrators working at NIU held bias against Doe in 2016, due to his relationship with his fraternity. Doe maintained a "B" grade average. Doe was active in campus organizations and maintained a part-time job at the school newspaper.

## FACTS OF THE TITLE IX CASE AGAINST DOE

15.     On April 16, 2016, Roe arrived at NIU to attend a sorority event with a friend.

16.     Upon information and belief, Roe is not, nor has been, enrolled at NIU as a student.

17.     Roe began to "pre-game" (drinking alcohol before a party) at or around 2:00pm, after her arrival to campus.

18.     Roe and her friend went to Doe's fraternity house for a short period of time that afternoon to drink alcohol. Doe and Roe did not meet or interact at this time.

19.     Roe arrived to the sorority event with her friend via a bus provided by the sorority. The event was held at O'Leary's Bar ("O'Leary's") in DeKalb, Illinois. Exhibit B.

20.     The second time Roe interviewed with police, she reported drinking "approximately" five (5) vodka tonic drinks while at O'Leary's. Exhibit B.

21.     Roe alleges she met Doe at the event at approximately 11:30pm. Doe purchased a drink for Roe. The two consensually kissed at the event, according to Roe's second statement to the police. Exhibit B.

22.     Both Doe and Roe willingly consumed alcohol on April 16, 2016.

23.     Doe does not recall how much alcohol he consumed on April 16, 2016.

24.     After the party at O'Leary's ended, Doe and Roe took the bus provided by the sorority back to campus. While on the bus, they consensually kissed again.

25.     Doe, Roe, and two other women, who were mutual friends of both parties, went to Doe's room at his fraternity house to continue drinking.

26.     The two other women left the room, leaving Doe and Roe alone.

27.     Roe and Doe continued to consensually kiss.

28.     At some point, Doe removed his clothing down to his boxers. Roe told Doe she did not wear any underwear under her dress. Roe then climbed on top of Doe without the underwear, on his couch. Doe and Roe subsequently engaged in consensual sexual intercourse.

29.     The sexual intercourse was consensual. Roe never communicated to Doe the intercourse was not consensual, nor did Roe attempt to leave the room, or call for help.

4

30.     After the sexual intercourse with Doe, Roe willingly and freely exited Doe's room and joined her friends.

31.     After leaving the party in the early morning of April 17, 2016, Roe allegedly told her friends about her encounter with Doe. Roe's friends indicated to Roe they believed she was raped, despite no evidence supporting that belief.

32.     When asked if she wanted to go to the hospital to have a rape kit taken, Roe refused. Later in the morning, over breakfast, Roe again repeatedly refused to go to the hospital for a rape kit.

33.     On April 17, 2016 at 6:47pm, Roe went with her mother to a police station and filed a police report alleging, among other things, that Plaintiff raped her. Roe alleged: (a) Plaintiff attempted to kiss her at O'Leary's, but she refused and never consensually kissed Doe; (b) while Roe was alone with Plaintiff in his room, he attempted to kiss her and she refused and did not consensually kiss Doe; (c) Roe claimed Plaintiff pushed her on her back and forced himself on her. Exhibit B.

34.     On May 12, 2016, Roe spoke with police at a follow-up interview. Roe provided a statement to police that differed from her April 17, 2016 statement in the following ways: (a) Roe stated she and Plaintiff consensually kissed at O'Leary's; (b) Roe stated she consensually kissed Plaintiff on the bus and in his bedroom; (c) Roe admitted to straddling Doe while he was in his underwear while she consensually kissed him. Roe admitted she told Doe she did not have any underwear on; (d) Roe claimed Doe forced himself on her, even though she was sitting on top of him, and again in "doggy style" position but makes no mention of sexual intercourse on her back. Exhibit B.

35.     On May 5, 2016, Sarah Adamski ("Adamski"), the Associate Director of Investigations, Affirmative Action and Equity Compliance, at NIU, and the person assigned to investigate the allegation against Doe for NIU, contacted Roe about the alleged incident. Adamski previously attempted to contact Roe on April 20, 2016. Roe claimed the police department told her not to speak with Adamski until the police investigation was complete. Roe also asked Adamski not to contact Doe about her allegations against him. Exhibit C, page 2.

36.     Police took Doe to the police station on May 9, 2016, and interviewed Doe without an attorney present. Doe indicated the sexual intercourse with Roe was consensual. Doe also indicated due to his drinking that evening, he could not recall many details of the evening or the consensual sexual intercourse. Exhibit B.

37.     On June 23, 2016, DeKalb County prosecutors filed criminal charges against Doe. To date, the criminal charges remain pending and Doe is not in custody. There is no trial date set.

38.     Adamski telephoned Roe again on June 6, 2016 and June 30, 2016. On those dates, Roe indicated she did not want to file a Title IX claim against Doe. Exhibit C, page 2.

39.     Finally, after the repeated phone calls with Adamski, Roe filed a Title IX complaint against Doe on July 1, 2016. Exhibit C, page 2.

40.     On August 1, 2016, Roe independently sent an email to administrators, faculty, alumni, and staff at NIU accusing Doe of rape. Roe specifically used Doe's first and last name in the email. Exhibit D.

41.     Roe claimed in the email that on the night of the incident, she "did not know anything was wrong" after her sexual contact with Doe until she "talked to her friends." Exhibit D.

42.     Defendant did not publicly refute the contents of Roe's email, nor did Defendant inform recipients the contents of the email were being investigated and had not been verified.

43.     Doe was not informed of this email until an employee at NIU, in confidence, alerted Doe to its existence.

44.     Doe and his counsel met with Adamski, in her office, on August 4, 2016. At this meeting, Adamski requested Doe "tell his side of the story." Doe, due to the pending criminal charges and upon advice of his counsel, informed Adamski he would not speak about the events of the evening and will assert his Fifth Amendment rights.

45.     Adamski represented she does not take into consideration the events or timeline of the criminal case pending in DeKalb County.

46.     NIU instituted "interim measures" measures against Doe due to Roe's Title IX complaint. On August 11, 2016, dissatisfied with the suggested measures, Adamski requested Doe also be banned from residing in a school resident hall or building.

47.     Adamski released the Preliminary Title IX report ("Preliminary Report") on August 16, 2016. The Preliminary Report included witness statements Adamski took during her investigation. Adamski also adopted Doe's statement to the police from May 9, 2016, even though Doe did not have an attorney present and Doe declined to adopt the statement. Exhibit E.

48.     Adamski did not note in the Preliminary Report that Doe stated he wished to invoke his Fifth Amendment rights, due to the pending criminal investigation. Exhibit E.

49.     Doe responded to the Preliminary Report with a rebuttal concerning unreliable witness statements and the lack of evidence against him, as well as the inconsistent statements made by Roe to the police.

50.     NIU did not allow Doe to cross-examine or question Roe, or any other witnesses, to verify the witness's statements before Adamski issued the Final Title IX Report ("Final Report"). Exhibit F.

51.     By denying Doe an opportunity to face his accuser, Defendant violated Doe's right to Due Process.

52.     By denying Doe an opportunity to face the other witnesses against him, Defendant violated Doe's right to Due Process.

53.     Adamski released the Final Report on September 14, 2016.  The Final Report determined Doe to be responsible for the allegations against him. Exhibit F.

54.     Upon information and belief, Adamski was the only investigator of the incident and the sole decision-maker of the finding of responsibility against Doe.

55.     The Final Report admits Roe provided inconsistent statements to the police, but still only adopts her second statement to the police as true. The Final Report additionally does not address the reliability of Roe as a witness, even though Roe admitted to heavy drinking at O'Leary's in the hours before the incident. Exhibit F.

56.     Long after the issuance of the Final Report, in March 2017, Doe discovered Adamski not only never met with Roe in person, but also that their communication was limited to short phone calls and emails.

57.     In the course of discovery for the criminal case, legal counsel for Defendant admitted Adamski's conversations with Roe did not "produce substantive information."

58.     Doe submitted his written appeal to the finding of responsibility on September 21, 2016, re-asserting the inconsistent statements made by Doe and outlining Defendant's failure to follow its own timeline laid out in Defendant's own policies. The issue of Defendant's failure to follow its own policies will be detailed in later paragraphs.

59.     Doe did not receive a response to his appeal of the decision until October 10, 2016.

60.     Despite the school's response to Doe's appeal, Glick, calling himself the schools "Resolution Officer," sent Doe a communication on October 14, 2016, stating the appeal deadline had passed and proposing harsh sanctions against Doe, including immediate expulsion and indefinite banishment from all NIU property.

61.     Defendant informed Doe only Glick or Jeanne Meyer ("Meyer"), the Director of Student Conduct, Student Affairs at NIU. Meyer and Doe conflicted on another matter, which will be addressed in the paragraphs concerning the drug allegations.

62.     Doe, in response to Glick's communication, requested a sanctions hearing, which took place on October 28, 2016 on NIU's campus.

63. At the sanctions hearing scheduled by the school, Roe attended via videoconference. The screen faced away from Doe and Doe's counsel, so Doe and his counsel were unable to view Roe's facial expressions or reactions during the sanctions hearing.

64. Glick, the "Resolution Officer," represented Defendant in a prosecutorial role at the sanctions hearing. He presented two witnesses, Roe and Adamski.

65. Roe's statements at the sanctions hearing conflicted with her prior statements made to police about the timeline of the evening, and the sequence of events that night. Roe's statements fully omitted her heavy alcohol and drug use on the night of the alleged incident.

66. Defendant did not afford Doe the opportunity to question Roe. Instead, Defendant required Doe to submit a list of questions for Roe. The hearing officer then selected which questions to ask Roe.

67. Doe submitted thirty-eight (38) questions to the hearing officer to ask Roe. The hearing officer only asked six (6) of the questions submitted by Doe.

68. The hearing officer did not permit Doe to ask follow up questions of Roe during the hearing, nor could Doe question the reliability of Roe's statements.

69. Adamski admitted at the hearing she did not submit to Doe all the text messages she reviewed for the Preliminary and Final Reports to Doe or his counsel.

70. Doe did not have knowledge of the additional text messages withheld by Adamski and therefore could not present it to question the reliability of Roe's memory of the night in question.

71.     Adamski stated that even though Roe several made inconsistent statements to the police, she found Roe's second statement to the police to be believable.

72.     Adamski did not produce all available or relevant text messages to Doe or his counsel during the investigation or the hearing, even though Adamski used the messages when she determined the finding of responsibility against Doe.

73.     Upon information and belief, at the above hearing, the hearing officer, Bethany Wall ("Wall") received her training to become a hearing officer for Title IX hearings only from NIU.

74.     Defendant only requires eight to ten hours of annual training to become a hearing officer for Title IX sanctions hearings.

75.     Upon information and belief, Wall is not an attorney, nor has Wall received legal training beyond the training provided by Defendant.

76.     Wall repeatedly stated the hearing was for sanctions purposes only, and that she would not disturb Adamski's liability finding.

77.     Wall subsequently determined the proper sanctions to be expulsion from the school and banning Doe from campus.

78.     Doe appealed Wall's sanctions, and Defendant denied his appeal.

**<u>FALSE ALLEGATIONS OF DRUG USE</u>**

79.     In the midst of the false Title IX claim against him, Defendant suspended Doe without a hearing or an opportunity to be heard on a separate allegation of violation of the Student Conduct Policy, when a staff member reported Doe allegedly used illegal drugs at his fraternity house. At the time, Doe was banned from his fraternity house, due to the Title IX allegations. Exhibits G and H.

80.    On or about Monday, September 26, 2016, Doe received a notice from Meyer accusing him of cocaine possession and use on September 24, 2016. The Notice informed Doe of a meeting with Meyer scheduled for September 29, 2016. Exhibit H.

81.    An incident report with scant facts was attached to the Notice. The information in the incident report included only allegations, filtered through several sources: an unknown female, who heard about the allegation from a friend, told her ex-boyfriend about the alleged incident, who then told his fraternity advisor, who then contacted administrators about the drug alleged incident. Notably, the incident report did not include names of the students making the allegations. Exhibit H.

82.    The unknown female an the ex-boyfriend were not present for the alleged incident. Exhibit H.

83.    Additionally, Doe received a second notice stating Defendant "temporarily banished" Doe from campus, and "temporarily suspended" him pending an investigation of the allegations. This email did not provide an end date for the suspension or the banishment from campus. Exhibit H.

84.    Doe did not have an opportunity to respond to the suspension and banishment, and was not permitted to attend class. Doe missed class and educational activities on September 26, 2016.

85.    Doe filed an administrative appeal of his suspension the next day, on September 27, 2016, but was summarily denied.

86.    As a result of the suspension, Doe could not attend class beginning on September 27, 2016 and missed valuable education time.

87.     On September 29, 2016, Doe and his counsel met with Meyer to discuss the drug allegations.

88.     At the meeting, Meyer provided the name of a potential witness, but could not produce the name of the individual claiming to have used cocaine at the fraternity house with Doe on September 24, 2016.

89.     The meeting concerning the drug allegation was continued to October 5, 2016 for Meyer to continue her alleged investigation.

90.     Doe was not permitted to return to class while Meyer completed her investigation.

91.     Doe, without prompting, voluntarily took a drug test at an independent laboratory in Chicago. The test results showed no illegal drugs in his system. Doe sent the test to Meyer on September 30, 2016.

92.     Doe remained suspended, despite the results of the drug test in Meyer's possession.

93.     Doe additionally provided Meyer the names of witnesses who were with him all day on September 24, 2016, and could refute the allegations against him.

94.     At the October 5, 2016 meeting, Meyer admitted it was likely Doe did not use cocaine on September 24, 2016.

95.     Meyer then verbally stated new allegations against Doe. Doe was now accused of using cocaine with a female student in the fraternity house on September 17, 2016. Meyer provided the names of Doe's accuser and the name of a witness the accuser allegedly told about the incident.

96.     Meyer indicated Doe's suspension would continue as she investigated the September 17, 2016 allegations.

97.     Defendant never provided an incident report or any other written notice or explanation of the allegations against Doe for his alleged behavior on September 17, 2016.

98.     Meyer told Doe, she did not believe the drug test he willingly submitted was sufficient to prove he did not use cocaine on September 17, 2016.

99.     Meyer shifted the burden of proof to Doe and asked Doe to present evidence refuting the new allegations for September 17, 2016. When asked how Doe could prove he did not use cocaine on September 17, 2016, Meyer stated a drug test of his hair "would be persuasive." Meyer offered no other solution.

100.    By October 12, 2016, after missing more than two weeks of classes and still attempting to resolve the false Title IX allegation, Doe contacted Meyer concerning the status of her investigation of the alleged events of September 17, 2016, but received no response.

101.    Defendant did not offer or afford Doe any resolution options for the cocaine allegation or a Case Resolution Form, even though it is required by school policy.

102.    Doe withdrew from NIU on October 14, 2016, as he was still not permitted to return to class. Doe withdrew to avoid his academic record being tarnished by incomplete and failed grades.

103. On November 4, 2016, Doe finally received notice the allegations violating the Student Conduct Policy for cocaine use and possession were dismissed. Exhibit I.

104. This notification was sent after the Title IX hearings and sanctions, but on the same day Doe submitted his Title IX appeal.

## FACTS IN SUPPORT OF DEFENDANT'S BIAS AGAINST MALE STUDENTS ACCUSED OF SEXUAL ASSAULT

105. Defendant attempts to tout itself as a safe place for female students.

106. Defendant is a member of Pact5, a group of universities around the country who pledge to fight sexual assault on college campuses.

107. Defendant participated in a film festival for Pact5 in 2015. The school submitted two films: "Red-Blooded Men," a documentary film involving interviews with current students about sexual assault on campus; and "In Motion," a short, fictional film about a female student being raped by a male student.

108. In the film "Red-Blooded Men," where interviewees discuss sexual assault and attempted sexual assault, only men were portrayed as the aggressors in sexual situations. No women are shown to commit or attempt to commit sexual assault, and the topic of women committing sexual assault is not discussed. The interviewees characterize the role of men and women in traditional, stereotypical roles, where men are strong predators and women are delicate and need protection.

109. The film "In Motion" shows a male student raping his female friend after a party. At the end of the film, the male student is dismissed from NIU as a result of the rape. The student is not arrested or criminally charged.

110.     Defendant promotes the use of a private group, the Rape Aggression Defense ("R.A.D.") program. R.A.D. offers self-defense programs for women. While self-defense is included in the program for men, the main focus of a R.A.D. class for men is how to deal with "aggressive behavior," including how to "learn steps to avoid aggressive behavior." Upon information and belief, the women's class does not teach women how to avoid aggressive behavior.

111.     The police chief of NIU's campus police promoted R.A.D. in 2014, as did Lesley Rigg, the 2015 interim vice president for Research and Graduate Studies in 2015.

112.     Defendant's participation in Pact5 and promoting "awareness" of sexual assault came after a school police officer, Andrew Rifkin ("Rifkin"), was accused of sexually assaulting a student in 2011.

113.     On December 16, 2016, Rifkin was acquitted of all criminal charges.

114.     In 2012, during Rifkin's criminal case, a judge in DeKalb County ruled that Defendant's police force "intentionally withheld key evidence that could have cleared Rifkin" of the sexual assault charges.

115.     On March 6, 2013, the FBI raided the police department at NIU, in connection with the school's investigation of the rape case and NIU's failure to turn over key evidence in Rifkin's criminal case.

116.     Defendant's actions in Rifkin's criminal case, the films submitted to Pact5, and its participation in R.A.D. indicates Defendant's bias toward males, in that Defendant and its agents believe and promote that only men are sexually aggressive and only men commit sexual assault. There is a presumption of liability against any male accused of sexual assault.

## DEFENDANT'S TITLE IX POLICY

117.    Defendant maintains a Title IX/Sexual Misconduct Policy and Complaint Procedures for Employees and Students ("Title IX Policy"). Exhibit J.

118.    The Title IX Policy is specifically separate from any other university grievance or disciplinary procedure. Exhibit J at page 12. See also, Exhibit K, Student Conduct Policy, Section G, Paragraph 1.

119.    Defendant's Title IX Policy is sweeping, as it applies to conduct not just on campus, but also off campus activities and programs, as well as "off-campus sexual harassment." Exhibit J at page 5.

120.    The Title IX Policy provides three ways to file a complaint: (1) by the complainant contacting a Title IX coordinator; (2) by filing an online incident report through NIU's Office of Student Conduct; or (3) by filing out a form, which would be forwarded to the Title IX coordinator. Exhibit J at page 8.

121.    Alternatively, if a police report is filed, the local police department may forward the report to a Title IX coordinator. The police report is not an official Title IX complaint to the university, and does not oblige the complainant to take further action with the university. Exhibit J at page 9.

122.    Adamski violated the Title IX Policy when she continued to call Roe, even though Roe repeatedly expressed she did not wish to file a Title IX complaint. See Exhibit C.

123.    The Title IX Policy provides a timeline for the investigative procedures. The timeline begins when a Title IX Complaint *or* a report of sexual misconduct is received. Exhibit J at page 13.

17

124. Between sixteen and twenty-two days the investigation begins, the preliminary report is to be issued. Exhibit J at page 13.

125. The school became aware of the alleged sexual assault by April 18, 2016. Exhibit C, page 1. Adamski first contacted Roe on May 5, 2016. Exhibit C, page 2. Roe filed the Title IX Complaint on July 1, 2016. Exhibit C, page 2.

126. NIU did not follow its own procedures and released the Preliminary Report on August 16, 2016, long after the designation allowed for in the timeline.

127. According to the timeline, the final report should be issued to the complainant and the respondent within thirty-eight to forty days from the beginning of the investigation. Exhibit J at page 13.

128. Here, the Final Report was not issued until September 14, 2016, long after the amount of time allowed in the Title IX Policy.

129. Doe submitted his appeal to the Final Report on September 21, 2016, five business days after the Final Report was issued.

130. Adamski failed to attach all the text messages referenced and reviewed by her in the Final Report. Doe did not submit his appeal to the Final Report until he received all the information Adamski claimed she considered in her Final Report.

131. The full investigation and imposition of sanction should be completed within sixty (60) days, unless "circumstances require a longer time period." Exhibit J at page 15. The policy does not define what circumstances qualify an investigation and sanctions hearing for a "longer time period," nor does it limit the "longer time period."

132. The hearing and imposition of the sanctions occurred on October 28, 2016, long after sixty (60) days from the first notice of the alleged incident.

133.    Defendant never provided a written statement or reasoning for the severe deviation from the timeline provided in the Title IX Policy.

## **DEFENDANT'S VIOLATIONS OF THE STUDENT CONDUCT POLICY**

134.    Defendant violated its own Student Conduct Policy. Exhibit K.

135.    Defendant adopted the administrative procedures laid out in the Student Conduct Policy for the Title IX Policy. Both policies were in effect at all relevant times.

136.    Under the Student Code of Conduct, the accused student in an administrative hearing is "presumed 'not responsible' until proven 'responsible.'" Exhibit K at Article I, Paragraph G.

137.    The burden of proof to prove responsibility is on the complainant. Exhibit K at Article I, Paragraph G.

138.    Admaski's actions when investigating the Title IX claim show she presumed Doe to be "responsible". Adamski never met with Roe in person; Adamski accepted Roe's conflicting statements; Adamski withheld text messages that would harm Roe's credibility; Adamski did not provide all the text messages to Doe she used to make her liability finding; and Adamski's repeatedly called Roe when Roe indicated she did not want to file a Title IX claim.

139.    Adamski disregarded Doe's assertion of his Fifth Amendment rights and the Student Conduct Policy. Adamski adopted Doe's statement to the police as a part of her Initial Report and Final Report after Doe asserted he would not make a statement and invoke his Fifth Amendment rights.

140.    In any administrative hearing at NIU, " [n]o one shall be required to provide information that may be self-incriminating." Exhibit K at Article 1, Paragraph K.

19

141.    Due to the bias against males accused of sexual assault, Defendant did not meet the burden of proof in proving responsibility in the Title IX case. Instead, Defendant relied solely on Roe's inconsistent statements.

142.    Meyer's actions concerning the alleged cocaine use show Meyer presumed Doe to be "responsible" for cocaine use.  Doe received a suspension without a hearing or opportunity to be heard; the suspension remained in place even after Doe voluntarily provided a clean drug test; Meyer investigation gave presumed credibility to the cocaine allegation, even though the allegations were through several layers of hearsay, based on rumors, and no name of an accuser was initially provided.

143.    When Meyer indicated the persuasive evidence to dismiss the cocaine use allegations would be a drug test on a hair sample, and offered no other forms of evidence for Doe to absolve himself of the allegations, Meyer clearly placed the burden of proof on Doe.

144.    Defendant did not bear the weight of the burden of proof concerning the cocaine allegation, since Defendant outwardly ignored Doe's hard evidence he did not use cocaine on September 24, 2016.

145.    Notice of a hearing for allegations of violations of the Student Conduct Policy is to be in writing. Exhibit K at Article I, Paragraph H.

146.    Defendant did not provide written notice of the allegations for his alleged cocaine use on September 17, 2016. Doe was entitled to written notice of the allegations against him on that date.

147.    When Defendant issues a University suspension as a sanction, the suspension must be for a definite period of time. Exhibit K at Article III, Section C(1)(q).

148.    Defendant violated its own policy by suspending Doe for an unspecified period of time in response to the false cocaine use allegations. Exhibits G and H.

149.    Defendant is required to produce a Case Resolution Form to an accused student after a preliminary conference; this Case Resolution Form is to contain a list of the alleged violations and recommendations for sanctions. Exhibit K at Article IV, Section A(4)(f).

150.    Defendant failed to produce a list of the allegations or a Case Resolution Form after the initial conference for the September 26, 2016 allegations, and thereby violating the Student Conduct Policy.

151.    Defendant failed to produce a list of the remaining allegations or a Case Resolution Form after the conference wherein Defendant verbally alleged Doe used cocaine on September 17, 2016, thereby violating the Student Conduct Policy.

## COUNT I – VIOLATION OF TITLE IX

152.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

153.    Title IX of the Education Amendments of 1972 provides, in relevant part that "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

154.    Title IX of the Education Amendments of 1972 applies to an entire school or institution if any part of that school receives federal funds.

155.    Upon information and belief, Defendant receives federal funding for research and development.

156.    Schools falling under the Title IX purview are required to adopt procedures that both ensure the rights of the complainant and "accord due process to both parties involved…" See generally, U.S. Department of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties –Title IX (2001)* at 22.

157.    Pursuant to the Department of Justice and the Department of Education regulations, schools are to promulgate "grievance procedures providing prompt and equitable" resolutions to Title IX complaints. 34 C.F.R. § 106.8(b) (Department of Education); 28 C.F.R. § 54.135(b).

158.    Prompt and equitable procedures include, but are not limited to "adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence", and "designated and reasonably prompt timeframes for the major stages of the complaint process." See generally, U.S. Department of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties –Title IX (2001)* at 20.

159.    Based on the foregoing, Defendant deprived Doe, on the basis of his sex, of his rights to due process and equal protection through the improper administration of and/or the existence, in its current state, of NIU's guidelines and regulations.

160.    Based on the foregoing, Defendant conducted its investigation of the incident on April 16, 2016 and the subsequent sanctions hearing, in a manner that was biased against Doe due to his gender.

161.    Adamski's involvement in Doe's investigation demonstrated an inherent bias and predetermination of guilt of Doe when she repeatedly contacted Roe and

withheld information that would harm Roe's credibility as a witness. Adamski's actions demonstrate Defendant's bias against Doe on the basis of his gender.

162.    NIU's failure to publicly refute the allegations in Roe's August 1 email, or to even publicly address the fact Adamski's investigation was ongoing, demonstrate NIU's bias against Doe on the basis of his gender.

163.    Furthermore, Wall, the hearing officer, showed her favorability of Roe when she accepted contradictory police statements from Roe, and contradictory statements during the hearing. Wall additionally did not question Adamski's failure to produce all relevant evidence. Wall's actions at the hearing and in her final decision demonstrate NIU's bias against Doe on the basis of his gender.

164.    Defendant created and maintains an environment where an accused male student is fundamentally denied due process by being prosecuted through the conduct process under a presumption of guilt. Such a one-sided process denied Doe, as a male student, of educational opportunities at NIU on the basis of his gender.

165.    In this case, Doe was punished for having consensual sex with a woman, who, by her own words, did not think his actions constituted rape until she "talked to her friends" and who refused repeatedly to file a Title IX claim. Any evidence introduced in the Final Report and at the sanctions hearing that Roe did not engage in consensual sex on April 16, 2016 was improper, as Roe's memory and reliability as a witness was not called into question, despite her admitted heavy alcohol use and drug use before the incident. In finding Doe culpable of sexual misconduct, Defendant afforded preferential treatment to Roe and her contradictory testimony on the basis of her female gender, and engaged in gender discrimination against Doe in violation of NIU's policies.

166.    NIU had no intention of following its own policies and procedures concerning the Title IX claim against Doe, as a male accused of sexual misconduct, when it found Doe responsible for sexual misconduct despite Roe's own words, conflicting statements, and Roe's unreliability as a witness.

167.    NIU did not participate in the Title IX sanctions hearing in good faith when it allowed Brian Glick to assume the prosecutorial role despite his bias against Doe, did not require Adamski to produce all evidence she considered in her finding against Doe, and refused Doe the right to cross-examine his accuser in a meaningful manner.

168.    NIU's actions have demonstrated its gender bias against Doe as the male accused of sexual assault.

169.    Based on the foregoing, the history of the Rifkin case indicates Defendant's habit of withholding relevant evidence when a male is accused of sexual assault.

170.    Based on the foregoing, NIU's involvement in PACT5 and its submissions in the film festival indicate an environment at NIU wherein male students accused of sexual assault are presumed to be guilty.

171.    Male respondents in sexual misconduct cases at NIU are discriminated against solely on the basis of their sex. They are presumed guilty, regardless of the actual evidence presented.

172.    The Title IX grievance process at NIU is inherently flawed, and in violation of Doe's rights and those similarly situated.

173.    Defendant failed to allow Doe the right to challenge the statements made by Roe, failed to allow Doe the right to challenge the reliability of Roe as a sole witness,

failed to turn over relevant character evidence prior to both the Final Report and the sanctions hearing, and therefore failed to allow Doe a fair opportunity to defend the Title IX allegations in a meaningful manner.

174.    NIU denied due process of law when it engaged in a biased Title IX investigation and sanctions hearing, resulting in damages to Doe in the loss of educational opportunities, the loss of his good name and academic record, and other damages to be determined at a trial of this matter.

175.    NIU deprived Doe of his right to his good name and academic record, loss of educational opportunity, loss of funds invested in his education, and other damages to be determined at trial when NIU expelled Doe and banished him from campus as a result of the Title IX sanctions hearing.

## COUNT II – VIOLATION OF DUE PROCESS IN STUDENT CONDUCT POLICY COMPLAINTS

176.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

177.    Defendant failed to afford Doe his Due Process Rights during the Student Conduct complaint concerning cocaine use in violation of the Fourteenth Amendment to the United States Constitution.

178.    Defendant violated Doe's right to know the name of his accusers by providing insufficient written notice of the allegations for the alleged cocaine use on September 24, 2016.

179.    Defendant violated Doe's right to written allegations and opportunity to prepare a defense when Meyer verbally told Doe about the allegation of cocaine use on September 17, 2016, and failed to provide written notice of the allegations.

180.     Defendant violated its own policies and Doe's Due Process rights when Defendant failed to provide an end date for the suspension instituted on September 26, 2016.

181.     Defendant violated Doe's Due Process rights when Defendant suspended Doe without a hearing or opportunity to be heard on September 26, 2016.

182.     NIU denied due process of law when it suspended Doe without a hearing, resulting damages to Doe in the loss of educational opportunities, the loss of his good name and academic record, and other damages to be determined at a trial of this matter.

183.     NIU denied due process of law when it failed to provide proper written allegations for the September 17, 2016 allegations, resulting damages to Doe in the loss of educational opportunities, the loss of his good name and academic record, and other damages to be determined at a trial of this matter.

## COUNT III – DEPRIVATION OF EDUCATIONAL RIGHTS

184.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

185.     Defendant deprived Doe of his right to an education when Defendant suspended Doe without a hearing or meaningful opportunity to defend himself against the drug allegations.

186.     Doe lost valuable class time, and was deprived of his right to educational benefits. This is a tremendous loss to Doe, as he was unable to finish his last semester of studies at NIU.

187.    As a result of the foregoing, Doe is entitled to damages including, without limitation, loss of educational opportunities, economic injuries, and other direct and consequential damages to be determined at a trial of this matter.

**COUNT IV – DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201**

188.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

189.    Defendant committed numerous violations of federal law in its treatment of Doe.

190.    Doe's education and future career has been severely damaged. Without appropriate redress, the unfair outcome of the Title IX investigation and hearing, as well as the suspension based on the unfounded drug allegations will continue to cause irreversible damage to Plaintiff's educational career and future employment prospects, with no end in sight.

191.    As a result of the foregoing, there exists a justiciable controversy between the Parties with respect to the outcome, permanency, and future handling of Doe's formal student record at NIU.

192.    By reason of the foregoing, Doe requests, pursuant to 28 U.S.C. § 2201, a declaration that: (i) the outcome and findings made by NIU's Title IX Final Report be reversed; (ii) the outcome and findings made by NIU at the Title IX sanctions hearing be reversed; (iii) Doe's reputation be restored; (iv) the record of Doe's suspension due to the unfounded cocaine use allegations be removed from his educational file; (v) the record of Doe's expulsion from NIU due to the Title IX claim be permanently removed from his education file; (vi) the record of Doe's suspension due to the unfounded cocaine use

allegations be destroyed; (vii) the record of Doe's expulsion due to the Title IX investigation and hearing be destroyed; and (viii) Defendant's rules, regulations, and guidelines as to Title IX are unconstitutional as applied.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiff John Doe demands judgment against Defendant, Northern Illinois University, as follows:

(1) On the first cause of action for violation of the Title IX of the Education Amendments of 1972, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorney's fees, expenses, costs and disbursements;

(2) On the second cause of action for violation of the Plaintiff's right to Due Process, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorney's fees, expenses, costs and disbursements;

(3) On the third cause of action for deprivation of Plaintiff's right to an education, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorney's fees, expenses, costs and disbursements;

(4) On the fourth cause of action for a declaratory judgment pursuant to 28 U.S.C. § 2201, a declaration that: (i) the outcome and findings made by NIU's Final Report be

reversed; (ii) the outcome and findings made by NIU at the sanctions hearing be reversed;

(iii) Doe's reputation be restored; (iv) the record of Doe's suspension due to the

unfounded cocaine use allegations be removed from his educational file; (v) the record of

Doe's expulsion from NIU due to the Title IX claim be permanently removed from his

education file; (vi) the record of Doe's suspension due to the unfounded cocaine use

allegations be destroyed; (vii) the record of Doe's expulsion due to the Title IX

investigation and hearing be destroyed; and (viii) Defendant's rules, regulations, and

guidelines as to Title IX are unconstitutional as applied; and

(5) Awarding Plaintiff such and other further relief as the Court deems just,

equitable, and proper.


JURY DEMAND

Plaintiff hereby demands a trial by jury of all triable issues in the present matter.


Respectfully submitted,

/s/ Gal Pissetzky_____
Gal Pissetzky,
Attorney for Plaintiff
Pissetzky & Berliner, LLC
53 W. Jackson Blvd – Suite 1515
Chicago, IL 60604