**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHER DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| JOHN DOE | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 1:17-CV-07991 |
| v. | ) |
| | ) |
| THE BOARD OF TRUSTEES OF | ) Honorable Judge Nancy |
| NORTHERN ILLINOIS UNIVERSITY | ) Maldonado |
| | ) |
| Defendant | ) |
| | ) |

**FIRST AMENDED COMPLAINT**

Plaintiff, John Doe ("Plaintiff"), by his attorneys Pissetzky Law, LLC, and for his

First Amended Complaint against The Board of Trustees of Northern Illinois University

("NIU") respectfully alleges as follows:

**THE NATURE OF THIS ACTION**

1.      This case arises from actions taken and procedures employed by NIU and

its administrators concerning allegations made against Doe, a male student enrolled at NIU

in 2016, in two matters: (i) false allegations of nonconsensual sex with Jane Roe ("Roe"),

a woman not enrolled as a student at NIU on April 17, 2016; and (ii) a false allegation of

Doe using cocaine in a fraternity house on September 17 or September 24, 2016.

2.      As a result of the procedures employed by Defendant and the actions taken

by Defendant and its employees, which procedures and actions were tainted by gender bias

against Doe as a male student and as a fraternity member, Doe suffered humiliation and a

loss of good reputation; his academic future is damaged and uncertain; and the monies

spent by Doe and his family, as well as the time Doe devoted to his education at NIU, are now wasted.

3.      Due to the damages suffered by Doe, he now brings this action against Defendants for Defendants' violation of Title IX of the Education Amendments of 1972 and the breach of contract.

4.      Doe is a natural person, a citizen of the United States, and a resident of the State of Illinois.

5.      Doe was enrolled as a student at NIU for the academic years 2012-2013, 2013-2014, 2014-2015, and 2015-2016, and he lived in his fraternity house during all times relevant to this action.

6.      Doe enrolled in the 2016-2017 academic year for the fall semester, his last semester, but was forced to withdraw in October of 2016 due to the actions of NIU and its administrators.

## **JURISDICTION AND VENUE**

7.      Defendant is a public university located in DeKalb County, Illinois and accepts federal financial assistance. Therefore, this Court has personal jurisdiction over Defendant.

8.      Federal question and supplemental jurisdiction are proper pursuant to 28 U.S.C. 1331 and 28 U.S.C. 1367.

9.      Venue for this action properly lies in this district pursuant to 28 U.S.C. 1391 because Defendant is located within this judicial district and a substantial part of the events, acts, and omissions giving rise to this claim occurred in this judicial district.

## PLAINTIFF'S RELATIONSHIP WITH DEFENDANT PRIOR TO THE ALLEGATIONS GIVING RISE TO THIS COMPLAINT

10.     Before the allegations leveled against Doe in 2016, Doe was familiar to Defendant and its administrators because one of Doe's fraternity pledge brothers passed away from excessive drinking at a party and hazing event in 2012. Exhibit A.

11.     Doe was not involved in the planning of or executing the hazing.

12.     There are numerous Greek organizations, known as fraternities and sororities, at NIU. Fraternities are exclusively male, and sororities are exclusively female.

13.     Sororities and fraternities engage in planning and executing similar events, both on and off campus.

14.     Doe became president of his fraternity in 2015. Administrators and staff, particularly Brian Glick ("Glick"), the Associate Director for Student Conduct, repeatedly interviewed and emailed Doe in a harassing manner. In these interviews and emails, Glick wrongly accused the fraternity and its members of wrongdoing.

15.     Glick required Doe to appear in Glick's office and answer questions about allegations leveled against his fraternity brothers. As a result of these meetings with Glick, Doe lost time he could have committed to other extracurricular activities, class time, and studying. Exhibit A.

16.     Other fraternities and fraternity presidents at NIU were questioned, scrutinized, made examples of, and penalized in a similar manner to Doe and his fraternity.

17.     To Doe's knowledge, no NIU sorority was subjected to the same baseless scrutiny, nor was any sorority president was ever questioned as frequently as Doe regarding the goings-on of the organization.

18.     This pattern evinces a general bias against men. In particular, the pattern of questioning Doe endured evinces a bias against Doe because he was a president of an exclusively male Greek organization. This constitutes gender bias.

19.     Doe maintained a "B" grade average. Doe was active in campus organizations and maintained a part-time job at the school newspaper.

## **FACTS OF THE TITLE IX CASE AGAINST DOE**

20.     On April 16, 2016, Roe arrived at NIU to attend a sorority event with a friend.

21.     Upon information and belief, Roe is not and has never been enrolled at NIU as a student.

22.     Roe began to "pre-game" (drinking alcohol and smoking marijuana before a party) at or around 2:00pm, after her arrival to campus.

23.     Roe and her friend went to Doe's fraternity house for a short period of time that afternoon to drink alcohol. Doe and Roe did not meet or interact at this time.

24.     Roe arrived at the event with her friend via a bus provided by the sorority. The event was held at O'Leary's Bar ("O'Leary's") in DeKalb, Illinois. Exhibit B.

25.     The second time Roe interviewed with police, she reported drinking "approximately" five (5) vodka tonic drinks while at O'Leary's. Exhibit B.

26.     Roe alleges she met Doe at the event at approximately 11:30pm. Doe purchased a drink for Roe. The two consensually kissed at the event, according to Roe's second statement to the police. Exhibit B.

27.     Both Doe and Roe willingly consumed alcohol on April 16, 2016.

28.     Doe does not recall how much alcohol he consumed on April 16, 2016.

29.    After the party at O'Leary's ended, Doe and Roe took the bus provided by the sorority back to campus. While on the bus, they consensually kissed again.

30.    Doe, Roe, and two other women who were mutual friends of both parties, went to Doe's room at his fraternity house to continue drinking.

31.    The two other women left the room, leaving Doe and Roe alone.

32.    Roe and Doe continued to consensually kiss.

33.    At some point, Roe climbed on top of Doe on his couch. Roe was not wearing underwear under her dress. Doe and Roe subsequently engaged in consensual sexual intercourse.

34.    The sexual intercourse was consensual. Roe never indicated to Doe in any manner that the intercourse was not consensual, nor did Roe attempt to leave the room or call for help.

35.    After the sexual intercourse with Doe, Roe willingly and freely exited Doe's room and joined her friends.

36.    After leaving the party in the early morning of April 17, 2016, Roe allegedly told her friends about her encounter with Doe. Roe's friends indicated to Roe they believed she was raped, despite no evidence supporting that belief.

37.    When asked if she wanted to go to the hospital to have a rape kit taken, Roe refused. Later in the morning, Roe went to breakfast with her friends and later drove back to her home in Chicago.

38.    On April 17, 2016 at 6:47 p.m., Roe went with her mother to police station in DeKalb County and filed a police report alleging, among other things, that Plaintiff raped her. Roe alleged, among other things, that: (a) Plaintiff attempted to kiss her at O'Leary's,

but she refused and never consensually kissed Doe; (b) while Roe was alone with Plaintiff in his room, he attempted to kiss her, and she refused and did not consensually kiss Doe; (c) Roe claimed Plaintiff pushed her on her back and forced himself on her. Exhibit B.

39. On May 12, 2016, Roe spoke with police at a follow-up interview. Roe provided a statement to police that differed materially from her April 17, 2016 statement in the following ways: (a) Roe stated she and Plaintiff consensually kissed at O'Leary's; (b) Roe stated she consensually kissed Plaintiff on the bus and in his bedroom; (c) Roe admitted that she was not wearing any underwear and that she consensually straddled Doe while he was in his underwear, and while she consensually kissed him; (d) Roe claimed Doe forced himself on her, even though she was sitting on top of him, and again in "doggy style" position but makes no mention of sexual intercourse on her back. Exhibit B.

40. On May 5, 2016, Sarah Adamski ("Adamski"), the Associate Director of Investigations, Affirmative Action and Equity Compliance, at NIU, and the person assigned to investigate the allegation against Doe for NIU, contacted Roe about the alleged incident. Adamski previously attempted to contact Roe on April 20, 2016. Roe claimed the police department told her not to speak with Adamski until the police investigation was complete. Roe also asked Adamski not to contact Doe about her allegations against him. Exhibit C, page 2.

41. Police took Doe to the police station on May 9, 2016, and interviewed Doe without an attorney present. Doe indicated the sexual intercourse with Roe was consensual. Doe also indicated due to his drinking that evening, he could not recall many details of the evening or the consensual sexual intercourse. Exhibit B.

42.     Adamski telephoned Roe again on June 6, 2016 and June 30, 2016. On those dates, Roe indicated she did not want to file a Title IX claim against Doe. Exhibit C, page 2.

43.     Finally, after the repeated and unsolicited phone calls with Adamski, Roe was convinced by Adamski to file a Title IX complaint against Doe on July 1, 2016. Exhibit C, page 2.

44.     On June 23, 2016, DeKalb County prosecutors filed criminal charges against Doe.

45.     On August 1, 2016, Roe independently sent an email to administrators, faculty, alumni, and staff at NIU accusing Doe of rape. Roe specifically used Doe's first and last name in the email. Exhibit D.

46.     Roe claimed in the email that on the night of the incident, she "did not know anything was wrong" after her sexual contact with Doe until she "talked to her friends." Exhibit D.

47.     Defendant failed to publicly address the contents of Roe's email in any way. It did not publicly refute the contents of Roe's email, nor did Defendant inform the recipients the allegations in the email were being investigated and had not been verified.

48.     This failure materially damaged Doe's reputation. This is further evidence of gender bias.

49.     The University had already decided to treat Doe as guilty because he was a man, even though it knew that Roe had made several inconsistent statements and continued to press NIU to take action.

50.     NIU did not alert Doe to the existence of the email. Doe was not informed of this email until an NIU employee, in confidence, alerted Doe to its existence.

51.     Doe and his counsel met with Adamski, in her office, on August 4, 2016. At this meeting, Adamski requested that Doe "tell his side of the story." Doe, due to the pending criminal charges and upon advice of his counsel, informed Adamski he would not speak about the events of the evening and would assert his Fifth Amendment rights.

52.     Adamski represented she did not find the events or timeline of the criminal case pending in DeKalb County as a reason to delay the Title IX procedure until the disposition of his criminal case.

53.     Because Doe could not freely discuss the facts of the case with Adamski, and Adamski refused to delay investigation to accommodate Doe's inability to participate, this compounded the unfairness of a process that was already biased against him as a male accused of sexual assault.

54.     On July 15, 2016, NIU instituted punishments, which they called "interim measures", against Doe pending the disposition of Roe's Title IX complaint, even though there had been no determination of responsibility on Doe's part. These measures were punitive, rather than preventative, in nature, and were therefore inappropriate at this phase of the investigation. The punishments included banning him from all student organizations, prohibiting him from participating in any University extracurricular activities, and immediately removing him from student leadership positions.

55.     These punishments were imposed at the insistence of Roe. On July 13, 2016, Roe demanded that Adamski prohibit Doe from attending fraternity functions. Adamski replied that such punishment would be instituted if Doe was found responsible. Roe

insisted that punishments should be instituted immediately. On July 15, 2016, Adamski capitulated to Roe's demand and instituted the above-described punishments.

56.     On August 11, 2016, dissatisfied with the already drastic punishments, Adamski and other NIU officials requested Doe also be banned from residing in a school resident hall or building.

57.     Doe was banned from residing in school resident halls or buildings on August 12, 2016.

58.     This is evidence of further gender bias because they evince the prejudice that a male merely accused of any sexual wrongdoing poses a threat to the safety of any and all students on campus.

59.     These punishments were imposed because Doe was a male and part of a male organization that the University wished to make an example of.

60.     Adamski released the Preliminary Title IX report ("Preliminary Report") on August 16, 2016. The Preliminary Report included witness statements Adamski solicited and collected during her investigation. Adamski also adopted Doe's statement to the police from May 9, 2016, even though Doe did not have an attorney present when he gave the statement, and Doe affirmatively declined to adopt the statement when asked by Adamski. Exhibit E.

61.     Adamski failed to note in the Preliminary Report that Doe stated he wished to invoke his Fifth Amendment rights, due to the pending criminal investigation. Exhibit E.

62.     Doe responded to the Preliminary Report with a rebuttal concerning unreliable witness statements and the lack of evidence against him, as well as the inconsistent statements made by Roe to the police.

63.     The rebuttal was clearly not considered.

64.     NIU refused Doe the opportunity to cross-examine or question Roe, or any other witnesses, to verify the witness's statements before Adamski issued the Final Title IX Report ("Final Report"). Exhibit F.

65.     By not providing Doe the opportunity to question or verify the witness statements, Doe's rights under the Student Conduct policy were abridged.

66.     Adamski released the Final Report on September 14, 2016.  The Final Report determined Doe to be responsible for the allegations against him. Exhibit F.

67.     Upon information and belief, Adamski was the only investigator of the incident and the sole decision-maker of the finding of responsibility against Doe.

68.     The Final Report admits Roe provided inconsistent statements to the police, but still only adopts her second statement to the police as true. The Final Report additionally does not address the reliability of Roe as a witness, even though Roe gave inconsistent statements, and admitted to heavy drinking and drug use  in the hours before the incident. Exhibit F.

69.     Long after the issuance of the Final Report, in March 2017, Doe discovered Adamski never met with Roe in person, and that their communication was limited to short phone calls and emails.

70.     In the course of discovery for the criminal case, legal counsel for Defendant admitted Adamski's conversations with Roe did not "produce substantive information."

71. Adamski was well aware there was little information to support a finding of an assault by Doe, but she continued to aggressively prosecute him.

72. Doe submitted his written appeal to the finding of responsibility on September 21, 2016, re-asserting the inconsistent statements made by Doe and outlining Defendant's failure to follow its own timeline laid out in Defendant's own policies. The issue of Defendant's failure to follow its own policies will be detailed in later paragraphs.

73. Doe did not receive a response to his appeal of the decision until October 10, 2016.

74. Despite the school's response to Doe's appeal, Glick, calling himself the schools "Resolution Officer," sent Doe a communication on October 14, 2016, stating the appeal deadline had passed and proposing harsh sanctions against Doe, including immediate expulsion and indefinite banishment from all NIU property.

75. Doe, in response to Glick's communication, requested a sanctions hearing, which took place on October 28, 2016 on NIU's campus.

76. At the sanctions hearing scheduled by the school, Roe attended via videoconference. The screen faced away from Doe and Doe's counsel, so Doe and his counsel were unable to view Roe's facial expressions or reactions during the sanctions hearing.

77. Glick represented Defendant in a prosecutorial role at the sanctions hearing. He presented two witnesses, Roe and Adamski.

78. Roe's statements at the sanctions hearing conflicted with her prior statements made to police about the timeline of the evening, and the sequence of events

11

that night. Roe's statements fully omitted her heavy alcohol and drug use on the night of the alleged incident.

79.     Defendant did not afford Doe the opportunity to question Roe. Instead, Defendant required Doe to submit a list of questions for Roe. The hearing officer then selected which questions to ask Roe.

80.     Doe submitted thirty-eight (38) questions to the hearing officer to ask Roe. The hearing officer only asked six (6) of the questions submitted by Doe.

81.     The hearing officer did not permit Doe to ask follow up questions of Roe during the hearing, nor could Doe question the reliability of Roe's statements.

82.     Adamski admitted at the hearing that she did not produce all available or relevant text messages she had with Roe to Doe or his counsel during the investigation or the hearing, even though Adamski used the messages when she determined the finding of responsibility against Doe.

83.     Doe did not have knowledge of the additional text messages withheld by Adamski, and therefore could not present it to question the reliability of Roe's memory of the night in question.

84.     This withheld evidence would have drastically altered Doe's proposed questioning of Jane Roe, as it would have provided him impeachment opportunities and provided him with an opportunity to further build a substantive defense.

85.     Adamski stated that even though Roe made several inconsistent statements to the police, she found Roe's second statement to the police to be believable.

86.     Adamski stated further that she did not find Doe's statements to the police believable, despite the consistency that remains throughout.

87.     Upon information and belief, at the above hearing, the hearing officer, Bethany Wall ("Wall") received her training to become a hearing officer for Title IX hearings only from NIU.

88.     Defendant only requires eight to ten hours of annual training to become a hearing officer for Title IX sanctions hearings.

89.     Upon information and belief, Wall is not an attorney, nor has Wall received legal training beyond the training provided by Defendant.

90.     Wall repeatedly stated the hearing was for sanctions purposes only, and that she would not disturb Adamski's finding of responsibility.

91.     Wall subsequently determined the proper sanctions to be expulsion from the school and banning Doe from campus.

92.     In doing so, she relied on Doe's allegedly flippant manner, and Roe's believability.

93.     Without the text messages, Doe could not establish his basis for consent nor cast doubt on Roe's story, which was described as straightforward and direct by Wall.

94.     The text messages are mentioned in the Title IX report, but there is no indication they were reviewed by Wall.

95.     Doe appealed Wall's sanctions, and Defendant denied his appeal.

96.     On December 1, 2022, after a jury trial on the criminal charges brought by the DeKalb County State's Attorney's Office, Doe was found not guilty.

### RETALIATORY AND FALSE ALLEGATIONS OF DRUG USE

97.     In the midst of the false Title IX claim against him, Defendant suspended Doe without a hearing or an opportunity to be heard on a separate allegation of violation

of the Student Conduct Policy, when a staff member reported Doe allegedly used illegal drugs at his fraternity house. At the time, Doe was banned from his fraternity house, due to the Title IX allegations. Exhibits G and H.

98.     On or about Monday, September 26, 2016, Doe received a notice from Jeanne Meyer ("Meyer"), the Director of Student Conduct, Student Affairs at NIU, accusing him of cocaine possession and use on September 24, 2016. The Notice informed Doe of a meeting with Meyer scheduled for September 29, 2016. Exhibit H.

99.     An incident report with scant facts was attached to the Notice. The information in the incident report included only allegations, filtered through several sources: an unknown female, who heard about the allegation from a friend, told her ex-boyfriend about the alleged incident, who then told his fraternity advisor, who then contacted administrators about the drug alleged incident. Notably, the incident report did not include the names of the students making the allegations. Exhibit H.

100.    The unknown female and the ex-boyfriend were not present for the alleged incident. Exhibit H.

101.    Additionally, Doe received a second notice stating Defendant "temporarily banished" Doe from campus, and "temporarily suspended" him pending an investigation of the allegations. This email did not provide an end date for the suspension or the banishment from campus. Exhibit H.

102.    Doe did not have an opportunity to respond to the suspension and banishment, and was not permitted to attend class. Doe missed class and educational activities on September 26, 2016.

103.    Doe filed an administrative appeal of his suspension the next day, on September 27, 2016, but was summarily denied.

104.    As a result of the suspension, Doe could not attend class beginning on September 27, 2016, and missed valuable education time.

105.    The scant factual evidence attached to the notice made clear to Doe that this was a retaliatory action for him refuting the Title IX allegations and asserting his Fifth Amendment rights in the investigation.

106.    Doe set about the process of gathering as much information as he could.

107.    On September 29, 2016, Doe and his counsel met with Meyer to discuss the drug allegations.

108.    At the meeting, Meyer provided the name of a potential witness, but could not produce the name of the individual claiming to have used cocaine at the fraternity house with Doe on September 24, 2016.

109.    The meeting concerning the drug allegation was continued to October 5, 2016 for Meyer to continue her alleged investigation.

110.    Doe was not permitted to return to class while Meyer completed her investigation.

111.    Doe, without prompting, voluntarily took a drug test at an independent laboratory in Chicago. The test results showed no illegal drugs in his system. Doe sent the test to Meyer on September 30, 2016.

112.    Doe remained suspended, despite the results of the drug test in Meyer's possession.

113.     Doe additionally provided Meyer the names of witnesses who were with him all day on September 24, 2016, and could refute the allegations against him.

114.     At the October 5, 2016 meeting, Meyer admitted it was likely Doe did not use cocaine on September 24, 2016.

115.     Despite this admission, the case continued.

116.     Meyer then verbally stated new allegations against Doe. Doe was now being accused of using cocaine with a female student in the fraternity house on September 17, 2016. Meyer provided the names of Doe's accuser and the name of a witness the accuser allegedly told about the incident.

117.     Meyer indicated Doe's suspension would continue as she investigated the September 17, 2016 allegations.

118.     Defendant never provided an incident report or any other written notice or explanation of the allegations against Doe for his alleged behavior on September 17, 2016.

119.     Meyer told Doe that she did not believe the drug test he willingly submitted was sufficient to prove he did not use cocaine on September 17, 2016.

120.     Meyer shifted the burden of proof to Doe and asked Doe to present evidence refuting the new verbal allegations for September 17, 2016. When asked how Doe could prove he did not use cocaine on September 17, 2016, Meyer stated a drug test of his hair "would be persuasive." Meyer offered no other solution.

121.     By October 12, 2016, after missing more than two weeks of classes and still attempting to resolve the false Title IX allegation, Doe contacted Meyer concerning the status of her investigation of the alleged events of September 17, 2016, but received no response.

16

122. Defendant did not offer or afford Doe any resolution options for the cocaine allegation or a Case Resolution Form, even though it is required by school policy.

123. The lack of response again made clear to Doe that the University had no intention of giving him a fair hearing, and he took the only action available to him, withdrawal.

124. Doe withdrew from NIU on October 14, 2016, as he was still not permitted to return to class. Doe withdrew to avoid his academic record being tarnished by incomplete and failed grades.

125. On November 4, 2016, Doe finally received notice the allegations violating the Student Conduct Policy for cocaine use and possession were dismissed. Exhibit I.

126. This notification was sent after the Title IX hearings and sanctions, but on the same day Doe submitted his Title IX appeal.

## FACTS IN SUPPORT OF DEFENDANT'S BIAS AGAINST MALE STUDENTS ACCUSED OF SEXUAL ASSAULT

127. Defendant attempts to tout itself as a safe place for female students.

128. Defendant is a member of Pact5, a group of universities around the country who pledge to fight sexual assault on college campuses.

129. Defendant participated in a film festival for Pact5 in 2015. The school submitted two films: "Red-Blooded Men," a documentary film involving interviews with current students about sexual assault on campus; and "In Motion," a short, fictional film about a female student being raped by a male student.

130. In the film "Red-Blooded Men," where interviewees discuss sexual assault and attempted sexual assault, only men were portrayed as the aggressors in sexual situations. No women are shown to commit or attempt to commit sexual assault, and the

topic of women committing sexual assault is not discussed. The interviewees characterize the role of men and women in traditional, stereotypical roles, where men are strong predators and women are delicate and need protection.

131.    The film "In Motion" shows a male student raping his female friend after a party. At the end of the film, the male student is dismissed from NIU as a result of the rape. The student is not arrested or criminally charged.

132.    Defendant promotes the use of a private group, the Rape Aggression Defense ("R.A.D.") program. R.A.D. offers self-defense programs for women. While self-defense is included in the program for men, the main focus of a R.A.D. class for men is how to deal with "aggressive behavior," including how to "learn steps to avoid aggressive behavior." Upon information and belief, the women's class does not teach women how to avoid aggressive behavior.

133.    The police chief of NIU's campus police promoted R.A.D. in 2014, as did Lesley Rigg, the 2015 interim vice president for Research and Graduate Studies in 2015.

134.    Defendant's participation in Pact5 and promoting "awareness" of sexual assault came after a school police officer, Andrew Rifkin ("Rifkin"), was accused of sexually assaulting a student in 2011.

135.    On December 16, 2016, Rifkin was acquitted of all criminal charges.

136.    In 2012, during Rifkin's criminal case, a judge in DeKalb County ruled that Defendant's police force "intentionally withheld key evidence that could have cleared Rifkin" of the sexual assault charges.

137.     On March 6, 2013, the FBI raided the police department at NIU, in connection with the school's investigation of the rape case and NIU's failure to turn over key evidence in Rifkin's criminal case.

138.     Defendant's actions in Rifkin's criminal case, the films submitted to Pact5, and its participation in R.A.D. indicates Defendant's bias toward males, in that Defendant and its agents believe and promote that only men are sexually aggressive and only men commit sexual assault. There is a presumption of liability against any male accused of sexual assault.

139.     Defendants also began demonstrating persistent male bias in light of a "Dear Colleague" letter from the Department of Education's Office of Civil Rights regarding Title IX enforcement at colleges.

140.     This letter ushered in a preponderance of evidence standard and required a prompt and immediate investigation, with an added concern that if schools did not act promptly, their funding could be pulled.

141.     The "Dear Colleague" letter also indicated that parties should not be directly permitted to question or cross-examine each other.

142.     This guidance puts male students at a distinct disadvantage and favors female students.

143.     Upon information and belief, in or around 2017, Defendant received three separate complaints about Trude Jacobsen ("Jacobsen"), a female professor at the University.

144.     Upon information and belief, two of the complaints accused Jacobsen of making unwanted sexual advances towards one of her male graduate students, who was

married. When the student refused, she threatened to retaliate against him using her position within the University.

145.    As in Doe's case, upon information and belief, the alleged victim initially declined to file a complaint. Unlike in Doe's case, however, Defendant did not exert pressure on the alleged victim to file a complaint.

146.    Upon information and belief, all three of the complaints against Jacobsen were dismissed by Defendant. Two of them were dismissed because the complainant expressed concerns of being retaliated against by Jacobsen (notably, one of the complaints states Jacobsen threatened to kill the complainant).

147.    Upon information and belief, Jacobsen is still a tenured professor at the University and has suffered no repercussions as a result of these investigations.

148.    This discrepancy in outcome in these two cases evinces an anti-male gender bias by Defendant. Defendant prosecuted allegations against Jacobsen, including allegations of forced sexual encounters, far less aggressively than it prosecuted allegations against Doe because 1) Doe is male and Jacobsen is female; and 2) because the alleged victim in Doe's case was female and the alleged victim in Jacobsen's case was male.

149.    This discrepancy further shows that Defendant does not merely have a pro-victim bias but has an affirmatively anti-male bias. Where the alleged victim is female, Defendant prosecutes aggressively, but where the alleged victim is male, Defendant does not prosecute aggressively.

150.    Upon information and belief, Adamski met with victims and was involved in the investigation with both these cases.

## DEFENDANT'S TITLE IX POLICY

151.    Defendant maintains a Title IX/Sexual Misconduct Policy and Complaint Procedures for Employees and Students ("Title IX Policy"). Exhibit J.

152.    The Title IX Policy is specifically separate from any other university grievance or disciplinary procedure. Exhibit J at page 12. See also, Exhibit K, Student Conduct Policy, Section G, Paragraph 1.

153.    Defendant's Title IX Policy is sweeping, as it applies to conduct not just on campus, but also off campus activities and programs, as well as "off-campus sexual harassment." Exhibit J at page 5.

154.    The Title IX Policy provides three ways to file a complaint: (1) by the complainant contacting a Title IX coordinator; (2) by filing an online incident report through NIU's Office of Student Conduct; or (3) by filing out a form, which would be forwarded to the Title IX coordinator. Exhibit J at page 8.

155.    Alternatively, if a police report is filed, the local police department may forward the report to a Title IX coordinator. The police report is not an official Title IX complaint to the university, and does not oblige the complainant to take further action with the university. Exhibit J at page 9.

156.    Adamski violated the Title IX Policy when she continued to call Roe, even though Roe repeatedly expressed she did not wish to file a Title IX complaint. See Exhibit C.

157.    The Title IX Policy provides a timeline for the investigative procedures. The timeline begins when a Title IX Complaint *or* a report of sexual misconduct is received. Exhibit J at page 13.

158.    Between sixteen and twenty-two days the investigation begins, the preliminary report is to be issued. Exhibit J at page 13.

159.    The school became aware of the alleged sexual assault by April 18, 2016. Exhibit C, page 1. Adamski first contacted Roe on May 5, 2016. Exhibit C, page 2. Roe filed the Title IX Complaint on July 1, 2016. Exhibit C, page 2.

160.    NIU did not follow its own procedures and released the Preliminary Report on August 16, 2016, long after the designation allowed for in the timeline.

161.    According to the timeline, the final report should be issued to the complainant and the respondent within thirty-eight to forty days from the beginning of the investigation. Exhibit J at page 13.

162.    Here, the Final Report was not issued until September 14, 2016, long after the amount of time allowed in the Title IX Policy.

163.    Doe submitted his appeal to the Final Report on September 21, 2016, five business days after the Final Report was issued.

164.    Adamski failed to attach all the text messages referenced and reviewed by her in the Final Report. Doe did not submit his appeal to the Final Report until he received all the information Adamski claimed she considered in her Final Report.

165.    The full investigation and imposition of sanction should be completed within sixty (60) days, unless "circumstances require a longer time period." Exhibit J at page 15. The policy does not define what circumstances qualify an investigation and sanctions hearing for a "longer time period," nor does it limit the "longer time period."

166.    The hearing and imposition of the sanctions occurred on October 28, 2016, long after sixty (60) days from the first notice of the alleged incident.

167. Defendant never provided a written statement or reasoning for the severe deviation from the timeline provided in the Title IX Policy.

## **DEFENDANT'S VIOLATIONS OF THE STUDENT CONDUCT POLICY**

168. Defendant violated its own Student Conduct Policy. Exhibit K.

169. Defendant adopted the administrative procedures laid out in the Student Conduct Policy for the Title IX Policy. Both policies were in effect at all relevant times.

170. Under the Student Code of Conduct, the accused student in an administrative hearing is "presumed 'not responsible' until proven 'responsible.'" Exhibit K at Article I, Paragraph G.

171. The burden of proof to prove responsibility is on the complainant. Exhibit K at Article I, Paragraph G.

172. Adamski's actions when investigating the Title IX claim show she presumed Doe to be "responsible". Adamski never met with Roe in person; Adamski accepted Roe's conflicting statements; Adamski withheld text messages that would harm Roe's credibility; Adamski did not provide all the text messages to Doe she used to make her liability finding; and Adamski's repeatedly called Roe when Roe indicated she did not want to file a Title IX claim.

173. Adamski disregarded Doe's assertion of his Fifth Amendment rights and the Student Conduct Policy. Adamski adopted Doe's statement to the police as a part of her Initial Report and Final Report after Doe asserted, he would not make a statement and invoke his Fifth Amendment rights.

174. In any administrative hearing at NIU, "[n]o one shall be required to provide information that may be self-incriminating." Exhibit K at Article 1, Paragraph K.

175.    Due to the bias against males accused of sexual assault, Defendant did not meet the burden of proof in proving responsibility in the Title IX case. Instead, Defendant relied solely on Roe's inconsistent statements.

176.    Meyer's actions concerning the alleged cocaine use show Meyer presumed Doe to be "responsible" for cocaine use.  Doe received a suspension without a hearing or opportunity to be heard; the suspension remained in place even after Doe voluntarily provided a clean drug test; Meyer's investigation gave presumed credibility to the cocaine allegation, even though the allegations were filtered through several layers of hearsay, based on rumors, and no name of an accuser was initially provided.

177.    When Meyer indicated the persuasive evidence to dismiss the cocaine use allegations would be a drug test on a hair sample and offered no other forms of evidence for Doe to absolve himself of the allegations, Meyer clearly placed the burden of proof on Doe.

178.    Defendant did not bear the weight of the burden of proof concerning the cocaine allegation, since Defendant outwardly ignored Doe's hard evidence he did not use cocaine on September 24, 2016.

179.    Notice of a hearing for allegations of violations of the Student Conduct Policy is to be in writing. Exhibit K at Article I, Paragraph H.

180.    Defendant did not provide written notice of the allegations for his alleged cocaine use on September 17, 2016. Doe was entitled to written notice of the allegations against him on that date.

181.    When Defendant issues a University suspension as a sanction, the suspension must be for a definite period of time. Exhibit K at Article III, Section C(1)(q).

182. Defendant violated its own policy by suspending Doe for an unspecified period of time in response to the false cocaine use allegations. Exhibits G and H.

183. Defendant is required to produce a Case Resolution Form to an accused student after a preliminary conference; this Case Resolution Form is to contain a list of the alleged violations and recommendations for sanctions. Exhibit K at Article IV, Section A(4)(f).

184. Defendant failed to produce a list of the allegations or a Case Resolution Form after the initial conference for the September 26, 2016 allegations, and thereby violating the Student Conduct Policy.

185. Defendant failed to produce a list of the remaining allegations or a Case Resolution Form after the conference wherein Defendant verbally alleged Doe used cocaine on September 17, 2016, thereby violating the Student Conduct Policy.

## CONTINUING HARM TO DOE

186. Doe had a delayed education and was unable to secure employment due to educational delays.

187. Due to these delays, and as a result of being forced to accept a position in a less prestigious school, he has suffered a loss of earning potential which remains a continuing harm.

## COUNT I – VIOLATION OF TITLE IX

188. Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

189. Title IX of the Education Amendments of 1972 provides, in relevant part that "No person in the United States shall, on the basis of sex, be excluded from

participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

190.     Title IX of the Education Amendments of 1972 applies to an entire school or institution if any part of that school receives federal funds.

191.     Upon information and belief, Defendant receives federal funding for research and development.

192.     Schools falling under the Title IX purview are required to adopt procedures that both ensure the rights of the complainant and "accord due process to both parties involved…" See generally, U.S. Department of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties –Title IX (2001)* at 22.

193.     Pursuant to the Department of Justice and the Department of Education regulations, schools are to promulgate "grievance procedures providing prompt and equitable" resolutions to Title IX complaints. 34 C.F.R. § 106.8(b) (Department of Education); 28 C.F.R. § 54.135(b).

194.     Prompt and equitable procedures include, but are not limited to "adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence", and "designated and reasonably prompt timeframes for the major stages of the complaint process." See generally, U.S. Department of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties –Title IX (2001)* at 20.

195.    Based on the foregoing, Defendant deprived Doe, on the basis of his sex, of his rights to due process and equal protection through the improper administration of and/or the existence, in its current state, of NIU's guidelines and regulations.

196.    Based on the foregoing, Defendant conducted its investigation of the incident on April 16, 2016 and the subsequent sanctions hearing, in a manner that was biased against Doe due to his gender.

197.    Adamski's involvement in Doe's investigation demonstrated an inherent bias and predetermination of guilt of Doe when she repeatedly contacted Roe and withheld information that would harm Roe's credibility as a witness. Adamski's actions demonstrate Defendant's bias against Doe on the basis of his gender.

198.    NIU's failure to publicly refute the allegations in Roe's August 1 email, or to even publicly address the fact Adamski's investigation was ongoing, demonstrate NIU's bias against Doe on the basis of his gender.

199.    Furthermore, Wall, the hearing officer, showed her favorability of Roe when she accepted contradictory police statements from Roe, and contradictory statements during the hearing. Wall additionally did not question Adamski's failure to produce all relevant evidence. Wall's actions at the hearing and in her final decision demonstrate NIU's bias against Doe on the basis of his gender.

200.    Defendant created and maintains an environment where an accused male student is fundamentally denied due process by being prosecuted through the conduct process under a presumption of guilt. Such a one-sided process denied Doe, as a male student, of educational opportunities at NIU on the basis of his gender.

201.    In this case, Doe was punished for having consensual sex with a woman who refused repeatedly to file a Title IX claim and provided multiple false and inconsistent stories. Any evidence introduced in the Final Report and at the sanctions hearing that Roe did not engage in consensual sex on April 16, 2016 was improperly relied on, as Roe's memory and reliability as a witness was not called into question, despite her admitted heavy alcohol use and drug use before the incident. In finding Doe culpable of sexual misconduct, Defendant afforded preferential treatment to Roe and her contradictory testimony on the basis of her female gender, and engaged in gender discrimination against Doe in violation of NIU's policies.

202.    NIU had no intention of following its own policies and procedures concerning the Title IX claim against Doe, as a male fraternity member accused of sexual misconduct, when it found Doe responsible for sexual misconduct despite Roe's own words, conflicting statements, and Roe's unreliability as a witness.

203.    NIU did not participate in the Title IX sanctions hearing in good faith when: it allowed Brian Glick to assume the prosecutorial role despite his bias against Doe; it did not require Adamski to produce all evidence she considered in her finding against Doe; and it refused Doe the right to cross-examine his accuser in a meaningful manner.

204.    NIU's actions have demonstrated its gender bias against Doe as the male accused of sexual assault.

205.    Based on the foregoing, the history of the Rifkin case indicates Defendant's habit of withholding relevant evidence when a male is accused of sexual assault.

206. Based on the foregoing, NIU's involvement in PACT5 and its submissions in the film festival indicate an environment at NIU wherein male students accused of sexual assault are presumed to be guilty.

207. Based on the foregoing, the history of the Jacobsen case indicates that NIU prosecutes allegations of sexual misconduct against females far less aggressively than allegations against males.

208. The "Dear Colleague" letter also added significant incentive to presume guilt based on being a male student accused of sexual assault.

209. This letter introduced the preponderance of the evidence standard for Title IX cases, provided potential restrictions on the right to cross-examine and review evidence, as well as informing schools that if they did not follow the letter, it could cause them to be investigated and potentially lose funding under Title IX.

210. Male respondents in sexual misconduct cases at NIU are discriminated against solely on the basis of their sex. They are presumed guilty, regardless of the actual evidence presented.

211. The Title IX grievance process at NIU is inherently flawed, and in violation of Doe's rights and those similarly situated.

212. Defendant failed to allow Doe the right to challenge the statements made by Roe, failed to allow Doe the right to challenge the reliability of Roe as a sole witness, failed to turn over relevant character evidence prior to both the Final Report and the sanctions hearing, and therefore failed to allow Doe a fair opportunity to defend the Title IX allegations in a meaningful manner.

213.     NIU denied due process of law when it engaged in a biased Title IX investigation and sanctions hearing, resulting in damages to Doe in the loss of educational opportunities, the loss of his good name and academic record, loss of future earnings, and other damages to be determined at a trial of this matter.

214.     NIU deprived Doe of his right to his good name and academic record, loss of educational opportunity, loss of funds invested in his education, loss of future earnings, and other damages to be determined at trial when NIU expelled Doe and banished him from campus as a result of the Title IX sanctions hearing.

215.     Meyer, Glick and Adamski all wanted to punish Doe as a male fraternity leader.

## COUNT II – BREACH OF CONTRACT UNDER ILLINOIS STATE LAW

216.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

217.     Defendant failed to afford Doe his rights under the Student Conduct policy during the Student Conduct complaint concerning cocaine use in violation of the policy itself.

218.     Doe was provided with a copy of the student handbook upon enrollment, and Doe followed the procedures of the student handbook and was subject to those procedures in the investigations of prior incidents in 2012.

219.     Defendant violated Doe's right to written allegations and opportunity to prepare a defense when Meyer verbally told Doe about the allegation of cocaine use on September 17, 2016, and failed to provide written notice of the allegations.

220.     Defendant violated its own policies when Defendant failed to provide an end date for the suspension instituted on September 26, 2016.

221.     Defendant violated its policies when Defendant suspended Doe without a hearing or opportunity to be heard on September 26, 2016.

222.     NIU also violated its policies when it suspended Doe without a hearing, resulting damages to Doe in the loss of educational opportunities, the loss of his good name and academic record, and other damages to be determined at a trial of this matter.

223.     Upon information and belief, adherence to the Student Conduct policy is a requirement for attendance at NIU, and NIU binds itself to the Student Conduct policy in order to carry out its duties to both students and funders.

224.     NIU further violated its policies when it failed to provide proper written allegations for the September 17, 2016 allegations, resulting damages to Doe in the loss of educational opportunities, the loss of his good name and academic record, and other damages to be determined at a trial of this matter.

## COUNT III – RETALIATION UNDER TITLE IX

225.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

226.     In the midst of Doe's defense of the Title IX allegations against him as described throughout the complaint, Doe was subject to a retaliatory investigation which claimed that he used cocaine as described above in Paragraphs 97 to 125.

227.     He received a written notice of this investigation which included no details about who his accuser was, which is required under the Student Conduct policy.

228.     He was required to prove his own innocence, which again is contradictory to the student conduct policy.

229.     He was notified of these allegations in a verbal interview rather than in writing.

230.     He provided a witness alibi and took a drug test of his own volition, yet the school continued to investigate, claiming a negative drug test did not prove he did not take drugs on that day.

231.     Doe asked what further information he could provide, and the disciplinary officer suggested that a drug test of his hair would be persuasive.

232.     Doe followed up but received ultimately no response, nor any status updates until shortly after the sanctions from his Title IX hearing were sent to him, at which point the allegations were dismissed.

233.     The allegations themselves were threadbare, contradicted by easily verifiable facts. Detail was not provided in a way that would give adequate notice to allow Doe to formulate a response.

234.     Providing testimony or contesting allegations of violations of Title IX is a protected activity under the law.

235.     At the time of these allegations of cocaine use, Doe was engaged in defending himself from allegations of misconduct under Title IX.

236.     The threadbare nature of the allegations, the changing disclosure of information, and the shifting of the burden of proof makes clear that but for his defense of the Title IX case, this further misconduct allegation would not have been investigated, as does the dismissal of these charges shortly after the receipt of his sanctions.

237.    No Case Resolution Form was produced for these allegations, despite it being required under the Student Conduct policy.

238.    Due to these allegations, Doe had to withdraw from class and lost at least two weeks of vital educational time.

239.    That caused harm to Doe and impacted his ability to continue his education which he was otherwise entitled to.

**COUNT IV – DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201**

240.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

241.    Defendant committed numerous violations of federal law in its treatment of Doe.

242.    Doe's education and future career has been severely damaged. Without appropriate redress, the unfair outcome of the Title IX investigation and hearing, as well as the suspension based on the unfounded drug allegations will continue to cause irreversible damage to Plaintiff's educational career and future employment prospects, with no end in sight.

243.    Due to his unsupported expulsion from NIU, Doe eventually had to go to an online college, which resulted in a significant loss of earning potential.

244.    As a result of the foregoing, there exists a justiciable controversy between the Parties with respect to the outcome, permanency, and future handling of Doe's formal student record at NIU.

245.    By reason of the foregoing, Doe requests, pursuant to 28 U.S.C. § 2201, a declaration that: (i) the outcome and findings made by NIU's Title IX Final Report be

reversed; (ii) the outcome and findings made by NIU at the Title IX sanctions hearing be reversed; (iii) the record of Doe's suspension due to the unfounded cocaine use allegations be removed from his educational file; (iv) the record of Doe's expulsion from NIU due to the Title IX claim be permanently removed from his education file; (v) the record of Doe's suspension due to the unfounded cocaine use allegations be destroyed; and (vi) the record of Doe's expulsion due to the Title IX investigation and hearing be destroyed.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiff John Doe demands judgment against Defendant, Northern Illinois University, as follows:

(1) On the first cause of action for violation of the Title IX of the Education Amendments of 1972, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorney's fees, expenses, costs and disbursements;

(2) On the second cause of action for breach of contract, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorney's fees, expenses, costs and disbursements;

(3) On the third cause of action for Title IX retaliation, Plaintiff seeks a judgment awarding Plaintiff damages in an amount to be determined at trial, including without limitation damage to reputation, damage to future career prospects and attorneys' fees;

34

(4) On the fourth cause of action for a declaratory judgment pursuant to 28 U.S.C. § 2201, a declaration that: (i) the outcome and findings made by NIU's Final Report be reversed; (ii) the outcome and findings made by NIU at the sanctions hearing be reversed;; (iii) the record of Doe's suspension due to the unfounded cocaine use allegations be removed from his educational file; (iv) the record of Doe's expulsion from NIU due to the Title IX claim be permanently removed from his education file; (v) the record of Doe's suspension due to the unfounded cocaine use allegations be destroyed; (vi) the record of Doe's expulsion due to the Title IX investigation and hearing be destroyed; and

(5) Awarding Plaintiff such and other further relief as the Court deems just, equitable, and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury of all triable issues in the present matter.

Respectfully submitted,

/s/ Gal Pissetzky_____
Gal Pissetzky,
Attorney for Plaintiff
Pissetzky Law, LLC
35 E. Wacker Dr.
Suite 1908
Chicago, IL 60601
(312) 939-4155
gal@pissetzkylaw.com

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned attorney hereby certifies that on May 29, 2023, the foregoing was filed electronically with the Clerk of Court using the ECF system, which sent notification of such filing to all parties/attorneys of record.

<u>/s/ Gal Pissetzky</u>

# EXHIBIT A

**2012063008**
Hazing

No Photo Available

�altered (Z1677328)

Closed

## DEMOGRAPHICS

| | | |
|---|---|---|
| **DOB** 1994-08-30 | **Athletics** Not Athlete | **Academic Referral Dept.** |
| **Gender** Male | **Greek** Pi Kappa Alpha Fraternity | **Ban/TS** |
| **Ethnicity** Hispanic | **Honors** No | **STAT-Current Threat Level** |
| **Classification** Freshman | **ROTC / Veteran** No | **Course Name/Number** |
| **Major** Accountancy | | |
| **Academic Advisor** | | |
| **GPA Last Term / GPA Cumulative** 0.000 / 0.000 | | |

## CONTACT INFORMATION

| | | |
|---|---|---|
| **Housing** Stevenson Tower C 0758A | **Local** | **Permanent** ▬▬▬▬ Arlington Heights IL 60005 |
| **Username** 01677328 | 773/573-4712 (cell) | |
| **Email Address** Z1677328@STUDENTS.NIU.EDU | | |
| **Emergency Contact** | | |

## INCIDENT AND CASE INFORMATION

| | | |
|---|---|---|
| **Report Number** | **Role** Accused (Student) | |
| **Incident Date** 2012-11-02 | **Incident Time** 10:14 am | **Incident Location** Pi Kappa Alpha Fraternity House |
| **Reported Date** | **Referral Source** DeKalb Police | **Reported By** Jeanne Meyer jeanne@niu.edu |
| **Case Created Date** 2012-11-05 | **Assigned To** Brian M. Glick (Assoc. Director - OCS & SC) | **Home Office** Student Conduct |
| **Access Restriction** Hazing | | |

Export of SID Z1677328 generated by Brian M. Glick on December 1, 2016 at 4:09:26pm CST

**Clery Reportability**
DISCIPLINARY ACTIONS: Liquor law violations

**Tags**
Alcohol-Abuse

**Next Deadline Date**        **Reason**

**Incident Description**

▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒ morning at the Pi Kappa Alpha house, 1020 W. Hillcrest Drive in DeKalb. DeKalb police responded to a call at 10:14 a.m. Friday, and ▒▒▒▒▒▒▒▒ was pronounced dead at the fraternity house about 30 minutes later, authorities said.

DeKalb police said they found evidence of alcohol use near ▒▒▒▒▒▒▒, who had been among several people invited Thursday to the fraternity house. Police will interview more than 20 people who had been at the fraternity house around that time and review autopsy results before determining what caused ▒▒▒▒▒ death.

## RESOLUTION INFORMATION

**Charges/Issues**
1) Hazing
2) Alcohol - Underage Possession/Consumption

**Findings (if applicable)**
Dismissed
Responsible

**Appt. Date**
2013-02-12

**Appt. Time**
1:30 pm

**Appt. Location**
280 Campus Life Building

**Hearing/Resolution Date**
2013-02-05

**Hearing/Resolution Type**
Informal Administrative Hearing
(Preliminary Confe

**Hearing Officer(s)**
Director - OCS & SC (Jeanne Meyer)

**Parental Notification**
No

**Holds in Place**

**Appeal Status**
No appeal filed

**Rationale**

**CC List**

## SANCTIONS / ACTIONS

✔ = completed, ✖ = incomplete, ↩ = referred to another case

✔    **Student Conduct Fine**

     **AMOUNT:**          50.00

✔    **Preliminary Conference Checklist**

✔    **Student Code Violation Fine ($25)**

✖    **BASICS**

     **DUE:**          2013-02-28

## NOTES

**Universal Notes**

Cellular telephone (773/573-4712) AT&T

**General Notes**

11/13/2012-Multiple attempts to contact, including via telephone and email, no call, no show, file closed. BMG

11/13/2012-█████████ - At house 1845-0800hrs, back to residence hall, █████████████, █████████ was in the same group as ████ matched drinks, unknown how many drinks consumed, started 2000hrs, over by 2200hrs, went to bed 0300hrs, Saw ████ passed out in bed on back, flipped him on stomach, unknown time, ███████████████ room, no one else in room at time, BMG

02/04/2013-0957hrs, Message left for █████████████ requesting callback to resolve matter. BMG

02/05/2013-student came in this am & wanted to talk with Brian Glick - told him he was at a conference for the rest of the week - he said that he was suppose to come in yesterday, but he didn't come back to campus until today. So he wanted to know if Jeanne was available - she was at a meeting out of the office. So I took his phone number to call him when she got back to see if she would be able to meet with him or not. In the meantime I called Brian to let him know. He said if Jeanne wouldn't be able to meet with him today to go ahead & make an appt for Monday when he would be back. kah

Fined $100 for not completing Basics sanction-kah/03/18/2013

06/24/2013-Message from Mrs. ████████ requesting callback ██████████ BMG
06/24/2013-1006hrs, Callback to Mrs. ████████ about ███████████ explained $100 non-compliance fee. BMG

## ELECTRONIC FILE CABINET

| Doc ID | Filename | Date Modified | File Size | Associated with |
|--------|----------|---------------|-----------|-----------------|
| 00044113 | Case Creation Sheet | November 5, 2012 3:15 pm | 6.05kb | This individual |
| 00044121 | WitnessAppearNotice(Email) | November 5, 2012 3:21 pm | 49.61kb | This individual |
| 00044122 | WitnessAppearNotice(Housing) | November 5, 2012 3:22 pm | 30.26kb | This individual |
| 00044434 | HzgInv(Email) | November 7, 2012 1:46 pm | 49.73kb | This individual |
| 00046665 | Former members PKA.pdf | November 8, 2012 4:57 pm | 31.63kb | All parties |
| 00044721 | HzgInv(Email) | November 9, 2012 9:14 am | 49.77kb | This individual |
| 00045037 | Group 6 notes.pdf | November 13, 2012 4:58 pm | 89.02kb | This individual |
| 00045586 | Pi Kappa Alpha Subpeona 11162012.pdf | November 16, 2012 4:17 pm | 188.76kb | All parties |
| 00045981 | IR | November 21, 2012 2:12 pm | 16.40kb | All parties |
| 00047496 | AllegedViolationsNotice(Email) | December 7, 2012 2:22 pm | 591.02kb | This individual |
| 00047497 | AllegedViolationsNotice(Housing) | December 7, 2012 2:22 pm | 77.73kb | This individual |
| 00048239 | PreliminaryConferenceChecklist | December 12, 2012 1:59 pm | 14.52kb | This individual |
| 00048244 | CRF | December 12, 2012 2:19 pm | 6.27kb | This individual |
| 00048245 | ████ CRF.pdf | December 12, 2012 2:28 pm | 72.70kb | This individual |
| 00049390 | DeKalb Police Information.pdf | January 16, 2013 1:40 pm | 50.52kb | All parties |
| 00049881 | HRGPCShow(Housing) | January 23, 2013 10:37 am | 36.33kb | This individual |
| 00049882 | HRGPCShow(Email) | January 23, 2013 10:38 am | 55.69kb | This individual |
| 00049885 | PCLCSSC(Custom) | January 23, 2013 10:40 am | 81.81kb | This individual |
| 00049886 | FullBoardHearScriptFrm | January 23, 2013 10:41 am | 214.22kb | This individual |
| 00049887 | HearingDecisionFrm | January 23, 2013 10:41 am | 228.15kb | This individual |
| 00050855 | HRGPCNoShowLtr(Email) | February 4, 2013 1:19 pm | 55.37kb | This individual |
| 00050856 | HRGPCNoShowLtr(Housing) | February 4, 2013 1:20 pm | 36.02kb | This individual |
| 00050983 | CRF | February 5, 2013 12:02 pm | 6.39kb | This individual |
| 00050984 | SummaryLtr(Email) | February 5, 2013 12:04 pm | 544.25kb | This individual |
| 00050985 | SummaryLtr(Housing) | February 5, 2013 12:04 pm | 531.21kb | This individual |
| 00051016 | ████ ████ signed crf.pdf | February 5, 2013 1:09 pm | 42.23kb | This individual |
| 00051017 | ████ basics referral form.pdf | February 5, 2013 1:09 pm | 55.92kb | This individual |
| 00051400 | BASICS Appointment.pdf | February 11, 2013 8:07 am | 61.89kb | This individual |
| 00053068 | OSCSSC(Email) | February 28, 2013 7:48 am | 54.31kb | This individual |
| 00053106 | Novotny Roth communication.pdf | February 28, 2013 1:07 pm | 9.45kb | This individual |
| 00072511 | DKPD report redacted.pdf | January 29, 2014 5:40 pm | 120.33kb | All parties |

**2014053425**
Hazing

<span style="float:right">Closed</span>

No Photo Available

~~[REDACTED]~~ **(Z1677328)**

## DEMOGRAPHICS

**DOB**
1994-08-30

**Athletics**
Not Athlete

**Academic Referral Dept.**

**Gender**
Male

**Greek**
Not Greek

**Ban/TS**

**Ethnicity**
Hispanic

**Honors**
No

**STAT-Current Threat Level**

**Classification**
Junior

**ROTC / Veteran**
No

**Course Name/Number**

**Major**
Accountancy

**Academic Advisor**

**GPA Last Term / GPA Cumulative**
0.000 / 0.000

## CONTACT INFORMATION

**Housing**
Off Campus

**Local**

**Permanent**
~~[REDACTED]~~
Arlington Heights IL 60005

**Username**
01677328

773/573-4712 (cell)

**Email Address**
Z1677328@STUDENTS.NIU.EDU

**Emergency Contact**

## INCIDENT AND CASE INFORMATION

**Report Number**
14-61106

**Role**
Witness (Student)

**Incident Date**
2014-11-16

**Incident Time**
3:10 a.m.

**Incident Location**
Phi Kappa Theta Fraternity House

**Reported Date**
2014-11-18

**Referral Source**
NIU Police

**Reported By**
Devon Buckle dbuckle@niu.edu

**Case Created Date**
2014-11-18

**Assigned To**
Brian M. Glick
(Assoc. Director - OCS & SC)

**Home Office**
Student Conduct

**Access Restriction**
Hazing

**Clery Reportability**
Not Clery Reportable

**Tags**

**Next Deadline Date**

**Reason**
NTA

**Incident Description**
Northern Illinois University – Police Department
CFS#: 002014061106
Title: Assist DPD/Information Only-(Hazing Investigation)
Date: Monday, November 17, 2014
Submitted by: Officer D. Buckle #36

On Monday, November 17, 2014 at approximately 0310 hours, dispatch advised that DeKalb City Police Department (DPD) was responding to 910 W. Hillcrest (Phi Kappa Theta Fraternity House) for a possible hazing situation. DPD received an anonymous call stating that pledges had been at the fraternity house since early Sunday evening 11/16/14, and were not allowed to leave.

I responded to the call to assist DPD. I met with DPD Officer Guzinski who was inside the house talking with fraternity president ▮▮▮▮▮▮▮▮▮▮ advised that there were no members that were being forced to stay. ▮▮▮▮ advised that Associate Members were going through their last events before they proceed to the next level membership. ▮▮▮▮ also informed that Associate Member ▮▮▮▮▮▮▮▮▮▮ decided to leave the fraternity house this afternoon because he has been depressed lately. ▮▮▮▮ stated that he and other members tried to encourage ▮▮▮▮ to stay and provided resources that might help him with his depression. ▮▮▮▮ ended up leaving the fraternity house approximately 1pm Sunday.

We also spoke with the associate members (approximately 20-25 members); they all stated that they were not being forced to stay, and could leave at any time. The associate members that we spoke to all appeared to be okay, and no apparent issues going on.

I also spoke with member ▮▮▮▮▮▮▮▮▮ who was good friends with ▮▮▮▮▮▮▮▮▮▮ advised that ▮▮▮ had been depressed off and on and was getting help. I told ▮▮▮▮ that I would attempt to talk with ▮▮▮ to make sure he was doing okay. ▮▮▮▮ was concerned about what was going to happen. I told Kunkle that we would document what he told us, and what I observed. I told ▮▮▮▮ that so far I did not see any signs of hazing incidents. Throughout my conversation with ▮▮▮▮, he repeatedly expressed wanting to help ▮▮▮ in any way that they could.

At approximately 0343 hours, Officer M. Anderson and I spoke with ▮▮▮ at his residence (▮▮▮▮▮▮▮▮▮▮▮) ▮▮▮ advised that he was okay and that he made the decision to leave the fraternity house on his own. ▮▮▮ stated that he has had issues with depression ("Mood Swings") and that he was taking medication for it. ▮▮▮ advised that he has an appointment this Friday (11/21/14) to see his doctor.
I asked ▮▮▮ if he at any time felt that the fraternity was trying to prevent him from leaving the house. ▮▮▮ stated no. ▮▮▮ stated that he just needed a break because of his own personal issues. I told ▮▮▮ that we just wanted to make sure he was okay. I also told ▮▮▮ that if he needed any help from NIU don't hesitate to ask.

End of report. 036-DPB

---

## RESOLUTION INFORMATION

**Charges/Issues**
1) No Charge

**Findings (if applicable)**

**Appt. Date**
2014-11-24

**Appt. Time**
7:30 p.m.

**Appt. Location**
100 Campus Life Building

**Hearing/Resolution Date**

**Hearing/Resolution Type**

**Hearing Officer(s)**

**Parental Notification**
No

**Holds in Place**

**Appeal Status**
No appeal filed

**Rationale**

CC List

---

## SANCTIONS / ACTIONS

✔ = completed, ✗ = incomplete, ⇥ = referred to another case

No sanctions/actions listed

---

## NOTES

**Universal Notes**
Cellular telephone (773/573-4712) AT&T

**General Notes**
11/24/2014-Was Asst. Rush Manager, running for VP in spring. Was not at the house during the incident. Was at girlfriend during incident. Was not present for the water balloon fight. ▮▮▮▮▮▮▮▮▮▮. BMG

---

## ELECTRONIC FILE CABINET

| Doc ID | Filename | Date Modified | File Size | Associated with |
|--------|----------|---------------|-----------|-----------------|
| 00090864 | Case Creation Sheet | November 18, 2014 12:23 pm | 8.58kb | This individual |
| 00090930 | IR | November 18, 2014 1:36 pm | 8.48kb | All parties |
| 00090978 | HIEC(Email) | November 18, 2014 3:54 pm | 85.02kb | This individual |
| 00090979 | HIEC(Email) | November 18, 2014 3:55 pm | 85.02kb | This individual |
| 00128645 | ▮▮▮▮communication 12012016.pdf | December 1, 2016 3:10 pm | 70.78kb | This individual |

# EXHIBIT B

| | | INCIDENT/INVESTIGATION REPORT | | Case# 16-02657 |
|---|---|---|---|---|

**Agency Name** Dekalb Police Department

**ORI** IL0190800

**Date / Time Reported** 04/17/2016 18:47 Sun

**Last Known Secure** 04/17/2016 18:47 Sun

**Location of Incident** 910 W Hillcrest Dr, Dekalb IL 60115-

**Premise Type** Apartment

**Zone/Tract** Z1E

**At Found** 04/17/2016 18:47 Sun

### INCIDENT DATA

**#1 Crime Incident(s)** (Com) Sex: Criminal Sexual Assault 0260

**Weapon / Tools** PERSONAL (HANDS, FIST, FEET)

| | Entry | Exit | Security | Activity |
|---|---|---|---|---|

**#2 Crime Incident** ( )

**Weapon / Tools**

| | Entry | Exit | Security | Activity |
|---|---|---|---|---|

**#3 Crime Incident** ( )

**Weapon / Tools**

| | Entry | Exit | Security | Activity |
|---|---|---|---|---|

**MO**

### VICTIM

**# of Victims** 1 **Type:** INDIVIDUAL **Injury:** None **Crime Agst Child=**

| V1 | Victim/Business Name (Last, First, Middle) | Victim of Crime # 1, | DOB | Race | Sex | Relationship To Offender | Resident Status | Military Branch/Status |
|---|---|---|---|---|---|---|---|---|

**Home Address**

**Home Phone**

**Employer Name/Address**

**Business Phone** **Mobile Phone**

| VYR | Make | Model | Style | Color | Lic/Lis | VIN |
|---|---|---|---|---|---|---|

### OTHERS INVOLVED

**CODES:** V- Victim (Denote V2, V3)   O = Owner (if other than victim)   R = Reporting Person (if other than victim)

**Type:** INDIVIDUAL **Injury:**

| Code OT | Name (Last, First, Middle) | Victim of Crime # | DOB Age | Race | Sex | Relationship To Offender | Resident Status | Military Branch/Status |
|---|---|---|---|---|---|---|---|---|

**Home Address**

**Home Phone**

**Employer Name/Address**

**Business Phone** **Mobile Phone**

**Type:** INDIVIDUAL **Injury:**

| Code PR | Name (Last, First, Middle) | Victim of Crime # | DOB Age | Race | Sex | Relationship To Offender | Resident Status | Military Branch/Status |
|---|---|---|---|---|---|---|---|---|

**Home Address** IL 60477

**Home Phone**

**Employer Name/Address**

**Business Phone** **Mobile Phone**

### PROPERTY

1 = None   2 = Burned   3 = Counterfeit / Forged   4 = Damaged / Vandalized   5 = Recovered   6 = Seized   7 = Stolen   8 = Unknown
("OJ" = Recovered for Other Jurisdiction)

| VI # | Code | Status Frm/To | Value | OJ | QTY | Property Description | Make/Model | Serial Number |
|---|---|---|---|---|---|---|---|---|

**Officer/ID#** JURSICH, J. (1146)

**Invest ID#** STEWART, M. A. (1052)

**Supervisor** TEHAN, M. S. (1054)

**Status** **Complainant Signature**

**Case Status** Cleared By Adult Arrest 07/08/2016

**Case Disposition:** Arrested By Other Agency 07/08/2016

**Page 2**

R_CS1IBR     Printed By: PMEIER, ADMINSEC     Sys#: 544720     07/13/2016 10:49

## Incident Report Additional Name List

**Dekalb Police Department**

OCA: *16-02657*

### Additional Name List



| | Name Code/# | Name (Last, First, Middle) | Victim of Crime # | DOB | Age | Race | Sex |
|---|---|---|---|---|---|---|---|
| **1 )** | PR  3 | | | | | | |
| | **Address** | | | **H:** – – | | | |
| | **Empl/Addr** | | | **B:** – – | | | |
| | | | | **Mobile #:** – – | | | |
| **2 )** | WI  1 | | | | | | |
| | **Address** | | | **H:** | | | |
| | **Empl/Addr** | | | **B:** – – | | | |
| | | | | **Mobile #:** – – | | | |
| **3 )** | OT  2 | | | | | | |
| | **Address** | | | **H:** | | | |
| | **Empl/Addr** | | | **B:** – – | | | |
| | | | | **Mobile #:** – – | | | |

## INCIDENT/INVESTIGATION REPORT

*Dekalb Police Department*

Case # *16-02657*

| Status Codes | 1 = None | 2 = Burned | 3 = Counterfeit / Forged | 4 = Damaged / Vandalized | 5 = Recovered | 6 = Seized | 7 = Stolen | 8 = Unknown |

| | IBR | Status | Quantity | Type Measure | Suspected Type | |
|---|---|---|---|---|---|---|
| **D R U G S** | EVI | E | 0.000 | | *SEX ASSAULT KIT* | |
| | EVI | E | 1.000 | | *EVIDENCE* | |
| | EVI | E | 1.000 | | *EVIDENCE* | |
| | EVI | E | 1.000 | | *OVERHEAR RECORDINGS* | |
| | EVI | E | 1.000 | | *EVIDENCE* | |
| | EVI | E | 1.000 | | *EVIDENCE* | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

Assisting Officers

Suspect Hate / Bias Motivated:

## INCIDENT/INVESTIGATION REPORT

Narr. (cont.)  OCA: 16-02657

*Dekalb Police Department*

N A R R A T I V E

On 04/17/16 an officer was dispatched to the PD reference a sexual assault report.

Investigation started.

# REPORTING OFFICER NARRATIVE

| | | OCA |
|---|---|---|
| *Dekalb Police Department* | | *16-02657* |
| Victim | Offense | Date / Time Reported |
| ▓▓▓▓▓ | *SEX: CRIMINAL SEXUAL ASSAULT* | *Sun 04/17/2016 18:47* |

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

On 04/17/16 I, Officer Jonathan Jursich, was dispatched to the PD reference a sexual assault report.

When I arrived at the PD I met with the complainant ▓▓▓▓▓. She was accompanied with her ▓▓▓▓▓. ▓▓▓ and ▓▓▓ stated they did not want to be present during the interview. I spoke with ▓▓▓ in the interview room off the main lobby. ▓▓▓ stated the following in summary;

▓▓▓ came to DeKalb yesterday (04/16/16). She went with her ▓▓▓▓▓ O'leary`s Pub and Grill for a semi-formal event. While at the event ▓▓▓ met a male named ▓▓▓▓▓ Throughout the formal ▓▓▓▓▓ kept talking with ▓▓▓ and kept showing interest in her. At one point while talking ▓▓▓▓ attempted to kiss ▓▓▓ She refused to and told him they had just met and she was not that type of ▓▓▓. When the formal ended a group of people went back to Phi Kappa Theta. Several of the males at the formal where members at that fraternity including ▓▓▓▓▓ When they arrived ▓▓▓▓ invited some people into his room to drink. ▓▓▓▓▓ and a few other unknown individuals went into ▓▓▓▓▓ room. At about a little after midnight some of the individuals left until it was just ▓▓▓ and ▓▓▓▓ in the room. ▓▓▓ was sitting on the couch in ▓▓▓▓▓ room. ▓▓▓▓▓ kept moving closer to ▓▓▓ He attempted to kiss her again. ▓▓▓ pushed him away and stated ▓▓▓ did not want to kiss him. He moved closer to ▓▓▓ and pulled ▓▓▓ dress of ▓▓▓ chest. ▓▓▓ moved away from him again and told him not to touch ▓▓▓. He asked if ▓▓▓ would feel more comfortable if he was naked. ▓▓▓ did not answer him and he undressed down to his boxer shorts. He then forced himself on top of ▓▓▓ again. She kept telling him to get off of her. When she was attempting to push him away he inserted his penis into her vagina briefly. She was able to push him off of her and she said again told him she did not want to have sex. ▓▓▓▓▓ than slapped her with an open hand across her face. He told her she would like it. He grabbed a condom and asked if he wore it would she let him have sex with her. She again stated no and attempted to get up off the couch. He grabbed her by her hair and pushed her down on the couch on her back. He then again forced himself onto of her and inserted his penis into her vagina. ▓▓▓ stated she began to cry and did not know what to do. He continued to have intercourse with her without wearing a condom. ▓▓▓▓▓ then removed his penis from her vagina and ejaculated. ▓▓▓ then dressed herself. She heard a knock at the door. ▓▓▓▓ told her to leave the room. ▓▓▓ left the room and found ▓▓▓ They then left the party and went to ▓▓▓ what had happened when they arrived at ▓▓▓▓▓ residence. End summary

▓▓▓ was very emotional during the interview and was crying. ▓▓▓▓▓ woke up this morning and had breakfast. ▓▓▓ then went home to Tinley Park. When she arrived home she went to bed. When she woke up she told her parents what had happened. ▓▓▓ and her parents then came to the PD to make a report. I asked ▓▓▓ if ▓▓▓▓ had attempted to contact her since the incident and she stated no. I advised her not to have any contact with him until further notice and she stated she understood. I asked ▓▓▓ if she had showered since the incident and she stated no. I advised ▓▓▓ to go to Kishwaukee Community Hospital to have a sex assault kit completed. She stated she would. ▓▓▓ and I spoke with her parents and they stated they would take her to KCH immediately. I advised them to contact me with any questions.

Case pending

| | | |
|---|---|---|
| Reporting Officer: *JURSICH, J.*<br>R_CS3NC | Printed By: PMEIER, ADMINSEC  07/13/2016 10:49 | Page 5 |

# REPORTING OFFICER NARRATIVE

| *Dekalb Police Department* | | OCA *16-02657* |
|---|---|---|
| Victim | Offense *SEX: CRIMINAL SEXUAL ASSAULT* | Date / Time Reported *Sun 04/17/2016 18:47* |

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

End of report

## Incident Report Suspect List

*Dekalb Police Department*

| 1 | Name (Last, First, Middle) | | | | | | Also Known As | | | | Home Address | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

**Business Address**                                   .

| DOB | Age | Race | Sex | Eth | Hgt | Wgt | Hair | Eye | Skin | Driver's License / State. |
|---|---|---|---|---|---|---|---|---|---|---|
| | 21 | W | M | N | 510 | 160 | BRO | BRO | LGT | |

Scars, Marks, Tattoos, or other distinguishing features

| *Reported Suspect Detail* | Suspect Age | Race | Sex | Eth | Height | Weight | SSN |
|---|---|---|---|---|---|---|---|

| Weapon, Type | Feature | Make | Model | Color | Caliber | Dir of Travel |
|---|---|---|---|---|---|---|
| | | | | | | Mode of Travel |

| VehYr/Make/Model | Drs | Style | Color | Lic/St | VIN |
|---|---|---|---|---|---|

Notes                                               Physical Char

*Hair Length, Short*
*Hair Style, Straight*
*Hair Facial, Clean Shaven*
*Build, Medium*

**CASE SUPPLEMENTAL REPORT**

Printed: 07/13/2016 10:49

*Dekalb Police Department*

OCA: **1602657**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

Case Status: *CLEARED BY ADULT...*    Case Mng Status: *ADULT ARREST*    Occurred: *04/17/2016*

Offense: *SEX: CRIMINAL SEXUAL ASSAULT*

Investigator: *JURSICH, J. (1146)*    Date / Time: *04/18/2016 00:39:21, Monday*

Supervisor: *TEHAN, M. S. (1054)*    Supervisor Review Date / Time: *04/18/2016 01:16:54, Monday*

Contact:    Reference: *Follow Up*

On 04/18/16 Officer Cicchetti advised me he was at Kishwaukee Community Hospital. He stated the sex assault kit had been completed. He transported the kit from Kishwaukee Community Hospital and I took possession of it at the PD. I logged it into evidence. I then placed it into refrigerated storage locker A.

End of report

Investigator Signature

Supervisor Signature

Case 1:17-cv-07991 Document #66 Filed: 05/29/23 Page 52 of 242 PageID #:463
Case: 1:17-cv-07991 Document #69-3 Filed: 05/03/17 Page 9 of 23 PageID #:49

**CASE SUPPLEMENTAL REPORT**

Printed: 07/13/2016 10:49

*Dekalb Police Department*

OCA: **1602657**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** *CLEARED BY ADULT...*  **Case Mng Status:** *ADULT ARREST*  **Occurred:** *04/17/2016*

**Offense:** *SEX: CRIMINAL SEXUAL ASSAULT*

**Investigator:** *STEWART, M. A. (1052)*  **Date / Time:** *04/19/2016 14:59:57, Tuesday*

**Supervisor:** *WOODRUFF, C. G. (1067)*  **Supervisor Review Date / Time:** *04/20/2016 10:20:40, Wednesday*

**Contact:** ███████████  ██████ *Follow Up*

I was assigned to investigate this case on 04-19-16. I then called the victim, ███████, via the telephone. I advised ████ that I had been assigned to this case and that I would like to meet with her. She advised that she was at home in ███████ and would be there for several days. I told her that I would prefer not to ask her details about the incident over the telephone but did need to know how she wished to proceed. ████ advised that she wanted to pursue the matter and wanted the suspect arrested if possible.

████ identified the suspect as ███████████ She said that he entered his telephone number into her cell phone during the night and that his phone number is ███████████. ████ said that ██ and ████ did kiss consensualy at one point early in the night, but that she did not consent to any other sexual activity with him during this incident. ████ told me that she had never met or seen ████ prior that night. ████ and I discussed possible investigative options including conducting a court ordered overhear. ████ advised that she was willing to take part in conducting a court ordered overhear. I advised her that I would prepare paperwork and seek to obtain the overhear on 04-20-16. She said that she would be willing to meet with me after I obtained the overhear and that we would proceed at that time.

Investigator Signature                    Supervisor Signature

## CASE SUPPLEMENTAL REPORT

Printed: 07/13/2016  10:49

*Dekalb Police Department*

OCA: **1602657**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

| | | | |
|---|---|---|---|
| **Case Status:** | *CLEARED BY ADULT...* | **Case Mng Status:** *ADULT ARREST* | **Occurred:** *04/17/2016* |
| **Offense:** | *SEX: CRIMINAL SEXUAL ASSAULT* | | |

| | | |
|---|---|---|
| **Investigator:** | *STEWART, M. A. (1052)* | **Date / Time:** *04/19/2016 16:00:14, Tuesday* |
| **Supervisor:** | *WOODRUFF, C. G. (1067)* | **Supervisor Review Date / Time:** *04/20/2016 11:07:38, Wednesday* |
| **Contact:** | | **Reference:** *Follow Up* |

I checked the Police2Police (P2P) database for ▮▮▮▮▮▮▮ using the identifiers listed on Officer Jursich`s report. I confirmed that this is the correct suspect and that he had the same phone number, 773-573-4712, on a contact on 01-02-14.

Investigator Signature                    Supervisor Signature

**CASE SUPPLEMENTAL REPORT**

Printed: 07/13/2016 10:49

*Dekalb Police Department*                                    OCA: *1602657*

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** *CLEARED BY ADULT…*     **Case Mng Status:** *ADULT ARREST*          **Occurred:** *04/17/2016*

**Offense:** *SEX: CRIMINAL SEXUAL ASSAULT*

**Investigator:** *STEWART, M. A. (1052)*

**Supervisor:** *WOODRUFF, C. G. (1067)*          **Date / Time:** *04/25/2016 12:19:04, Monday*

**Contact:**          **Supervisor Review Date / Time:** *05/09/2016 09:15:20, Monday*

          **Reference:** *Follow Up*

On 04-25-16, I completed an on-line lab submittal form for this case along with a case scenario worksheet and sexual assault certification form so that the sexual assault kit can be sent to the crime lab. I spoke with CSO Rhoades and provided him with copies of the documents and requested that the kit be sent to the crime lab. The documents were scanned and are attached to this report electronically. Copies were also sent to records.

Investigator Signature                    Supervisor Signature

# CASE SUPPLEMENTAL REPORT

Printed: 07/13/2016 10:49

*Dekalb Police Department*

OCA: **1602657**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

Case Status: *CLEARED BY ADULT...*     Case Mng Status: *ADULT ARREST*     Occurred: *04/17/2016*

Offense: *SEX: CRIMINAL SEXUAL ASSAULT*

Investigator: *STEWART, M. A. (1052)*     Date / Time: *04/25/2016 12:50:55, Monday*

Supervisor: *WOODRUFF, C. G. (1067)*     Supervisor Review Date / Time: *05/09/2016 09:19:25, Monday*

Contact:     Reference: *Overhear*

On 04-20-16, I prepared paperwork for a court ordered overhear. I met with Assistant States Attorney, Stephanie Klein, at the Courthouse. We went before Judge Matekaitis who reviewed and authorized the overhear which he signed at 11:20 a.m.

I subsequently met with ▓▓▓▓▓▓▓, at her residence, later on 04-20-16. ▓▓▓▓ signed the consent form at 2:00 p.m.

Copies of the documents were scanned and are attached to this report electronically. Additional copies were sent to records. The original signed consent form was retained and will be turned over to Assistant States Attorney, Stephanie Klein at a later date.

Investigator Signature

Supervisor Signature

**CASE SUPPLEMENTAL REPORT**

Printed: 07/13/2016  10:49

Dekalb Police Department

OCA: **1602657**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

Case Status: *CLEARED BY ADULT...*      Case Mng Status: *ADULT ARREST*         Occurred: *04/17/2016*

Offense: *SEX: CRIMINAL SEXUAL ASSAULT*

| | |
|---|---|
| Investigator: *STEWART, M. A. (1052)* | Date / Time: *05/12/2016 10:16:50, Thursday* |
| Supervisor: *WOODRUFF, C. G. (1067)* | Supervisor Review Date / Time: *06/10/2016 12:54:15, Friday* |
| Contact: | *Interview* |

On 04-20-16, I met with the victim, ███████████, at her residence. We spoke while seated at her kitchen table. I asked ████ to recount what had occurred during this incident. ████ told me that she came to DeKalb on 04-16-16 to visit with her friend, ████████████ who attends Northern Illinois University, and that they were going to attend a Sigma Kappa Sorority formal event. When she arrived in DeKalb, she went to ████████ residence. They then went to the Phi Kappa Theta house for a short time, ████ said that she and ████ then went back to the Sigma Kappa house to check in for the formal event. She said that they then took a bus to O`Leary`s bar where the formal event was to be held. ████ said that they arrived at O`Leary`s bar and that members of the Phi Kappa Theta fraternity were also at the event.

████ said that while at O`Leary`s, she was dancing and socializing. She said that she consumed approximately five vodka tonic drinks. She said that at around 11:30 p.m., she met a subject now known as ████████████ who is a member of the Phi Kappa Theta Fraternity. She and ████ started talking and at one point he asked her to step outside with him and she did so. She said that ████ tried to kiss her but she declined and told him that they did not know each other. They went back in the bar and ████ bought her a drink. ████ said that she continued to dance with ████. She and ████ then went back outside where they kissed consensually. They talked for a while on the first floor of the bar and flirted with each other.

████ said that the event ended shortly after midnight and everyone took a bus back to the Phi Kappa Theta Fraternity house. While on the bus, she and ████ kissed some more consensually. Upon arrival at the house, ████, and ████ went to ████ room. After a short time, ████ left the room and now ████ and ████ were alone in the room. She said that she and ████ kissed consensually but that at one point he tried to pull up her dress. She said she told ████ that she did not want to be naked and that she did not know him and did not feel comfortable.

████ said that ████ then asked her if it would make her feel comfortable if he was naked and that he then took off his clothes, down to his boxers. She said that ████ then pulled her on top of him onto a couch. She and ████ then kissed some more consensually. She said that she had been wearing only a dress and did not have underpants on. She said that at this time, he was seated on the couch and that she was straddling him. She said that without warning, he inserted his penis into her vagina. ████ said that she immediately got off of ████ and told him that she did not want to have a one night stand. She said that she continued by telling him that she did not want to "Hook up" with him and that she did not feel comfortable. She said that ████ then said that he would call her the next day.

████ said that ████ then pulled her back down onto the couch and placed his penis back into her vagina. She said that she did not know what to do because she thought she made it clear that she did not want to have sex with him. She said that ████ kept pressuring her and she reiterated that she was not comfortable. She then got up again and ████ tried to pull her dress off and her breast was now exposed. She said that he then pulled her back towards him and asked her to perform oral sex on him. She said that she kissed ████ in an attempt to pacify

Investigator Signature _____      Supervisor Signature _____

Page 13

# CASE SUPPLEMENTAL REPORT

Printed: 07/13/2016 10:49

Dekalb Police Department

OCA: **1602657**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

| | | | | |
|---|---|---|---|---|
| Case Status: | *CLEARED BY ADULT...* | Case Mng Status: | *ADULT ARREST* | Occurred: *04/17/2016* |
| Offense: | *SEX: CRIMINAL SEXUAL ASSAULT* | | | |

| | | | |
|---|---|---|---|
| Investigator: | STEWART, M. A. (1052) | Date / Time: | 05/12/2016 10:16:50, Thursday |
| Supervisor: | WOODRUFF, C. G. (1067) | Supervisor Review Date / Time: | 06/10/2016 12:54:15, Friday |
| Contact: | ███████████ | ██████ | Interview |

him. She said that ███████then tried to guide her down towards his penis for oral sex and she was now on her knees on the floor. She said she told ███████, "I just don`t feel comfortable, I don`t know you". She said that he was pressuring her verbally to continue.

███████ said that without warning, ███████ slapped her on the left side of her face with an open hand. She said that she was shocked and froze out of fear. She said that the slap was loud enough to make a slapping sound. She said that ███████ then said, "I know you like that". ███████ said that she pushed ███████ away but that he got behind her and grabbed her hair. He then directed her towards a couch underneath his bed. The bed was raised off the floor similar to a bunk bed. She was now face down on the couch and ███████ inserted his penis into her vagina from behind. She said that he pulled her hair and she began to cry to herself. She said that she did not say anything to ███████ at his time. She said that ███████ continued to have sex with her for about five minutes and then asked, "Where should I finish?" He asked her if he should finish on her breasts or inside of her. She said that he then pulled his penis out of her and ejaculated on her buttocks.

███████ said that ███████then got up and she was able to pull up her dress. She said that she texted ███████ at 12:51 to come and get her. She said that ███████ came to the door and ███████ said, "I thought you didn`t want a one night stand". ███████ and went to her residence. She said that ███████ also walked with them. She said that she told ███████ briefly what had happened. She said that she told them that she did not want to have sex with ███████ but that he kept pressuring her. She said that she did not tell them the whole story. She said that she fell asleep at ███████ and woke up the next day. She said that she returned home and told her sister what happened and then told her mother. She then came to the DeKalb Police Department and then to Kishwaukee Hospital for an exam.

I then had ███████ complete the overhear consent form (2:00 p.m.). At 2:39 p.m. ███████ attempted to call ███████ and left a voicemail for him. At 3:02 p.m., she attempted a second call which was answered. A brief conversation occurred and ███████ indicated that he was at work. At approximately 3:24 p.m., ███████ called ███████ back and an approximately twenty minute conversation ensued. The above calls were recorded and later saved to the secured server under DV photos folder 16-02657. The following is a summary of the twenty minute call:

███████ says that she kept saying that she was not comfortable. ███████ says that they were both drunk and everything just happened. ███████ tells ███████ that when she was sitting on the ground telling him that she did not feel comfortable and did not want to do things, he hit her in the face. ███████ asks, "Did I really?" and continues, "Wait, I hit you?". ███████ tells him that he pulled her hair and pulled her onto the couch and ███████ asks, "What?". She then says, "You don`t remember?" and he responds, "Uh, no".

███████ tells ███████ that he does not remember anything that happened. She asks him what he is sorry for and he says for humiliating her, disrespecting her, and for violating her space. She tells ███████ that he hit her and if he is not sorry for that. He asks, "Did I hit you hard?" She responds that he slapped her face and then went behind her

| | |
|---|---|
| Investigator Signature | Supervisor Signature |

## CASE SUPPLEMENTAL REPORT

Printed: 07/13/2016  10:49

*Dekalb Police Department*

OCA: **1602657**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

| | | |
|---|---|---|
| **Case Status:** CLEARED BY ADULT... | **Case Mng Status:** ADULT ARREST | **Occurred:** 04/17/2016 |
| **Offense:** SEX: CRIMINAL SEXUAL ASSAULT | | |

| | | |
|---|---|---|
| **Investigator:** STEWART, M. A. (1052) | **Date / Time:** 05/12/2016 10:16:50, Thursday | |
| **Supervisor:** WOODRUFF, C. G. (1067) | **Supervisor Review Date / Time:** 06/10/2016 12:54:15, Friday | |
| **Contact:** ███████████ | ██████ *Interview* | |

and pulled her up by her hair. She asks if he is sorry for hitting her and he says, "Yea". She asks, "Do you remember?" and he says that he does not remember.

███████ says that if it was a mistake, can he just admit it and be honest. He says, "Yes, yes, I'm one hundred percent so sorry". She asks if he wished it did not happen and he says that he does not have any recollection. She again asks if he remembers anything that happened and he says that he does not and only remembers them coming back and being in his room. She asks him if he is sorry for slapping her and he says yes. He continues by saying that he does not remember. ██████ says that he does not deny that it happened but that he does not remember anything. He repeats several times that he does not remember anything. At the end of the conversation ██████ apologizes for anything he did when he was blacked out.

Please refer to recording for exact wording and content.

| | |
|---|---|
| Investigator Signature | Supervisor Signature |

# CASE SUPPLEMENTAL REPORT

Printed: 07/13/2016  10:49

*Dekalb Police Department*

OCA: **1602657**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** *CLEARED BY ADULT...*      **Case Mng Status:** *ADULT ARREST*      **Occurred:** *04/17/2016*

**Offense:** *SEX: CRIMINAL SEXUAL ASSAULT*

| | | |
|---|---|---|
| **Investigator:** *STEWART, M. A. (1052)* | **Date / Time:** | *06/08/2016 14:51:26, Wednesday* |
| **Supervisor:** *WOODRUFF, C. G. (1067)* | **Supervisor Review Date / Time:** | *06/10/2016 13:04:23, Friday* |
| **Contact:** | | *Overhear* |

On 05-03-16, I met with ▇▇ at her residence where she attempted to call ▇▇ but was unable to make contact.

On 05-04-16, I again met with ▇▇ at her residence. She attempted to call ▇▇ and again did not get an answer. Later that day, I met with ▇▇ dormitory in ▇▇. She called ▇▇ at 4:40 p.m. and left a message for him. She placed a second call at 5:11 p.m. but it was believed that his phone was shut off.

On 05-05-16, I again met with ▇▇ outside of her dormitory in ▇▇. She called ▇▇ again and did not get an answer. I then left the digital recording device with her and instructed her on how to use the device should ▇▇ call her back. At about 7:40 p.m., ▇▇ called me back and advised that ▇▇ had called her back and that she had recorded the conversation. I then returned and met with ▇▇ and she turned the recorder over to me. I subsequently saved the recorded conversation to the secured server under DV Photos folder 16-02657B. The following is a summary of the conversation:

▇▇ says that he still does not remember what happened. ▇▇ s him that she does not understand this and that he was able to function. She tells ▇▇ to admit that he hit her, pulled her by her hair and did what he wanted. He tells her that he does not know anything. ▇▇ says that she does not appreciate him assaulting her and raping her because that is what he did. ▇▇ tells ▇▇ that he is trying to figure out what happened. He apologizes and says he wants to move past this. He again says that he does not know what he did and what happened.

▇▇ forcefully tells ▇▇ that he hit a girl and sexually violated her. He then asks what she wants from him. He again says that he does not remember anything and that he cannot admit to it but he apologizes. ▇▇ asks ▇▇ what he thinks happened and he says he does not know. He said he only remembers being on a bus and then the next thing he knows, he wakes up in his friends room. ▇▇ again forcefully tells ▇▇ that he assaulted her and he mumbles in response and gets quiet. He goes on to say that he has nothing else to say and that he will not contact her again.

Please refer to recording for details of exact content and wording.

Investigator Signature                          Supervisor Signature

**CASE SUPPLEMENTAL REPORT**

*Dekalb Police Department*                                                    OCA: **1602657**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** *CLEARED BY ADULT...*     **Case Mng Status:** *ADULT ARREST*          **Occurred:** *04/17/2016*

**Offense:** *SEX: CRIMINAL SEXUAL ASSAULT*

---

**Investigator:** *STEWART, M. A. (1052)*               **Date / Time:** *06/09/2016 11:59:39, Thursday*

**Supervisor:** *WOODRUFF, C. G. (1067)*        **Supervisor Review Date / Time:** *06/10/2016 12:35:06, Friday*

**Contact:**                                                      **Reference:** *Interview*

---

At about 3:30 p.m., on 05-10-16, Sergeant Woodruff and I went to 910 West Hillcrest in an attempt to speak with █████████. ██████ arrived home and I approached him in the parking lot. I advised ██████ that I would like to speak with him about an investigation. I asked him if he knew a girl named ██████ and he advised that he did. ██████ agreed to come to the police department to speak with me further about this case. I advised him that we could provide a ride for him and he accepted this offer. I advised him that he was not under arrest and he said he understood. I advised him that I would give him a ride home after we spoke. ██████ sat in the front seat and he was not handcuffed.

Upon arrival at the police department, I escorted ██████ to interview room number 206. I reminded him that he was not under arrest. I told him where the bathroom was and told him that he could use it at anytime. ██████ provided me with his identifiers. I told him that I wanted to talk with him about an incident that happened between he and ██████ and he said that he was aware of what I was talking about. I asked him to tell me what occurred. He said that he only remembered meeting her at O`Leary`s bar during the formal event. He denied having any memory after that. He told me that he had consumed several alcoholic drinks during the night. I advised him that ██████ told me that he had done some inappropriate things to her during the night. He continued to deny having any memory of what happened.

After about forty-five minutes, ██████ told me that he now remembered some details of the night. He said he remembered flirting with ██████ and kissing her while at the ██████ He said that he also recalled making out with her on the bus back home after the event. He said that he did not remember anything after being on the bus. I pressed him further and told him that I believed that he remembered more. He then said that he did remember more details. He then admitted that he did have sexual intercourse with ██████ I told him to tell me what occurred.

██████ told me that he and ██████ went into his room upon arriving at his fraternity house. He said that he sat on the couch and she was on top of him. He said that everything was going good between them and they were kissing. He said that it became obvious that they were going to have sex. He told me that he and ██████ had "Doggy style" sexual intercourse. He told me that she was bent over on a couch that was underneath his loft styled bed. He said that he did not remember her ever saying no or to stop. He said that he did not recall using a condom or if he ejaculated. ██████ said that after having sex, ██████ left his room. He said that he woke up the next day and was in his friend`s room.

I advised ██████ that ██████ told me that he had slapped her across the face and had pulled her by her hair. He said that he did not remember slapping ██████ and said that it might have been possible that he pulled her hair while they were having sex. I told him that she further told me that he had forced her up onto the couch and that the sexual intercourse was against her will. ██████ said that he is not the type of person that would do something with a girl that was not consensual. He repeated several times that he did not remember slapping her or being forceful with her in any way. He said that he never got any indication from her that she did not want to have sex

---

Investigator Signature                              Supervisor Signature

# CASE SUPPLEMENTAL REPORT

Printed: 07/13/2016  10:49

*Dekalb Police Department*

OCA: **1602657**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

| | | |
|---|---|---|
| **Case Status:** *CLEARED BY ADULT...* | **Case Mng Status:** *ADULT ARREST* | **Occurred:** *04/17/2016* |
| **Offense:** *SEX: CRIMINAL SEXUAL ASSAULT* | | |

| | |
|---|---|
| **Investigator:** *STEWART, M. A. (1052)* | **Date / Time:** *06/09/2016 11:59:39, Thursday* |
| **Supervisor:** *WOODRUFF, C. G. (1067)* | **Supervisor Review Date / Time:** *06/10/2016 12:35:06, Friday* |
| **Contact:** | **Reference:** *Interview* |

with him. He reiterated that he did not remember much of what happened in his room.

I pointed out that I thought that it was odd that his version of events is consistent with ▮▮▮▮ with the exception of the details that would show the incident was against her will. He repeated that he did not remember doing anything violent toward ▮▮▮▮ and did not remember her saying or doing anything that would have indicated that she did not want to have sex with him. I also pointed out that he was not denying slapping ▮▮▮▮ or pulling her up by her hair onto the couch and was only saying that he did not remember doing so. During my interaction with ▮▮▮▮ he seemed very nervous and stuttered when responding to pointed questions.

▮▮▮▮ declined to provide an audio or video statement. He also declined to provide a mouth swab for DNA comparison. At approximately 5:15 p.m., I drove ▮▮▮▮ back to his residence. I advised ▮▮▮▮ that I would be reviewing this case with the States Attorney's Office and would contact him after a decision was made.

Investigator Signature

Supervisor Signature

**CASE SUPPLEMENTAL REPORT**

Printed: 07/13/2016 10:49

*Dekalb Police Department*                                                      OCA: **1602657**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** *CLEARED BY ADULT...*   **Case Mng Status:** *ADULT ARREST*   **Occurred:** *04/17/2016*

**Offense:** *SEX: CRIMINAL SEXUAL ASSAULT*

**Investigator:** *STEWART, M. A. (1052)*              **Date / Time:** *06/09/2016 14:31:57, Thursday*

**Supervisor:** *WOODRUFF, C. G. (1067)*       **Supervisor Review Date / Time:** *06/10/2016 12:37:06, Friday*

**Contact:** ████████                       ████████   *Interview*

On 05-24-16, I spoke with ████████ by telephone. I asked her to tell me what she knew about this incident. She said that ████████ came out to DeKalb for the Sigma Kappa formal event and arrived at apartment around 2:30 p.m. ████████ said that ████████ She said that she and ████████ walked to the Phi Kappa house. She said that she and ████████ were out on the balcony along with ████████. At some point ████████ asked ████████ if he wanted to attend the formal event at O`Leary`s and he agreed to come. ████████ took a bus to O`Leary`s and arrived around 7:45 p.m. The event was scheduled to go until midnight.

She said that the event took place on the second floor. She said that ████ sat ████████ that she was ████████. She said that ████████ and ████ went outside toward the end of the event. When the event was over, everyone got onto the bus. ████s said that she and ████████. They arrived at the Sigma Kappa house and then walked to the Phi Kappa house where ████████ is a member. ████████ said that she, ████, and ████ were in ████████ room. ████████ left the room and that ████████ and ████ remained inside. When asked, ████ said that up to this time, ████████ never said anything about wanting to be intimate with ████.

████████ said that after about thirty minutes, she went to ████ room and knocked on the door. There was no answer and the door was locked. She said that she went to look for ████ and could not locate her so she went ack to ████ room. ████ came out of ████ room and was distraught and was crying. ████ told ████ then came out of the room and appeared angry. ████ said that ████ would not make eye contact with her. ████ was dressed at this time. She estimated the time to be around 1:00 a.m. ████ said that she has known ████ for two years.

████████ walked back to ████████. ████s said that ████ was upset and was crying during the walk back to the apartment. ████████ t ████ had forced her to have sex and that she did not want to. ████ also said that ████ had hit her and held her down.

When they arrived back at the apartment, ████ calmed down. ████████ was at the apartment with her boyfriend ████. ████████ did not talk about the incident in their presence. ████ went into ████████ room alone. ████████ if she wanted to go to the hospital to have an exam done. ████ told ████ that she just wanted to go to sleep. They woke up the next morning and went to breakfast. They then returned to the apartment and ████ her belongings. ████████ that she did not want to talk about the incident any more and just wanted to leave DeKalb. She told me that ████ was not her typical self at this point and was obviously upset. ████ said that she and ████ did not text each other during th night.

_____                         _____
Investigator Signature                          Supervisor Signature

**CASE SUPPLEMENTAL REPORT**

Printed: 07/13/2016  10:49

*Dekalb Police Department*

OCA: **1602657**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

| | | |
|---|---|---|
| **Case Status:** *CLEARED BY ADULT...* | **Case Mng Status:** *ADULT ARREST* | **Occurred:** *04/17/2016* |
| **Offense:** *SEX: CRIMINAL SEXUAL ASSAULT* | | |

| | | |
|---|---|---|
| **Investigator:** *STEWART, M. A. (1052)* | **Date / Time:** *06/09/2016 14:31:57, Thursday* |
| **Supervisor:** *WOODRUFF, C. G. (1067)* | **Supervisor Review Date / Time:** *06/10/2016 12:37:06, Friday* |
| **Contact:** | *Interview* |

that ██████ had been aggressive.  She said that ██████████████, had previously been intimate with ██████ and that ██████ said

Investigator Signature

Supervisor Signature

**CASE SUPPLEMENTAL REPORT**

Printed: 07/13/2016 10:49

_Dekalb Police Department_

OCA: **1602657**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** _CLEARED BY ADULT..._   **Case Mng Status:** _ADULT ARREST_   **Occurred:** _04/17/2016_

**Offense:** _SEX: CRIMINAL SEXUAL ASSAULT_

**Investigator:** _STEWART, M. A. (1052)_   **Date / Time:** _06/09/2016 15:22:31, Thursday_

**Supervisor:** _WOODRUFF, C. G. (1067)_   **Supervisor Review Date / Time:** _06/10/2016 12:47:55, Friday_

**Contact:**   _Interview_

On 05-24-16, I spoke with ▇▇▇▇▇▇ by telephone. I advised ▇▇ that I wished to speak with her about this incident and she said she was aware of the investigation. I asked her to tell me what occurred that night.

▇▇ said that she had gone to O`Leary`s for the formal event. She said that she saw ▇▇ and ▇▇ interact during the night and they were friendly towards each other. She said that the event ended around midnight and everyone went back to the fraternity house that ▇▇ belonged to. She said that at one point ▇▇ and ▇▇ ended up alone in ▇▇ room. She said that she discovered that ▇▇ door wa▇ ▇▇ came out crying and said that she wanted to go home.

▇▇ said that she, ▇▇, walked back to their apartment. ▇▇ are roommates. ▇▇ said that during the walk, ▇▇ said something to the affect that she did not want to do that, he just put it in. ▇▇ said that ▇▇ was obviously talking about sex. She said that ▇▇ also said that ▇▇ had pushed her down on the bed.

Upon arrival at the apartment, ▇▇ went to ▇▇ The next morning, they all went to breakfast. She said that ▇▇ seemed okay at that time but went home a short time later.

Investigator Signature                    Supervisor Signature

Page 21

# CASE SUPPLEMENTAL REPORT

Printed: 07/13/2016  10:49

*Dekalb Police Department*

OCA: **1602657**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** *CLEARED BY ADULT...*   **Case Mng Status:** *ADULT ARREST*   **Occurred:** *04/17/2016*

**Offense:** *SEX: CRIMINAL SEXUAL ASSAULT*

| | | |
|---|---|---|
| **Investigator:** | STEWART, M. A. (1052) | **Date / Time:** *06/09/2016 16:13:38, Thursday* |
| **Supervisor:** | WOODRUFF, C. G. (1067) | **Supervisor Review Date / Time:** *06/10/2016 12:47:46, Friday* |
| **Contact:** | | *Interview* |

On 06-09-16, I spoke with ▮▮▮▮▮ via the telephone. I had receive information that ▮▮▮ had previously been intimate with ▮▮▮▮▮▮▮ and told ▮▮▮▮▮▮ that ▮▮▮▮ had been aggressive with her.

I advised ▮▮▮▮ that I was investigating this case and she said that she was aware of the investigation. ▮▮▮ told me that she had met ▮▮▮ in ▮▮▮▮▮. She said that it was a mixer event at the "Pike" fraternity house where ▮▮▮ was a member at the time. ▮▮▮▮ said that she and ▮▮▮▮ had made out at the mixer. ▮▮▮ told me that ▮▮▮ was aggressive in that he initiated kissing her. She told me that she kissed him consensually and wanted to kiss him. She explained that it was just very unexpected when he kissed her. She told me that he did not force her to do anything and reiterated that it was just unexpected when he did it. ▮▮▮ said that ▮▮▮▮▮

Upon hearing what happened, ▮▮▮▮▮▮ that she could see how this incident could have happened. She said that she thought that ▮▮▮▮ misinterpreted what she meant and did not tell her exactly what happened between her and ▮▮▮.

Investigator Signature

Supervisor Signature

**CASE SUPPLEMENTAL REPORT**

Printed: 07/13/2016  10:49

*Dekalb Police Department*

OCA: **1602657**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

| | | |
|---|---|---|
| Case Status: | *CLEARED BY ADULT...* | |
| | Case Mng Status: *ADULT ARREST* | Occurred: *04/17/2016* |
| Offense: | *SEX: CRIMINAL SEXUAL ASSAULT* | |

| | | |
|---|---|---|
| Investigator: | *STEWART, M. A. (1052)* | |
| | Date / Time: *06/14/2016 19:18:10, Tuesday* | |
| Supervisor: | *WOODRUFF, C. G. (1067)* | Supervisor Review Date / Time: *06/20/2016 14:31:33, Monday* |
| Contact: | | Reference: *Follow Up* |

On 06-14-16, I met Assistant States Attorney, Stephanie Klein, at her office.  I provided Klein with copies of all case reports, the original signed overhear consent document, the overhear return document, and two CD`s that contained the recorded calls in this case (States Attorney`s copy and Judge`s copy).  A copy of the overhear return document was scanned and is attached to this report electronically and a copy was also sent to records.  I briefed ASA Klein on the case and requested that she review all material for possible charges against ▇▇▇▇▇

This case is pending at this time.

Investigator Signature                    Supervisor Signature

Page 23

## CASE SUPPLEMENTAL REPORT

Printed: 07/13/2016 10:49

*Dekalb Police Department*

OCA: **1602657**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

**Case Status:** *CLEARED BY ADULT...*   **Case Mng Status:** *ADULT ARREST*   **Occurred:** *04/17/2016*

**Offense:** *SEX: CRIMINAL SEXUAL ASSAULT*

**Investigator:** *STEWART, M. A. (1052)*   **Date / Time:** *06/23/2016 12:48:58, Thursday*

**Supervisor:** *WOODRUFF, C. G. (1067)*   **Supervisor Review Date / Time:** *06/24/2016 09:40:27, Friday*

**Contact:**   **Reference:** *Warrant*

On 06-23-16, I spoke with Assistant States Attorney, Stephanie Klein, via the telephone. ASA Klein advised that after reviewing the reports from this case, she was authorizing one count of Criminal Sexual Assault against ▮▮▮▮▮▮▮. I then met with ASA Klein at the courthouse and we went before Judge Montgomery. I obtained a warrant for ▮▮▮▮▮ arrest. Bond was set at $50000.00 with ten percent to apply. Copies of the complaint and warrant were scanned and attached to this report electronically and also sent to records.

I then contacted ▮▮▮▮▮ attorney, Gal Pissetzky. I advised Pissetzky that charges had been authorized and that the warrant was obtained. I advised him of the bond amount as well. Pissetzky advised that he would arrange for ▮▮▮▮ to turn himself in on the warrant.

Investigator Signature                    Supervisor Signature

# CASE SUPPLEMENTAL REPORT

Printed: 07/13/2016 10:49

*Dekalb Police Department*

OCA: **1602657**

THE INFORMATION BELOW IS CONFIDENTIAL - FOR USE BY AUTHORIZED PERSONNEL ONLY

| | | | | | |
|---|---|---|---|---|---|
| **Case Status:** | *CLEARED BY ADULT...* | **Case Mng Status:** | *ADULT ARREST* | **Occurred:** | *04/17/2016* |
| **Offense:** | *SEX: CRIMINAL SEXUAL ASSAULT* | | | | |

| | | | |
|---|---|---|---|
| **Investigator:** | *STEWART, M. A. (1052)* | **Date / Time:** | *07/08/2016 11:15:32, Friday* |
| **Supervisor:** | *WOODRUFF, C. G. (1067)* | **Supervisor Review Date / Time:** | *07/11/2016 10:29:12, Monday* |
| **Contact:** | | **Reference:** | *Arrest Made* |

I learned that ▉▉▉▉▉▉▉▉ turned himself in on the warrant for this case. He was arrested on 06-24-16 after turning himself in at the Arlington Heights Police Department.

This case is cleared by arrest.

Person arrested: ▉▉▉▉▉▉▉ M/W D.O.B. 08-30-94

Charge: Criminal Sexual Assault 720 ILCS 5/11-1.20(a)(1)

Investigator Signature                    Supervisor Signature

# EXHIBIT C

Case 1:17-cv-07991 Document #: 66 Filed: 05/29/23 Page 70 of 242 PageID #:481
Case 1:17-cv-07991 Document #: 1-4 Filed: 11/03/17 Page 2 of 13 PageID #:66

CONFIDENTIAL

## TITLE IX EXECUTIVE SUMMARY

**By:**  Sarah Adamski, Associate Director of Investigations,
Affirmative Action and Equity Compliance

**To:**  Karen Baker, Associate Vice President and Title IX Coordinator

**Claimant:**  ▓▓▓▓▓▓▓▓▓▓

**Respondent:**  ▓▓▓▓▓▓▓▓ Student

**Basis of Investigation:**  Sexual Assault

**Persons Interviewed:[1]**  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

**Documents Collected:**  Screenshots of ▓▓▓▓▓▓▓▓▓▓▓▓▓▓
April 16 and April 17, 2016
Statements collected by the City of DeKalb Police Department, dated
April 14, 2016 to June 9, 2016
E-mail sent from ▓▓▓▓▓▓ o NIU Administrators, dated
August 1, 2016

**Date:**  September 6, 2016

### ISSUE

The issue that formed the basis of this Title IX Investigation is as follows:

Whether there is sufficient evidence to render it more likely than not that ▓▓▓▓▓▓▓
sexually assaulted ▓▓▓▓▓▓ on or about April 16, 2016, in violation of the University's *Title
IX/Sexual Misconduct Policy and Procedures.*

### CHRONOLOGY OF INVESTIGATION

| | |
|---|---|
| 4/18/16 | Informed of criminal sexual assault from NIU Police involving student accused ▓▓▓▓▓▓ ▓▓▓▓ and non-student victim ▓▓▓▓▓▓ Summary of incident does not contain details of allegation besides date, time, and location. |

▓▓▓▓▓▓▓▓▓▓ was contacted for an interview. However, ▓▓▓▓▓▓ failed to respond to

1

Case 1:17-cv-07991 Document #: 66 Filed: 05/29/23 Page 71 of 242 PageID #:482
Case 1:17-cv-07991 Document #: 61-1 Filed: 11/03/17 Page 3 of 13 PageID #:672

CONFIDENTIAL

| | |
|---|---|
| 4/20/16 | Called ▭ regarding report and she answered. ▭ informed me that a detective was at her residence and she cannot speak to me right now. She informed me that she will call me back when she is available. ▭ did not call me back. |
| 5/5/16 | Called ▭ due to not receiving a return call. ▭ did not answer. Left her a voicemail. |
| 5/5/16 | ▭ returned my phone call. Informed me that the DeKalb Police told her not to talk to me until the criminal investigation is over. She asked me whether I spoke to the accused student yet. I told her no. She told me that she does not want me to speak to the accused student. |
| 6/6/16 | Called ▭ back to see if changed her mind. ▭ did not answer. Left her a voicemail. |
| 6/6/16 | FOIA'd DeKalb police records. No response. |
| 6/8/16 | ▭ returned my phone call. She agreed to meet with me. We rescheduled a meeting for 2:30 p.m. that afternoon. ▭ called me later in the day and cancelled the meeting. I informed ▭ at I will contact her once I obtain the police report which contains her statement provided to them. ▭ agreed. |
| 6/14/16 | Contacted accused student ▭ to discuss report received. ▭ attorney contacts me and informs that he is ▭ attorney. Back and forth communications about when to meet. |
| 6/15/16 | ▭ submits FERPA waiver. |
| 6/15/16 | FOIA'd DeKalb police records a second time. |
| 6/24/16 | Obtained DeKalb police report. |
| 6/24/16 | Criminal charges of criminal sexual assault approved. Arrest warrant issued. ▭ attorney contacts me. Informs me that ▭ will not be providing a statement to Title IX, but can meet to discuss what to expect. |
| 6/30/16 | ▭ nd I arrange for telephone meeting at 11:00 a.m. that day. I called ▭ at 11:00 a.m. She informs me to call her the following day. |
| 7/1/16 | Called ▭ at pre-arranged time of 11:00 a.m. **During this phone call, ▭ decides that she wants to file a Title IX Complaint against ▭. I informed ▭** hat she can either provide a new statement to me or use the statement given to DeKalb police for purposes of Title IX Investigation. ▭ elected to use statement provided to DeKalb police. I informed her that I would sent her that statement by the end of the day for her to review. ▭ also questions why there is no news report about ▭ being a rapist. I informed ▭ that such is a criminal matter and she should contact the DeKalb police with such inquiry. |
| 7/1/16 | Sent ▭ tatement provided to Dekalb police for her review and verification. Provided information about services at her ▭ nd provided her with information about Title IX process. |
| 7/2/16 | Contacted ▭ again to schedule a meeting to discuss and explain process. Back and forth communications with ▭ attorney about when to meet. |
| 7/11/16 | ▭ attorney contacts me and informed me that he and ▭ can meet on 8/17/16. I informed ▭ attorney that such a date is too far out and need to meet with him sooner. |
| 7/11/16 | ▭ calls me and leaves me a voicemail asking why ▭ can attend fraternity functions. Upset that he has such privileges. Returned ▭ call back. She does not answer. |
| 7/12/16 | ▭ returns my voicemail. I was not in office. |
| 7/13/16 | ▭ attorney contacts me and tells me that ▭ does not feel comfortable meeting without his attorney present. |
| 7/13/16 | Called ▭ back. She informs me that she is upset that the process is taking long and that ▭ can attend fraternity functions. I advised her that her that she filed the complaint less than 2 weeks ago and that there is an active investigation. I informed ▭ that I am |

CONFIDENTIAL

|  |  |
|---|---|
|  | scheduling a meeting with ▮▮▮▮ so he may provide a response to the allegations. I also advised ▮▮▮ hat whether ▮▮▮ can attend extracurricular functions may be the result of the investigation. ▮▮▮ was not pleased about that response and feels that such privileges should be revoked now. ▮▮▮ informed me that she has been recruiting friends to write to the "Dean" (not sure who she is taking about). |
| 7/13/16 | ▮▮▮ provides verified summary back to me. |
| 7/15/16 | Interim measures implemented to include suspension from student organizations, prohibition from participating in University extra-curricular activities; removal from any student leadership position, and no contact with |
| 7/25/16 | ▮▮▮ attorney informs me that ▮▮▮ will not verify the statement provided to police for purposes of the Title IX Investigation |
| 7/26/16- 7/28/16 | Contacted ▮▮▮ for interview. Informs me that wrong ▮▮▮ |
| 7/29/16 | ▮▮▮ contacted for an interview. |
| 8/1/16 | ▮▮▮ sends e-mail to various NIU general mailboxes re: incident |
| 8/4/16 | Meeting with ▮▮▮ and attorney regarding the Title IX process, what to expect, and resources available |
| 8/4/16 | Phone interview with |
| 8/5/16 | Phone interview with |
| 8/5/16 | Provided update to ▮▮▮ regarding the status of the investigation per request |
| 8/5/15 | E-mailed ▮▮▮ o set up a meeting |
| 8/8/16 – 8/12/16 | Called ▮▮▮ for interview, no answer, left voicemail |
| 8/12/16 | ▮▮▮ does not respond to attempts to schedule a meeting |
| 8/12/16 | ▮▮▮ and ▮▮▮ provided update on investigation |
| 8/12/16 | Per my request, ▮▮▮ provides screenshot of text message between her and ▮▮▮ on date of incident |
| 8/12/16 | Additional interim measures of banishment from residing in University residential facilities implemented |
| 8/12/16 | Attorney requested and provided a copy of August 1st email ▮▮▮ ent to University administrators |
| 8/16/16 | Preliminary Report sent to ▮▮▮ and ▮▮▮ |
| 8/21/16 | Rebuttal submitted by ▮▮▮ |
| 8/23/16 | Additional information provided by ▮▮▮ upon request |
| 8/26/16 | Additional information provided by ▮▮▮ upon request |

## SUMMARY OF EVIDENCE

▮▮▮ *requested to use the following statement provided to the City of DeKalb Police Department for purposes of the Title IX Investigation.* ▮▮▮ *did not wish to meet with me to provide a statement.* ▮▮▮ *verified the statement for accuracy.*

▮▮▮ ame to DeKalb on 4/16/16 to visit with her friend, ▮▮▮ and that they were going to attend a Sigma Kappa Sorority formal event. When she arrived in DeKalb, she went to ▮▮▮ esidence. They then went to Phi Kappa Theta house for a short time. ▮▮▮ said that she and ▮▮▮ hen went back to the Sigma Kappa house to check-in for the formal event. She said that they then took a bus to O'Leary's bar where the formal event was to be held. ▮▮▮ said that they arrived at O'Leary's bar and that members of the Phi Kappa Theta fraternity were also at the event.

CONFIDENTIAL



████ said that while at O'Leary's, she was dancing and socializing. She said that she consumed approximately five vodka tonic drinks. She said that around 11:30 p.m., she met a subject now known as ████████, who is a member of Phi Kappa Theta fraternity. She and ████ started talking and at one point he asked her to step outside with him and she did so. She said that ████ tried to kiss her but she declined and told him that they did not know each other. They went back in the bar and ████ bought her a drink. ████ said that she continued to dance with ████ She and ████ then went back outside where they kissed consensually. They talked for a while on the first floor of the bar and flirted with each other.

████ said that the event ended shortly after midnight and everyone took a bus back to the Phi Kappa Theta fraternity house. While on the bus, she and ████ kissed some more consensually. Upon arrival to the house, ████ a girl named ████ and ████ went to ████'s room. After a short time, ████ and ████ left the room and now ████ and ████ were alone in the room. She said that she and ████ kissed consensually but that at one point he tried to pull up her dress. She said she told ████ that she did not want to be naked and that she did not know him and did not feel comfortable.

████ said that ████ then asked her if it would make her feel comfortable if he was naked and that he then took off his clothes, down to his boxers. She said that ████ then pulled her on top of him onto a couch. She and ████ then kissed some more consensually. She said that she had been wearing only a dress and did not have underpants on. She said that at this time, he was seated on the couch and that she was straddling him. She said that without warning, he inserted his penis into her vagina. ████ said that she immediately got off of ████ and told him that she did not want to have a one night stand. She said that she continued by telling him that she did not want to "hook up" with him and that she did not feel comfortable. She said that ████ then said that he could call her the next day.

████ said that ████ then pulled her back down onto the couch and placed his penis back into her vagina. She said that she did not know what to do because she thought she made it clear that she did not want to have sex with him. She said that ████ kept pressuring her and she reiterated that she was not comfortable. She then got up again and ████ tried to pull her dress off and her breast was now exposed. She said that he then pulled her back towards him and asked her to perform oral sex on him. She said that she kissed ████ in an attempt to pacify him. She said that ████ then tried to guide her down towards his penis for oral sex and she was now on her knees on the floor. She said she told ████, "I just don't feel comfortable, I don't know you." She said that he was pressuring her verbally to continue.

████ said that without warning, ████ slapped her on the left side of her face with an open hand. She said that she was shocked and froze out of fear. She said that the slap was loud enough to make a slapping sound. She said that ████ then said, "I know you like that." ████ said that she pushed ████ away but that he got behind her and grabbed her hair. He then directed her towards a couch underneath his bed. The bed was raised off the floor similar to a bunk bed. She was now face down on the couch and ████ inserted his penis into her vagina from behind. She said that he pulled her hair and she began to cry to herself. She said that she did not say anything to ████ at this time. She said that ████ continued to have sex with her for about five minutes and then asked, "Where should I finish?" He asked her if he should finish on her breasts or inside of her. She said that he then pulled his penis out of her and ejaculated on her buttocks.

████ said that ████ then got up and she was able to pull up her dress. She said that she texted ████ at 12:51 to come and get her. She said that ████ came to the door and ████ said, "I thought you didn't want a one night stand." ████ then left with ████ and went to her residence. She said that ████ also

4

Case 1:17-cv-07991 Document #: 66 Filed: 05/29/23 Page 74 of 242 PageID #:485
Case 1:17-cv-07991 Document #: 61-1 Filed: 11/03/17 Page 6 of 13 PageID #:76

CONFIDENTIAL



walked with them. She said that she told ▮▮▮ and ▮▮▮ briefly what happened. She said that she told them that she did not want to have sex with ▮▮▮ but that he kept pressuring her. She said that she did not tell them the whole story. She said that she fell asleep at ▮▮▮ and woke up the next day. She said that she returned home and told her sister what happened and then told her mother. She then came to the DeKalb Police Department and then to Kishwaukee Hospital for an exam.

**▮▮▮▮▮ ▮▮▮▮▮ Statement**
*▮▮▮▮▮ following statement was provided to the City of DeKalb Police Department. Davila does not want to provide a statement to regarding what happened. ▮▮▮▮▮ is not admitting that the below statement is true or accurate.*

At about 3:30 p.m., on 05-10-16, Sergeant Woodruff and [Detective Stewart] went to 910 West Hillcrest in an attempt to speak with ▮▮▮▮▮ ▮▮▮▮. ▮▮▮▮ arrived home and [Detective Stewart] approached him in the parking lot. [Detective Stewart] advised ▮▮▮▮ that [he] would like to speak with him about an investigation. [Detective Stewart] asked him if he knew a girl named ▮▮▮ and he advised that he did. ▮▮▮▮ agreed to come to the police department to speak with [Detective Stewart] further about the case. [Detective Stewart] advised him that [they] could provide a ride for him and he accepted this offer. [Detective Stewart] advised him that he was not under arrest and he said he understood. [Detective Stewart] advised him that [he] would give him a ride home after [they] spoke. ▮▮▮▮ sat in the front seat and he was not handcuffed.

Upon arrival at the police department, [Detective Stewart] escorted ▮▮▮▮ to interview room number 206. [Detective Stewart] reminded him that he was not under arrest. [Detective Stewart] told him where the bathroom was and told him that he could use it at any time. ▮▮▮▮ provided [Detective Stewart] with his identifiers. [Detective Stewart] told him that [he] wanted to talk with him about an incident that happened between he and ▮▮▮ and he said that he was aware of what [Detective Stewart] was talking about. [Detective Stewart] asked him to tell [him] what occurred. He said that he only remembers meeting her at O'Leary's bar during the formal event. He denied having any memory after that. He told [Detective Stewart] that he had consumed several alcoholic drinks during the night. [Detective Stewart] advised him that ▮▮▮▮ old [him] that he had done some inappropriate things to her during the night. He continued to deny having any memory of what happened.

After about forty-five minutes, ▮▮▮▮ told [Detective Stewart] that he now remembers some details of the night. He said he remembered flirting with ▮▮▮ at O'Leary's and kissing her while at the bar. He said that he also recalled making out with her on the bus back home after the event. He said that he did not remember anything after being on the bus. [Detective Stewart] pressed him further and told him that [he] believed that he remembered more. He then said that he did remember more details. He then admitted that he did have sexual intercourse with ▮▮▮ [Detective Stewart] told him to tell [him] what occurred.

▮▮▮▮ told [Detective Stewart] that he and ▮▮▮ went into his room upon arriving to his fraternity house. He said that he sat on the couch and she was on top of him. He said that everything was going good between them and they were kissing. He said that it became obvious that they were going to have sex. He told [Detective Stewart] that he and ▮▮▮ had "doggy style" sexual intercourse. He told [him] that she was bent over onto a couch that was underneath his loft styled bed. He said that he did not remember her ever

Case 1:17-cv-07991 Document #: 66 Filed: 05/29/23 Page 75 of 242 PageID #:486
Case: 1:17-cv-07991 Document #: 9-1 Filed: 11/03/17 Page 5 of 13 PageID #:73

CONFIDENTIAL



saying no or to stop. He said that he did not recall using a condom or if he ejaculated. ████ said that after having sex, ████ left the room. He said that he woke up the next day and was in his friend's room.

[Detective Stewart] advised ████ that ████ old [him] that he had slapped her across the face and had pulled her by her hair. He said that he did not remember slapping ████ and said that it might have been possible that he pulled her hair while they were having sex. [Detective Stewart] told him that she further told [him] that he had forced her up onto the couch and that the sexual intercourse was against her will. ████ said that he is not the type of person that would do something with a girl that was not consensual. He repeated several times that he did not remember slapping her or being forceful with her in any way. He said that he never got any indication from her that she did not want to have sex with him. He reiterated that he did not remember much of what happened in his room.

[Detective Stewart] pointed out that [he] thought that it was odd that his version of events is consistent with ████ with the exception of the details that would show the incident was against her will. He repeated that he did not remember doing anything violent towards ████ and did not remember her saying or doing anything that would have indicated that she did not want to have sex with him. [Detective Stewart] also pointed out that he was not denying slapping ████ or pulling her by her hair onto the couch and was only saying that he did not remember doing so. During [Detective Stewart's] interaction with ████ he seemed very nervous and stuttered when responding to pointed questions.

**Summary of Phone Interview with** ████ **Student, Witness**
████ verified the below statement for completeness and accuracy:

████ has never met the reporting party, ████ before. He does not know what she looks like and would not be able to identify her. ████ does not recall seeing ████ and ████ together during the night in question.

████ is ████ raternity brother with Phi Kappa Theta and they reside two (2) doors down from each other in the fraternity house. ████ and ████ are best friends.

Regarding the events that occurred on April 16, 2016, ████ was a last minute fill-in for the sorority event. ████ was with ████ as he was getting ready for the event. They were "sipping on a few beers" during this time. Someone approached ████ and asked him if he would be their date for the event, since this individual did not have a date. ████ agreed. ████ has no idea who asked ████ to be their date. ████ s not sure if this person was a Sigma Kappa sorority member or an NIU student. ████ has never seen this person before. ████ does not recall what this person looked like.

████ got ready for the event and went with the group to Sigma Kappa where 2-3 buses were located for transportation to the event. Pictures were taken before the group left. ████ does not have any picture of ████ before the event and is unsure if there are any pictures taken of ████ with his date.

On the bus to O'Leary's, ████ sat next to his date. He does not recall who was sitting in front of him or around him because he was not paying attention to such detail. ████ does not recall if ████ was on the same bus as him, but may have been since there were both seniors and "the girls" (Sigma Kappa sorority members) "roll that way."

6



At the event, ▮▮▮▮ only recalls one (1) interaction with ▮▮▮▮ He and ▮▮▮▮ were at the bar together and bought themselves a drink, a White Russian. ▮▮▮▮ does not recall what was discussed.

Prior to this event, ▮▮▮▮ and ▮▮▮▮ agreed that they are going to be more composed and drink less during the evening because they were training for Tugs. They wanted to set an example for other fraternity members and not drink as they do on other occasions or during other times of the year.

▮▮▮▮ was "absolutely not" exhibiting any signs of intoxication during the night of April 16, 2016.

▮▮▮▮ does not remember seeing ▮▮▮▮ talk to any unknown females during the event. ▮▮▮▮ was not paying close attention to the details of the event.

▮▮▮▮ believes he knows ▮▮▮▮ but cannot say for certain. ▮▮▮▮ is not sure who her date was for that event.

▮▮▮▮ did not stay long at the event. He left around 10:00 p.m., which was 1-2 hours before the event had ended. ▮▮▮▮ believes the event ended at either 11:00 p.m. or 12:00 a.m. He went back to Phi Kappa Theta with his date and went to bed. ▮▮▮▮ was asleep between 10:30 – 11:00 p.m.

▮▮▮▮ does not recall whether people came back to the fraternity house after the event, but they may have. If they did, it would have been a "dead" event, meaning not many people were there.

▮▮▮▮ stated that he is a "heavy sleeper" so there may have been music playing, but he cannot say for certain.

▮▮▮▮ did not see ▮▮▮▮ when he arrived back to the fraternity house that evening. The next time that ▮▮▮▮ saw ▮▮▮▮ was the next morning, April 17, 2016 at 10:00 or 11:00 a.m. They typically wake each other up. ▮▮▮▮ cannot recall the exact moment that he saw ▮▮▮▮. ▮▮▮▮ does not recall where ▮▮▮▮ was or what his mannerisms were like.

On April 17, 2016, Davila told ▮▮▮▮ that he had sex the night before. ▮▮▮▮ does not recall and is not confident about the exact details of what ▮▮▮▮ shared with him. This conversation occurred in a friend group as they were talking about what happened the night before. ▮▮▮▮ was not boasting about him having sex the night prior.

The first time that ▮▮▮▮ heard about what was going on (the allegation) was approximately two (2) weeks ago when he heard people talking about a situation on Greek row. After that, ▮▮▮▮ shared with ▮▮▮▮ that he was going through a difficult situation. ▮▮▮▮ then put two and two together, but didn't want to assume what happened. It was not until a few days ago that ▮▮▮▮ knew exactly what was going on.

▮▮▮▮ escribed ▮▮▮▮ as the most "well together gentleman of his life." ▮▮▮▮ was the President of the house and held roles within the University. ▮▮▮▮ was the Vice President of Interfraternity Council (IFC) and a "big influence on Greek row." ▮▮▮▮ is "well composed." To ▮▮▮▮ these allegations don't make sense to him or anyone else. There is no doubt in ▮▮▮▮ mind that ▮▮▮▮ did not do it (the alleged conduct).

7

CONFIDENTIAL

**Summary of Phone Interview with** ███████████████████
███████ *verified the below statement for completeness and accuracy:*

███████████ attended the same high school. ████████████████████████████
████████████

████████ has known ███████ for approximately two (2) years. ███████ has not been close friends with ████████ but considers him an acquaintance. ████████ was described as "pretty friendly" and outgoing. ██████ and ████████ have never "hooked up" or had sexual relations with one another.

On April 16, 2016, ███████ recalled attending a sorority (Sigma Kappa) event during the evening. Her boyfriend could not attend, so ████████████████████ to be her date in-advance of the evening. ██████ agreed.

████████████████████ apartment to get ready that night. Approximately 5-7 people were also there getting ready. Everyone was "pre-gaming" (consuming alcohol). The entire group then walked over to Phi Kappa Theta. They hung out there for a bit and continued to drink. ██████ was only drinking "a little."

███████████ roommate, ██████████████ did not have a date to the event so she asked ██████ to be her date approximately 15 minutes before the event started. ██████ agreed and got ready. Everyone then walked to Sigma Kappa to get on the bus to attend the event, including ██████ and ██████

████████ does not recall the interactions between ██████ and ██████ before the event began. The interactions, if any, were nothing memorable and casual. ██████ sat next to ██████ on the bus. They were not sitting with ██████

The group arrived to O'Leary's bar, where the event was scheduled to take place.

During the event, ██████ and ██████ started talking. They went outside for a period of time. They seemed friendly towards one another. ██████ does not recall specific details of their interactions as she was not with them much. ██████ did not see them kiss while at the event. ██████ recalls ██████ and ██████ consuming alcohol, but ████████ was not paying much attention so she does not recall how much.

After the event, everyone took the bus back to Sigma Kappa. ██████████████ on the bus. ██████ does not recall ██████ sitting with ██████, but her recollection is unclear due to her alcohol consumption during the night.

After returning back to Sigma Kappa, everyone went to Phi Kappa Theta fraternity house. ██████ ██████, ██████ went to ██████ room at the fraternity house to hang out. During this time, ██████ and ██████ were talking "a lot." ██████ was "not giving off a vibe that she was uncomfortable." ██████ appeared more "into" ██████ than she was to him. ██████ was being "touchy." ██████ also did not appear drunk. ██████ described him as being in control of himself and a 4 out of 10, in terms of how intoxicated he may be.

At some point while in ██████ room ████████████████ is not sure why she and ██████ left the room. After approximately one (1) hour had passed, ████████████████ went to look for ██████ They went to ██████ room and knocked. The door was locked. No one answered. ██████ did not hear anything happening inside the room, but it was loud in the house since a party was going on. ██████ and ██████ checked other rooms and were unable to find ██████ ██████ and ██████ returned to ██████

CONFIDENTIAL

room and knocked. ███ answered the door and looked "shaken up" and upset. ███ was not crying. ███ walked out of ███████ room and told ███ that she wants to go home. ███ walked out after ███ and went in the opposite direction as ███ appeared angry and upset. ███ did not say anything to ██████████ after he left the room.

███████ left the fraternity house and walked back to ████ apartment. ███ began crying. ███ was "super upset" and told ████ that she kept telling ██████ no, that he hit her, locked the door, and would not let her leave.

███████ did not see marks on ████ face during the walk home or after they arrived to ██████ apartment. ███ noted that it was dark outside and she does not recall such detail due to her level of intoxication.

When they arrived to the apartment, ████ did not say anything and was not crying. She was sitting on the couch in the living room, but appeared that she "wasn't there." Other people were also at the apartment eating pizza. ████ was not with the group for very long before she left the living room to go to sleep.

After ████ left the living room, ████ approached her and asked her if she wanted to get a rape kit. ████ said no. ████ then left ████ and ████ went to bed.

The next morning, ████████ woke up ████████ if she wanted to get a rape kit. ████ said no. ████ left ███████ apartment in the morning and drove home. ████████ were text messaging throughout the day. ████ informed ████ that she told her parents about what happened and her parents want her to come back to DeKalb to report the incident and get a rape kit. To ████ knowledge, ████ returned later that day with her parents.

███████ does not recall getting a text message while the alleged incident was taking place, but she could have received one and does not remember.

**Screenshots of ██████████ text message conversation with ████████ dated April 17, 2016 [Attached as Exhibit A]**

**Statements collected by the City of DeKalb Police Department, dated April 14, 2016 to June 9, 2016 [Attached as Exhibit B]**

**E-mail sent from ██████████ to NIU Administrators, dated August 1, 2016 [Attached as Exhibit C]**

**Rebuttal submitted by ████████ Davila, Respondent**
*████ provided the following rebuttal, verbatim:*

The information presented in the Title IX Preliminary Report ("Report") supports a finding that ████████ ████████ did **not** violate the *Title IX Policy*. The statements provided in the Report from the claimant, ████████ "Claimant"), and witness ████████████ are inconsistent and unreliable and therefore support a finding by the preponderance of the evidence that a violation of the *Title IX Policy* did not occur on April 16, 2016.

CONFIDENTIAL

### Claimant's Statement is Inconsistent With Previous Statements and is Unreliable

Claimant adopted her statement given to the DeKalb police on May 12, 2016. However, this statement is inconsistent with previous statements provided to the police, statements made in an inflammatory and unsolicited email to, among others, the faculty members of the University, and statements provided by other witnesses. The numerous inconsistencies and unreliable statement are listed numerically below. Part (a) of each number provides the statement made by Claimant in the Report and part (b) shows in what way that statement is inconsistent with either her previous statements or other evidence. Each cites to a page or exhibit in the Report.

1.	(a) Claimant states she kissed ▓▓▓▓▓ consensually at O'Leary's. Pg. 3.

	(b) However, on April 17, 2016, the day after the alleged incident, Claimant told police she refused to kiss ▓▓▓▓ at O'Leary's. Exhibit B.

2.	(a) Claimant states she kissed ▓▓▓▓▓ consensually at the Phi Kappa Theata house after the Sigma Kappa formal.

	(b) Yet, on April 17, 2016, she told police she refused to kiss him at the Phi Kappa Theta house. Exhibit B.

3.	(a) Claimant states she consumed "approximately" five vodka tonic drinks at O'Leary's and that ▓▓▓▓▓ purchased another drink for her. Pg. 2-3.

	(b) (i) She fails to mention the "pre-gaming" before the event. Exhibit B and Pg. 7. It is unknown how many drinks she consumed before going to O'Leary's.

	(ii) She does not indicate she was binge drinking (as defined by the CDC for a woman as more than four drinks in two hours) to the police on April 17 or in her inflammatory email to the faculty of the University.

4.	(a) Claimant states she straddled ▓▓▓▓▓ while he was in his boxers and she was in a dress without any underwear on while consensually kissing him. Pg. 3

	(b) She conveniently omits this statement in her April 17 statement to the police, her statements to witness ▓▓▓▓▓ nd in her email to the University.

5.	(a) Claimant alleges ▓▓▓▓▓ forced himself on her while she straddled him and again while standing. Pg. 3.

	(b) On April 17, she alleged she was on her back on the couch when ▓▓▓▓▓ supposedly forced himself on her.

6.	(a) Claimant alleges ▓▓▓▓▓ slapped her on the face.

	(b) The police report and witnesses do not ever indicate Claimant had a mark on her face.

In summary, Claimant engaged in binge drinking on the night of the alleged incident and made conflicting statements about what she claims occurred. Her statement in the Report is wholly unreliable. Therefore, by a preponderance of the evidence, her allegations cannot be relied upon and it should be found ▓▓▓▓▓ did **not** violate the *Title IX Policy*.

CONFIDENTIAL



### Witness ███ is an Unreliable Witness

████████ admits in her statement that she drank alcohol before, during, and after the event at O'Leary's and that her alcohol consumption meant she could not clearly recall events or details of the evening of April 16. Pg. 7-8. It appears ████ was only sober when she and Claimant began "pre-gaming" in the afternoon before the alleged incident and then in the morning of April 17. It is notable that on the morning of April 17, ████ asked Claimant if Claimant wanted to get a rape kit and Claimant said "no."

████████ states she knocked on the door of ████████ room the night of April 16, but no one answered and the door was locked. However, in response to the text Claimant sent to ████████ asked which room Claimant was in. Exhibit A. ████ would not have asked this if she knew Claimant's location. In fact, ████ in her June 9, 2016 statement to the police, indicated ████ was not with her when ████████ discovered the door to the room was locked. Exhibit B. She then stated she and ████ were "near" ████████ room when Claimant left the room. Exhibit B. ████████ does not indicate that Claimant was missing or that she and ████ were searching for Claimant.

Furthermore, ████ also states her friendship with Claimant began in high school. Both Claimant and ████ admitted to texting one another over the course of April 16 and April 17. In fact, while Claimant does not name ████ she states in her email to the faculty and administration that she did not think anything was wrong until she texted her friends. Exhibit C. ████████ is an unreliable and biased witness and therefore, by a preponderance of the evidence, her statements cannot be relied upon and it should be found ████████ did **not** violate the *Title IX Policy*.

### Exhibit A is Incomplete

Finally, the screenshot of the text message from Claimant to ████ only presents a snapshot of the evening. There is no context for the screenshot, as it does not show if ████ and Claimant discussed ████████ before or after the alleged incident or if there was discussion of the incident itself. ████████ asks that all written communication between Claimant and ████ on April 16 and 17 is produced.

### Conclusion

████ The inconsistent and unreliable statements from Claimant and the unreliable testimony from ████ show that it is more likely than not that a *Title IX Policy* violation did **not** occur.

**Additional Information provided by** ████████ **Claimant [Attached as Exhibit D]**
*In response to* ████████ *rebuttal,* ████ *was requested to provide screenshots of the text message conversation between her and* ████████ *provided the requested screenshots and are attached as Exhibit D.*

### ISSUE

The issue that formed the basis of this Title IX Investigation is as follows:

Whether there is sufficient evidence to render it more likely than not that ████████ sexually assaulted ████████ on or about April 16, 2016, in violation of the University's *Title IX/Sexual Misconduct Policy and Procedures.*

11

CONFIDENTIAL

## CONCLUSION

After a careful review of University policy and applicable state and federal law, there is enough evidence to render it more likely than not that ███████ sexually assaulted ███████ on or about April 16, 2016, in violation of the University's *Title IX/Sexual Misconduct Policy and Procedures*.

## ANALYSIS

Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 *et. seq*., provides in part:

> *No person in the United States shall, on the basis of sex, be excluded from participating in, be denied benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance...*

Northern Illinois University complies with Title IX by prohibiting sex discrimination in the form of sexual misconduct. Sexual misconduct includes acts of sexual assault. Sexual assault is defined, in pertinent part, as any nonconsensual sexual act or an act of sexual penetration by the use of force or threat of force. Consent is defined, in pertinent part, by the University's *Title IX/Sexual Misconduct Policy and Procedures* (September 29, 2015)[2] as the following:

> *[A] clear, unambiguous, informed and voluntary agreement between all participants to knowingly engage in sexual activity. Consent must be mutually understandable by words or actions (i.e. a reasonable person would consider the words or actions to indicate mutual agreement to engage in sexual activity.) Consent is active and cannot be based on the absence of an affirmative statement or act of denial. Silence or lack of resistance does not constitute consent. Seeking and receiving consent is the responsibility of the person(s) initiating the sexual act or acts regardless of whether the person initiating the act is under the influence of drugs and/or alcohol...Consent cannot be given when it is the result of... force. The University prohibits any sexual activity that does not involve the consent of each individual.*

███████ is alleging that ███████ sexually assaulted her on or about April 16, 2016 when he vaginally penetrated her on two occasions without her consent. Before the issue at hand is discussed, events leading up to the alleged incident will be presented.

Sigma Kappa sorority was having a formal event at O'Leary's Bar. ███████ was witness ███████ date for the evening (since her boyfriend could not attend). ███████ s a student of NIU and member of Sigma Kappa. ███████ roommate, NIU student and member of Sigma Kappa, did not have a date for the event. Shortly before the event began, ███████ asked ███████ to be her date. ███████ agreed and got ready for the event with friend ███████ at the fraternity house, Phi Kappa Theta. ███████ and ███████ were also at Phi Kappa Theta before leaving for the formal event. Alcohol beverages were consumed prior to the departure to the formal event.

███████, ███████ and others walked from Phi Kappa Theta to Sigma Kappa, where buses were located to take them to O'Leary's. All boarded the bus and went to O'Leary's. There is no indication that ███████ and ███████ socialized before arriving to O'Leary's. While at O'Leary's is where the involved parties and witnesses state that ███████ and ███████ met each other. During the event, the two were flirty and engaged in consensually kissing throughout the evening. ███████ during the initial report of

---

[2] The University's *Title IX/Sexual Misconduct Policy and Procedures* was updated during the course of the investigation. However, the policy with revision date of September 29, 2015 will remain to be the controlling policy for this investigation due to the alleged incident occurring when this version was in effect and the investigation started when this version was in effect.

CONFIDENTIAL



the incident, initially told the DeKalb police that she did not consensually kiss ████ during the formal event. However, when she was interviewed by the DeKalb police detective, she informed them that she and ████ consensually kissed at the formal event. The event ended between 11:00 p.m. or 12:00 a.m. and at that time, the bus took the group back to Sigma Kappa sorority event. A group of people, including ████, ████ went back to Phi Kappa Theta. The four then went into ████ room at the fraternity house. At some point while in the room together, ████ and ████ left ████ room, leaving ████ and ████ alone.

What happened inside ████ room with ████ and ████ alone is where the version of events between ████ and ████ are inconsistent. ████ initial statement to the DeKalb police officer, ████ second statement to the DeKalb police detective, ████ extraneous statement to third parties, ████ statement to the DeKalb police detective, and any witness/documentary evidence will be presented as to what allegedly occurred while in the room together.

Per ████ initial statement given on April 17th (later in the day of the incident/day after the incident), ████ and ████ were seated on his couch in his room. ████ kept moving closer to ████ and attempted to kiss her. ████ pushed him away saying that she did not want to kiss him. ████ moved closer to ████ and pulled her dress off her chest. ████ moved away again and told him that she did not want him to touch her. ████ then asked if she would be more comfortable if he was naked. ████ did not answer but ████ undressed himself down to his boxers. ████ then forced himself on top of ████ and ████ told him to get off of her. As ████ was pushing him away while saying this, ████ inserted his penis into ████ vagina briefly. ████ was able to push ████ off of her and she told him that she did not want to have sex. ████ then slapped ████ with an open hand across her face and stated that she would like it. ████ then grabbed a condom and asked ████ if she would let him have sex with her. ████ said no and attempted to get off the couch. ████ grabbed ████ by the hair and pushed her down on the couch on her back. ████ then forced himself onto her and inserted his penis into her vagina. ████ began crying. ████ continued having sexual intercourse with ████ without a condom. ████ removed his penis for her vagina and ejaculated. ████ dressed herself, heard a knock on the door, and ████ told ████ to leave the room. ████ left the room, found ████ and returned to ████ residence.

Per ████ second statement given on April 20th and one she verified for purposes of this Title IX investigation, ████ said that she and ████ kissed consensually while alone in his room with him but that at one point he tried to pull up her dress. ████ told ████ that she did not want to be naked and that she did not know him and did not feel comfortable. ████ then asked her if it would make her feel comfortable if he was naked and that he took off his clothes, down to his boxers. She said that ████ then pulled her on top of him onto a couch. She and ████ then kissed some more consensually. ████ had been wearing only a dress and did not have underpants on. At this time, ████ was seated on the couch and ████ was straddling him. Without warning, ████ inserted his penis into ████ vagina. ████ immediately got off of ████ and told him that she did not want to have a one night stand. ████ continued by telling him that she did not want to "hook up" with him and that she did not feel comfortable. ████ then pulled her back down onto the couch and placed his penis back into her vagina. ████ did not know what to do because she thought she made it clear that she did not want to have sex with him. ████ kept pressuring her and she reiterated that she was not comfortable. She then got up again and ████ tried to pull her dress off and her breast was now exposed. ████ then pulled her back towards him and asked her to perform oral sex on him. ████ kissed ████ in an attempt to pacify him. ████ then tried to guide her down towards his penis for oral sex and she was now on her knees on the floor. ████ told ████, "I just don't feel comfortable, I don't know you." ████ was pressuring her verbally to continue. ████ said that without warning, ████ slapped her on the left side of her face with an open hand. ████ then said, "I know you like that." ████ pushed ████ away but that he got behind her and grabbed her hair. He then directed her towards a couch underneath his bed, which was lofted. ████ inserted his penis into her vagina from behind as she was face down on the couch. ████ pulled her hair and she began to cry to herself. She

13

CONFIDENTIAL

said that she did not say anything to ▮▮▮▮ at this time. ▮▮▮▮ continued to have sex with her for about five minutes and then asked, "Where should I finish?" He asked her if he should finish on her breasts or inside of her. ▮▮▮▮ then pulled his penis out of her and ejaculated on her buttocks. ▮▮▮▮ then got up and she was able to pull up her dress. ▮▮▮▮ texted ▮▮▮▮ at 12:51 to come and get her (see Exhibit A) and ▮▮▮▮ came to the door. ▮▮▮▮ said, "I thought you didn't want a one night stand." ▮▮▮▮ then left with ▮▮▮▮ and went to her residence.

As illustrated above and stated in ▮▮▮▮ rebuttal ▮▮▮▮ provided a different version of events between her initial interview on April 17th and follow-up interview with the detective on April 20th. ▮▮▮▮ initial statement states that she and ▮▮▮▮ did not consensually kiss during the night in question, both vaginal penetrations occurred while ▮▮▮▮ was on her back, and she went looking for ▮▮▮▮ after the alleged incident. The second statement alleges that she and ▮▮▮▮ consensually kissed while at the formal event and while in his room, the vaginal penetrations occurred when she was straddling him and the other occurred while she was bent over his couch below his lofted bed, and that ▮▮▮▮ was knocking on ▮▮▮▮ door after the alleged incident. The second statement is consistent with ▮▮▮▮ statement that they had "doggy style" sexual intercourse, with her bent over his couch that was underneath the lofted bed. ▮▮▮▮ however, was not able to corroborate and/or refute many other details of the evening, as presented below. Moreover, ▮▮▮▮ second statement is consistent with the text messages regarding the incident that she exchanged with various individuals before the first statement to the DeKalb Police was provided. Therefore, this evidence supports a conclusion that ▮▮▮▮ second statement is a version of events that is consistent with the weight of the evidence and, therefore, reflects the allegations and formed the basis of this investigation.

To the DeKalb police department in response to the pending criminal matter, ▮▮▮▮ said that he did not remember anything after being on the bus. After being pressed further, ▮▮▮▮ stated that he did remember more details. ▮▮▮▮ then admitted that he did have sexual intercourse with ▮▮▮▮ and ▮▮▮▮ went into his room upon arriving at his fraternity house. ▮▮▮▮ sat on the couch and ▮▮▮▮ was on top of him. Everything was going good between them and they were kissing. It became obvious that they were going to have sex. ▮▮▮▮ and ▮▮▮▮ had "doggy style" sexual intercourse when ▮▮▮▮ was bent over onto a couch that was underneath his loft styled bed. ▮▮▮▮ does not remember her ever saying no or to stop. ▮▮▮▮ does not recall using a condom or if he ejaculated. After having sex, ▮▮▮▮ left the room. ▮▮▮▮ woke up the next day and was in his friend's room. ▮▮▮▮ does not remember slapping ▮▮▮▮ and said that it might have been possible that he pulled her hair while they were having sex. After being questioned about ▮▮▮▮ forcing ▮▮▮▮ onto the couch and that the sexual intercourse was against her will. ▮▮▮▮ said that he is not the type of person that would do something with a girl that was not consensual. ▮▮▮▮ told the DeKalb Detective several times that he did not remember slapping her or being forceful with her in any way. ▮▮▮▮ never got any indication from her that ▮▮▮▮ did not want to have sex with him. ▮▮▮▮ reiterated that he did not remember much of what happened in his room. ▮▮▮▮ repeated that he did not remember doing anything violent towards ▮▮▮▮ and did not remember her saying or doing anything that would have indicated that she did not want to have sex with him.

There are no witnesses to the alleged events that took place inside ▮▮▮▮ room. The witnesses presented were present with ▮▮▮▮ and/or ▮▮▮▮ before and after the incident took place: ▮▮▮▮ First. ▮▮▮▮ was present with ▮▮▮▮ and ▮▮▮▮ in ▮▮▮▮ room immediately before the incident. ▮▮▮▮ admits that ▮▮▮▮ was described as "not giving off a vibe that she was uncomfortable" and ▮▮▮▮ was "into" ▮▮▮▮ and being "touchy" with her. ▮▮▮▮ did not appear to be drunk and was a 4/10 in terms of level of intoxication. ▮▮▮▮ left the room for unknown reason and returned to ▮▮▮▮ room approximately one (1) hour later. The door was locked, so ▮▮▮▮ and friend . ▮▮▮▮ continued looking for ▮▮▮▮ and ultimately ended up at ▮▮▮▮ room again. ▮▮▮▮ knocked again and ▮▮▮▮ answered, looking upset and "shaken up." ▮▮▮▮ was not crying and no words were exchanged between ▮▮▮▮ and ▮▮▮▮ During the

---

▮▮▮▮ was contacted as a witness to the investigation but failed to participate and provide a statement.

Case 1:17-cv-07991 Document #: 66 Filed: 05/29/20 Page 84 of 242 PageID #:495
Case 1:17-cv-07991 Document #: 61-4 Filed: 12/03/17 Page 4 of 43 PageID #:80

CONFIDENTIAL

walk back to ████ apartment, ████ began crying and told ████████ hat she kept telling ████ no, that he hit her, locked the door and would not let her leave. Thereafter, ████ did not appear engaged into the group and went to bed shortly after arriving to the apartment. ████ admits that she was intoxicated on the night in question and, as a result, details were not able to be fully recalled. ████ did not see a mark on ████ face from an alleged physical altercation (slap).

████ exchanged text messages later in the day at approximately 12:32 p.m. before ████ reported the incident to DeKalb police. During this exchange, ████ shared with ████ her version of events (see Exhibit D). ████ stated that ████ kept pulling her by him and ████ kept going away. ████ then pulled her onto him and they kissed. ████ tried to take her dress off but she said no and got up. ████ then took off all his clothes, continued to try to take her dress and ████ said she didn't want to. ████ then took off all his clothes, pulled her on him and was kissing her neck. ████ was looking away at the door saying she didn't want to do this. ████ then got up and ████ pushed her down to the ground. ████ asked ████ o "blow" him and ████ responded that she didn't like him and didn't want to. ████ then got mad and pulled ████ up. He kissed her and tried to put "it" in. ████ "just sat there." She said she didn't want to and he started moving her hips. ████ told ████ she can't so he tried to push her down onto him. ████ said no. ████ then slapped her face and grabbed her by the hair and put her on his couch. ████ then started "fucking" ████ and ████ "just cried." ████ slapped ████ butt and told her that she liked it. After ████ "finished," ████ knocked on the door and ████ told ████ to go away. ████ ran and answered the door. This statement is consistent with and corroborates ████ second statement given to the DeKalb detective.

████ also text messaged ████ and ████ about the alleged incident. The statement that ████ gave is substantially similar to the text conversation between ████ and ████ as illustrated above and provided within Exhibit D.

████ was present with ████ during the social event that occurred earlier in the evening ████ and ████ had agreed earlier in the evening to be more composed and drink less during the evening due to training for Tugs. While present at the formal event together, ████ was "absolutely not" exhibiting any signs of intoxication. ████ does not who ████ is or what she looks like and does not recall seeing ████ talk to a female he was unfamiliar with. The next morning after the alleged incident, ████ shared with ████ that he had sexual intercourse with someone, but does not recall the details shared to him. ████ statement is inconsistent with the involved parties' versions of events. He asserts that ████ was not intoxicated. However, by ████ own admission, his lack of memory from the evening was due to consuming alcohol throughout the evening.

While ████ did not participate in the Title IX Investigation, she did provide a statement to the DeKalb detective during the pending criminal investigation. To the detective, ████ stated that ████ and ████ were friendly towards each other. After the formal event ended, everyone went back to ████ s fraternity house and ████ and ████ ended up alone in ████ room. ████ discovered that ████ door was locked and told ████ about this. 20 minutes later, ████ were near ████ room when ████ came out drying and said that she wanted to go home. During the walk home, ████ disclosed to ████ something to the affect that she did not want to do that, he just put it in. ████ informed the detective that ████ was obviously talking about sex. ████ that ████ pushed her down on the bed.

As illustrated, the witnesses were not able to provide any direct evidence as to whether the vaginal penetration between ████ and ████ was consensual. Rather, the witnesses provided contextual and corroborating or conflicting evidence as to what occurred before and after the alleged incident. First, ████ statement was able to provide corroborating information to ████ allegation. ████ estified that shortly after the alleged incident, ████ told her that she kept saying no, that ████ hit her, locked the door and would not leave. ████ made a similar statement during the walk home.

CONFIDENTIAL



provide conflicting information as to how they found ▮▮▮ after the alleged incident in ▮▮▮▮▮ room. However, this conflicting information is likely due to the level of intoxication that both witnesses testified they experienced that night. The discrepancies are also not vastly different. ▮▮▮▮▮ was not able to provide much information pertinent to the allegation due to the fact that he had limited interactions with ▮▮▮▮ during the night in question, did not know who ▮▮▮ was, and did not recall any interactions between ▮▮▮▮ and an unknown female. Moreover, ▮▮▮▮ provided contradictory information to ▮▮▮▮▮ statement by testifying that ▮▮▮▮ was sober during the formal event and ▮▮▮▮ agreed not to consume too much alcohol that evening.

In analyzing at the evidence, I find it more likely than not that ▮▮▮▮ sexually assaulted ▮▮▮ on or about April 17th, 2016. In accordance with the *Title IX Policy*, consent is:

> *[A] clear, unambiguous, informed and voluntary agreement between all participants to knowingly engage in sexual activity. Consent must be mutually understandable by words or actions (i.e. a reasonable person would consider the words or actions to indicate mutual agreement to engage in sexual activity.) Consent is active and cannot be based on the absence of an affirmative statement or act of denial. Silence or lack of resistance does not constitute consent. Seeking and receiving consent is the responsibility of the person(s) initiating the sexual act or acts regardless of whether the person initiating the act is under the influence of drugs and/or alcohol…Consent cannot be given when it is the result of… force. The University prohibits any sexual activity that does not involve the consent of each individual.*

Regarding the first alleged sexual penetration ▮▮▮ is alleging that ▮▮▮▮ inserted his penis into her vagina without consent when she was straddling him without any underpants on while he was in his boxers, on his own accord and initiative. ▮▮▮ is alleging that ▮▮▮▮ did not obtain consent to the vaginal penetration prior to the occurrence. Based upon the evidence outlined above, there is no evidence supporting the conclusion that ▮▮▮▮ sought or received consent on the night in question for the vaginal penetration that occurred on his couch with ▮▮▮. ▮▮▮▮ states that everything was going good between them and they were kissing…it became obvious that they were going to have sex. ▮▮▮▮ stated that he got no indication from ▮▮▮ that she did not want to have sex. There is nothing more presented on how ▮▮▮▮ sought and received consent during the night in question. ▮▮▮▮ declined to verify and/or clarify what that statement provided to the DeKalb detective meant. Therefore, there is no explanatory evidence as to what made ▮▮▮▮ think that it was obvious that they were going to have sex that evening and how ▮▮▮ indicated to him and/or a reasonable person how her words and/or actions indicated a mutual agreement to engage in the sexual activity. ▮▮▮▮ testimony that she was straddling him without underwear on while consensually kissing is not consent for sexual activity. Rather, such action was consent for what was occurring at that moment (kissing). The witness evidence and testimony also does not provide information about whether ▮▮▮▮ consented to the first sexual penetration that occurred that day. Therefore, by a preponderance of the evidence, there is sufficient information to conclude that ▮▮▮▮ did not have consent to vaginally penetrate ▮▮▮▮ while seated on the couch together in his room on or about April 16, 2016.

Regarding the second alleged sexual penetration, ▮▮▮ is alleging that ▮▮▮▮ vaginally penetrated her a second time from behind as a result of slapping her and pulling her hair after she said no. To the DeKalb police, ▮▮▮▮ admits that he had "doggy style" sexual intercourse with her (penetration from behind), but did not recall engaging in unwelcomed physical contact (a slap) and said that it might have been possible that he pulled her hair while having sex. ▮▮▮▮ also reiterated that he does not remember being forceful and/or violent towards her and her saying no or stop. Witness ▮▮▮▮ was unable to recall and the statements contained within the police report do not indicate whether ▮▮▮ had any marks on her face due to the alleged physical contact. Therefore, it is inconclusive whether ▮▮▮▮ slapped her due to a lack of information in support of this allegation. However, based upon the evidence gathered, there is sufficient evidence to render it more likely than not (preponderance of the evidence) that ▮▮▮▮ did not have consent to engage in the second alleged penetration due to a lack of evidence denying ▮▮▮ allegation that she

16

Case: 1:17-cv-07991 Document #: 66 Filed: 05/29/20 Page 86 of 242 PageID #:497
Case: 1:17-cv-07991 Document #: 1-1 Filed: 11/03/17 Page 18 of 43 PageID #:82

CONFIDENTIAL

said no and a lack of evidence concluding that the hair pulling was consensual in nature. This act constitutes a violation of the University's *Title IX Policy* in the form of nonconsensual sexual activity, as defined above, because ████ did not give ████ a clear, unambiguous, informed and voluntary agreement to knowingly engage in sexual intercourse with her from behind on or about April 16, 2016 because she verbally informed him that she did not want to engage in sexual intercourse and, despite this verbal indication, he engaged in sexual intercourse with her.

In conclusion, I find it more likely than not that ████ did not give ████ a clear, unambiguous, informed and voluntary agreement to knowingly engage in sexual activity based upon a lack of consent prior to the first sexual penetration and a verbal indication of a lack of consent and the use of force prior to the second penetration. Therefore, there is enough evidence to render it more likely than not that ████ sexually assaulted ████, in violation of the University's *Title IX Policy*.

It also must be noted that ████ and ████ met the first time at the formal event that occurred immediately before the alleged incident. There is also no evidence indicating that ████ planned to meet ████ prior to that evening or engage in any interactions with her during the course of the evening. The incident was also reported to friends shortly after it was alleged to have occurred. Therefore, there is no evidence suggesting that the complaint was filed in bad faith or that there was a motive for filing such a report, such as a bad breakup or retaliation. It is unclear whether both parties were intoxicated on the night in question. There is evidence that the Claimant presented herself in a way that may have suggested the possibility of taking actions further than what was occurring (straddling without underwear on while consensually kissing) and ████ had the opportunity to deny the allegations that the sexual intercourse was nonconsensual. However, such actions do not indicate consent for sexual activity and the lack of evidence presented by ████ supports a conclusion that a sexual assault occurred.



17

Ex. A

 ‹ **Messages**  **Details**

Sun, Apr 17, 12:51 AM

Why did you leave me

Where you bel

I want to go

Please

I want to cry

Pleas

I'm here still

I want to go home

What happened

I'm about to come out

I can't remember what too you on

What room is it again

 

# EXHIBIT D

## Sarah Adamski

**From:**
**Sent:**
**To:**
**Subject:**

TitleIXCoordinator
Friday, August 12, 2016 3:23 PM
Sarah Adamski
████████████

-----Original Message-----
From ████████████████████████
Sent: Monday, August 01, 2016 11:53 PM
To: conadvising@niu.edu; accy <accy@niu.edu>; businessalumni <businessalumni@niu.edu>; elc <elc@niu.edu>; FINA <FINA@niu.edu>; MBA <MBA@niu.edu>; mgmt@niu.edu; mktg <mktg@niu.edu>; omis <omis@niu.edu>; COBTech <COBTech@niu.edu>; CEDU <CEDU@niu.edu>
Subject: Respect

Dear Northern Illinois University,

My name is ████████████ This is a name you shall not forget, because I intend to use every part of my strength to gain justice.

On April 17, 2016 a student who attends YOUR university committed a crime. He RAPED a twenty-one year old student. He harassed her, he abused her, and he humiliated her.

The only thing she could do was cry after the event took place. She left the room crying out for her best friend, to be helped home in a frantic state. As she got to a place that felt safe she cried herself to sleep. The kind of cry that causes bystanders to ache for you. The kind of cry that you know a part of their soul is lost. The kind of cry that you know a part of this person died.

It wasn't until she texted her two best friends what had happened that it was wrong. It wasn't until she drove all the way back home from Dekalb until she broke down in the car, attempting to understand how someone took her power. It wasn't until she talked to all of her friends and family to gain the strength to report this incident.

Months have gone by and nothing has occurred.

I know the pain because I am this woman.

I ask for all of you to take a moment and think about a time in your life that you felt infinite. Imagine one night someone took that from you. Now imagine what made you feel infinite now means nothing to you. The night I was raped a part of me died.
It took months to overcome my shock. How did this happen to me? I said no. I said no. I backed away and said no.

As a girl I have grown up with sexual assault all around me, but it wasn't until this night I had realized how darkening rape can be.

I cried for months. I cry for hours now. I sit in my bed feeling hopeless. I look at my map of the world and feel nothing but sorrow. When I used to see a map, I felt inspired by opportunity. When I go out I fear any new guy coming up to me. I shy away and have my friends speak for me. I can't eat because I am trying to regain control over my body. I have lost

1

15 pounds. The determination for my dreams are fading away. I lay in my bed just because I am in a constant state of fear, depression and anxiety.

My strength comes in waves. I have the opportunity to nanny three wonderful children. I look at them and think to myself I need to be a great role model. When I told my friends about my rape, some responded that they too have experienced similar situations. I sometimes remember who I used to be before this awful night that plays like a movie over and over my head, and I want to be strong for her. I need to be strong for me and other survivors of rape or sexual assault.

██████████████████ am smart. I am kind. I am intelligent. I am powerful. I am strong. I am a survivor.

I will not stop until my rapist, ███████████ is unable to attain a degree.

One of my hopes in my lifetime is to make the world better. I ask all of you, do you really want to enable a rapist?

My case has been taken be the state and will be reviewed August 17. If the state refuses to put him away I will ask you all to not allow someone who hits, pushes around, humiliates, and rapes women to attend your school. My case was pushed back because your school allowed my rapist to continue meeting with his fraternity. The humiliation almost broke me down. How could a university allow a student who is being charged with rape attend an event where he is most likely bragging about getting away with rape?

I ask you all to take a moment and watch until it happens to you by lady gaga. No one could ever understand the sadness of rape until you experience it. I said no. My no is enough. I have a rape kit and my story hasn't changed once. The accused has changed his story several times. The accused claimed he was too drunk to remember. The survivor was not drunk. I remember ever detail almost everyday. It haunts me. It haunts me. it haunts me.

To feel disconnected from your body is a feeling I wouldn't wish on any of my enemies. To feel hopeless, depressed, suicidal. I don't feel safe anymore. I am slowly recovering.

Rape is serious. Please help make a difference for the safety of your students and the world. Please help me. Rape destroys a part of you. A part you will never get back. I used to enjoy being alone and traveling and now I'm scared and lonely. I feel completely humiliated that your university has barely done anything except let him run off with his fraternity. I understand that a school must protect its reputation, but a student at your university RAPED ME. He took so much from me. Can you imagine saying you don't want any food, but someone shoves it in your face and proceeds to tell you that you like it? Can you imagine crying your eyes out as you are being held face down by your hair frozen in fear? Can you imagine saying no in a variety of statements and not be taken seriously? Can you imagine being slapped then laughed at? Can you imagine finding the strength to tell your story and no one doing anything to help you?

I ask you all to please help push my case. I have the evidence, but I hope you'll believe my story without it. I can send any information that you need to stand with me. Please help me make your university reputable by not allowing rapists to attend.

I will not allow my rapist to be able to receive the gift of education. Education is the most powerful weapon and it should not be given to those who rape, humiliate, or abuse another human.

No matter what the survivor wore, said before, or did before saying NO, is not validation of rape. Once a person says no I am not comfortable then that means no. It doesn't mean to keep pushing. It doesn't mean try to rip her dress off. It doesn't mean slapping her. It doesn't mean pulling her by her hair. It doesn't mean taking your clothes off to put pressure on her. It doesn't mean try to slip it in before she realizes. It doesn't mean belittle her. It doesn't mean anything but no. Once I said I was uncomfortable and did not want to that should have been enough. No matter what. My no was enough.

2

# EXHIBIT E

CONFIDENTIAL

## TITLE IX PRELIMINARY REPORT

**INSTRUCTIONS:**

This Preliminary Report contains a summary of the information obtained to date. This information will be used in making the determination of whether it is "more likely than not" (preponderance of the evidence) that a violation of the University's *Title IX/Sexual Misconduct Policy and Procedures ("Title IX Policy")* has or has not occurred. A copy of the *Title IX Policy* is found at http://www.niu.edu/aaec/_pdf/Title-IX-Sexual-Misconduct-Policy.pdf.

██████████ "Claimant") and ████████ ("Respondent") are given a copy of this Report and no one else. The report is twenty-four (24) pages long (including this page) and the end of the report is indicated by the words "**END**".

Please take some time to read the report. This is your opportunity to provide a rebuttal (response) to information contained within the Report and/or suggest additional witnesses **within five (5) calendar days after the date of this report.** You may e-mail your rebuttal to me at sadamski1@niu.edu. There is no specific format that your response should be written in. If I do not receive your rebuttal within five (5) calendar days, I will proceed with the investigation without your additional information.

I will then consider the additional information provided by the Claimant and Respondent, conduct any necessary additional interviews or investigation, and then make a finding of whether it is "more likely than not" (preponderance of the evidence) that a violation of the *Title IX Policy* has or has not occurred.

**Also, please be advised that it is a separate violation of the Title IX Policy to retaliate against any individual who, in good faith, files a complaint or participates in an investigation alleging that sex discrimination, including sexual assault, has occurred. The individuals who are named in this Preliminary Report and/or have participated in the investigative process are protected by the Title IX Policy. If the Claimant, Respondent, and/or witnesses experience what they believe to be retaliation because of their participation, they have been advised to contact me immediately.**

If you have any questions or concerns, please contact me at sadamski1@niu.edu or (815) 753-5560.

Thank you.

CONFIDENTIAL

## PRELIMINARY REPORT

| | |
|---|---|
| **By:** | Sarah Adamski, Assistant Director of Investigations, Affirmative Action and Equity Compliance |
| **To:** | ████████ Student, Respondent |
| **Basis of Investigation:** | Sexual Assault |
| **Persons Interviewed:**[1] | ████████ |
| **Documents Collected:** | ████████ ation with ████████ Statements collected by the City of DeKalb Police Department, dated April 14, 2016 to June 9, 2016 ████████ to NIU Administrators, dated August 1, 2016 |
| **Date:** | August 16, 2016 |

████████████ came to DeKalb on 4/16/16 to visit with her friend ████████ who attends Northern Illinois University, and that they were going to attend a Sigma Kappa Sorority formal event. When she arrived in DeKalb, she went to ████████ residence. They then went to Phi Kappa Theta house for a short time. ████ said that she and ████ then went back to the Sigma Kappa house to check-in for the formal event. She said that they then took a bus to O'Leary's bar where the formal event was to be held. ████ said that they arrived at O'Leary's bar and that members of the Phi Kappa Theta fraternity were also at the event.

████ said that while at O'Leary's, she was dancing and socializing. She said that she consumed approximately five vodka tonic drinks. She said that around 11:30 p.m., she met a subject now known as ████████ who is a member of Phi Kappa Theta fraternity. She and ████ started talking and at one point he asked her to step outside with him and she did so. She said that ████ tried to kiss her but she declined and told him that they did not know each other. They went back in the bar and ████ bought her

CONFIDENTIAL



a drink ████ said that she continued to dance with ████. She and ████ then went back outside where they kissed consensually. They talked for a while on the first floor of the bar and flirted with each other.

████ said that the event ended shortly after midnight and everyone took a bus back to the Phi Kappa Theta fraternity house. While on the bus, she and ████ kissed some more consensually. Upon arrival to the house, ████ and ████ went to ████ room. After a short time, ████ and ████ left the room and now ████ and ████ were alone in the room. She said that she and ████ kissed consensually but that at one point he tried to pull up her dress. She said she told ████ that she did not want to be naked and that she did not know him and did not feel comfortable.

████ said that ████ then asked her if it would make her feel comfortable if he was naked and that he then took off his clothes, down to his boxers. She said that ████ then pulled her on top of him onto a couch. She and ████ then kissed some more consensually. She said that she had been wearing only a dress and did not have underpants on. She said that at this time, he was seated on the couch and that she was straddling him. She said that without warning, he inserted his penis into her vagina. ████ said that she immediately got off of ████ and told him that she did not want to have a one night stand. She said that she continued by telling him that she did not want to "hook up" with him and that she did not feel comfortable. She said that ████ then said that he could call her the next day.

████ said that ████ then pulled her back down onto the couch and placed his penis back into her vagina. She said that she did not know what to do because she thought she made it clear that she did not want to have sex with him. She said that ████ kept pressuring her and she reiterated that she was not comfortable. She then got up again and ████ tried to pull her dress off and her breast was now exposed. She said that he then pulled her back towards him and asked her to perform oral sex on him. She said that she kissed ████ in an attempt to pacify him. She said that ████ then tried to guide her down towards his penis for oral sex and she was now on her knees on the floor. She said she told ████, "I just don't feel comfortable, I don't know you." She said that he was pressuring her verbally to continue.

████ said that without warning, ████ slapped her on the left side of her face with an open hand. She said that she was shocked and froze out of fear. She said that the slap was loud enough to make a slapping sound. She said that ████ then said, "I know you like that." ████ said that she pushed ████ away but that he got behind her and grabbed her hair. He then directed her towards a couch underneath his bed. The bed was raised off the floor similar to a bunk bed. She was now face down on the couch and ████ inserted his penis into her vagina from behind. She said that he pulled her hair and she began to cry to herself. She said that she did not say anything to ████ at this time. She said that ████ continued to have sex with her for about five minutes and then asked, "Where should I finish?" He asked her if he should finish on her breasts or inside of her. She said that he then pulled his penis out of her and ejaculated on her buttocks.

████ said that ████ then got up and she was able to pull up her dress. She said that she texted ████ at 12:51 to come and get her. She said that ████ came to the door and ████ said, "I thought you didn't want a one night stand." ████ then left with ████ nd went to her residence. She said that ████ also walked with them. She said that she told ████ briefly what happened. She said that she told them that she did not want to have sex with ████ but that he kept pressuring her. She said that she did not tell them the whole story. She said that she fell asleep at ████ and woke up the next day. She said that she returned home and told her sister what happened and then told her mother. She then came to the DeKalb Police Department and then to Kishwaukee Hospital for an exam.

3

CONFIDENTIAL



██████████ **Statement**

██████ *following statement was provided to the City of DeKalb Police Department.* ████ *is not admitting that the below statement is true or accurate.*

At about 3:30 p.m., on 05-10-16, Sergeant Woodruff and [Detective Stewart] went to 910 West Hillcrest in an attempt to speak with ███████████. ████ arrived home and [Detective Stewart] approached him in the parking lot. [Detective Stewart] advised ████ that [he] would like to speak with him about an investigation. [Detective Stewart] asked him if he knew a girl named ████████ and he advised that he did. ████ agreed to come to the police department to speak with [Detective Stewart] further about the case. [Detective Stewart] advised him that [they] could provide a ride for him and he accepted this offer. [Detective Stewart] advised him that he was not under arrest and he said he understood. [Detective Stewart] advised him that [he] would give him a ride home after [they] spoke. ████ sat in the front seat and he was not handcuffed.

Upon arrival at the police department, [Detective Stewart] escorted ████ to interview room number 206. [Detective Stewart] reminded him that he was not under arrest. [Detective Stewart] told him where the bathroom was and told him that he could use it at any time. ████ provided [Detective Stewart] with his identifiers. [Detective Stewart] told him that [he] wanted to talk with him about an incident that happened between he and ████ and he said that he was aware of what [Detective Stewart] was talking about. [Detective Stewart] asked him to tell [him] what occurred. He said that he only remembers meeting her at O'Leary's bar during the formal event. He denied having any memory after that. He told [Detective Stewart] that he had consumed several alcoholic drinks during the night. [Detective Stewart] advised him that ████████ told [him] that he had done some inappropriate things to her during the night. He continued to deny having any memory of what happened.

After about forty-five minutes, ████ told [Detective Stewart] that he now remembers some details of the night. He said he remembered flirting with ████████████ and kissing her while at the bar. He said that he also recalled making out with her on the bus back home after the event. He said that he did not remember anything after being on the bus. [Detective Stewart] pressed him further and told him that [he] believed that he remembered more. He then said that he did remember more details. He then admitted that he did have sexual intercourse with ████████ [Detective Stewart] told him to tell [him] what occurred.

████ told [Detective Stewart] that he and ████████ went into his room upon arriving to his fraternity house. He said that he sat on the couch and she was on top of him. He said that everything was going good between them and they were kissing. He said that it became obvious that they were going to have sex. He told [Detective Stewart] that he and ████████ had "doggy style" sexual intercourse. He told [him] that she was bent over onto a couch that was underneath his loft styled bed. He said that he did not remember her ever saying no or to stop. He said that he did not recall using a condom or if he ejaculated. ████ said that after having sex, ████████ left the room. He said that he woke up the next day and was in his friend's room.

[Detective Stewart] advised ████ that ████████ told [him] that he had slapped her across the face and had pulled her by her hair. He said that he did not remember slapping ████████ and said that it might have been possible that he pulled her hair while they were having sex. [Detective Stewart] told him that she further told [him] that he had forced her up onto the couch and that the sexual intercourse was against her will. ████ said that he is not the type of person that would do something with a girl that was not consensual.

4

CONFIDENTIAL

He repeated several times that he did not remember slapping her or being forceful with her in any way. He said that he never got any indication from her that she did not want to have sex with him. He reiterated that he did not remember much of what happened in his room.

[Detective Stewart] pointed out that [he] thought that it was odd that his version of events is consistent with ▮▮▮▮▮▮▮ with the exception of the details that would show the incident was against her will. He repeated that he did not remember doing anything violent towards ▮▮▮▮▮ nd did not remember her saying or doing anything that would have indicated that she did not want to have sex with him. [Detective Stewart] also pointed out that he was not denying slapping ▮▮▮▮ or pulling her by her hair onto the couch and was only saying that he did not remember doing so. During [Detective Stewart's] interaction with ▮▮▮▮ he seemed very nervous and stuttered when responding to pointed questions.

### Summary of Phone Interview with ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ has never met the reporting party, ▮▮▮ before. He does not know what she looks like and would not be able to identify her. ▮▮▮▮▮ does not recall seeing ▮▮▮ and ▮▮▮▮ together during the night in question.

▮▮▮ is ▮▮▮▮▮ fraternity brother with Phi Kappa Theta and they reside two (2) doors down from each other in the fraternity house. ▮▮▮ and ▮▮▮▮ are best friends.

Regarding the events that occurred on April 16, 2016, ▮▮▮▮ was a last minute fill-in for the sorority event. ▮▮▮▮ was with ▮▮▮▮ as he was getting ready for the event. They were "sipping on a few beers" during this time. Someone approached ▮▮▮ and asked him if he would be their date for the event, since this individual did not have a date. ▮▮▮ agreed. ▮▮▮ has no idea who asked ▮▮▮ to be their date. ▮▮▮▮ is not sure if this person was a Sigma Kappa sorority member or an NIU student. ▮▮▮ has never seen this person before. ▮▮▮ does not recall what this person looked like.

▮▮▮▮ got ready for the event and went with the group to Sigma Kappa where 2-3 buses were located for transportation to the event. Pictures were taken before the group left. Minogue does not have any picture of ▮▮▮▮ before the event and is unsure if there are any pictures taken of ▮▮▮ with his date.

On the bus to O'Leary's, ▮▮▮▮ sat next to his date. He does not recall who was sitting in front of him or around him because he was not paying attention to such detail. ▮▮▮▮ does not recall if ▮▮▮ was on the same bus as him, but may have been since there were both seniors and "the girls" (Sigma Kappa sorority members) "roll that way."

At the event, ▮▮▮▮ only recalls one (1) interaction with ▮▮▮. He and ▮▮▮ were at the bar together and bought themselves a drink, a White Russian. ▮▮▮ does not recall what was discussed.

Prior to this event, ▮▮▮▮ and ▮▮▮ agreed that they are going to be more composed and drink less during the evening because they were training for Tugs. They wanted to set an example for other fraternity members and not drink as they do on other occasions or during other times of the year.

▮▮▮ was "absolutely not" exhibiting any signs of intoxication during the night of April 16, 2016.

▮▮▮▮▮ does not remember seeing ▮▮▮ talk to any unknown females during the event. ▮▮▮ was not paying close attention to the details of the event.

5

CONFIDENTIAL



████████████████████████ but cannot say for certain. ████████ s not sure who her date was for that event.

████████ did not stay long at the event. He left around 10:00 p.m., which was 1-2 hours before the event had ended. Minogue believes the event ended at either 11:00 p.m. or 12:00 a.m. He went back to Phi Kappa Theta with his date and went to bed. ████████ was asleep between 10:30 – 11:00 p.m.

████████ oes not recall whether people came back to the fraternity house after the event, but they may have. If they did, it would have been a "dead" event, meaning not many people were there.

████████ stated that he is a "heavy sleeper" so there may have been music playing, but he cannot say for certain.

████████ did not see ██████ when he arrived back to the fraternity house that evening. The next time that ████████ saw ██████ was the next morning, April 17, 2016 at 10:00 or 11:00 a.m. They typically wake each other up. ████████ cannot recall the exact moment that he saw ██████. ████████ does not recall where ██████ was or what his mannerisms were like.

On April 17, 2016, ██████ told ████████ that he had sex the night before. ████████ es not recall and is not confident about the exact details of what ██████ shared with him. This conversation occurred in a friend group as they were talking about what happened the night before. ██████ was not boasting about him having sex the night prior.

The first time that ████████ heard about what was going on (the allegation) was approximately two (2) weeks ago when he heard people talking about a situation on Greek row. After that, ██████ shared with ████████ that he was going through a difficult situation. ████████ then put two and two together, but didn't want to assume what happened. It was not until a few days ago that ████████ new exactly what was going on.

████████ described ██████ as the most "well together gentleman of his life." ██████ was the President of the house and held roles within the University. ██████ was the Vice President of Interfraternity Council (IFC) and a "big influence on Greek row." ██████ is "well composed." To ████████ these allegations don't make sense to him or anyone else. There is no doubt in ████████ mind that ██████ did not do it (the alleged conduct).

Summary of Phone Interview with ████████████████████████████████

████████████████████████████████████████████████████████

████████ has known ██████ for approximately two (2) years. ████████ has not been close friends with ██████ but considers him an acquaintance. ██████ was described as "pretty friendly" and outgoing. ████████ d ██████ have never "hooked up" or had sexual relations with one another.

On April 16, 2016, ████████ recalled attending a sorority (Sigma Kappa) event during the evening. Her boyfriend could not attend, so ████████████████████ to be her date in-advance of the evening. ████████

████████ partment to get ready that night. Approximately 5-7 people were also there getting ready. Everyone was "pre-gaming" (consuming alcohol). The entire group then walked over to Phi Kappa Theta. They hung out there for a bit and continued to drink. ████ was only drinking "a little."

████ roommate, ████████ did not have a date to the event so she asked ████ to be her date approximately 15 minutes before the event started. ████ agreed and got ready. Everyone then walked to Sigma Kappa to get on the bus to attend the event, including ████ and ████

████ does not recall the interactions between ████ and ████ before the event began. The interactions, if any, were nothing memorable and casual. ████ sat next to ████ on the bus. They were not sitting with ████.

The group arrived to O'Leary's bar, where the event was scheduled to take place.

During the event, ████ nd ████ started talking. They went outside for a period of time. They seemed friendly towards one another. ████ does not recall specific details of their interactions as she was not with them much. ████ did not see them kiss while at the event. ████████ and ████ consuming alcohol, but ████ was not paying much attention so she does not recall how much.

After the event, everyone took the bus back to Sigma Kappa. ████████ on the bus ████ does not recall ████ sitting with ████, but her recollection is unclear due to her alcohol consumption during the night.

After returning back to Sigma Kappa, everyone went to Phi Kappa Theta fraternity house ████ ████████ went to ████ room at the fraternity house to hang out. During this time, ████ nd ████ were talking "a lot." ████ 'not giving off a vibe that she was uncomfortable." ████ appeared more "into" ████ than she was to him. ████ was being "touchy." ████ also did not appear drunk. ████ described him as being in control of himself and a 4 out of 10, in terms of how intoxicated he may be.

At some point while in ████ room, ████████ left. ████ s not sure why she an left the room. After approximately one (1) hour had passed ████ They went to ████ room and knocked. The door was locked. No one answered. ████ uld not hear anything happening inside the room, but it was loud in the house since a party was going on. ████ and ████ checked other rooms and were unable to find ████ ████ returned to ████ room and knocked. ████ answered the door and looked "shaken up" and upset. ████ was not crying. ████████ room and told ████ that she wants to go home. ████ walked out after ████ nd went in the opposite direction as ████ ████ appeared angry and upset. ████ did not say anything to ████ fter he left the room.

████████ eft the fraternity house and walked back to ████████ s ████ began crying. ████ was "super upset" and told ████ that she kept telling ████ no, that he hit her, locked the door, and would not let her leave.

**CONFIDENTIAL**



did not see marks ▮▮▮▮ face during the walk home or after they arrived to ▮▮▮ apartment. ▮▮▮ noted that it was dark outside and she does not recall such detail due to her level of intoxication.

When they arrived to the apartment ▮▮▮ did not say anything and was not crying. She was sitting on the couch in the living room, but appeared that she "wasn't there." Other people were also at the apartment eating pizza ▮▮▮ was not with the group for very long before she left the living room to go to sleep.

After ▮▮ left the living room ▮▮▮ approached her and asked her if she wanted to get a rape kit. ▮▮▮ said no. ▮▮▮▮▮▮▮▮ went to bed.

The next morning ▮▮▮▮▮▮ woke up ▮▮▮▮▮▮▮ f she wanted to get a rape kit ▮▮ said no. ▮▮▮▮▮ apartment in the morning and drove home. ▮▮▮▮▮▮ were text messaging throughout the day. ▮▮▮▮▮▮▮▮▮ hat she told her parents about what happened and her parents want her to come back to DeKalb to report the incident and get a rape kit. ▮ knowledge, ▮▮▮ returned later that day with her parents.

▮▮▮ does not recall getting a text message while the alleged incident was taking place, but she could have received one and does not remember.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ dated April 17, 2016 [Attached as Exhibit A]

Statements collected by the City of DeKalb Police Department, dated April 14, 2016 to June 9, 2016 [Attached as Exhibit B]

▮▮▮▮▮▮▮▮▮▮▮▮▮ to NIU Administrators, dated August 1, 2016 [Attached as Exhibit C]

# EXHIBIT F

*Sent via Electronic Mail Attachment*

**CONFIDENTIAL MEMORANDUM**



**Northern Illinois University**

*Affirmative Action and Equity Compliance*

**To:** ▮▮▮▮▮▮▮▮ Student 
▮▮▮▮2@niu.edu

**From:** **Sarah Adamski**, Associate Director of Investigations
Affirmative Action and Equity Compliance
sadamski1@niu.edu

**Date:** **September 14, 2016**

**Re:** *Official Report of Findings for the Title IX Investigation of the Complaint of Sexual Assault that*
▮▮▮▮▮▮▮▮▮▮ *filed against you, dated July 1, 2016.*

Affirmative Action and Equity Compliance
Lowden Hall 101
DeKalb, Illinois 60115-2828
815-753-1118
Fax 815-753-1001
aaec@niu.edu
www.niu.edu/aaec

## INTRODUCTION

This memorandum represents the Official Report of the Findings related to the Title IX Investigation ("Investigation") that was conducted by Affirmative Action and Equity Compliance ("AAEC") for the complaint of sexual assault that ▮▮▮▮▮▮▮▮▮▮ filed against you, dated July 1, 2016.

## ISSUE PRESENTED

A comprehensive and thorough investigation was conducted. The issue that formed the basis of this investigation is as follows:

> Whether there is sufficient evidence to render it more likely than not that you sexually assaulted ▮▮▮▮ on or about April 16, 2016, in violation of the University's *Title IX/Sexual Misconduct Policy and Procedures* ("*Title IX Policy*").

## CONCLUSION

After a careful review of the evidence presented, University policy and applicable federal and state laws, there was enough evidence to render it more likely than not that you sexually assaulted ▮▮▮▮ on or about April 16, 2016, in violation of the University's *Title IX Policy*.

## DISCUSSION

Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 *et. seq.*, provides in part:

> *No person in the United States shall, on the basis of sex, be excluded from participating in, be denied benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance...*

Northern Illinois University complies with Title IX by prohibiting sex discrimination in the form of sexual misconduct. Sexual misconduct includes acts of sexual assault. Sexual assault is defined, in pertinent part, as any nonconsensual sexual act or an act of sexual penetration by the use of force or threat of force. Consent is defined, in pertinent part, by the University's *Title IX Policy* as the following:

> *[A] clear, unambiguous, informed and voluntary agreement between all participants to knowingly engage in sexual activity. Consent must be mutually understandable by words or actions (i.e. a reasonable person would consider the words or actions to indicate mutual agreement to engage in sexual activity.) Consent is active and cannot be based on the absence of an affirmative statement or act of denial. Silence or lack of resistance does not*

*constitute consent. Seeking and receiving consent is the responsibility of the person(s) initiating the sexual act or acts regardless of whether the person initiating the act is under the influence of drugs and/or alcohol...Consent cannot be given when it is the result of... force. The University prohibits any sexual activity that does not involve the consent of each individual.*

During the course of the investigation, you, ▇▇▇and witnesses were interviewed. Documentary evidence that included the following was reviewed and analyzed: text messages between ▇▇▇nd a witness dated April 16th and April 17th, text messages between ▇▇▇and two friends dated April 17th, DeKalb Police Department report, email from ▇▇▇to NIU Administrators dated August 1st, and your submitted Rebuttal. As illustrated through the evidence collected and presented within the Preliminary Report provided to you and ▇▇▇ whether or not you and ▇▇▇engaged in sexual intercourse was not at issue. Rather, whether the sexual intercourse between you and ▇▇▇ was consensual, as defined by the *Title IX Policy*, was disputed and therefore formed the basis of this investigation.

As illustrated within your rebuttal and statements provided by ▇▇▇ her version of events differed from the first time she spoke to the DeKalb police to the second time. Even though both statements are not entirely inconsistent, you assert that such conflicting statements support a conclusion that ▇▇▇s "wholly unreliable" and, thus, her allegations cannot be relied upon. However, ▇▇▇second statement is consistent with the recalled details, albeit limited, that you provided about the night in question. Moreover, ▇▇▇second statement is consistent with a version of events that she shared with friends shortly after the incident occurred. Witnesses were not able to provide any direct evidence as to what allegedly occurred between you and ▇▇▇n your room alone. Rather, they provided inconsistent information to both parties' (you and ▇▇▇ versions of events. You and ▇▇▇first met during the formal event that preceded the alleged incident; any interaction between you and ▇▇▇during the night in question was not planned and/or anticipated prior to its occurrence, which suggests that the allegation was not supported by bad faith and/or a motive. Therefore, ▇▇▇econd statement is a version of events that is consistent with the weight of the evidence and, as a result, reflects the allegations that formed the basis of this investigation.

Regarding the first alleged sexual penetration ▇▇▇s alleging that you inserted your penis into her vagina without consent while she was seated on top of you. ▇▇▇is alleging that you did not obtain consent to the vaginal penetration prior to the occurrence. Based upon the evidence proffered and collected during the investigation, there is not enough evidence supporting the conclusion by a preponderance of the evidence that you sought and/or received consent on the night in question for the vaginal penetration that occurred on your couch with ▇▇▇ You state that everything was going good between you and ▇▇▇it became obvious that you and ▇▇▇were going to have sex, and you got no indication from ▇▇▇that she did not want to have sex. There was nothing more presented on how you sought and received consent during the night in question due to your election not to provide a response to the allegations and/or clarification on the earlier statement provided to police, after you were provided an opportunity to do so. Therefore, there is no explanatory evidence as to what made it obvious to you and/or a reasonable person that ▇▇▇ by her words and/or actions, indicated a mutual agreement to consensually engage in sexual intercourse that evening. ▇▇▇ testimony that she was straddling you without underwear on while consensually kissing is not consent for sexual intercourse. Rather, such action was consent for what was occurring at that moment, kissing. There is evidence that both parties were consuming alcohol during the night in question, but such does not negate the responsibility for the individual initiating the sexual activity (you) to seek and receive consent. Therefore, by a preponderance of the evidence, there is sufficient information to conclude that you did not have consent to vaginally penetrate ▇▇▇while seated on the couch together in your room on or about April 16, 2016.

Regarding the second alleged sexual penetration, ████ is alleging that you vaginally penetrated her a second time from behind as a result of slapping her and pulling her hair after she said no. To the DeKalb police, you admit that you had "doggy style" sexual intercourse with ████ penetration from behind), but did not recall engaging in unwelcomed physical contact (a slap) and said that it might have been possible that you pulled her hair while having sex. You also reiterated that you do not remember being forceful and/or violent towards her and her saying no or stop. A witness was unable to recall and the statements contained within the police report do not indicate whether ████ had any marks on her face due to the alleged physical contact. Therefore, it is inconclusive whether you slapped ████ due to a lack of information in support of this allegation. However, based upon the evidence gathered, there is sufficient evidence to render it more likely than not (preponderance of the evidence) that you did not have consent to engage in the second alleged penetration due to a lack of evidence denying ████ allegation that she said no and a lack of evidence concluding that the hair pulling was consensual in nature. This act constitutes a violation of the University's *Title IX Policy* in the form of nonconsensual sexual activity, as defined above, because ████ did not give you a clear, unambiguous, informed and voluntary agreement to knowingly engage in sexual intercourse with you from behind on or about April 16, 2016 because she verbally informed you that she did not want to engage in sexual intercourse and, despite this verbal indication, you engaged in sexual intercourse with her.

In conclusion, there is sufficient evidence to render it more likely than not that you sexually assaulted ████ in violation of the University's *Title IX Policy*, on or about April 16, 2016.

**No further investigation will be conducted by AAEC into this matter unless facts and/or evidence warrant a subsequent review and/or investigation.** The results of the Investigation may be appealed by either party by submitting a written request of appeal to Dr. Lisa Freeman, Executive Vice President and Provost, Office of the Provost, or her designee. The appeal must be submitted within five (5) business after the date of your receipt of this written Report regarding the Investigation, and must contain the specific reason for the appeal and/or facts that were not available at the time of the investigation. More information about the appeal process can be found in the *Title IX Policy*, located at go.niu.edu/TitleIXPolicy.

After an appeal, if any, is processed, a Resolution Officer from Student Conduct will be appointed and in contact with you about the resolution of this violation of the *Title IX Policy*. During this process, the following implemented interim measures will remain in effect:
1. Temporary/interim and immediate banishment from the following activities;
   - All Student Organizations;
   - Prohibition from participating in any University extra-curricular activities, including, but not limited to, student organization meetings and events, University-sponsored athletic events, and student-sponsored social events;
   - Immediate and temporary removal from any student leadership position; and
   - Residing in any residential facility owned or operated by Northern Illinois University
2. No contact (direct or indirect) with ████████

Please also be advised that it is a violation of the University's *Title IX Policy*, as well as federal and state laws, to retaliate against any individual who, in good faith, files a complaint alleging that sex discrimination has occurred, or because he or she has opposed that which he or she reasonably and in good faith believes to be sex discrimination in higher education, or because he or she has made a charge, filed a complaint, testified, assisted, or participated in any way in an investigation, proceeding, or hearing concerning sex discrimination. Should you experience what you believe to be retaliation as defined above, please contact Affirmative Action and Equity Compliance (AAEC) immediately.

Thank you for your patience and assistance with this matter.  Should you have any further questions, please do not hesitate to contact me directly at (815) 753-5560 or sadamski1@niu.edu.

cc:    Karen L. Baker, Associate Vice President, Title IX Coordinator
        Jeanne Meyer, Director, Student Conduct, Deputy Title IX Coordinator
        Title IX File

# EXHIBIT G

**NORTHERN ILLINOIS UNIVERSITY**
## Student Conduct
**Division of Student Affairs & Enrollment Management**

September 26, 2016

████████████

Sent electronically to Z1677328@STUDENTS.NIU.EDU

**PERSONAL AND CONFIDENTIAL**

Regarding Case Number: 2016021301

Dear ████████

The following temporary/interim sanction(s) has/have been imposed upon you:

1. Temporary/interim and immediate suspension from Northern Illinois University;
2. Temporary/interim and immediate banishment from the following location(s); All NIU Campus Property

**Please note that failure to abide by these temporary/interim sanction(s) may result in further student conduct action**

This serious administrative action is being taken on the basis of reasonable cause to believe that the alleged offense(s) involved one or more of the following criteria:

Serious disruption of residence hall students' lives (based on repeated violations of The Student Code of Conduct where judicial action had been initiated).

If in the course of preparing a defense, you should need to enter an area from which you have been restricted, you must:

(1) Obtain permission from Student Conduct.
(2) Sign in at Student Conduct before entering the restricted area, and sign out at the Student Conduct after leaving the area.

If you need assistance in preparing your case, you may contact Student Conduct, Campus Life Building, 280, or phone 815-753-1571.

You are being given a copy of The Student Code of Conduct in addition to this letter outlining the temporary/interim sanction(s) you received. Please refer to the section on Temporary Sanctions for additional information on temporary/inerim sanctions.

This temporary/interim sanction will be reviewed upon your request by the Vice President for Student Affairs & Enrollment Management or his/her designee within two (2) academic days.

The imposition of a temporary/interim sanction should not be construed as a judgment of your responsibility in the matter at hand, but as an administrative decision by the University which shall not prejudice your case when it is heard by the Student Conduct Board or Administrative Hearing Officer.

Sincerely,

Jeanne Meyer
Director

# EXHIBIT H



NORTHERN ILLINOIS UNIVERSITY
**Student Conduct**
*Division of Student Affairs & Enrollment Management*

September 26, 2016

<del>Jonathan Davila</del>
935 South Beverly Lane
Arlington Heights, IL 60005

<b>PERSONAL AND CONFIDENTIAL</b>

Regarding Case Number: 2016021301

***NOTICE OF ALLEGED VIOLATION***
***NIU STUDENT CODE OF CONDUCT***

Dear <del>Jonathan</del>

Student Conduct received an incident report from the following source: Student Conduct, indicating your involvement in an incident. The specific incident is detailed below:

Date: September 24, 2016;
Time:
Location: Phi Kappa Theta Fraternity House

Alleged policy violation(s):

1. Non-Compliance with University Officials-Failure to comply with directions of Northern Illinois University officials or law enforcement officers acting in the performance of their duties, and/or failure to identify oneself to these persons when requested to do so is prohibited.
2. Abuse - SC System - Failure to Comply-Abuse of the Student Conduct System, including but not limited to: h. Failure to comply with the sanction(s) imposed under the Student Code of Conduct
3. Drugs-Abuse of drugs includes use, possession, manufacture, or distribution of any illegal controlled substance including but not limited to the following: cocaine, hashish, heroin, lysergic acid diethylamide (LSD), marijuana, methamphetamines, or any legally controlled substance without a prescription issued by a licensed physician.

I would like to speak with you regarding this incident, so that I may get a better understanding of what occurred. I scheduled a preliminary conference for you on **Thursday, September 29, 2016, at 1:00 p.m.**, in my office, Campus Life Building 280.

PLEASE BRING YOUR NIU ONE CARD (STUDENT ID) WITH YOU TO THE

PRELIMINARY CONFERENCE. You will need to show your ID when you check in.

At this preliminary conference, I will explain to you the student conduct process here at Northern. I will answer any questions that you have about the process. Additionally, I want to hear your version of the facts about this incident. Finally, at this preliminary conference, I will offer you the opportunity to resolve the matter or to move the case forward in our student conduct process.

I understand that you may have questions about this letter or the process in which you have become involved. I am available to answer questions about the procedure and the student conduct process. However, you may want to speak with an advisor who can provide insight as to how you may want to proceed through this process; for instance, do you want to accept responsibility or request a hearing on the matter. Student Conduct maintains a list of advisors who have received training in the student conduct system here at Northern. You may, however, choose to consult anyone you wish and allow that individual to serve as your advisor. Whomever serves as your advisor should be familiar with the NIU student conduct process. Your advisor may attend the preliminary conference with you; however, the advisor will not be allowed to speak on your behalf.

PLEASE NOTE THAT STUDENT CONDUCT AT NORTHERN ILLINOIS UNIVERSITY RESERVES THE RIGHT TO INITIATE ADDITIONAL STUDENT CONDUCT ACTION IF NEW INFORMATION IS PRESENTED TO THE UNIVERSITY

I urge you to read through all of the attached materials before our preliminary conference, and to bring any questions to our preliminary conference that you may have. I look forward speaking with you soon.

**Accessibility Statement:**

Northern Illinois University is committed to providing an accessible educational environment in collaboration with the Disability Resource Center (DRC). Any student requiring an accommodation in the student conduct process, due to a disability should let Student Conduct know as soon as possible. Students who need accommodations based on the impact of a disability will be encouraged to contact the DRC if they have not done so already. The DRC is located on the 4th floor of the Health Services Building, and can be reached at 815-753-1303 (V) or drc@niu.edu.

Sincerely,

Jeanne M. Meyer

Jeanne Meyer
Director



**NORTHERN ILLINOIS UNIVERSITY**

# Student Conduct

*Division of Student Affairs & Enrollment Management*

280 Campus Life Building
DeKalb, IL 60115

815-753-1571 (Office)
815-753-9289 (Fax)

## INCIDENT INFORMATION

Incident date/time: September 24, 2016 at
Incident location: Phi Kappa Theta Fraternity House
Incident description:

At 1355hrs on September 26, 2016, Chapter Advisor to Phi Kappa Theta Fraternity, Anthony Preston sent an email to Brian Glick requesting a telephone call regarding ▆▆▆▆▆ (See attached email). At 1459hrs on September 26, 2016, Glick called Preston at Preston's office phone number. Preston relayed the following information to Glick non-verbatim:

On Sunday, September 25, 2016, in the evening, a member of Phi Kappa Theta attempted to contact Preston and requested a telephone call to discuss a situation allegedly falling under the umbrella of Title IX of the Education Amendments of 1972. The member advised Preston of the following, non-verbatim:

On the night of Saturday, September 24, 2016, temporarily suspended Phi Kappa Theta member ▆▆▆▆▆ ▆▆▆▆ entered the Phi Kappa Theta Fraternity house with an unknown female (victim). ▆▆▆▆ and the victim went to ▆▆▆▆ former room in the fraternity house. ▆▆▆▆ and the victim both ingested cocaine. ▆▆▆▆ "attempted to put the moves on the (victim)." The victim attempted to leave the room, but ▆▆▆▆ blocked the door by placing his hands on the door and also standing in front of the door. The victim did not want to report this information to the university for fear of consequence for drug use.

The member learned of this information from his ex-girlfriend, name unknown. The member's ex-girlfriend is a member of an NIU sorority. The member shared with Preston that there may be additional victims subject to similar actions by ▆▆▆▆. Preston encouraged the member to come forward and report this information to the Student Conduct office. Preston is going to meet with the member tonight (9/26/2016) for further follow up. Preston relayed to Glick that the fraternity will change the locks on the fraternity house door.

Glick notified Sarah Adamski of this information prior to filing the report.



NORTHERN ILLINOIS UNIVERSITY
## Student Conduct
*Division of Student Affairs & Enrollment Management*

September 26, 2016

Jonathan Davila
935 South Beverly Lane
Arlington Heights, IL 60005

**PERSONAL AND CONFIDENTIAL**

Regarding Case Number: 2016021301

### ***NOTICE OF ALLEGED VIOLATION***
### ***NIU STUDENT CODE OF CONDUCT***

Dear Jonathan,

Student Conduct received an incident report from the following source: Student Conduct, indicating your involvement in an incident. The specific incident is detailed below:

Date: September 24, 2016;
Time:
Location: Phi Kappa Theta Fraternity House

Alleged policy violation(s):

1. Non-Compliance with University Officials-Failure to comply with directions of Northern Illinois University officials or law enforcement officers acting in the performance of their duties, and/or failure to identify oneself to these persons when requested to do so is prohibited.
2. Abuse - SC System - Failure to Comply-Abuse of the Student Conduct System, including but not limited to: h. Failure to comply with the sanction(s) imposed under the Student Code of Conduct
3. Drugs-Abuse of drugs includes use, possession, manufacture, or distribution of any illegal controlled substance including but not limited to the following: cocaine, hashish, heroin, lysergic acid diethylamide (LSD), marijuana, methamphetamines, or any legally controlled substance without a prescription issued by a licensed physician.

I would like to speak with you regarding this incident, so that I may get a better understanding of what occurred. I scheduled a preliminary conference for you on **Thursday, September 29, 2016, at 1:00 p.m.**, in my office, Campus Life Building 280.

PLEASE BRING YOUR NIU ONE CARD (STUDENT ID) WITH YOU TO THE

PRELIMINARY CONFERENCE. You will need to show your ID when you check in.

At this preliminary conference, I will explain to you the student conduct process here at Northern. I will answer any questions that you have about the process. Additionally, I want to hear your version of the facts about this incident. Finally, at this preliminary conference, I will offer you the opportunity to resolve the matter or to move the case forward in our student conduct process.

I understand that you may have questions about this letter or the process in which you have become involved. I am available to answer questions about the procedure and the student conduct process. However, you may want to speak with an advisor who can provide insight as to how you may want to proceed through this process; for instance, do you want to accept responsibility or request a hearing on the matter. Student Conduct maintains a list of advisors who have received training in the student conduct system here at Northern. You may, however, choose to consult anyone you wish and allow that individual to serve as your advisor. Whomever serves as your advisor should be familiar with the NIU student conduct process. Your advisor may attend the preliminary conference with you; however, the advisor will not be allowed to speak on your behalf.

PLEASE NOTE THAT STUDENT CONDUCT AT NORTHERN ILLINOIS UNIVERSITY RESERVES THE RIGHT TO INITIATE ADDITIONAL STUDENT CONDUCT ACTION IF NEW INFORMATION IS PRESENTED TO THE UNIVERSITY

I urge you to read through all of the attached materials before our preliminary conference, and to bring any questions to our preliminary conference that you may have. I look forward speaking with you soon.

**Accessibility Statement:**

Northern Illinois University is committed to providing an accessible educational environment in collaboration with the Disability Resource Center (DRC). Any student requiring an accommodation in the student conduct process, due to a disability should let Student Conduct know as soon as possible. Students who need accommodations based on the impact of a disability will be encouraged to contact the DRC if they have not done so already. The DRC is located on the 4th floor of the Health Services Building, and can be reached at 815-753-1303 (V) or drc@niu.edu.

Sincerely,

Jeanne M. Meyer
Director



## NORTHERN ILLINOIS UNIVERSITY
# Student Conduct
### Division of Student Affairs & Enrollment Management

280 Campus Life Building
DeKalb, IL 60115

815-753-1571 (Office)
815-753-9289 (Fax)

### INCIDENT INFORMATION

Incident date/time:        September 24, 2016 at
Incident location:         Phi Kappa Theta Fraternity House
Incident description:

At 1355hrs on September 26, 2016, Chapter Advisor to Phi Kappa Theta Fraternity, Anthony Preston sent an email to Brian Glick requesting a telephone call regarding ▮▮▮▮▮▮ (See attached email). At 1459hrs on September 26, 2016, Glick called Preston at Preston's office phone number. Preston relayed the following information to Glick non-verbatim:

On Sunday, September 25, 2016, in the evening, a member of Phi Kappa Theta attempted to contact Preston and requested a telephone call to discuss a situation allegedly falling under the umbrella of Title IX of the Education Amendments of 1972. The member advised Preston of the following, non-verbatim:

On the night of Saturday, September 24, 2016, temporarily suspended Phi Kappa Theta member ▮▮▮▮▮▮ ▮▮▮▮ entered the Phi Kappa Theta Fraternity house with an unknown female (victim). ▮▮▮▮ and the victim went to ▮▮▮▮▮ former room in the fraternity house. ▮▮▮▮ and the victim both ingested cocaine. ▮▮▮▮ "attempted to put the moves on the (victim)." The victim attempted to leave the room, but ▮▮▮▮ blocked the door by placing his hands on the door and also standing in front of the door. The victim did not want to report this information to the university for fear of consequence for drug use.

The member learned of this information from his ex-girlfriend, name unknown. The member's ex-girlfriend is a member of an NIU sorority. The member shared with Preston that there may be additional victims subject to similar actions by ▮▮▮▮▮. Preston encouraged the member to come forward and report this information to the Student Conduct office. Preston is going to meet with the member tonight (9/26/2016) for further follow up. Preston relayed to Glick that the fraternity will change the locks on the fraternity house door.

Glick notified Sarah Adamski of this information prior to filing the report.

## TEMPORARY SANCTION/INTERIM MEASURE ADMINISTRATIVE REVIEW REQUEST FORM

I, ▓▓▓▓▓▓▓, request an administrative review of the temporary sanction(s) imposed against me for the following reasons:

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Signature of Student: _____     Contact Phone Number: _____

Please attach additional sheets if necessary

Please submit completed form to Altgeld Hall, Room 208, Attn: Dr. Michael Stang

FOR OFFICE USE ONLY: Date Received: _____

Maxient ID: 2016021301

REQUEST FOR AN ADMINISTRATIVE REVIEW OF A TEMPORARY SANCTION/INTERIM MEASURE TO THE VICE PRESIDENT FOR STUDENT AFFAIRS & ENROLLMENT MANAGEMENT

**Request Process**

Requests for an administrative review of a temporary sanction must be made to the Office of the Vice President for Student Affairs & Enrollment Management, Altgeld Hall 208, (815) 753-1573, in writing within TWO (2) CLASS DAYS of receipt of the temporary sanction letter and shall set forth the grounds for appeal.

Temporary sanctions issued by Student Conduct should be made attention to: Dr. Michael Stang.

Temporary sanctions issued by the Department of Housing & Residential Services should be made attention to: Ms. Patricia A.R. Martinez.

**The Administrative Review**

The administrative review will normally be held within two class days of receipt of the request for appeal and will be conducted by the Vice President or a member of his or her staff. The purpose of the review is to determine the continuing appropriateness of the temporary sanctions imposed. No judgment of responsibility will be made on the charges. Responsibility will be decided through a subsequent student conduct process.

The student will be given the opportunity to present and justify his/her grounds for appeal. The Vice President or designee may then ask questions regarding the situation.

**Rendering of the Decision**

The Vice President or designee will issue a decision in writing, normally within two (2) class days of the completion of the administrative review. The decision will be to sustain, lessen (but not increase) or remove the sanctions and will be based on the material from the review and other germane information (e.g. the student's conduct file). There is no appeal for this decision.

NOTE: Complete details concerning temporary sanctions may be found in The Student Code of Conduct, on page 32 and 33.

Modified 04/2016



### NORTHERN ILLINOIS UNIVERSITY
## Student Conduct
### *Division of Student Affairs & Enrollment Management*

280 Campus Life Building
DeKalb, IL 60115

815-753-1571 (Office)
815-753-9289 (Fax)

### Receipt of Temporary Sanction

Your signature on this form is not an admission of responsibility, nor does it indicate your agreement with the temporary sanction(s) levied upon you. Your signature does verify that you received the temporary sanction letter and any other accompanying correspondence.

Name of Student Receiving Temporary Sanction: ~~Jonathan Davila~~
Case Number:    **2016021301**
Signature of Student: _____
Date of Service: _____

Temporary Sanction Served By (Printed Name): _____
Date of Service: _____

Please return this completed form to the NIU Department of Police & Public Safety, Records Division.

Modified 09/2015



**NORTHERN ILLINOIS UNIVERSITY**

## Student Conduct

*Division of Student Affairs & Enrollment Management*

September 26, 2016

**PERSONAL AND CONFIDENTIAL**

Regarding Case Number: 2016021301

Notification of Temporary/Interim Sanction-Class Removal

**THIS IS A TEMPORARY/INTERIM SANCTION AND MAY BE OVERTURNED. TAKE NO ACTION UNTIL OR UNLESS A FINAL DISPOSITION OF SUSPENSION/EXPULSION IS ISSUED OR A NOTICE OF CLASS REINSTATEMENT IS ISSUED BY THIS OFFICE.**

To: Office of the Advising Dean, College of College of Business (Ms. Lori Marcellus, College of Business)
From: Student Conduct (Brian M. Glick)
_____(Signature)
Re: Temporary/Interim Sanction-Class Removal for Student Conduct Reasons

The following student has had a temporary suspension issued, banning the student from all NIU property. The student will not be removed from the roster unless or until the student is found responsible and sanctioned to suspension/expulsion, or the student decides to withdraw from the University. The student remains banned from campus until an administrative review or final disposition.
Student Name: ~~Jonathan David~~ ID: Z1677328
Address: 935 South Beverly Lane, Arlington Heights, IL, 60005
Phone: (Permanent)//773/573-4712 (Cellular)
Email: Z1677328@STUDENTS.NIU.EDU

Effective Date of Sanction: September 26, 2016
Date Student Informed of Sanction: September 26, 2016

Sanction (Include Who/What/When as needed):
X University Suspension:

*A Temporary Sanction is imposed by Student Conduct based on a credible and imminent threat to the safety of the Northern Illinois University community or an NIU community member. Although the student remains on the roster until a final disposition in the conduct matter or the STUDENT elects to withdraw from NIU of his/her own volition, the student should not attend class during the time this temporary sanction is in effect. If the student appears in class, please dial 911.*

The following courses are affected:

Golf I/ KNPE 119/ Pam Tyska
Creativity, Innovation, Entrepenureship/ MGMT 327/ Furkan Gur
Entre into Microfinance Organizations/ MGMT 411/ Dennis Barsema
Portfolio/ OMIS 99/ Steven Kispert
Introduction to Business Intelligence/ OMIS 472/ Brian Mackie
Operations and Information Management/OMIS 498/Gerald Aase
Passport Culmination/UBUS 201/Beth Towell

Comments: (including instructions given to student for follow through)
The student has been instructed to meet with his or her academic college to discuss the academic implications of this temporary/interim sanction.
**This is not a University excused absence. The instructor should follow class, college and University policies in determining the impact of the absence on meeting the course requirements.**
Student's Major: Operations and Info Management

CC:   Mr. Jerry Montag, Registrar
         Ms. Diane Garman, Registration & Records
         Ms. Lori Marcellus, Advising Dean, College of Business
         Pam Tyska
         Furkan Gur
         Dennis Barsema
         Steven Kispert
         Brian Mackie
         Gerald Aase
         Beth Towell

# EXHIBIT I



NORTHERN ILLINOIS UNIVERSITY

**Student Conduct**

*Division of Student Affairs & Enrollment Management*

November 4, 2016

Jonathan Davila

Sent electronically to Z1677328@STUDENTS.NIU.EDU

**PERSONAL AND CONFIDENTIAL**

Regarding Case Number: 2016021301

Dear Jonathan:

This letter shall serve as a Notice of Dismissal in the case 2016021301, regarding an incident on September 24, 2016, involving the following charge(s):

1. Non-Compliance with University Officials-Failure to comply with directions of Northern Illinois University officials or law enforcement officers acting in the performance of their duties, and/or failure to identify oneself to these persons when requested to do so is prohibited.
2. Abuse - SC System - Failure to Comply-Abuse of the Student Conduct System, including but not limited to: h. Failure to comply with the sanction(s) imposed under the Student Code of Conduct
3. Drugs-Abuse of drugs includes use, possession, manufacture, or distribution of any illegal controlled substance including but not limited to the following: cocaine, hashish, heroin, lysergic acid diethylamide (LSD), marijuana, methamphetamines, or any legally controlled substance without a prescription issued by a licensed physician.

Based on the information Student conduct has at this time I am dismissing the charges in this matter. Please note that Student Conduct at Northern Illinois University reserves the right to initiative additional student conduct action in this matter if more information becomes available in the future. This matter is concluded at this time. Should you have any questions, please contact me at 815-753-1571.

Sincerely,

Jeanne M. Meyer

Jeanne Meyer
Director

CC:   NIU Police Records

# EXHIBIT J



# Northern Illinois University

## Affirmative Action & Equity Compliance

# Title IX/Sexual Misconduct Policy and Complaint Procedures for Employees and Students

*Last Revision Date:  September 29, 2015*

**Title IX Policy and Procedures**

**Last Revision Date: September 29, 2015**

**Table of Contents**

|  |  | Page |
|---|---|---|
| I. | **PURPOSE** | **3** |
| II. | **POLICY** | **4** |
|  | Notice of Non-Discrimination | 4 |
|  | Retaliation Prohibited | 4 |
|  | Application of this Policy | 5 |
|  | Athletics | 5 |
|  | Responsible Employees | 5 |
|  | Reporting Obligations | 6 |
|  | Training and Education | 6 |
|  | Child Abuse and Neglect | 6 |
| III. | **TITLE IX COORDINATOR(S)** | **7** |
| IV. | **PROCEDURE** | **7** |
|  | Addressing Sexual Misconduct | 7 |
|  | File a Title IX Complaint | 7 |
|  | File a Criminal Complaint | 9 |
|  | Anonymous/Confidential Complaint | 10 |
|  | Title IX Investigation Process and Procedures | 12 |
|  | Investigative Procedure and Timeline | 13 |
|  | Interim Measures | 14 |
|  | Voluntary Informal Resolution Mechanisms | 14 |
|  | Investigation Rules | 14 |
|  | Sanctions | 16 |
|  | Sanction by Agreement (students) | 16 |
|  | Sanction by Hearing (for student Respondents only) | 17 |
|  | Sanction by Decision (for employees and third party Respondents) | 18 |
|  | Possible Sanctions | 18 |
|  | Remedies | 19 |
|  | Appeals | 20 |
| V. | **EXTERNAL AGENCIES** | **21** |
| VI. | **DEFINITIONS** | **22** |

# I.  PURPOSE

The mission of Northern Illinois University (NIU) is the mission of the University is to promote excellence and engagement in teaching and learning, research and scholarship, creativity and artistry, and outreach and service. The University is a community of those whose varied functions, responsibilities, and contributions are supportive of the instructional, research, and service mission of the institution. Civil and professional interactions among all faculty, staff and students are essential to support that mission in an effective, efficient, and ethical manner.

Pursuant to this mission of excellence, it is therefore crucial for the University to ensure that all members of its community, including guests and visitors, have the right to learn and work in the safest possible community and environment, and to be free from all forms of sex discrimination. *Title IX of the Education Amendments of 1972*, 20 U.S.C. § 1681 *et seq.* provides in part, that no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

Sex discrimination also includes sexual misconduct in the form of sexual harassment, hostile work environment, sexual violence (i.e., rape, sexual assault, and sexual abuse), domestic violence, dating violence, stalking and gender/sex-based harassment or discrimination, all of which represent conduct/behavior that is prohibited by this Policy in accordance with Title IX.

All members of the University community, visitors, and guests are expected to conduct themselves in a manner that does not infringe on the rights of others. In order to provide recourse for allegations of inappropriate treatment involving sexual misconduct by faculty, staff, or students, the procedures contained within this Policy will be used. This is intended to be consistent with the Preamble to the Northern Illinois University Constitution, which declares, "Respect for the intrinsic dignity of each member of the University community, both by the University itself and by each member of that community, is the basic cornerstone governing all community activities." The purpose of this Policy is to comply with Title IX as advised by the Department of Education's Office of Civil Rights by providing clear guidance regarding the University's internal formal system of reporting, processing, and adjudicating complaints of sexual misconduct.

Throughout these procedures, all persons involved should exercise discretion in receiving and transmitting information. All complaints and/or allegations filed in accordance with this policy will be examined in a fair and equitable manner, and in accordance with applicable federal and state laws. As warranted by the facts of the situation and in coordination with the organizational areas involved, suitable corrective action will be implemented whenever sex discrimination in the form of sexual misconduct and/or retaliation for opposing conduct/behavior that is believed to be unlawful and/or a form of sex discrimination occurs.  Any employee or student who engages in conduct prohibited by this Policy will be required to participate in appropriate corrective measures. All disciplinary actions will be performed in accordance with applicable procedural and substantive due process principles and personnel procedures as stated by this or other applicable university policies.

3

An investigation of sexual misconduct may also result in a criminal investigation by the University, which is separate and apart from the standard University due process procedures contained within the complaint filing process and procedures. Employment related matters and/or resolutions resulting from any employment discrimination and/or Title IX complaint will be conducted independent of any applicable criminal investigation. The University Office of Student Conduct may conduct an independent review of any matter to determine if a separate student conduct violation occurred. Such a review would be conducted pursuant to the Student Code of Conduct to address violations outside of any alleged sexual misconduct.

## II.   POLICY

*Title IX of the Education Amendments of 1972*, 20 U.S.C. § 1681 *et seq.* provides in part:

> *No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.*

Northern Illinois University has jurisdiction over all Title IX complaints of sexual misconduct occurring at NIU.

### Notice of Non-Discrimination
Academic and employment decisions based upon sex or gender and/or acts of sexual misconduct are forms of illegal sex discrimination under Title IX, additional federal and state laws, and are prohibited under this and other policies of Northern Illinois University. The University does not discriminate on the basis of sex, gender or gender identity in any phase of its educational or employment programs; the University is required by Title IX and other applicable laws to not so discriminate.

The University will not tolerate sex discrimination in the form of sexual misconduct. If the University knows or reasonably should know of possible sexual misconduct, a thorough, impartial, and confidential investigation will be conducted in as prompt a manner as possible to determine if there has been a violation of this Policy. If, as a result of that investigation, it is determined that any act of sexual misconduct has occurred, appropriate discipline will be imposed, and the University will take the necessary steps to address and stop the sexual misconduct, prevent its recurrence, and remedy its effects.

### Retaliation Prohibited
Retaliation against any individual who opposes what they believe to be discrimination on the basis of sex, gender, gender identity or in the form of sexual misconduct is prohibited by this Policy. Any person who is found to have retaliated against another for making a Complaint of sexual misconduct under Title IX, being a witness for purposes of any such investigation, or being otherwise involved in the complaint and/or investigative process (including the Respondent), will be subject to discipline, up to and including termination or expulsion, depending on the circumstances, even if no responsibility is found for the alleged sexual misconduct. Retaliation should be reported immediately to **Karen L. Baker, Associate**

4

**Vice President and Title IX Coordinator**, Lowden Hall 101, DeKalb, IL 60115 (815) 753-6017, klbaker@niu.edu.

## Application of this Policy

This Policy applies to all students, employees, and third parties, regardless of race, color, national origin, ancestry, sex, religion, age, physical and mental disability, marital status, veteran status, sexual orientation, gender identity, gender expression, political affiliation, or any other factor unrelated to professional or educational qualifications, and is in coordination with the *Non-Discrimination/Harassment Policy and Complaint Procedures for Employees and Students*, which prohibits discrimination at the University. However, this Policy serves, primarily, as the governing document for Affirmative Action and Equity Compliance (AAEC) to conduct investigations of sexual misconduct involving employees and students.

This Policy also applies to *all* conduct in any academic, educational, extra-curricular, athletic, or other University program and activity, whether those programs and activities occur in University facilities, on or off campus. Even if the sexual harassment and/or misconduct did not occur in the context of an education program or activity, NIU will consider the effects of the off-campus sexual harassment when evaluating whether there is a hostile environment on campus or in an off-campus education program or activity. Accordingly, the University will investigate all complaints, regardless of where the alleged conduct occurs. Should the University become aware that any contractor, vendor, partner, or other affiliate engages in sexual misconduct, it will take appropriate action, up to and including termination of the business relationship or partnership.

## Athletics

Northern Illinois University faculty, staff, and students with questions concerning the application of Title IX to the University's intercollegiate athletic programs and activities may contact: **Debra Boughton, Intercollegiate Athletics, Deputy Title IX Coordinator for Athletics**, 1525 W. Lincoln Highway, DeKalb, IL, (815) 753-9541.

## Responsible Employee

The University is obligated to address acts of sexual misconduct of which a responsible employee knew or should have known occurred. A "responsible employee" is any employee who:
   (1) Has the authority to take action to address sexual misconduct;
   (2) Has been given the duty of reporting incidents of sexual misconduct or any other misconduct by students; or
   (3) A student could reasonably believe has this authority or duty.

At Northern Illinois University, "responsible employees" include faculty members, administrators (Deans, Department Chairs, Directors, Vice Presidents, etc.), Community Advisors (CAs), Residence Life Administration, Complex Coordinators, Hall Directors, faculty advisors, police officers, building service workers, dining hall employees, and administrative professionals in a supervisory capacity or who have regular interactions with students.

## Reporting Obligations

A responsible employee *must* report to the Title IX Coordinator all relevant details about alleged sexual misconduct that the student or other person has shared and that the University will need to determine what occurred and resolve the situation. This includes the names of the alleged Respondent (if known), the student or other person who experienced the alleged sexual misconduct, others involved in the alleged sexual misconduct, as well as relevant facts, including the date, time, and location of the incident. Additional definitions of terms can be found in a list at the end of this policy. Reports can be made at: http://niu.edu/conduct/Incidentreporting/index.shtml

**Before** a person reveals information that he or she may wish to keep confidential, a responsible employee should make every effort to ensure that the person understands: (1) the employee's obligation to report the names of the alleged Respondent and person involved in the alleged sexual misconduct, as well as relevant facts regarding the alleged incident (including date, time, and location of the incident), to the Title IX Coordinator; (2) the person's option to request that the University maintain confidentiality, which an appropriate committee composed of Title IX Coordinator(s), Title IX Investigator(s), an Advocacy Coordinator from Counseling and Consultation Services and a representative from the NIU Department Police and Public Safety when appropriate may consider; and (3) the person's ability to share the information confidentially with the confidential resources identified herein.

A responsible employee should provide the following information to a Claimant: (1) the reporting obligations (discussed above) of the responsible employee; (2) Claimant's option to request confidentiality and available confidential resources, as provided herein; (3) Claimant's right to file a Title IX Complaint with the University; and (4) Claimant's right to report a crime to campus or local law enforcement.

## Training and Education

All persons involved in implementing a school's grievance procedures (i.e., Title IX coordinators, others who receive complaints, investigators, and adjudicators) must have training or experience in handling sexual misconduct complaints, and in the operation of the school's grievance procedures. Such training, should include, but is not limited to, working with and interviewing persons subjected to sexual misconduct, the proper standard of review for sexual misconduct complaints, information on consent, and the ability to consent with the role of drugs and alcohol.

## Child Abuse and Neglect

All staff and faculty must report suspected or known child abuse to the Illinois Department of Children and Family Services (DCFS). 325 ILCS 5/4. Accordingly, all employees of NIU must report suspected sexual misconduct perpetrated against those under the age of 18 to DCFS. The DCFS hotline is (800) 252-2873, for additional information: http://www.hr.niu.edu/resources/files/other/DCFS%20Flowchart.pdf

6

## III.   TITLE IX COORDINATOR(S)

Questions or concerns regarding Title IX, this Policy, or other aspects of the University's equal opportunity or affirmative action programs can be directed to **Karen L. Baker, Associate Vice President and Title IX Coordinator,** Lowden Hall 101, DeKalb, IL, (815) 753-6017, klbaker@niu.edu. Inquiries/questions regarding this policy and/or Title IX may also be referred to **Office for Civil Rights**, U.S. Department of Education, Citigroup Center, 500 W. Madison Street, Suite 1475, Chicago, IL 60661-4544, (312) 730-1560, OCR.Chicago@ed.gov. Questions and/or concerns may also be referred to the Deputy Title IX Coordinators listed below:

**Anne Birberick, Vice Provost, Deputy Title IX Coordinator for Academic Affairs**
Altgeld Hall 215, DeKalb, IL 60115, (815) 753-0494, annie@niu.edu.

**Debra Boughton, Athletic Associate Director, Business Affairs, Deputy Title IX Coordinator for Athletics**, Intercollegiate Athletics, Convocation Center, Room 200D, DeKalb, IL 60115, (815) 753-9541, dboughton1@niu.edu.

**Jeanne Meyer, Director, Office of Student Conduct, Deputy Title IX Coordinator for Student Conduct**, Office of Student Conduct, Campus Life Building, Room 280, DeKalb, IL 60115, (815) 753-9286, jeanne@niu.edu.

## IV.   PROCEDURE

**Addressing Sexual Misconduct**
Any student or employee (other than Responsible Employees) who witnesses and/or experiences what that person believes is a form of sexual misconduct as defined by this Policy is strongly encouraged to (1) file a Title IX Complaint, (2) file a criminal complaint, or (3) file anonymous/ confidential complaint as described in this Policy.

This Policy also recognizes the ultimate decision of the victim/survivor not to pursue any formal method of reporting sexual misconduct and/or to seek confidential counseling and assistance in lieu of these formal methods.

**File a Title IX Complaint**
*Who May File a Title IX Complaint*
Any University student, employee, or third party on any NIU campus, or those acting on another's behalf (for example, Departments, parents, or guardians), may file a Title IX/Sexual Misconduct complaint to report acts of sexual misconduct in the treatment of students, employees, or third parties. A Title IX/Sexual Misconduct Complaint may also concern retaliation for filing a Complaint or participating in an investigation relating to acts of sexual misconduct. The University expects that all Title IX/Sexual Misconduct complaints will be filed in good faith. All incidents of sexual misconduct will be taken

7

seriously by the University when formally reported, and such incidents will be investigated and properly resolved in accordance with the procedures contained herein.

### *How to File a Title IX/Sexual Misconduct Complaint*

A formal Title IX/Sexual Misconduct complaint can be filed utilizing one of the following options:

- *Contact a Title IX Coordinator.* Any Title IX Coordinator may be contacted for an appointment to discuss the nature of the Complaint, during which the employee/student should be prepared to discuss all factual circumstances and information upon which the Title IX/Sexual Misconduct Complaint is based. This includes the names of the alleged Respondent (if known), the student or other person(s) who experienced the alleged sexual misconduct, others involved in or witnesses to the alleged sexual misconduct, as well as relevant facts, including the date, time, and location. The Title IX Coordinator will determine whether a Title IX investigation, further inquiry, follow-up, and/or other resolution methods are warranted.

- *File a Maxient Report.* The employee/student may file a Title IX Complaint by completing the online incident report utilizing the Maxient Reporting system, located through the Office of Student Conduct at: http://niu.edu/conduct/Incidentreporting/index.shtml

- *Complete the AAEC Title IX/Sexual Misconduct Complaint form.* The Title IX/Sexual Misconduct complaint that is filed as an incident report and/or formal AAEC complaint, will be forwarded to the Title IX Coordinator, or designee, for review and follow-up.

Additional documents may be submitted with the Title IX/Sexual Misconduct Complaint (*e.g.*, police report, e-mails), but is not required.

### *What to Expect if a Title IX/Sexual Misconduct Complaint is filed*

If a formal Title IX/Sexual Misconduct complaint is filed, a preliminary review of the complaint will be conducted by the Title IX Coordinator to determine if there are enough facts, evidence, and/or information to warrant a Title IX investigation, further follow-up, inquiry, and/or resolution. The Title IX Coordinator, or designee, will review the facts of the alleged incident with the Complainant and develop a list of witnesses who can provide information regarding the alleged incident. If necessary, the Title IX Coordinator, or designee, will conduct a meeting with the Claimant in a confidential setting and provide the Claimant with information regarding all available options.

The issue of confidentiality and retaliation will also be discussed with the Complainant and information from Counseling and Consultation Services and/or services that are available within the community will be provided. The Complainant will have an opportunity to discuss the investigation process and ask questions regarding the possible outcomes and next steps within the process. The Complainant will also be provided with information on how to file a police report and information related to confidential counseling and advocacy services. An assessment of whether or not further involvement by the University Police is warranted will also be performed by the Coordinator and/or designee.

8

## File a Criminal Complaint
### *Who May File a Criminal Complaint*
Any student/employee may file a police report by contacting the NIU Department of Police and Public Safety or the DeKalb Police Department. The NIU Department of Police and Public Safety will forward the report to the Title IX Coordinator or designee, and the procedure outlined below in the *Investigation* Section will be followed.

Note: a criminal complaint with campus police or the DeKalb Police Department can be filed at any time and is encouraged to occur in cases of sexual violence, including but not limited to incidents of rape, sexual assault, violent sexual stalking, and/or sexual abuse.

### *How to File a Criminal Complaint*
A police report may be filed utilizing the contact information listed below:

**NIU Department of Police and Public Safety** – for incidents that occur on campus.
375 Wirtz Drive
DeKalb, IL 60115
Emergency: 911
Non-Emergency: 815-753-1212
Email: niupd@niu.edu
www.niu.edu/publicsafety

**DeKalb Police Department** – for incidents that occur off campus.
700 West Lincoln Highway
DeKalb, IL 60115
Emergency: 911
Non-Emergency: (815) 748-8400
Email: dekalb.police@cityofdekalb.com
www.cityofdekalb.com/184/Police-Department

### *What to Expect if a Police Report is Filed*
If you go to the NIU Department of Police and Public Safety, you can expect to meet with a full-time sworn officer to discuss the incident, and an official police report will be generated. The police report is not a complaint to the University and does not obligate you to take any further action.

The police officer will make you aware of services available to you, both on campus and off, and will put you in contact with an Advocacy Coordinator from Counseling and Consultation Services. The police officer may also accompany you to the hospital for evidence gathering, if you wish. Finally, the police officer will notify the Title IX Coordinator that an instance of sexual misconduct has occurred.

If it is a criminal matter, the police will then undertake an initial inquiry into the incident. When enough information is gathered, you may be asked to sign a criminal complaint, also known as filing charges. You do not have to sign a complaint or file charges.

9

If you do sign the complaint, it will be filed with the circuit clerk, and the DeKalb County State's Attorney will become involved in the matter. A warrant for the Respondent's arrest may be issued. Once the DeKalb County State's Attorney is involved, your continued cooperation in the matter will be between you and the State's Attorney's Office.

You may obtain assistance making any report or complaint with any **Title IX Coordinator, Advocacy Coordinator at Counseling and Consultation Services,** (815) 753-1206, or **Safe Passage designee,** (815) 756-5228. See *Confidential Resources* section for more information.

## File an Anonymous/Confidential Complaint
### *Who Can Seek Confidential Counseling and Assistance*
Any employee or student may request that the matter involving sexual misconduct remain confidential and/or anonymous as defined by this policy. Additionally, any student and/or employee may obtain assistance with filing a Title IX/Sexual Misconduct Complaint, Police Report, and/or information regarding available counseling resources on campus and in the surrounding community.

### *What Confidential Resources are Available*
The University and DeKalb community provide confidential resources if you have suffered sexual misconduct. Services include confidential counseling and medical services, if needed. If you desire the act of sexual misconduct be kept completely confidential, but need assistance, you can speak with any of the following persons or offices. **These resources will not provide notice to the University of the alleged sexual misconduct, an investigation into the matter will not result, and the matter will remain confidential to the extent permissible at law.**

A report or complaint is not necessary to utilize these resources.

**NIU Advocacy Coordinator**
**Counseling & Consultation Services**
200 Campus Life Building
(815) 753-1206
www.niu.edu/counseling/advocacy

**NIU Health Services**
Wirtz Drive & Lucinda Avenue
(815) 753-1311
www.niu.edu/healthservices

**NIU Office of the Ombudsperson**
601 Holmes Student Center
(815) 753-1414
www.niu.edu/ombuds

**Employee Assistance Program**
700 Holmes Student Center
www.hr.niu.edu/ServiceAreas/EmployeeAssistance

**NIU Psychological Services Center**
Psychology/Math Building 86
(815) 753-0591
www.niu.edu/PSYC/psc

**NIU Couple & Family Therapy Clinic**
Wirtz Hall 146
(815) 753-1684
www.chhs.niu.edu/familytherapyclinic

**Kishwaukee Community Hospital\*\***
One Kishwaukee Hospital Drive
DeKalb, IL 60115
(815) 756-1521
www.kishhealth.org
\*\*The Hospital can provide evidence collection in cases of sexual violence, which is an important step towards pursuing a complaint or criminal charges.

**Safe Passage, DeKalb**
(815) 758-7922
safepassagedv.org

**Ben Gordon Counseling Center**
12 Health Services Drive
Sycamore, IL 60178
(815) 756-4875
Crisis Line:  (866)-242-0111
bengordoncenter.org

**Depression Crisis Hotline**
(630) 482-9696

**Suicide Hotline**
(800) 784-2433

*What to Expect When Confidentiality is Requested*

If a Claimant chooses to remain completely anonymous and utilizes resources listed above, no complaint will be filed. If a Claimant chooses to report an incident to any reporting entity on campus, but requests to remain confidential the Title IX Coordinator will determine if confidentiality should be maintained. Where there is a likelihood of further harm to the Claimant and/or the campus community, confidentiality may be revoked.

When confidentiality of the Claimant is maintained or the Claimant's identity is unknown, the University's ability to respond and take appropriate disciplinary action may be impeded. Nevertheless, the University will attempt to provide resources as provided herein and to take steps addressed to remedy the effects of the alleged sexual misconduct and to prevent its recurrence.

Nothing in this provision prohibits the Title IX Coordinator from determining whether or not to maintain the request for confidentiality and/or from consulting with appropriate university officials is warranted by the facts of the case.

## Title IX Investigation Process and Procedures

The procedures outlined in this document may proceed independent of any other University grievance or disciplinary procedure provided for elsewhere by the University including, but not limited to, Faculty/Staff University Grievance Process, Affirmative Action Complaint Process, Grade Appeal Process, Student Conduct Process, Student Complaint Process, and Collective Bargaining Grievance Processes. The procedures herein will also proceed independent of any police investigation.

If the University knows (through the filing of a Title IX/Sexual Misconduct Complaint) or reasonably should know of possible sexual misconduct, a fair and equitable investigation will be conducted in as prompt a manner as possible to determine if there has been a violation of this Policy.

Where an act in violation of this Policy is undertaken for independently unlawful reasons (for example, because of the Claimant's race or religion), both bases for violation of University Policy will be investigated and disciplined accordingly.

In all cases, the final decision on whether, how, and to what extent the University will conduct an investigation, and whether other measures will be taken in connection with any allegation of sexual misconduct, rests primarily within the discretion of the Title IX Coordinator, or designee.

**Investigative Procedure and Timeline**

The Title IX/Sexual Misconduct Complaint or report of sexual misconduct will be investigated by the Title IX Investigator(s), generally, in accordance with the following timeline:

**Day 1:**         Title IX Complaint or report of sexual misconduct is received by the Title IX Coordinator or designee;

**Day 2-5:**       Title IX Coordinator, or designee, determines extent of Title IX investigation (may be with assistance of a Title IX Committee). A preliminary investigation may be necessary, and interim measures may be implemented;

**Day 6-15:**      The Title IX Investigator(s) will (1) provide notice to the Respondent of the Complaint/Report; (2) meet with the Claimant (if participating), the Respondent, and any identified witnesses. This *Policy* and the *Procedure* will be explained to Claimant and Respondent, and each will have the opportunity to share their version of events and suggest other witnesses during the meeting with the Title IX Investigator(s);

**Day 16-22:**     The Title IX Investigator(s) will write a *preliminary report* containing a summary of the information obtained to date and will deliver this *report* to the Claimant and Respondent;

**Day 23-28:**     Claimant and Respondent may provide a rebuttal to information in the *preliminary report* or suggest additional witnesses;

**Day 29-35:**     The Title IX Investigator(s) will consider additional information provided by Claimant and Respondent, conduct any necessary additional interviews or investigation, and write a *final report* which contains: (1) conclusions of fact and (2) a finding or findings;

**Day 36-38:**     The Title IX Coordinator, or designee, reviews and approves the *final report*;

**Day 38-40:**     The Title IX Investigator sends notice of the finding(s) to Claimant and Respondent. Email is deemed an acceptable form of delivery. The Claimant and the Respondent will have five (5) days to appeal the finding(s) contained within the final report to the Executive Vice President and Provost (if the Respondent is an employee) or the Vice President for Student Affairs and Enrollment Management (if the Respondent is a student) and/or designee for review;

**Day 41-45:**     Absent an appeal of the findings by either party, a Resolution Officer will be appointed by the Office of Student Conduct, and will receive a copy of the *final report from the* Title IX Investigator;

**Day 46-55:**     If an appeal of the findings is submitted, the Executive Vice President and Provost or designee will render a decision with next steps communicated and implemented accordingly;

13

**Day 41-45:**     The Resolution Officer attempts to resolve the sanction by agreement;

**Day 45-55:**     If no agreement on sanction(s) is reached, the Resolution Officer will impose a sanction by decision on an employee. For students, a hearing shall occur, and a hearing officer will impose a sanction by hearing. Notice will be sent to Claimant and Respondent as provided herein. Email is an acceptable method of delivery;

**Day 56-61:**     Five (5) day period to Appeal the finding(s) and/or any sanction imposed by decision/hearing;

**Day 62-82:**     Appeal, if any, is processed.

## Interim Measures

The University reserves the right to take whatever interim measures deemed necessary to protect the rights and personal safety of the Claimant, Respondent, and/or community members. Such measures include, but are not limited to, providing a police escort between classes and/or related to the workplace, no-contact orders, modification of class schedules and/or locations, employment and/or living arrangements, and interim suspension/administrative paid leave from campus pending an investigation. The remedies provided in the *Remedies* section herein are also available as interim measures. The individual receiving an interim measure may appeal the interim measure to the Office of Student Conduct or the Title IX Coordinator.

## Voluntary Informal Resolution Mechanisms

If the investigator(s) believe the matter may be resolved by informal means, the investigator(s) may undertake to obtain such a result with the assistance of a third party (mediator or counselor) for as long as both Claimant and Respondent consent to such methods. The Claimant or Respondent may end informal resolution mechanisms and initiate a formal investigation at any point. The University reserves the right to ensure that any resolution is designed to stop problematic behavior. **\*\*NOTE\*\* *Informal means of resolution are <u>not</u> available in cases of alleged sexual violence*.**

## Investigation Rules

The following rules apply to all Sexual Misconduct Investigations, resulting from the filing of a Sexual Misconduct Complaint as a result of sexual misconduct:

- Any investigation will proceed independent of any criminal or other legal proceedings. Further, the University reserves the right to forward any Sexual Misconduct Complaint to the appropriate law enforcement agency for criminal investigation and/or charges.

- Fairness to all individuals involved with a Sexual Misconduct Complaint is a priority. Both the Claimant and Respondent to a Sexual Misconduct Complaint will be given a copy of these procedures and will have the opportunity to respond to all allegations.

14

- The Claimant and Respondent may each have another person present at any meeting to provide support. Support persons may act in an *advisory capacity only* and may not speak on behalf of the party in any proceeding.

- Every Title IX Complaint of sexual misconduct will be investigated to the maximum extent practicable.

- The investigation and the imposition of any sanction will be completed within 45-60 calendar days unless circumstances require a longer time period for completion of the investigation process (to be determined by the Title IX Coordinator or designee).

- Any and all of the procedures outlined in this Policy will proceed regardless of whether the Claimant or Respondent has withdrawn from and/or has otherwise been separated from the University, including the imposition of sanctions related to suspensions (for proven conduct).

- The Claimant and Respondent shall each have access to a meeting with the Title IX Investigator(s) during which: (1) the proceedings under this Policy will be explained; (2) any questions of either party will be answered; and (3) each party will be given the opportunity to provide their version of events.

- The Claimant will receive periodic information on the status of the investigation, including when the Respondent receives notice of the Title IX/Sexual Misconduct Complaint. Email is an acceptable form of delivery.

- Claimant and Respondent shall receive notice of the identity of any investigator(s) or Resolution Officer and shall have the opportunity to challenge each for cause if such challenge is delivered within two (2) business days of such notice.

- The use of alcohol or drugs by Claimant at the time of the incident will be considered for purposes of determining consent or memory *only* and will not form the basis for independent proceedings or discipline.

- The sexual history or sexual character of Claimant shall not be presented in any investigation or hearing and may be considered as to Respondent *only* if it establishes a pattern of complaints or behavior.

- At the conclusion of the investigation, the investigator(s) will weigh all evidence received throughout the course of the investigation and will issue findings on the basis of a preponderance of the evidence (*i.e.*, it is more likely than not that an act in violation of this Policy has or has not occurred.)

15

- If it is determined that a violation of this Policy has occurred, appropriate sanctions will be imposed by the Office of Student Conduct as outlined herein.

- Respondents found to have violated this Policy will be given the opportunity to agree to an appropriate sanction ("sanction by agreement.") or to request a hearing by a Resolution Officer.

- Claimant and Respondent will concurrently be notified in writing about the outcome of both the Complaint and any appeal. Email is an acceptable form of delivery.

- Claimant will also receive notice of individual remedies available to the Claimant, any sanctions imposed that directly relate to the Claimant, and other steps the University has or will take to eliminate the hostile environment. In sexual violence cases, the Claimant will receive notice of any disciplinary sanction imposed on the responsible Respondent, and whether or not those sanctions directly relate to the Claimant.

- The Respondent will not be notified of the individual remedies offered or provided to the Claimant.

- Claimant and Respondent have the right to appeal the finding of the investigator(s) and/or Resolution Officer regarding sanctions as provided herein. (See *Appeals*, below).

- At the conclusion of an investigation, regardless of the outcome, a Title IX Coordinator, or designee, shall review all evidence to determine whether Claimant is entitled to any remedy under Title IX that may not have been provided for under the University's procedures.

**Sanctions**

Upon completion of the investigation, in cases involving student Respondents, if there is a finding of sexual misconduct, a Final Report of Findings will be forwarded to the Office of Student Conduct to determine the appropriate sanction(s). The Title IX Coordinator reserves the right to schedule individualized training and/or similar educational opportunities, including, but not limited to, acts of community service, for either party when there is no finding of sexual misconduct. Both the Claimant and Respondent will receive a Final Report of Findings simultaneously. Witness(es) will receive a Final Closure Memorandum.

In matters involving an NIU employee or third parties, a Final Report of Findings and Recommendations will be forwarded to the Division Head, or designee, for review and implementation upon their discretion.

**Sanction by Agreement** *(students)*

The Director of Student Conduct, or designee, will consult with the participating Claimant, Respondent, Title IX Coordinator (or designee), and other affected parties, as appropriate, to gather input on potential sanctions. Depending on the circumstances, the Director may ask to meet with each party separately or invite them to submit statements for consideration. If a Claimant or a Respondent meets with the Director, they may be accompanied by a Support Person.

16

Case: 1:17-cv-07901 Document #: 55-1 Filed: 11/03/17 Page 18 of 36 PageID #:235

The Director will then prepare a proposed resolution agreement between the University and the Respondent, informed by input from the Respondent, the Claimant (if participating), and the University. The proposed agreement will be shared with the Respondent and the participating Claimant in a manner that honors due process and privacy considerations.

If the Respondent accepts the proposed agreement and the Claimant does not object to it, the agreement will become binding, the Respondent will be required to fulfill the sanctions included therein, and neither the Claimant nor the Respondent will be permitted to appeal the finding(s) or sanction.

## Sanction by Hearing *(for student Respondents only)*

If the Respondent is a student and unwilling to enter into an agreement and/or fails to appear for the preliminary conference required by the Sanction by Agreement process, or if the Claimant objects to the proposed agreement, the sanctions will be decided by a Resolution Officer in accordance with the hearing procedures of the Office of Student Conduct. The Resolution Officer will determine appropriate sanctions after a hearing. The Resolution Officer will not modify the findings of the investigative report and will address only what sanctions are appropriate at the hearing. The Resolution Officer's review will consist solely of (1) reviewing the investigative report, the proposed resolution agreement, and any written objections to the proposed resolution agreement submitted by the Claimant or Respondent; (2) consulting with appropriate University officials, including the Title IX Coordinator or designee; and (3) any witnesses or documents presented by Respondent or a participating Claimant. Witnesses and documents may be presented to the hearing officer as it relates to sanctions *only*.

The following rules will be followed during any hearing:

- Respondent and a participating Claimant shall receive notice of the identity of the Resolution Officer, and shall have the opportunity to challenge for cause if such challenge is delivered within two (2) academic days of such notice;

- Respondent and a participating Claimant may each have another person present at any hearing to provide support. Support persons may act in an *advisory capacity* only and may not speak on behalf of the party during the hearing;

- A hearing may be held regardless of whether Respondent or Claimant has withdrawn from the University;

- Claimant is not required to attend any hearing;

- Respondent and Claimant will each receive three (3) academic days' notice prior to the hearing of the other's evidence, including witnesses and documents, to be used at said hearing. Failure to provide a witness list and copies of documentary evidence three (3) academic days prior to the hearing may result in the inability to present said witness or evidence;

- All questions directed to the Claimant or Respondent will only be asked by the hearing officer;

17

- Claimant and Respondent may be allowed to testify or answer questions outside the direct physical presence of the other (*e.g.* via telephone or behind a screen, etc.); and

- All hearings conducted under this Policy shall be closed to the public.

**Sanction by Decision** *(for employees and third party Respondents)*
The Division Head must review the Final Report of Findings and Recommendations to determine the appropriate level of corrective action. The Title IX Coordinator also reserves the right to consult with appropriate University officials regarding imposition of corrective action. To ensure fairness and consistency, as well as compliance with the University's Title IX obligations, the Division Head and/or appropriate University official, should consult with the Title IX Coordinator (or designee) regarding the facts of the case, proposed resolution and recommendations, and any written objections to the report of findings and recommendations. The Division Head or University Official will then either adopt the proposed resolution agreement or modify the recommendations as needed.
Once a decision has been reached, reviewed and approved by the Title IX Coordinator, or designee, the Division Head will issue a letter to the Respondent and Claimant sharing, in a manner appropriate to honor due process and privacy considerations, the corrective action that will be implemented. Any imposition of corrective action may be appealed in accordance with the Appeals section herein.

**Possible Sanctions**
Not all forms of sexual misconduct will be deemed to be equally serious offenses, and the University reserves the right to impose different sanctions depending on the severity of the offense and/or offender history.

Any <u>student</u> found responsible for violating this Policy may receive sanctions including, but not limited to, the following:

- Anger Intervention Assessment;
- Abuse Intervention Program;
- Banishment from all NIU property, functions, etc.;
- Community Service to NIU or the DeKalb community;
- Discretionary Sanction-required work assignments, written assignments, service to NIU or other related discretionary assignments;
- Educational Sanctions-includes, but is not limited, to the completion of an educational assignment (e.g., research paper, program presentation, etc.);
- Fines;
- Formal Written Warning;
- Loss of Privileges (e.g., inability to have visitors/guests, etc.);
- No Contact (direct or indirect) with the victim;
- Parental Notification;
- Probation;
- Residence Hall Expulsion;
- Residence Hall Suspension;

18

- Restitution;
- Revocation of Admission and/or Degree;
- Substance Abuse Assessment;
- Training on Sexual Misconduct;
- University Expulsion;
- University Suspension;
- Withholding Degree;

Any <u>employee</u> found responsible for violating this Policy may receive corrective action including, but not limited to, the following:

- Letter of warning;
- Official Reprimand;
- Referral to a required counseling program;
- Suspension from employment with pay;
- Suspension from employment without pay;
- Termination from employment;
- Training on Sexual Misconduct;
- Community Service;
- Any other sanction deemed appropriate by the Title IX Coordinator.

Any <u>third party</u> (visitor, guest, contractor, subcontractor, vendor, partner, or business affiliate) found responsible for violating this Policy will receive a sanction ranging from a written warning to being banned from any University property, activities, and/or programs, including the termination of any business contract with the University.

**Remedies**
In addition to the interim measures described in this document, the following remedies may be available at the conclusion of an investigation whether or not a Respondent is found to be responsible:

- Providing an effective escort to ensure that the Claimant can move safely between classes and activities;

- Ensuring the Claimant and Respondent do not share classes, extracurricular activities, or work space;

- Moving the Respondent or Claimant (if the Claimant requests to be moved) to a different residence hall;

- Providing comprehensive, holistic victim services including medical, counseling, and academic support services, such as tutoring;

- Arranging for the Claimant to have extra time to complete or re-take a class or withdraw from a class without an academic or financial penalty;

19

- Reviewing any disciplinary actions taken against the Claimant to see if there is a causal connection between the sexual misconduct and the disciplinary action that Claimant may have received;

- Training or retraining University employees on responsibilities to address allegations of sexual misconduct and how to conduct Title IX Investigations;

- Developing and distributing materials on sexual misconduct;

- Conducting bystander intervention and sexual violence prevention programs with students and employees;

- Issuing policy statements or taking other steps that clearly communicate that the University does not tolerate sexual misconduct and will respond to any incidents and to any student/employee who reports such incidents;

- Conducting, in conjunction with student leaders, a campus climate survey to assess the effectiveness of efforts to ensure that the University is free from sexual misconduct and using that information to inform future proactive steps that the school will take;

- Targeted training for a group of students, if, for example, the sexual misconduct created a hostile environment in a residence hall, fraternity or sorority, or on an athletic team; and

- Any other remedy that the Title IX Coordinator may consider appropriate.

**Appeals**

Sanction(s) will be implemented and in effect during the appeal process.

Appeals may be made *only* on the following grounds and *only* within five (5) business days of receipt of the decision regarding sanction(s):

- A material deviation from these procedures affected the outcome of the case;

- New and relevant information is available that was not available, with reasonable diligence and effort, at the time of the investigation that could reasonably affect the investigation finding(s);

- The sanction(s) is/are inappropriate or disproportionate to the determined finding(s); or

- A review of all available and relevant information indicates that the evidence does not clearly support the finding(s) and provides clear and definite support for modifying the original finding(s).

20

*If the Respondent is an NIU Student*

In cases where the Respondent is a student, the finding(s) and/or sanction(s) may be appealed by either the Claimant or Respondent on the grounds listed above to the Vice President of Student Affairs & Enrollment Management, or designee. The appealing party should submit a copy of the investigator's decision and/or any sanction to the Vice President within five (5) business days of receipt of the decision regarding sanction(s).

*If the Respondent is an Employee of NIU or a Third Party*

In cases where the Respondent is an employee or third party, the finding(s) of the investigators and/or any sanction(s)/corrective action may be appealed by either the Claimant or Respondent on the grounds listed above by submitting a copy of the investigator's decision and/or any sanction/corrective action to the Executive Vice President and Provost, or designee, within five (5) business days of receipt of the decision regarding sanction(s).

If no appeal is received within the five (5) day period, the investigator's finding(s) and/or any sanction(s) or corrective action(s) will be final. If the appeal is received within the five (5) day period, the Executive Vice President and/or applicable Vice President, or designee, will review the investigator's finding(s) and/or any sanction(s) imposed by decision/hearing and obtain any additional information deemed necessary for resolution of the appeal. Within twenty one (21) calendar days of the date of the filing of the appeal, the Claimant and Respondent will receive notice of the Executive Vice President and/or Vice President's decision in writing. Email is an acceptable method of delivery.

If appropriate, copies of the final decision may be delivered to department or division heads in an identifiable line of supervisory or administrative responsibility in relation to the parties and subjects involved in the Complaint. Other persons and witnesses will receive no specific notification or information regarding the Complaint or investigation absent a request made by subpoena or court order.

## V.   EXTERNAL AGENCIES

At any time during the pendency of the above-described investigation, hearing, and/or appeal, students and employees with questions about Title IX or those who believe they have been subjected to sexual misconduct or retaliation may file a complaint with the **Office for Civil Rights (OCR):**

**Office for Civil Rights (Chicago Office)**
U.S. Department of Education
Citigroup Center
500 W. Madison Street, Suite 1475
Chicago, IL 60661-4544
Telephone: 312-730-1560
FAX: 312-730-1576; TDD: 877-521-2172
Email: OCR.Chicago@ed.gov
www.ed.gov/

At any time during the pendency of the above-described investigation and/or appeal, employees who believe they have been subjected to sexual misconduct or retaliation based thereon in violation of *Title VII of the Civil Rights Act*, 42 U.S.C. § 2000e *et seq*., may file a complaint with the **Illinois Department of Human Rights (IDHR)** or the **Equal Employment Opportunity Commission (EEOC):**

**Illinois Department of Human Rights**
James R. Thompson Center
100 W. Randolph Street, Suite 10-100
Chicago, Illinois 60601
(312) 814-6200
TDD: (12) 263-1579
www.state.il.us/dhr

**Equal Employment Opportunity Commission**
Chicago District Office
500 West Madison Street, Suite 2000
Chicago, Illinois 60661
(312) 353-2713
TTY: (312) 353-2421
www.eeoc.gov

## VI.   DEFINITIONS

- **Active**: consent must take the form of clearly understandable words or actions that reveal one's expectations and agreement to engage in specific sexual activity. This means that silence, passivity, submission or the lack of verbal or physical resistance (including the lack of a "no") should not- in and of themselves- be understood as consent. Consent cannot be inferred by an individual's manner of dress, the giving or acceptance of gifts, the extension or acceptance of an invitation to go to a private room or location, or going on a date.

- **Anonymous Complaint**: is one where the identity of the Claimant is not known.

- **Claimant**: refers to the alleged victim; a person who alleges to have been subjected to any of the conduct prohibited by this Policy and/or person who files a formal complaint.

- **Confidential Complaint**: is one where the name of the Claimant is known, but does not want to file a complaint, pursue an investigation or to have their identity known.

- **Consent**: a clear, unambiguous, informed and voluntary agreement between all participants to knowingly engage in sexual activity. Consent must be mutually understandable by words or actions (i.e. a reasonable person would consider the words or actions to indicate mutual agreement to engage in the sexual activity). Consent is active and cannot be based on the absence of an affirmative statement or act of denial. Silence or lack of resistance does not constitute consent.

  Seeking and receiving consent is the responsibility of the person(s) initiating the sexual act or acts regardless of whether the person initiating the act is under the influence of drugs and/or alcohol.

  Consent to any sexual act or prior consensual sexual activity between or with any party does not in and of itself constitute consent to any other sexual act.

  Consent may be initially given but withdrawn at any time. Consent cannot be given when a person is incapacitated (including, but not limited to, a person or someone with a physical or mental disability and/or level of intoxication that causes impairment resulting in incapacitation. Consent cannot be given when it is the result of coercion, intimidation, force, or threat of harm. The University prohibits any sexual activity that does not involve the consent of each individual.

  Consent must be given to engage in the act of sexual activity, and consent should also be given to any person who records or photographs any aspect of the sexual encounter as well as third parties who wish to view the sexual activity either in person or via any electronic equipment, methods, or devices. Any of these acts will be deemed to be sexual exploitation. Sexual exploitation includes, but is not limited to, the following acts:
  - Sexual voyeurism or allowing others to witness or observe the sexual or intimate activity of another person without that person's full knowledge and consent;
  - Indecent or lewd exposure or inducing another person to expose themselves when consent is not present;
  - Recording any person engaged in sexual or intimate activity in a private space without that person's full knowledge and consent, even if the person recording the sexual or intimate activity is also engaged in the consented to sexual activity;
  - Distributing sexual or intimate information, images, or recordings about another person without that person's full knowledge and consent;
  - Recruiting, harboring, transporting, providing, or obtaining another person for the purpose of sexual exploitation;
  - Inducing incapacitation in another person with the intent to engage in sexual conduct, regardless of whether prohibited sexual conduct actually occurs.

  The definition of consent does not vary based upon a participant's sex, sexual orientation, gender identity, or gender expression.

- **Dating Violence:** (1) Violence committed by a person who is or has been in a social relationship of a romantic or intimate nature with the victim. For the purposes of this definition, dating violence includes, but is not limited to, sexual or physical abuse or the threat of such abuse. Dating violence does not include acts covered under the definition of domestic violence. Any incident meeting this definition is considered a crime for the purposes of Clery Act reporting (42 U.S. Code Section 13925 (a)(9)and(10)); or (2) Threatening to use physical, mental, or emotional abuse to control another person who is in a dating relationship with the person (See 105 ILCS 110/3.10). (3) The existence of a dating relationship in 1 or 2 above shall be determined based on the reporting party's statement and with consideration of the length of the relationship, the type of relationship, and the frequency of interaction between the persons involved in the relationship.

- **Domestic Violence:** (1): A felony or misdemeanor crime of violence committed by a current or former spouse or intimate partner of the victim; by a person with whom the victim shares a child in common; by a person who is cohabitating with, or has cohabitated with, the victim as a spouse or intimate partner; by a person similarly situated to a spouse of the victim under the domestic or family violence laws of the jurisdiction in which the crime of violence occurred; by any other person against an adult or youth victim who is protected from that person's acts under the domestic or family violence laws of the jurisdiction in which the crime of violence occurred (42 U.S. Code Section 13925 (a)(8)); or (2) Physical abuse, harassment, intimidation of a dependent, interference with personal liberty or willful deprivation of a family or household member, which includes spouses, former spouses, parents, children, stepchildren and other persons related by blood or by present or prior marriage, persons who share or formerly shared a common dwelling, persons who have or allegedly have a child in common, and persons who share or allegedly share a blood relationship through a child. (725 ILCS 5/112A-3; 750 ILCS 60/103).

- **Force:** the use of physical violence and/or otherwise physically imposing on another person to gain sexual access. Also includes threats, intimidation, implied threats, and coercion that overcome resistance or produce consent.

- **Gender-based Harassment or Discrimination**: acts of a verbal or nonverbal nature or physical aggression, intimidation, or hostility based upon sex/gender or sex/gender-stereotyping (even if those acts do not involve conduct of a sexual nature) that is sufficiently serious to limit or deny the ability to participate in or benefit from the University's programs and activities or the terms and conditions of employment. *Example: the repeated sabotaging of female graduate students' laboratory experiments by male students in the class.*

- **Incapacitation**: physical or mental impairment due to drugs or alcohol (whether such use is voluntary or involuntary); the lack of consciousness or being asleep; being involuntarily restrained; if any of the parties are under the age of 17; or if an individual otherwise cannot consent. Generally, an incapacitated individual is incapable of recognizing what is occurring and is not able to recognize the nature of sexual activity or the extent of a sexual situation;

24

- **Intoxication**: when alcohol is involved, a person can be incapacitated due to intoxication. Some ways in which a person can be incapacitated as a result of alcohol use may include, but are not limited to, lack of control over physical movements, lack of awareness of circumstances or surroundings, or the inability to communicate for any reason. The individual may experience a blackout state in which they appear to be giving consent but does not actually have conscious awareness or the ability to consent. Therefore, individuals who engage in sexual activity of any kind must be aware of the other person's level of intoxication;

- **Knowingly**: Consent must demonstrate that all individuals understand, are aware of, and agree to the "who" (same partners), "what" (same acts), "where" (same location), "when" (same time), and "how" (the same way and under the same conditions) of the sexual activity.

- **Physical and Mental Disability**: "a physical or mental impairment that substantially limits one or more life activities of an individual, such as caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working. This also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." (Americans with Disabilities Act).

- **Proceeding**: all activities related to a non-criminal resolution of an institutional disciplinary complaint, including, but not limited to, fact finding investigations, formal or informal meetings, and hearings. Proceeding does not include communications and meetings between officials and victims concerning accommodations or protective measures to be provided to a victim.

- **Rape**: the penetration, no matter how slight, of the vagina or anus with any body part or object, or oral penetration by a sex organ of another person, without the consent of the victim.

- **Resolution Officer**: a representative from the Office of Student Conduct or Human Resource Services who will be appointed to administer sanctions.

- **Respondent**: the alleged offender/ accused; a person alleged to have engaged in any of the conduct prohibited by this Policy.

- **Responsible Employee:** is any employee who:
  - Has the authority to take action to redress sexual violence;

  - Has been given the duty of reporting incidents of sexual violence or any other misconduct by students; or

  - Anyone a student could reasonably believe has this authority or duty.

25

- **Result**: any initial, interim, and final decision by any official or entity authorized to resolve disciplinary matters within the institution. The result must include any sanctions imposed by the institution.

- **Retaliation**: taking any adverse or hostile act, engaging in harassment and/or making an adverse employment/academic decision because an employee/student/third party has opposed violations of this Policy or other unlawful employment/academic practices by filing a complaint, testifying, assisting, or participating in an investigation, proceeding, or hearing. Respondents are also protected from Retaliation.

- **Sanction by Agreement**: a proposed resolution agreement between the University and the Respondent, informed by input from the Respondent, the Claimant (if participating), and the University. There shall be no appeal of a Sanction by Agreement.

- **Sanction by Decision**: (for employees & third parties only). the Resolution Officer will either adopt the proposed resolution agreement and impose the sanctions therein or modify the sanctions as needed.

- **Sanction by Hearing**: (for students only) a hearing officer shall, at the conclusion of a hearing as to sanctions only, impose appropriate sanction(s) as provided herein.

- **Sexual Assault**: (1) any nonconsensual sexual act proscribed by Federal or Illinois law, including when the victim lacks capacity to consent. An offense that meets the definition of rape, fondling, incest, or statutory rape as used in the FBI's UCR program. (42 U.S. Code Section 13925 (a)(29)) or (2) an act of sexual penetration by the use of force or threat of force; or (3) an act of sexual penetration and the respondent knew that the claimant was unable to understand the nature of the act or was unable to give knowing consent; or (4) an act of sexual penetration with a claimant who was under 18 years of age when the act was committed and the respondent was a family member; or (5) an act of sexual penetration with a claimant who was at least 13 years of age but less than 18 years of age when the act was committed and the respondent was 17 years of age or over and held a position of trust, authority or supervision in relation to the claimant.

- **Sex Discrimination**: treating a person differently because of their sex in the terms and conditions of educational programs, activities, and/or employment; *Example: A professor requires all male students in a class to do an extra assignment that is not required of female students.*

- **Sexual Exploitation**: taking non-consensual or abusive sexual advantage of another for your own benefit.

26

- **Sexual Harassment**: unwelcome, verbal, or physical conduct of a sexual nature (such as sexual advances or requests for sexual favors) sufficiently serious that it unreasonably interferes with or limits a person's ability to participate in or benefit from the University's educational programs, activities, and/or employment. Sexual harassment may be based on a power differential, the creation of a hostile environment (reasonably severe conduct that is sufficiently pervasive to have the purpose or effect of unreasonably interfering with work or educational performance, or creating an intimidating, hostile or offensive working or educational environment) , or retaliation.

The two types of sexual harassment are known as Quid Pro Quo and Hostile Environment. Quid Pro Quo is the Latin term for "this for that" and occurs when there is a demand for a sexual favor in exchange for some employment/academic benefit. Sexual harassment in the form of a hostile work and/or academic environment occurs when the harassing behavior unreasonably interferes with the employee/student work/academic performance and/or creates a hostile, intimidating, or offensive work/academic environment.

In order for the conduct to be considered sexual harassment, the behavior must be:
- Unwanted and/or unwelcome;

- Sexual in nature and/or related to the sex or gender of the employee/student;

- Sufficiently severe or pervasive enough to alter the conditions of the employee/student employment or academic environment (when describing sexual harassment resulting from a hostile work/academic environment).

Examples of sexual harassment include, but are not limited to, the following:
- A professor insists that a student have sex with him/her in exchange for a good grade;

- A student repeatedly sends sexually oriented jokes in an email list they created, even when asked to stop, causing one recipient to avoid the sender on campus and in the residence hall in which they both live;

- A professor demands that students discuss their past sexual experiences, yet the conversation is not in any way germane to the class;

- A staff member repeatedly touches and makes sexually suggestive remarks to a student while the two are waiting at a stop for the school's shuttle bus, causing the student to walk long distances instead of taking the shuttle bus;

- One instance of rape and/or other acts of Sexual Violence;

27

Sexual Harassment also includes harassment of a sexual nature directed at gay or lesbian persons that is sufficiently serious to limit or deny the ability to participate in or benefit from the University's educational and employment programs. Likewise, sexual harassment can occur where Claimant and Respondent are members of the same sex. *Example: a male student or a group of male students target a gay student for physical sexual advances.*

For purposes of this Policy, stalking may also be a form of sexual harassment. For more information regarding sexual harassment, please consult the Non-Discrimination Policy and Complaint Procedures for Employees and Students.

- **Sexual Misconduct**: one or more acts of sex discrimination, sexual harassment, sexual violence, dating violence, domestic violence, stalking or gender-based harassment or discrimination. Sexual misconduct can occur among, between or to heterosexual, lesbian, gay, bisexual and transgender individuals.

- **Sexual Penetration**: any contact, however slight, between the sex organ or anus of one person by an object, the sex organ, mouth, or anus of another person, or any intrusion, however slight, of any part of the body of one person or of any animal or object into the sex organ or anus of another person. Includes, but not limited to, cunnilingus, fellatio, or anal penetration.

- **Sexual Violence**: nonconsensual sexual acts: physical sexual acts perpetrated against a person's will or where a person is incapable of giving consent (*e.g.,* due to the Claimant's age, use of drugs or alcohol, or a disability that prevents the Claimant from having the capacity to give consent). Conduct will be deemed sexual violence whether obtained by force or threat of force and whether completed or attempted. Sexual exploitation (taking non-consensual or abusive sexual advantage of another for your own benefit) may also be considered a form of sexual violence, depending on the circumstances. *Examples: Rape, Sexual Assault, Sexual Abuse*

- **Stalking**: (1) engaging in a course of conduct directed at a specific person that would cause a reasonable person to (A) fear for the person's safety or the safety of others; or (B) suffer substantial emotional distress. For the purposes of this definition: (i) Course of conduct means two or more acts, including, but not limited to, acts in which the stalker directly, indirectly, or through third parties, by any action, method, device, or means, follows, monitors, observes, surveils, threatens, or communicates to or about a person, or interferes with a person's property; (ii) Reasonable person means a reasonable person under similar circumstances and with similar identities to the victim; (iii) Substantial emotional distress means significant mental suffering or anguish that may, but does not necessarily, require medical or other professional treatment or counseling; (iv) Any incident meeting this definition is considered a crime for the purposes of Clery Act reporting (42 U.S. Code Section 13925 (a)(30)) or (2) (A) Knowingly and without lawful justification, on at least 2 separate occasions, following another person or placing the person under surveillance or any combination thereof and (i) at any time transmitting a threat of immediate or future bodily harm, sexual assault, confinement or restraint and the threat is directed towards that person or a family member of that person, or (ii) places that person in reasonable apprehension of immediate or future bodily harm, sexual assault, confinement or restraint to or of

28

that person or a family member of that person; or (B) when, having been previously convicted of stalking another person, knowingly and without lawful justification on one occasion, (i) follows that same person or places that same person under surveillance; and (ii) transmits a threat of immediate or future bodily harm, sexual assault, confinement or restraint to that person or a family member of that person. (720 ILCS 5/12-7.3). (3) Stalking may be accomplished by physical act or electronic means, such as computer or cell phone.

- **Title IX Coordinator**: Karen L. Baker, Lowden Hall 101, DeKalb, IL 60115, (815) 753-6017, klbaker@niu.edu;

- **Voluntary**: Consent must be freely given and cannot be the result of force (violence, physical restraint, or the presence of a weapon), threats (indications of intent to harm, whether direct or indirect), intimidation (extortion, menacing behavior, bullying), coercion (undue pressure) or fraud (misrepresentation or material omission about oneself or the situation in order to gain permission for sexual or intimate activity).

- **Voyeurism**: the condition of one who derives sexual satisfaction from observing the sexual organs or acts of others, generally from a secret vantage point.

---

[1]Portions of this Policy and Procedures have been provided by *Revised Sexual Harassment Guidance*, U.S. Dept. of Educ., Office for Civil Rights (January, 2001); *Dear Colleague Letter*, U.S. Dept. of Educ., Office for Civil Rights (April 4, 2011); the *Atixa Gender-Based and Sexual Misconduct Model Policy*, Sokolow, Lewis and Schuster, NCHERM & ATIXA, 2011; *Navigating Sexual Violence Issues Under OCR's 2011 Dear Colleague Letter*, Margolis Healy, 2011; *Questions and Answers on Title IX and Sexual Violence*, U.S. Dept. of Educ., Office for Civil Rights (2014); and the University of Michigan *Student Sexual Misconduct Policy* (August, 2013).

[2]*The Family Educational Rights and Privacy Act* (FERPA) (20 U.S.C. § 1232g) is a Federal law that protects the privacy of student education records.

[3]This does not prevent the presentation and consideration of evidence regarding whether conduct was welcome or unwelcome.

# EXHIBIT K

# NORTHERN ILLINOIS UNIVERSITY

## STUDENT CONDUCT

### *STUDENT CODE OF CONDUCT*

**Effective October 15, 2015**

# Table of Contents

Table of Contents .................................................................................................................. 2
Northern Illinois University PACT ........................................................................................ 4
Article I: Rights of Students and Recognized Student Organizations .................................... 6
Organizational Chart of the Student Conduct System ........................................................... 9
Student Conduct Process Flow Chart .................................................................................... 10
Article II: Authority.............................................................................................................. 11
Article III: Proscribed Conduct Violations and Sanctions.................................................... 13
   1. Abuse (Physical): ....................................... 13
   2. Abuse (Verbal and Threats):. ..................... 13
   3. Abuse (Student Conduct System): ............. 13
   4. Academic Misconduct: .............................. 10
   5. Acceptable Usage Policy.....................14
   6. Accessory to a Violation:........................... 10
   7. Alcohol:...................................................... 10
   8. Cannabis:.................................................... 10
   9. Damage to Property...........................14
   10. Dishonesty................................................ 10
   11. Disruptive Behavior ................................. 11
   12. Drugs........................................................ 11
   13. Fire Safety ................................................ 11
   14. Fraud ........................................................ 11
   15. Fraud (Degree) .......................................... 11
   16. Guest Responsibility ................................ 11
   17. Harassment................................................ 12
   18. Hazing ...................................................... 12
   19. Keys ......................................................... 12
   20. Legal ........................................................ 12
   21. Noncompliance with University Officials .. 12
   22. Posting of Signage .................................... 12
   23. Retaliation......................................16
   24. Theft (Property): ....................................... 12
   25. University Policy Violation: ..................... 12
   26. Weapons:................................................... 13
   27. Sexual Misconduct/Title IX...................17
   B.    Violation of Law and the Northern Illinois University Student Conduct Process   13
   C.    Sanctions ................................................ 14
   D.    Alcohol, Drug, & Violence Sanctions.... 20
   E.    Temporary Sanctions............................... 31
ARTICLE IV: STUDENT CONDUCT PROCEDURE (INDIVIDUAL STUDENT &
RECOGNIZED STUDENT ORGANIZATION) .................................................................. 33
   A.    Incident Reporting, Notice, and Preliminary conference  33
   B.    Student Conduct Board Hearings ........... 32
   C.    Administrative Hearings ......................... 35

D.      Residence Hall Conduct Board Hearings 40
E.      Academic Misconduct.....................42
F.      Appeals (Non-Academic Misconduct)....45
G.      Title IX/Sexual Misconduct Violations....47
ARTICLE V: RECORDS MANAGEMENT ........................................................................... 50
ARTICLE VI: STUDENT CONDUCT ADVISORY BOARD ………………………………...51
GLOSSARY OF DEFINITIONS FOR THE STUDENT CONDUCT PROCESS ...................... 52

## Northern Illinois University PACT

The Northern PACT encompasses **six principles** that outline the expectations we have for members of our community. With each individual making a commitment to uphold these principles, we will have the collective benefit of a culture of care and a sense of connectedness. As a **student** in the NIU community, each individual is expected to support and contribute to a community that that honors the Northern PACT principles.

**Purposeful:** Where academic goals are shared, and faculty and students work together to strengthen teaching and learning across campus.

**Just:** Where all people are valued and supported while they learn from the diversity of our community.

**Caring:** Where the well-being of all is supported, and service to others is encouraged.

**Open:** Where freedom of expression is welcomed, and others are respected.

**Disciplined:** Where group members accept their responsibility, and expectations guide behavior for the common good.

**Celebrative:** Where traditions are honored, and both past and new rituals are embraced.

As **members of the NIU staff**, we hold a shared commitment to responsibility and accountability and pledge to our students that we will act in ways that honor the Northern PACT principles.

**Purposeful** – Where responsibility and accountability foster community, support ethical leadership and create a safe and secure teaching and learning environment across the campus.

**Just** – Where responsibility and accountability are free from bias, respectful of the individual, and embraces the spirit of fairness and equity.

**Caring** – Where policies and accountability are used to promote social-consciousness, civility, and respect for the well-being of all.

**Open** – Where responsibility and accountability are proactive and empowering to the community while protecting the dignity of its members.

**Disciplined** – Where policies and accountability set expectations that guide behavior for the common good while promoting safety, security, responsibility, ownership, and accountability.

**Celebrative** – Where responsibility and accountability honor inclusion, diversity, and accessibility.

These principles were created in alliance with the educational mission of Northern Illinois University, and reflect the values and vision of individual departments and partners that play a fundamental role in the creation and upholding of University policies.

## Article I: Rights of Students and Recognized Student Organizations

Every student and recognized student organization is entitled to certain procedural rights and guarantees in the student conduct process. The procedural rights outlined below are not exhaustive, but serve as guidelines to ensure that all students and recognized student organizations are treated fairly.

A. An accused student or recognized student organization is entitled to be notified of an alleged *Student Code of Conduct* violation as soon as reasonably possible. An incident report for each alleged violation shall be completed in a timely manner.

B. In accordance with the *Family Educational Rights and Privacy Act of 197*4, as amended, a Student may inspect and review his/her student conduct file upon request to Student Conduct.

C. An advisor may accompany the accused student, recognized student organization, complainant, and victim/survivor of an incident at any time during the student conduct process. Any person may serve as an advisor. The advisor need not be affiliated with the Northern Illinois University community. If an accused student, recognized student organization, complainant, or victim/survivor elects to have an advisor, it is highly recommended that the party choose an advisor trained by Student Conduct. Student Conduct shall maintain a list of advisors who received training in the Northern Illinois University student conduct system. Advisors are not required to attend or participate in hearings. The purpose of an advisor is to assist a student in preparing for the student conduct process. During a hearing, advisors will only be allowed to confer with their advisees (accused student, recognized student organization, complainant, or victim/survivor). The advisor may not directly participate in the student conduct process on behalf of any party or as a spokesperson or advocate.

D. The accused student and the recognized student organization have the right to meet with a student conduct administrator about their incident and be informed of the entire student conduct process.

E. A student conduct administrator will not coerce the accused student or recognized student organization into accepting either responsibility for an alleged violation of University policy or a recommended sanction.

F. The accused student or recognized student organization has the right to be informed of the identity of known witnesses to the incident and to examine all documents, statements, or other evidence that will be presented at the hearing, if this information is known to the student conduct administrator. The university may act as complainant for incidents including, but not limited to those in which a complainant or victim wishes to remain anonymous for fear of retaliation.

G. The accused student, recognized student organization, complainant, and victim/survivor are entitled to a fair and impartial hearing. The accused student or recognized student

organization is presumed "not responsible" until proven "responsible." The burden of proof rests with the complainant, and the standard of proof is preponderance of the evidence. This means that, based on all of the evidence and testimony presented in the case, it is determined that, more likely than not (50.1% of the information presented), the accused student or recognized student organization committed the alleged violation of the *Student Code of Conduct*.

**H.** The Student Conduct Administrator shall give written notice of a hearing to the accused student, recognized student organization, complainant, or victim/survivor. The notice shall include the date, time, and location of the hearing before the administrative hearing officer or conduct board, and it shall be given at least three (3) business days prior to the hearing. If, after such notification, the accused student, recognized student organization, or complainant does not appear at the hearing, the case may be heard and a decision rendered despite the absence (Victims/survivors are not required to attend any hearings). Students are responsible for notifying the Office of Registration and Records of any address change. Notices mailed to the local address provided by the student and listed in MyNIU will constitute valid notification to the accused student. Additionally, any e-mail notification with correspondence will be considered delivered when the University has proof that the electronic correspondence has been delivered to the accused student's NIU e-mail account.

**I.** Hearings before any administrative hearing officer or conduct board shall be closed. The accused student, recognized student organization, complainant, and victim/survivor may each have one (1) person serve as an observer of the hearing, in addition to their adviser and any witnesses. The observer will not be permitted to participate in any way in the hearing.

**J.** The accused student, recognized student organization, complainant, and victim/survivor shall each have the right to request that any particular conduct board member(s) not be allowed to serve on the conduct board if there is reasonable cause to believe that the conduct board member(s) may be biased either for or against a particular party involved in the incident. The student conduct facilitator, or conduct board advisor shall make the final determination regarding which board members shall be qualified to hear the case.

**K.** In any administrative hearing or conduct board hearing, the accused student, recognized student organization, complainant, or victim/survivor shall have the right to present his/her respective position by introducing information and a witness(es), making statements, and asking questions. No one shall be required to provide information that may be self-incriminating.

**L.** The student conduct board facilitator shall notify the accused student and the victim/survivor (in student conduct incidents of sexual misconduct), of the decision of the hearing, in writing, within two (2) business days after the deliberation. This notification shall be sent in a way to certify receipt of the notification. For any incident involving violent crime or non-forcible sexual offense, as described in the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act of 1990, 20 U.S.C.

§1092(f), as amended, both the accused student and the victim/survivor will be notified by the student conduct board facilitator, in writing, within two (2) business days after the deliberation. The notification shall be sent in a way to certify receipt of the notification. If the victim is deceased, the student conduct board facilitator shall notify the victim's next of kin, upon written request by the next of kin.

**M.** The accused student or recognized student organization and the victim/survivor (in student conduct incidents of sexual misconduct) that receives an adverse decision shall have the right to file a written appeal of the decision and/or sanctions of an administrative hearing or conduct board hearing.

**N.** No penalty may be levied by the student conduct system—with the exception of a temporary sanction—without the acceptance of responsibility by the accused student or recognized student organization before a student conduct administrator, or the finding of responsibility before an administrative hearing officer or a conduct board.

**O.** Students in possession of a valid State of Illinois Compassionate Use of Medical Cannabis, issued by an appropriately licensed physician, may seek accommodation through the University Disability Resource Center.

**P.** Students wishing to file grievances against Northern Illinois University faculty or staff members should speak with a member of NIU Human Resource Services, 815-753-6000.

**Organizational Chart of the Student Conduct System**





**Student Conduct Process**
**Flow Chart**
Non-Title IX/Sexual Misconduct Matters

Incident Report Submitted

Initial Determination of Student Code Violation

Temporary Sanction may be issued

Preliminary Conference Scheduled
(For Alleged Violation

Finding of Responsibility

Finding of Not Responsible or Dismissal of Charges

Acceptance of Responsibilty and Sanctions

Hearing Requested

Matter Concluded

Sanctions Completed//Matter Closed

Finding of Responsibility//Sanctions Imposed

Finding of Not Responsible

Finding and/or sanctions may be appealed

## Article II: Student Code of Conduct Authority

**A.** The *Student Code of Conduct* shall be applicable to both individual students and recognized student organizations.

**B.** The policies in the *Student Code of Conduct* are applicable to conduct both on and off campus. Students and Recognized Student Organizations are expected to follow all applicable policies in University documents and publications.

**C.** The *Student Code of Conduct* applies at all locations of the University, University-sponsored events, and events sponsored by Recognized Student Organizations. The *Student Code of Conduct* shall also apply to Students completing approved study abroad coursework through the Northern Illinois University Study Abroad Office.

**D.** The *Student Code of Conduct* shall apply to actions and behaviors of Students and Recognized Student Organizations that are exhibited directly or otherwise, either in person and/or through the use of any electronic medium.

**E.** The Vice President for Student Affairs & Enrollment Management oversees the Student Conduct Process. The Vice President for Student Affairs & Enrollment Management has designated Student Conduct with primary oversight of all student conduct and student organizational conduct matters. Student Conduct has designated Housing & Dining to adjudicate particular student conduct incidents occurring within or on Housing & Dining property, involving residential students. Final authority for incident adjudication rests with Student Conduct, unless otherwise delegated. All student and organizational conduct incidents are reported to and overseen by Student Conduct. Student Conduct has designated Faculty to adjudicate academic misconduct infractions in which the recommended sanction(s) do not involve suspension or expulsion from Northern Illinois University.

**F.** The *Student Code of Conduct* shall not normally apply to the following University relationships with Students:
   1. **Employment Regulations:** Obligations regarding student employment are specified in the *Student Employment Handbook* distributed by the Student Financial Aid Office. Disputes regarding employment are resolved through Student Employment grievance procedures.

   2. **Academic Regulations:** Student grievances over grades are resolved through the Grade Appeals System established by the University Council. However, academic misconduct as a violation of The *Student Code of Conduct* may be adjudicated through Student Conduct.

   3. **Financial Regulations:** Disputes over alleged violation of University policies regarding the payment of bills and loans are resolved through the Accounting Office, the Bursar's Office, or the Student Financial Aid Office.

4. **Traffic Regulations:** The Department of Police & Public Safety handles violations of the University Traffic Policy, as outlined in the Illinois *Rules of the Road*.

5. **Parking Regulations:** The Campus Parking Services handles violations of the University Parking Policy, outlined in the *Motor Vehicle and Parking Regulations Handbook*.

6. **Contractual Obligations:** Questions, disputes, and alleged violations of contracts between various University offices and Students are handled between the Student and the contractual office, such as the Bursar's Office, Housing & Dining, or Student Financial Aid.

## Article III: Proscribed Conduct Violations and Sanctions

### A. Conduct

Any Student found to have committed or to have attempted to commit the following misconduct is subject to the disciplinary sanctions outlined below. Proscribed conduct includes the following:

1. **Abuse (Physical):** Physical violence of any nature against any person, on or off campus, other than for self-defense. This includes fighting; battery; the use of a weapon; restraining or transporting someone against his/her will; or any action that threatens or endangers the physical health or safety of any person or causes reasonable apprehension of such harm.

2. **Abuse (Verbal and Threats):** Persistent, severe, and/or pervasive abuse, threats, intimidation, coercion, bullying and/or other conduct which threatens or endangers the mental or physical health or safety of any person or causes reasonable apprehension of such harm.

3. **Abuse (Student Conduct System):** Abuse of the Student Conduct System. Includes, but is not limited to:

   a. Failure to obey the notice from any Conduct Board or University official to appear for a meeting or hearing as part of the Student Conduct System;

   b. Falsification, distortion, or misrepresentation of information before any Conduct Board or Administrative Officer;

   c. Disruption or interference with the orderly conduct of any Conduct Board proceeding or Administrative Hearing;

   d. Knowing completion and filing of a false incident report;

   e. Discouraging an individual's proper participation in, or use of, the Student Conduct System;

   f. Influencing the impartiality of a member of a Conduct Board prior to, and/or during the course of, the Conduct Board proceeding;

   g. Harassment (unwelcome verbal or physical behavior for interference, disruption, or retaliatory purpose toward) or intimidation of a member of any Conduct Board prior to, during, or after a Student Conduct Code proceeding;

   h. Failure to comply with the sanction(s) imposed under the *Student Code of Conduct*;

   i. Influencing another person to commit an abuse of the Student Conduct Code System.

4. **Academic Misconduct:** The receipt or transmission of unauthorized aid on assignments or examinations, plagiarism, unauthorized use of examination materials, cheating, or other forms of dishonesty in academic matters. The term "cheating" includes but is not limited to the following:

    a. Use of sources beyond those authorized by the instructor in writing papers, preparing reports, solving problems, or carrying out other assignments;

    b. Acquisition, without permission, of tests or other academic material belonging to a member of the University faculty or staff;

    c. Engagement in any behavior specifically prohibited by a faculty member in the course syllabus or class discussion.

    The term "plagiarism" includes but is not limited to the use, by paraphrase or direct quotation, of the published or unpublished work of another person without full and clear acknowledgment. Plagiarism also includes the unacknowledged use of materials prepared by another person or agency engaged in the selling of term papers or other academic materials.

5. **Accessory to a Violation:** Aiding another individual in the commission of an offense defined in the *Student Code of Conduct*.

6. **Alcohol:** Use of alcohol includes but is not limited to the following:

    a. Providing alcohol to a person less than 21 years of age, by any student;

    b. Consuming alcohol by any student with a person less than 21 years of age including, but not limited to, in the same residence hall room;

    c. Possessing or consuming of alcohol by any student who is less than 21 years of age.

7. **Cannabis:**
    a. Use or possession of cannabis is prohibited;
    b. Constructive possession of cannabis. (See Glossary)

8. **Damage to Property:** Causing damage to or vandalizing the property of Northern Illinois University or the personal property of another person.

9. **Dishonesty:** Acts of dishonesty include but are not limited to the following forms of deceit:
    a. Furnishing false information to any Northern Illinois University official, faculty member, or office representative;
    b. Forgery, alteration, or misuse of any Northern Illinois University document, record, or instrument of identification;
    c. Impersonating a Northern Illinois University staff or faculty member.

10. **Disruptive Behavior:** Disruption or obstruction of a University activity when the conduct occurs on Northern Illinois University premises; Conduct that is disorderly, lewd, or indecent. Causing a disturbance off campus when the situation or the parties involved are related to the educational mission of the university.

11. **Drugs:** Use of drugs includes use, possession, manufacture, or distribution of any illegal controlled substance including but not limited to the following: cocaine, hashish, heroin, lysergic acid diethylamide (LSD), marijuana, methamphetamines, or any legally controlled substance without a prescription issued by a licensed physician.

12. **Fire Safety:** Acts relating to fire safety endangerment, including but not limited to the following:

    a. Knowingly, recklessly, or negligently setting a fire on University property;

    b. Creating a fire hazard or endangering the safety of persons or property by the improper use or possession of hazardous substances;

    c. Falsely reporting a fire;

    d. Failing to report a fire;

    e. Interfering with the response of University or City officials to emergency calls;

    f. Misuse of or tampering with fire prevention and control equipment;

    g. Use or possession of any electrical appliance not authorized in University residence halls or other areas of the University;

    h. Burning of candles in the residence halls;

    i. Engaging in pranks involving fire;

    j. Refusing to comply with fire alarm and fire drill procedures.

13. **Fraud:** Acts of fraud include deception, forgery, alteration, or the unauthorized use of University documents, records, or identification.

14. **Fraud (Degree):** Violations include fraud, misrepresentation, or other violation(s) of University standards in obtaining a University degree.

15. **Guest Responsibility:** Northern Illinois University students may be held responsible for the actions of their guests. When a guest commits a violation, the student host may be charged with violation of the Northern Illinois University *Student Code of Conduct*.

16. **Harassment:** Acts of harassment include the use of words or actions that persistently and wrongfully attack another person. The unwanted communication must be objectively offensive to a reasonable person before it may be considered actionable harassment.

17. **Hazing:** Acts of hazing include participation in any act or activity by an organization or group or by a member of the organization or group in which a member(s) or prospective member(s) may be subjected to an activity that might cause or create a substantial risk to one's physical or mental health. Hazing includes any act or activity that might cause but is not limited to the following: fear or intimidation; embarrassment or ridicule, physical exhaustion, endangerment, harm, mutilation, or alteration of any part(s) of the body; mental fatigue, harassment, or duress; and defacement, damage, or destruction of property. The intent of the act or the consent or the cooperation of the hazing recipient shall not constitute a defense of hazing. The University or the hazing recipient may charge an individual and/or the Recognized Student Organization with responsibility for the hazing act(s) committed either on or off campus.

18. **Keys:** The unauthorized possession, duplication, or use of keys to any University premises, or the unauthorized entry to or use of Northern Illinois University premises is prohibited.

19. **Legal:** Violation of any federal, state, or local law is prohibited.

20. **Noncompliance with University Officials:** Failure to comply with directions of Northern Illinois University officials or law enforcement officers acting in the performance of their duties and/or failure to identify oneself to these persons when requested to do so is prohibited.

21. **Posting of Signage:** Failure to post signage in accordance with established procedures of the specific building is prohibited.

22. **Retaliation:** Taking any adverse or hostile action, engaging in harassment and/or making an adverse employment/academic decision because an employee/student/third party has opposed violations of this policy or other unlawful employment/academic practices by filing a complaint, testifying, assisting, or participating in an investigation, proceeding, or hearing.

23. **Smoking Violation:** Violation of the Illinois Smoke Free Campus Act, Public Law 98-0895.

24. **Theft (Property):** Theft includes the taking of and/or damage to property of the University or property of a member of the Northern Illinois University Community or other personal or public property on or off campus.

25. **University Policy Violation:** Violation of any Northern Illinois University policy not specifically mentioned in the *Student Code of Conduct*. A complete list of policies

applicable to students can be found on the Vice President for Student Affairs & Enrollment Management website: http://www.niu.edu/stuaff/audience/students.shtml

26. **Weapons:** The following is prohibited.  Any device whether loaded or unloaded, that shoots a bullet, pellet, flare or any other projectile including those powered by carbon dioxide ($CO_2$). This includes but is not limited to rifles, shotguns, handguns or other firearm, BB/pellet gun, flare gun, stun gun, airsoft gun, dart gun, nun chuck(s), and/or any chemical weapon used in a manner other than as described as self-defense under the "Physical Abuse" provision of this Code, and any ammunition for any such device. Any replica of the foregoing is also prohibited. Any explosive including firecrackers or black powder. Any device that is designed or traditionally used to inflict harm including but not limited to any knife with a blade longer than three (3) inches, hunting knife, fixed blade knife, throwing knives, dagger, razor or other cutting instrument the blade of which is exposed is also prohibited.

27. **Sexual Misconduct/Title IX Policy Violation:** Violation of any of the provisions of the NIU Sexual Misconduct/Title IX Policy, including but not limited to:
    a. Dating Violence;
    b. Domestic Violence;
    c. Gender-based Harassment or Discrimination;
    d. Rape;
    e. Retaliation;
    f. Sex-based Misconduct;
    g. Sex Discrimination;11.
    h. Sexual Assault;
    i. Sexual Harassment;
    j. Sexual Penetration;
    k. Sexual Violence;
    l. Stalking

## B. Violation of Law and the Northern Illinois University Student Conduct Process

Northern Illinois University disciplinary proceedings may be instituted against a Student charged with conduct that potentially violates both criminal law and the *Student Code of Conduct* (if both possible violations result from the same factual situation) without regard to the pendency of civil or criminal litigation in court or criminal arrest and prosecution. Proceedings under the *Student Code of Conduct* may be carried out prior to, simultaneously with, or following civil or criminal proceedings off campus at the discretion of the Director of Student Conduct, or designee. Determinations made or sanctions imposed under the *Student Code of Conduct* shall not be subject to change because criminal charges arising out of the same facts and giving rise to violation of University rules were dismissed, reduced, or resolved in favor of or against the criminal law defendant.

## C. Sanctions

1. The following sanctions may be imposed upon any Student or Recognized Student Organization found to have violated the *Student Code of Conduct* :

   a. **Class Removal or Reassignment:**  A sanction that removes a student from a class or requires a student to move into a different class or section.

   b. **Community Service:** A sanction that requires a Student or Recognized Student Organization to complete hours of service to Northern Illinois University or the DeKalb Community;

   c. **Counseling:** A sanction that includes but is not limited to the requirement of the completion of counseling. (e.g., Referral to Counseling, Substance Use Assessment, Anger Intervention Assessment, etc.);

   d. **Deferred Sanction:** A sanction that is deferred may become effective if the Student is found "responsible" or accepts responsibility for a future violation of the *Student Code of Conduct* or other institutional policy. Any sanction may be deferred, the deferred sanction will include the length of deferment and the expiration date of the deferred sanction;

   e. **Discretionary Sanctions:** A sanction that requires work assignments, written assignments, service to Northern Illinois University, or other related discretionary assignments;

   f. **Educational Sanctions:** A sanction that includes but is not limited to the requirement of the completion of an educational assignment or assessment. (e.g., research paper, program presentation, interviews, Partner Abuse Intervention Program, anger assessment, etc.);

   g. **Fines:** An amount of money applied to the Bursar's Account of the Student or Recognized Student Organization for violation of a University or Department policy;

   h. **Formal Written Warning:** A notice in writing to the Student or Recognized Student Organization indicating a violation of institutional regulations;

   i. **Loss of Privileges:** A denial of specified privileges for a designated period of time (e.g., inability to have guests/visitors, inability to hold social functions, etc.);

   j. **Loss of Recognized Student Organization Status:** A loss of all privileges, including Northern Illinois University recognition as a student organization, for a specified period;

k. **Probation:** Probation for a designated period that includes the probability of more severe disciplinary sanctions if the Student is found to violate any institutional regulation(s) during the probationary period;

l. **Residence Hall Expulsion:** Permanent separation of the student from the residence halls;

m. **Residence Hall Suspension:** Separation of the student from the residence halls for a definite period of time, after which the student is eligible to return. Conditions for readmission may be specified;

n. **Restitution:** Compensation for loss, damage, or injury. This may take the form of appropriate service and/or monetary or material replacement;

o. **Revocation of Admission and/or Degree:** A revocation of admission to or a recommendation of revocation of degree awarded by the University;

p. **University Expulsion:** A permanent separation of the student from Northern Illinois University;

q. **University Suspension:** A separation of the student from Northern Illinois University for a definite period of time, after which the student, upon completion, may be eligible to return. A Student Conduct Board issuing the sanction of suspension must start the suspension immediately, or not impose the sanction at all;

r. **Withholding Degree:** A withholding of the awarding of a degree otherwise earned until the completion of the process set forth in the *Student Code of Conduct*.

2. More than one (1) of the sanctions listed above may be imposed for any single violation.

3. In cases that involve policy violation(s) in which the outcome is subject to disclosure under *The Clery Act* (1990, as amended) or the *Family Educational Rights and Privacy Act of 1974*, as amended, Student Conduct shall notify the Accused student or Recognized Student Organization and the Complainant, and the Victim/Survivor (in cases of Sexual Misconduct or other Title IX offenses) of the outcome of the proceedings, simultaneously.

4. In each case for which an Administrative Hearing Officer, a Student Conduct Board, Residence Hall Conduct Board, or Organizational Conduct Board determines that a Student or Recognized Student Organization has violated the *Student Code of Conduct*, the sanction(s) shall be determined and imposed by the appropriate Administrative Hearing Officer or Conduct Board.

5. Any sanction not completed by the deadline set by the Student Conduct Administrator or the Conduct Board may result in additional sanction. Student Conduct shall monitor the deadlines for sanction completion.

6. Sanctions imposed are in effect as determined by the Student Conduct Administrator, Conduct Board or Administrative Hearing Officer. Sanctions are in effect throughout any appeal process undertaken by the student.

7. In determining organizational sanctions, the Student Conduct Administrator shall only consider offenses in which the Recognized Student Organization has been found responsible, no more than four (4) years from the calendar date of the current Preliminary Conference.

8. Recognized Student Organizations regaining their recognition, after a period of suspension, as a student conduct sanction, shall automatically be placed on a period of organizational disciplinary probation for one (1) calendar year upon their re-recognition.

## D. Alcohol, Drug, & Violence Sanctions

Northern Illinois University students are expected to comply with local, state, and federal laws relating to the use of drugs and alcohol, and crimes of violence. With this in mind, NIU has established clear and specific sanctions that result from violations of the policies. The sanctions, ranging from probation and substance abuse awareness programs for minor offenses to dismissal and/or referral to civil authorities for major and/or multiple offenses, are applied consistently and fairly. The University recognizes that, while the sanctioning process is educational in nature, students must understand that they will be held accountable for their actions in both the university setting and the external world.

In some instances, education must defer to community standards and community safety. In cases of a serious nature or in instances of multiple recidivism, it sometimes is necessary to impose sanctions that extend beyond the educational realm. In those situations, NIU is committed, when necessary, to imposing stern and swift sanctions up to and including dismissal from the University and referral of the matter to the local authorities for prosecution, as necessary. The NIU Community will not tolerate violations of this nature and will not shield its students from just and appropriate consequences for their illegal actions. **The sanctions enumerated below are the minimum sanctions that will be imposed if a student accepts responsibility, is found responsible, or, in applicable cases, enters an option of "No Contest" to one of these NIU** *Student Code of Conduct* **violations.**

**Minimum Sanctions for Violations Relating to Alcohol, Drugs, or Violence**

| Violation | First Time Offender | Second Time Offender | Third Time Offender |
|---|---|---|---|
| Abuse (Physical) | University Suspension for one (1) academic semester<br><br>Banishment from NIU Campus Property during period of suspension | University Suspension for one (1) academic year<br><br>Banishment from NIU Campus Property during period of suspension | University Expulsion<br><br>Banishment from NIU Campus Property |
| Alcohol<br><br>(No Harm to Self, Others, Property) | Referral to BASICS<br><br>$50 Student Conduct Fine | Completion of Substance Use Assessment<br><br>Completion of Alcohol Edu<br><br>$75 Student Conduct Fine<br><br>Probation for one (1) academic year<br><br>Parental Notification<br><br>Referral to Office of Student Academic Success | University Suspension for one (1) academic semester<br><br>Banishment from NIU Campus Property during period of suspension<br><br>Parental Notification<br><br>$125 Student Conduct Fine<br><br>Probation for at least one (1) year upon return to NIU |
| Alcohol<br><br>(Harm to Self, Others, Property) | Substance Use Assessment<br><br>Completion of Alcohol Edu<br><br>$50 Student Conduct Fine<br><br>Probation for one (1) academic year<br><br>Parental Notification | University Suspension for one (1) academic semester<br><br>Parental Notification<br><br>$75 Student Conduct Fine<br><br>Probation for at least one (1) year upon return to NIU | University Suspension for one (1) academic year<br><br>Banishment from NIU Campus Property during period of suspension<br><br>Parental Notification<br><br>$125 Student Conduct Fine |

|  | Referral to Office of Student Academic Success |  | Probation for at least one (1) year upon return to NIU |
|---|---|---|---|
| Cannabis/Drugs | Substance Use Assessment<br><br>$75 Student Conduct Fine<br><br>Probation for one (1) academic year<br><br>Parental Notification<br><br>Referral to Office of Student Academic Success | University Suspension for one (1) academic semester<br><br>Banishment from NIU Campus Property during period of suspension<br><br>Parental Notification<br><br>$75 Student Conduct Fine<br><br>Probation for at least one (1) year upon return to NIU | University Suspension for one (1) academic year<br><br>Banishment from NIU Campus Property during period of suspension<br><br>Parental Notification<br><br>$125 Student Conduct Fine<br><br>Probation for at least one (1) year upon return to NIU |
| Hazing (No Harm) | University disciplinary probation for at least one (1) calendar year<br><br>Educational Program<br><br>$100 Student Conduct Fine | Suspension from NIU for one (1) year<br><br>Banishment from NIU campus property for period of suspension | University expulsion<br><br>Banishment from NIU campus property |

| Violation | First Time Offender | Second Time Offender | Third Time Offender |
|---|---|---|---|
| Hazing (Harm) | University suspension for at least one (1) academic year<br><br>Banishment from NIU campus property during period of suspension<br><br>Completion of off campus counseling prior to returning to NIU | University expulsion<br><br>Banishment from NIU campus property | |
| Weapons (Used in a threatening manner) | University Suspension for one (1) academic semester<br><br>Banishment from NIU Campus Property during period of suspension | University Suspension for one (1) academic year<br><br>Banishment from NIU Campus Property during period of suspension | University Expulsion<br><br>Banishment from NIU Campus Property |

| Student Code of Conduct Violation | First Time Offender (Student Organizations) | Second Time Offender* (Student Organizations) | Third Time Offender* (Student Organizations) |
|---|---|---|---|
| ALCOHOL (No Harm to Self, Others or Property) | Loss of social privileges for one semester<br><br>Notification of incident made to National/International Office ( if applicable)<br><br>$100 fine assessed and distributed to the university Student Involvement & Leadership Development for Alcohol Education/ Social Policy Training<br><br>Educational Sanction | Loss of social and university privileges for one calendar year<br><br>Notification of incident made to National/International Office (if applicable)<br><br>$300 fine assessed and distributed to the university Student Involvement & Leadership Development for Alcohol Education/ Social Policy Training<br><br>Organization required to propose an alcohol awareness program/speaker for their organization and/ or campus | Loss of Recognized Student Organization status for five (5) years<br><br>Notification of incident made to National/ International Office (if applicable) |
| ALCOHOL (Harm to Self, Others or Property) | Loss of social privileges for one calendar year<br><br>Notification of incident made to National/ International Office (if applicable)<br><br>$100 fine assessed and distributed to the university Student Involvement & Leadership Development for Alcohol Education/Social Policy Training | Loss of Recognized Student Organization Status for five (5) years<br><br>Notification of incident made to National/ International Office( if applicable)<br><br>$300 fine assessed and distributed to the university Student Involvement & Leadership Development for Alcohol Education/Social Policy Training | |

|  | Restitution for damages (if applicable) | Restitution for damages (if applicable) | |
|---|---|---|---|
| CANNABIS/DRUGS | Loss of social and university privileges for one calendar year<br><br>Notification of incident made to National/ International Office if applicable<br><br>$250 fine assessed and distributed to Student Involvement & Leadership Development for Alcohol-Drug Education/ Social Policy Training<br><br>Educational Sanction | Loss of Recognized Student Organization Status for five (5) years<br><br>Notification of incident made to National/ International Office if applicable<br><br>$500 fine assessed and distributed to Student Involvement & Leadership Development for Alcohol-Drug Education/Social Policy Training | |

| Student Code of Conduct Violation | First Time Offender (Student Organizations) | Second Time Offender* (Student Organizations) | Third Time Offender* (Student Organizations) |
|---|---|---|---|
| HAZING | University Disciplinary Probation for three (3) calendar years<br><br>$300 fine to be given to Student Involvement & Leadership Development for Hazing Prevention Education<br><br>Mandatory attendance by all members at an educational program (to be determined in the sanction letter)<br><br>Notification of incident made to National/International Office (if applicable)<br><br>Required to provide a report detailing how the organization will educate the entire organization as well as new members about hazing<br>Restriction of social and university activities for one academic year<br><br>Restitution (if applicable)<br><br>A detailed review of the new member program with a member of the SILD staff, prior to | Loss of Recognized Student Organization Status for five (5) years<br><br>$500 fine to be given to Student Involvement & Leadership Development for Hazing Prevention Education<br><br>Mandatory attendance by all members at an education program created by the organization (to be determined in the sanction letter)<br><br>Notification of incident made to National/International Office if applicable<br><br>Required to provide a report detailing how the organization will educate the new members about hazing and the organization as a whole<br><br>A detailed review of the new member program with a member of the SILD and CSSC staff, prior to any recognition<br><br>No current member may rejoin organization at recognition | |

| | | | |
|---|---|---|---|
| | conducting any membership process<br><br>Monthly meetings with a member of the SILD staff to provide an update on progress | | |
| ON-CAMPUS SOCIAL POLICY | University Disciplinary Probation for one (1) year<br><br>12 hours of community service per member<br><br>Deferred Loss of Recognized Student Organization Status<br><br>Loss of ability to hold events on or off campus for one (1) semester<br><br>Notification of incident is made to National/International Office (if applicable) | University Disciplinary Probation for one (1) year upon reinstatement as organization<br><br>Loss of Recognized Student Organization Status for one (1) semester<br><br>Loss of ability to hold events with alcohol for one (1) year<br><br>Notification of incident is made to National/International Office (if applicable) | Loss of Recognized Student Organization Status for five (5) years<br><br>Notification of incident is made to National/International Office (if applicable) |
| Weapons found at an organization facility or meeting space | Loss of Recognized Student Organization Status for one (1) year | | |

**OFF CAMPUS SOCIAL POLICY VIOLATION CHART**

| Violation | First Time Offense (Level I Violation) | Second Time Offense (Level I Violation) | Third Time Offense (Level I Violation) |
|---|---|---|---|
| Off Campus Social Policy Violation | 1. Loss of ability to hold social events for two (2) academic weeks 2. Executive Board must meet with SILD staff to review Off Campus Social Events Policy | 1. Loss of ability to hold off-campus social events for four (4) academic weeks 2. Educational Sanction 3. Notification made to National/International office | 1. Loss of ability to hold off-campus social events for sixteen (16) academic weeks 2. Educational Sanction 3. Notification made to National/International office |

| Violation | First Time Offense (Level II Violation) | Second Time Offense (Level II Violation) | Third Time Offense (Level II Violation) |
|---|---|---|---|
| Off Campus Social Policy Violation | 1. Loss of ability to hold off-campus social events for four (4) academic weeks 2. Executive Board must meet with SILD staff to review Off Campus Social Events Policy 3. Provide a program on "Safe Partying" for the NIU campus community 4. Notification made to National/International office | 1. Loss of ability to hold off-campus social events for eight (8) academic weeks 2. Educational Sanction 3. Notification made to National/International office 4. Deferred Loss of Recognized Student Organization Status 5. Organizational Disciplinary Probation for one (1) calendar year | 1. Loss of Recognized Student Organization status for one (1) semester 2. Notification made to National/International office 3. Organizational Disciplinary Probation for one (1) calendar year upon reinstatement |

| Violation | First Time Offense (Level III Violation) | Second Time Offense (Level III Violation) | Third Time Offense (Level III Violation) |
|---|---|---|---|
| Off Campus Social Policy Violation | 1. Loss of ability to hold off-campus social events for sixteen (16) academic weeks<br>2. Executive Board must meet with SILD staff to review Off Campus Social Events Policy<br>3. Loss of ability to co-host social events for eight (8) academic weeks<br>4. Notification made to National/International office<br>5. Mandatory attendance by 90% of the chapter at a Bystander Intervention training<br>6. Develop and implement a marketing campaign about safe partying for the NIU campus community | 1. Notification made to National/International office<br>2. Organizational Disciplinary Probation for one (1) calendar year upon reinstatement<br>3. Loss of Recognized Student Organization Status for one (1) semester | 1. Loss of Recognized Student Organization status for one (1) calendar year<br>2. Notification made to National/International office<br>3. Organizational Disciplinary Probation for one (1) calendar year upon reinstatement |

## OFF CAMPUS SOCIAL POLICY VIOLATION LEVEL

**Level I**
- Unregistered alcohol-free social event
- Failure to clean up exterior of house by 8:00 a.m. the following morning
- Guest list does not meet policy requirements
- Sound from event can be heard from curb (after 10:00 p.m. on Thursdays, after 12:00 a.m. on Fridays and Saturdays)
- Organization does not maintain the guest list for one (1) year following an event
- Failure to hang appropriate signage at event

**Level II**
- Event with alcohol does not end on time or exceeds four (4) hours
- Failure to submit a guest list to SILD or guest list submitted is different from the list used at the door
- Glass containers at the event
- Failure to have an executive board member as a sober monitor on duty at the event
- Event exceeds the maximum number of guests allowed
- Failure to provide adequate food or non-alcoholic drinks
- Members/Guests enter the event with more than six (6) drinks
- Failure to close off living quarters from the party area or failure to contain the party to a common area

**Level III**
- Hard alcohol present at the event
- Common source alcohol present at the event
- Unregistered social event with alcohol
- Purchasing alcohol using chapter funds or chapter members pooling money to purchase and/or provide alcohol
- Alcohol at a recruitment or new member event/activity
- Event location is not in compliance with Fire Code
- Open Party or Guest list not used
- Not using wristband or other system of indicating age of attendees
- System for limiting attendee to six (6) drinks not present
- Required number of sober monitors not present
- Having a sober monitor visibly under the influence of alcohol or a controlled substance at an event
- Attendee present who is not on the guest list
- Not utilizing security when required
- No fence marking off the designated party area for an outdoor event
- More than one (1) entrance to the party area
- Underage students or students without a State issued ID (containing a birth date) consuming alcohol
- Drinking games occurring
- Failure to allow compliance check to be conducted

*   In determining organizational sanctions, the Student Conduct Administrator shall only consider offenses in which the Recognized Student Organization has been found responsible, no more than four (4) years from the calendar date of the current Preliminary Conference.

### E. Temporary Sanctions

In certain circumstances, the Vice President for Student Affairs & Enrollment Management or designee may impose a temporary sanction prior to the start of the Student Conduct Process. The temporary sanction issued will be no more restrictive than necessary to minimize the impact on a student's academic success while still maintaining the safety of the University Community.

1. Temporary sanctions may be imposed only:

    a. To ensure the safety and well-being of members of the Northern Illinois University Community or preservation of Northern Illinois University property;

    b. To ensure the student's own physical or emotional safety and well-being;

    c. If the student poses an ongoing threat of disruption of or interference with the normal operations of Northern Illinois University.

2. Under the temporary sanction, a student or recognized student organization may be denied access to the residence halls and/or to the campus (including classes) and/or all other Northern Illinois University activities or privileges for which the student or recognized student organization might otherwise be eligible. The student or recognized student organization may be banned from contact with another person or group of people.

3. The temporary sanction does not replace the regular process, which shall proceed on the normal schedule. A meeting shall be scheduled within five (5) business days of the temporary sanction being issued for the student. The preliminary conference may be continued by the Student Conduct Administrator, if necessary to gather more information, or to follow up on information presented by the Accused Student.

4. Students or recognized student organizations receiving a Temporary Sanction will also receive simultaneously a copy of the *Student Code of Conduct*. As soon as possible after receiving notice of temporary sanction, the student or recognized student organization shall receive a Notice of Alleged Violation, notice of any incident report(s), and notice of any other pertinent case information.

5. Students or recognized student organizations receiving a Temporary Sanction may request an administrative review of the temporary sanction by submitting their request in writing to the Office of the Vice-President for Student Affairs & Enrollment Management or designee.

    a. Requests for administrative review of temporary sanctions must be submitted within two (2) business days of receipt of the Temporary Sanction, in writing.

    b. The student or recognized student organization will be given the opportunity to present and justify his/her grounds for appeal. The Vice President for Student

Affairs & Enrollment Management or designee may then ask questions regarding the situation.

c. The Vice President for Student Affairs & Enrollment Management or designee will issue a decision in writing, normally within five (5) business days of <u>completion</u> of the administrative review. The decision will be to sustain, lessen, increase, or remove the temporary sanction(s), and it will be based on the material from the review and other germane information (e.g., the student's or recognized student organization's Conduct file). There is no appeal of this decision. This time frame may be reasonably extended by the Vice President for Student Affairs & Enrollment Management or designee.

d. Any temporary sanction that is either upheld or modified by the Vice President for Student Affairs & Enrollment Management or designee will remain in effect until the final resolution of the Student Conduct Process.

e. Once issued, temporary sanctions may only be modified or removed by the Vice President for Student Affairs & Enrollment Management or designee.

f. Student Conduct has the authority to remove any temporary sanction upon final resolution of a case in which any temporary sanction(s) was issued.

# ARTICLE IV: STUDENT CONDUCT PROCEDURE (INDIVIDUAL STUDENT & RECOGNIZED STUDENT ORGANIZATION)

*NOTE: This section of the Student Code of Conduct applies to both individual students and recognized student organizations. Any reference to "student" or "accused student" in this section may also mean recognized student organization when applicable. Any reference to student conduct board may also mean organizational conduct board when appropriate.*

## A. Incident Reporting, Notice, and Preliminary Conference

1. **Incident Reporting**
   Any member of the Northern Illinois University Community may file an incident report against a student for alleged violation(s) of the *Student Code of Conduct* or other applicable University policy. An incident report shall be submitted as soon as possible after the incident has taken place, but normally no more than thirty (30) calendar days from the date of the incident. The Director of Student Conduct or designee shall have the authority, for reasonable cause, to extend the deadline for submission of an incident report.

2. **Notice of Alleged Violation**
   A Notice of Alleged Violation shall be presented to the accused student in written and/or electronic form. A time and date shall be set for a preliminary conference, normally not less than three (3) nor more than ten (10) business days after the accused student has been notified. Maximum time limits for the scheduling of a preliminary conference may be extended, for cause, at the discretion of the Student Conduct Administrator. For cause includes, but is not limited to gathering further information and/or following up on information provided by the Accused Student. Electronic notification for delivery of the Notice of Alleged Violation is the preferred method of communication. An e-mail shall be sent to the accused student's Z-ID e-mail notifying him/her of the alleged violation(s) and setting up a preliminary conference. When an electronic system is unavailable, a paper copy shall be substituted for electronic notification. With either form of communication, proof of delivery is required. The student conduct process will proceed with or without participation from any or all parties involved.

3. **Meeting with Victim/Survivor**
   The victim/survivor will be provided with an opportunity to meet with the student conduct administrator in order to share his or her information about the incident, and for the student conduct administrator to provide information and resources to the victim/survivor. Contact between the parties will be limited to necessity.

4. **Preliminary Conference**
   At the preliminary conference, the student conduct administrator will perform the following tasks with the accused student:

   a. Ensure that the accused student has received all of the proper documentation regarding the alleged violation(s) (e.g., Notice of Alleged Violation(s), NIU *Student*

*Code of Conduct,* and a copy of the narrative section of the incident report, redacted when required).

b.  Explain the Northern Illinois University Student Conduct Process to the accused student.

c.  Answer any questions of the accused student about the student conduct process.

d.  Listen to an accused student's version of the incident, although the accused student shall not be required to discuss the incident.

e.  Engage in a candid discussion of the incident with the accused student.

f.  Upon completion of a preliminary conference, the Student Conduct Administration shall determine if the alleged conduct violation(s) against the accused student are to remain in place, are to be modified, or are to be dismissed after listening to the accused student's version of events. If alleged conduct violation(s) remains in an accused student's case, the student conduct administrator will offer the accused student a Case Resolution Form. The Case Resolution Form will contain a list of any remaining alleged conduct violation(s) and recommendations for sanctions.

The Case Resolution Form will contain the following three options (and may contain a third option, if applicable):

1)  Option I: I ACCEPT responsibility for violating the *Student Code of Conduct* and ACCEPT the recommended sanction(s);

2)  Option II: I request a hearing before either a Student Conduct Board or Administrative Hearing Officer;

3)  Option III: No Contest regarding Responsibility and ACCEPTANCE of recommended sanctions. **(The option for No Contest is only available to Accused students who are facing concurrent criminal charge(s) at the time of their Preliminary conference.)**

If an accused student selects Option I or Option III on the Case Resolution Form, the case shall be considered resolved, and the student conduct administrator will provide the accused student with all paperwork necessary to complete the imposed sanctions, and will follow up at the appropriate time to ensure completion of the imposed sanctions.

If the accused student selects Option II on the Case Resolution Form, the student conduct administrator shall notify the student before which entity (Hearing Board or Administrative Hearing Officer) the hearing will occur.

g.  Signing the Case Resolution Form

1) When an accused student is presented with a Case Resolution Form, the accused student may select an option to resolve the incident or proceed with a student conduct board hearing or an administrative hearing officer hearing.

    2) An accused student will have up to five (5) business days to change the resolution initially agreed to on the Case Resolution Form. After five (5) business days from the dated signature on the Case Resolution Form, the decision is final and no change may be made.

5. **Non-Attendance at a Preliminary Conference**
If an accused student does not attend a preliminary conference after being notified of such and makes no documented effort to contact the student conduct administrator, requesting a rescheduling of the preliminary conference, the student conduct administrator shall complete a Case Resolution Form and enter a choice of Option II (Request for a hearing) on behalf of the accused student. The incident will then be scheduled for a hearing and notify all applicable parties. The preliminary conference may be rescheduled at the discretion of the Student Conduct Administrator.

6. Northern Illinois University reserves the right to initiate additional student conduct action if new information is presented to the university.

## B. Student Conduct Board Hearings

1. **Selection of Individuals to Serve in the Pool as Student Conduct Board Members and Administrative Hearing Officers**

   a. Five (5) supportive professional staff and operating staff members recommended by the Vice President for Student Affairs & Enrollment Management and appointed by the Faculty Senate;

   b. Students (Graduate and Undergraduate) who apply for, are accepted for service, and are in good standing with the institution;

   c. Faculty as appointed by the process outlined by the NIU University Council or as appointed by the Vice President for Student Affairs & Enrollment Management;

   d. Staff members appointed by the Vice President for Student Affairs & Enrollment Management

2. **Composition of a Student Conduct Board Hearing**
   Student Conduct Boards shall be comprised according to the following guidelines:

   Three (3) students and two (2) faculty or staff drawn from the faculty, supportive professional or operating staff members shall comprise the student conduct board to hear non-academic misconduct incidents

   a. The Quorum at all Student Conduct Board Hearings shall be at least four (4) members;

b. If only four (4) members are present, in the case of a tie, the accused student shall be found "not responsible" for the alleged violation currently being voted on by the student conduct board.

3. **Notice of Hearings**

An accused student, complainant, victim/survivor, and witness(es) shall be given notice in writing and/or electronic form not less than three (3) business days prior to the date and time of the conduct hearing. The notice of the hearing shall be delivered in such a manner that can be certified to guarantee receipt by the appropriate party. Electronic notification for delivery of the Notice of Hearing is the preferred method of communication. An e-mail shall be sent to the accused student's Z-ID e-mail notifying him/her of the alleged violation(s) and setting up a student conduct board hearing. When an electronic system is unavailable, a paper copy shall be substituted for electronic notification. With either form of communication, proof of delivery is required.

4. **Privacy of Hearings**

All conduct hearings shall be closed.

5. **Attendance at Student Conduct Board Hearings**

The following people will be allowed to attend the entire hearing: the accused student, complainant, victim/survivor, advisors (if any), observer, university presenter, student conduct board facilitator, and student conduct board members. Witnesses will be allowed to be present only when they are providing testimony. Admission of any other person to the student conduct board hearing shall be at the discretion of the student conduct board facilitator. Only the members of the student conduct board will be present during deliberations. The student conduct board facilitator may be present during deliberations if the student conduct board members have a question(s) concerning procedure.

6. **Hearings Involving Multiple Accused Students**

In a student conduct board hearing involving more than one (1) accused student, the student conduct administrator, at his/her discretion may permit a joint student conduct board hearing.

7. **Advisors**

The accused student, complainant, and victim/survivor may be accompanied by an advisor in a student conduct board hearing. Any person may serve as an advisor. The advisor need not be affiliated with the Northern Illinois University community. If a student elects to have an advisor, it is highly recommended that an accused student, complainant, and/or victim/survivor choose from the list of trained advisors that is maintained by the Student Conduct. An advisor will only be allowed to confer with his/her advisee (accused student, complainant, victim/survivor). The advisor will not be allowed to participate in the student conduct process on behalf of his/her advisee.

8. **Witnesses**
   The accused student, complainant, and victim/survivor may arrange for witnesses to present pertinent information to the student conduct board. Student Conduct will try to arrange the attendance of possible witnesses who are members of the university community. Witnesses shall provide information about the incident and answer questions from the student conduct board.

9. **Questioning During Student Conduct Board Hearings**
   The university presenter, accused student, complainant, victim/survivor, and student conduct board members may ask questions of each respective side during the student conduct board hearing. The student conduct board facilitator shall inform each side as to the appropriate time to ask questions during the hearing. Questions asked by the university presenter, accused student, complainant, victim/survivor, or student conduct board members should be relevant to the incident. The student conduct board facilitator will determine if the question is relevant and should be answered.

10. **Information**
    Pertinent records, exhibits, and written statements may be accepted as information for consideration by the student conduct board at the discretion of the student conduct board facilitator.

11. **Procedural Questions**
    All procedural questions are subject to the final decision of the student conduct board facilitator. Formal rules of process, procedure, and technical rules of evidence, such as are applied in criminal or civil court, are not applicable in student conduct board hearings.

12. **Deliberations**
    After all information is presented in a student conduct board hearing, the student conduct board shall determine whether the accused student is deemed "responsible" or "not responsible" for each alleged violation. The determination shall be made by majority vote of the student conduct board. The student conduct board's determination shall be made based on the preponderance of the evidence.

13. **Notification of Decision**
    The student conduct board facilitator shall notify the accused student, and in the case of sexual misconduct or violence, the victim/survivor, of the decision of the student conduct board, in writing, within two (2) business days after the deliberation. This notification shall be sent in a way to certify receipt of the notification. For any incident involving violent crime or non-forcible sexual offense, as described in the Jeanne Cleary Disclosure of Campus Security Policy and Campus Crime Statistics Act of 1990, 20 U.S.C. §1092(f), as amended, both the accused student and the victim/survivor will be notified by the student conduct board facilitator, in writing, within two (2) business days after the deliberation, simultaneously. The notification shall be sent in a way to certify receipt of the notification. If the victim is deceased, the student conduct board facilitator shall notify the victim's next of kin, upon written request by the next of kin. The decision shall include the rationale for the finding(s) and the sanction(s). Any deviation from the minimum sanctioning grid shall include an appropriate justification for such deviation.

Any sanction that does not meet the standards provided in the minimum sanction grid must be approved by the Director of Student Conduct or designee, prior to being issued. If the deviation from the sanctions is not approved, the Student Conduct Board must impose the minimum sanctions.

14. **Records of Student Conduct Board Hearings**
   There shall be a single verbatim record, such as a tape recording, of all student conduct board hearings. Deliberations shall not be recorded. The record shall be the property of Northern Illinois University and shall be maintained by the Student Conduct. Only the Student Conduct may audio-record the hearing.

15. **Non-Attendance of an Accused Student at a Student Conduct Board Hearing**
   It is the responsibility of an accused student and complainant to attend the scheduled hearing. The student conduct board hearing will proceed without the accused student or complainant if proof of delivery is held of the Notice of Hearing.

16. **Personal Safety Consideration**
   The student conduct board facilitator shall accommodate concerns for the personal safety, well-being, and/or fears of confrontation of the accused student, complainant, victim/survivor, or any witness(es) during the hearing, by taking appropriate and reasonable measures.

C. **Administrative Hearings**

1. **Administrative Hearing Officers**
   Student Conduct shall select, train, and maintain a pool of Administrative Hearing Officers. Administrative Hearing Officers shall function as a one-person Student Conduct Board.

2. **Notice of Hearings**
   An accused student, complainant, and witness(es) shall be given notice in writing and/or electronic form not less than three (3) business days prior to the date and time of the administrative hearing. The notice of the hearing shall be delivered in such a manner that can be certified to guarantee receipt by the cooperating accused student, complainant, and victim/survivor. Electronic notification for delivery of the Notice of Alleged Violation(s) is the preferred method of communication. An e-mail shall be sent to the accused student's Z-ID e-mail notifying him/her of the alleged violation(s) and setting up an administrative hearing. When an electronic system is unavailable, a paper copy shall be substituted for electronic notification. With either form of communication, proof of delivery is required.

3. **Privacy of Hearings**
   All conduct hearings shall be closed.

4. **Attendance at Administrative Hearings**
   The following people will be allowed to attend the entire hearing: the accused student, complainant, victim/survivor, advisors (if any), observers (if any), university presenter, and the administrative hearing officer. Witnesses will be allowed to be present only

when they are providing testimony. Admission of any other person to the administrative hearing shall be at the discretion of the administrative hearing officer.

5. **Hearings Involving Multiple Accused students**
   In an administrative hearing involving more than one (1) accused student, the student conduct administrator, at his/her discretion may permit a joint administrative hearing.

6. **Advisors**
   The accused student, complainant, and victim/survivor may be accompanied by an advisor in an administrative hearing. Any person may serve as an advisor. The advisor need not be affiliated with the Northern Illinois University community. If a student elects to have an advisor, it is highly recommended that an accused student, complainant, or victim/survivor choose from the list of trained advisers that is maintained by the Student Conduct. An advisor will only be allowed to confer with his/her advisee (accused student, complainant, victim/survivor), but will not be allowed to interrupt the hearing. The advisor will not be allowed to participate in the student conduct process on behalf of his/her advisee.

7. **Witnesses**
   The accused student, complainant, and victim/survivor may arrange for witnesses to present pertinent information to the administrative hearing officer. Student Conduct will try to arrange the attendance of possible witnesses who are members of the university community. Witnesses shall provide information about the incident and answer questions from the administrative hearing officer.

8. **Questioning During Administrative Hearings**
   The university presenter, accused student, complainant, victim/survivor, and administrative hearing officer may ask questions of each respective side during the administrative hearing. The administrative hearing officer shall inform each side of the appropriate time to ask questions during the hearing. Questions asked by the university presenter, accused student, complainant, victim/survivor, or administrative hearing officer should be relevant to the incident. Queries regarding appropriateness of evidence and questions should be directed to the administrative hearing officer.

9. **Information**
   Pertinent records, exhibits, and written statements may be accepted as information for consideration by the administrative hearing officer at his/her discretion.

10. **Procedural Questions**
    All procedural questions are subject to the final decision of the administrative hearing officer. Formal rules of process, procedure, and technical rules of evidence, such as are applied in criminal or civil court, are not used in administrative hearings.

11. **Deliberations**
    After all information has been presented in an administrative hearing, the administrative hearing officer shall determine whether the accused student is deemed "responsible" or "not responsible" for each alleged violation. The administrative hearing officer's determination shall be made based on the preponderance of the evidence.

12. **Notification of Decision**
The administrative hearing officer shall notify the accused student, and in the case of sexual misconduct or violence, the victim/survivor, of the decision of the administrative hearing officer, in writing, within two (2) business days after the deliberation. This notification shall be sent in a way to certify receipt of the notification. For any incident involving violent crime or non-forcible sexual offense, as described in the Jeanne Cleary Disclosure of Campus Security Policy and Campus Crime Statistics Act of 1990, 20 U.S.C. §1092(f), as amended, both the accused student and the victim/survivor will be notified by the administrative hearing officer, in writing, within two (2) business days after the deliberation, simultaneously. The notification shall be sent in a way to certify receipt of the notification. If the victim is deceased, the administrative hearing officer shall notify the victim's next of kin, upon written request by the next of kin. The decision shall include the rationale for the finding(s) and the sanction(s). Any deviation from the minimum sanctioning grid shall include an appropriate justification for such deviation. Any deviation from the minimum sanctioning grid shall include an appropriate justification for such deviation. The Director of Student Conduct or designee must approve any sanction that does not meet the standards provided in the minimum sanction grid, prior to being issued. If the deviation from the sanction is not approved, the minimum sanction(s) must be imposed by the Administrative Hearing Officer.

13. **Records of Administrative Hearings**
There shall be a single verbatim record, such as a tape recording, of all administrative hearings. Deliberations shall not be recorded. The record shall be the property of Northern Illinois University and shall be maintained by Student Conduct. Only Student Conduct may audio-record the hearing.

14. **Non-Attendance of an Accused student at an Administrative Hearing**
It is the responsibility of an accused student and complainant to attend the scheduled administrative hearing. The administrative hearing will proceed without the accused student or complainant if proof of delivery is held of the Notice of Hearing.

15. **Personal Safety Considerations**
The administrative hearing officer shall accommodate concerns for the personal safety, well-being, and/or fears of confrontation of the accused student, complainant, victim/survivor, or other witness(es) during the hearing, by taking appropriate and reasonable measures.

D. **Residence Hall Conduct Board Hearings**

1. **Composition of a Residence Hall Conduct Board**
Residence hall conduct boards shall be comprised according to the following guidelines:

   a. Five (5) residential students shall comprise a residence hall conduct board.

   b. The quorum at all residence hall conduct board hearings shall be at least four (4) members. If only four (4) members are present, in the case of a tie, the accused

student shall be found "not responsible" for the alleged violation currently being voted on by the residence hall conduct board.

2. **Notice of Hearings**
An accused student and complainant shall be given notice in writing and/or electronic form not less than three (3) business days prior to the date and time of the residence hall conduct board hearing. The notice of the hearing shall be delivered in such a manner that can be certified to guarantee receipt by the accused student, complainant, and victim/survivor. Electronic notification for delivery of the Notice of Hearing is the preferred method of communication. An e-mail shall be sent to the accused student's Z-ID e-mail notifying him/her of the alleged violation(s) and setting up a conduct hearing. When an electronic system is unavailable, a paper copy shall be substituted for electronic notification. With either form of communication, proof of delivery is required.

3. **Privacy of Hearings**
All conduct hearings shall be closed.

4. **Attendance at Residence Hall Conduct Board Hearings**
The following people will be allowed to attend the entire hearing: the accused student, complainant, victim/survivor, advisors (if any), observer, residence hall conduct board members, and residence hall conduct board advisor. Witnesses will be allowed to be present only when they are providing testimony. Admission of any other person to the residence hall conduct board hearing shall be at the discretion of the residence hall conduct board advisor. Only the members of the residence hall conduct board and the residence hall conduct board advisor shall be present during deliberations. The residence hall conduct board advisor shall not have a vote during the deliberations.

5. **Hearings Involving Multiple Accused students**
In a residence hall conduct board hearing involving more than one (1) accused student, the student conduct administrator, at his/her discretion may permit a joint residence hall conduct board hearing.

6. **Advisors**
The accused student, complainant, and/or victim/survivor may be accompanied by an advisor in a residence hall conduct board hearing. Any person may serve as an advisor. The advisor need not be affiliated with the Northern Illinois University community. If the student elects to have an advisor, it is highly recommended that an accused student, complainant, and/or victim/survivor choose from the list of trained advisors that is maintained by Student Conduct. An advisor will only be allowed to confer with his/her advisee (accused student, complainant, or victim/survivor). The advisor will not be allowed to participate in the student conduct process on behalf of his/her advisee.

7. **Witnesses**
The accused student, complainant, and/or victim/survivor may arrange for witnesses to present pertinent information to the residence hall conduct board. Housing & Dining will try to arrange the attendance of possible witnesses who are members of the

university community. Witnesses shall provide information about and answer questions from the residence hall conduct board.

8. **Questioning During Residence Hall Conduct Board Hearings**
The accused student, complainant, victim/survivor, and residence hall conduct board may ask questions of each respective side during the residence hall conduct board hearing. The residence hall conduct board advisor shall inform each side as to the appropriate time to ask questions during the hearing. Questions asked by the accused student, complainant, victim/survivor, or residence hall conduct board members should be relevant to the incident. Queries regarding appropriateness of evidence and questions should be directed to the residence hall conduct board hearing chair.

9. **Information**
Pertinent records, exhibits, and written statements may be accepted as information for consideration by the residence hall conduct board at the discretion of the residence hall conduct board chair, in consultation with the residence hall conduct board advisor.

10. **Procedural Questions**
All procedural questions are subject to the final decision of the residence hall conduct board chair. The residence hall conduct board chair may consult with the residence hall conduct board advisor. Formal rules of process, procedure, and technical rules of evidence, such as are applied in criminal or civil court, are not applicable in residence hall conduct board hearings.

11. **Deliberations**
After all information and evidence is presented in a residence hall conduct board hearing, the residence hall conduct board shall determine whether the accused student is deemed "responsible" or "not responsible" for each alleged violation. The determination shall be made by majority vote of the residence hall conduct board. The residence hall conduct board's determination shall be made based on the preponderance of the evidence.

12. **Notification of Decision**
The residence hall conduct board advisor shall notify the accused student of the decision of the residence hall conduct hearing, in writing, within two (2) business days after the deliberation. This notification shall be sent in a way to certify receipt of the notification. For any incident involving violent crime or non-forcible sexual offense, as described in the Jeanne Cleary Disclosure of Campus Security Policy and Campus Crime Statistics Act of 1990, 20 U.S.C. §1092(f), as amended, both the accused student and the victim/survivor will be notified by the residence hall conduct board advisor, in writing, within two (2) business days after the deliberation, simultaneously. The notification shall be sent in a way to certify receipt of the notification. If the victim is deceased, the residence hall conduct board advisor shall notify the victim's next of kin, upon written request by the next of kin. The decision shall include the rationale for the finding(s) and the sanction(s). Any deviation from the minimum sanctioning grid shall include an appropriate justification for such deviation. Any sanction that does not meet the standards provided in the minimum sanction grid must be approved by the Director of Student Conduct or designee, prior to being issued. If the deviation from the sanction is

not approved, the minimum sanction(s) must be imposed by the Residence Hall Conduct Board.

13. **Records of Residence Hall Conduct Board Hearings**
There shall be a single verbatim record, such as a tape recording, of all residence hall conduct board hearings. Deliberations shall not be recorded. The record shall be the property of Northern Illinois University and shall be maintained by Student Conduct. Only Housing & Dining may audio-record the residence hall conduct board hearing.

14. **Non-Attendance of an Accused student at a Residence Hall Conduct Board Hearing**
It is the responsibility of an accused student and complainant to attend the scheduled residence hall conduct board hearing. The residence hall conduct board hearing will proceed without the accused student or complainant, if proof of delivery is held of the Notice of Hearing.

15. **Personal Safety Considerations**
The residence hall conduct board advisor may accommodate concerns for the personal safety, well-being, and/or fears of confrontation of the complainant, accused student, witness(es), and/or victim/survivor during the hearing, by taking appropriate and reasonable measures.

E. **Academic Misconduct**

**The procedure to adjudicate alleged incidents of academic misconduct is the same that is outlined in both the *Undergraduate* and *Graduate Catalogs*. Nothing in the *Student Code of Conduct* shall supersede information in either the *Undergraduate* or *Graduate Catalogs*.**

1. **Academic Misconduct Jurisdiction**
A faculty member has original jurisdiction over any instance(s) of academic misconduct that occurs in a course that the faculty member teaches.

2. **Departmental Level Resolution of Academic Misconduct**
The accused student shall be given the opportunity to resolve the alleged incident in a meeting with the faculty member and the department chair. If the facts of the incident are not disputed by the accused student, the faculty member may elect to resolve the matter at that level by levying a sanction no greater than an *F* for that course. If resolution of the incident is achieved at the faculty level, the faculty member shall notify the accused student in writing or via e-mail of the resolution, and Student Conduct shall receive a copy of the academic misconduct incident report and all supporting material indicating the final disposition of the case. This report shall be placed into the accused student's Student Conduct file. The accused student shall be given an opportunity to view the completed Academic Misconduct Incident Report.

3. **Academic Misconduct Incident Reporting**
The faculty member or designee shall complete an academic misconduct incident report preferably within thirty (30) calendar days of the alleged academic misconduct.

4. **Notification of the Accused student for Academic Misconduct**
   The faculty member shall send a copy of the Academic Misconduct Incident Report to Student Conduct and the accused student.

5. **Referral of Academic Misconduct Incident(s) to Student Conduct for Resolution**
   If the facts of the incident are disputed by the accused student, or if the faculty member feels that a sanction of greater than an $F$ in the course is appropriate, the faculty member shall refer the matter to Student Conduct, making use of the Academic Misconduct Incident Report.

   When the academic incident is referred to Student Conduct, a student conduct administrator will handle the incident according to the notice and preliminary conference procedure outlined above. The student conduct administrator will meet with the accused student for a preliminary conference.

6. **Sanctions Greater than an $F$ in the Course**
   Sanctions greater than an $F$ in the course may be levied only by the student conduct board for cases involving academic misconduct.

7. **Academic Misconduct Hearings**
   Any student accused of academic misconduct who does not accept responsibility shall have his/her case scheduled before a student conduct board.

8. **Composition of a Student Conduct Board**
   Student conduct boards for academic misconduct cases shall be comprised according to the following guidelines:

   a. Two (2) students and three (3) faculty members shall comprise the student conduct board for academic misconduct incidents.

   b. The quorum at all student conduct board hearings shall be at least four (4) members. If only four (4) members are present, in the case of a tie, the accused student shall be found "not responsible" for the alleged violation currently being voted on by the student conduct board.

9. **Notice of Hearings**
   An accused student and faculty complainant shall receive notice in writing and/or electronic form not less than three (3) business days prior to the date and time of the student conduct board hearing. The notice of the hearing shall be delivered in such a manner that can be certified to guarantee receipt by the accused student and complainant. Electronic notification for delivery of the Notice of Alleged Violation(s) is the preferred method of communication. An e-mail shall be sent to the accused student's Z-ID e-mail notifying him/her of the alleged violation(s) and setting up a conduct hearing. When an electronic system is unavailable, a paper copy shall be substituted for electronic notification. With either form of communication, proof of delivery is required.

10. **Privacy of Hearings**
    All conduct hearings shall be closed.

11. **Attendance at Student Conduct Board Hearings**
    The following people will be allowed to attend the entire hearing: the university presenter, faculty complainant, accused student, his/her advisor (if any), student conduct board members, and the student conduct board facilitator. Witnesses will be allowed to be present only when they are providing testimony. Admission of any other person to the conduct board hearing shall be at the discretion of the student conduct board facilitator.

    Only the members of the student conduct board will be present during deliberations. The student conduct board facilitator may be present during deliberations, if the student conduct board members have a question(s) concerning procedure.

12. **Hearings Involving Multiple Accused Students**
    In a student conduct board hearing for academic misconduct involving more than one (1) accused student, the student conduct administrator, at his/her discretion may permit a joint student conduct board hearing.

13. **Advisors**
    The accused student may be accompanied by an advisor in a student conduct board hearing. Any person may serve as an advisor. The advisor need not be affiliated with the Northern Illinois University community. If a student elects to have an advisor, it is ˙ highly recommended that an accused student choose from the list of trained advisors that is maintained by Student Conduct. An advisor will only be allowed to confer with his/her advisee (accused student). The advisor will not be allowed to participate in the student conduct process on behalf of his/her advisee.

14. **Witnesses**
    The faculty complainant and the accused student may arrange for witnesses to present pertinent information to the student conduct board. Student Conduct will try to arrange the attendance of possible witnesses who are members of the university community. Witnesses shall provide information about the incident and answer questions from the student conduct board.

15. **Questioning During Student Conduct Board Hearings**
    The university presenter, faculty complainant, accused student, and student conduct board members may ask questions of each respective side during the student conduct board hearing. The student conduct board facilitator shall inform each side as to the appropriate time to ask questions during the hearing. Questions asked by the university presenter, faculty complainant, accused student, or student conduct board members should be relevant to the incident. Queries regarding appropriateness of evidence and questions should be directed to the student conduct board facilitator.

16. **Information**
    Pertinent records, exhibits, and written statements may be accepted as information for consideration by the student conduct board at the discretion of the facilitator.

17. **Procedural Questions**
All procedural questions are subject to the final decision of the student conduct board facilitator. Formal rules of process, procedure, and technical rules of evidence, such as are applied in criminal or civil court, are not used in student conduct board hearings for academic misconduct.

18. **Deliberations**
After all information and evidence is presented in a conduct board hearing, the student conduct board shall determine whether the accused student is deemed "responsible" or "not responsible" for each alleged violation. The determination shall be made by majority vote of the student conduct board. The student conduct board's determination shall be made based on the preponderance of the evidence.

19. **Notification of Decision**
The student conduct board facilitator shall notify the accused student and the faculty complainant of the decision of the student conduct board. This notification may take place verbally at the conclusion of deliberations. Additionally, the student conduct board facilitator shall notify the accused student and the faculty complainant of the decision of the student conduct board in writing within two (2) business days after the deliberation. This notification shall be sent in a way to certify receipt of the notification. The decision of a student conduct board hearing shall be binding. The student conduct board has no authority to modify or recommend a grade, and may only impose sanctions outlined in the *Student Code of Conduct*. The decision shall include the rationale for the finding(s) and the sanction(s).

20. **Records of Student Conduct Board Hearings**
There shall be a single verbatim record, such as a tape recording, of all student conduct board hearings. Deliberations shall not be recorded. The record shall be the property of Northern Illinois University and shall be maintained by Student Conduct. Only Student Conduct may audio-record the hearing.

21. **Non-Attendance of an Accused student at a Student Conduct Board Hearing**
It is the responsibility of an accused student and faculty complainant to attend the scheduled student conduct board hearing. The student conduct board hearing will proceed without the accused student or faculty complainant, if proof of delivery is held of the Notice of Hearing.

22. **Personal Safety Considerations**
The student conduct board facilitator may accommodate concerns for the personal safety, well-being, and/or fears of confrontation of the faculty complainant, accused student, or other witness(es) during the hearing, by taking appropriate and reasonable measures.

23. **Grade Appeal for Academic Misconduct Incident**
Any accused student who wishes to appeal the grade in a course may do so by following the rules outlined in the Academic Policy and Procedure Manual.

## F. Appeals Hearings (Non-Academic Cases)

1. **To Whom and How to Appeal**
   a. A decision reached by an administrative hearing officer (for an incident adjudicated through Student Conduct) or student conduct board may be appealed by the accused student/appellant within five (5) business days of the date the decision notice is delivered to the student's mailbox or e-mail account (documentation for proof of delivery is required). The appeal must be in writing and be delivered to Student Conduct. The written appeal request must include what is being appealed (decision and/or sanctions). Additionally, the written appeal request must include the reasons for the appeal.

   b. A decision reached by the residence hall conduct board or an administrative hearing officer (for an incident adjudicated through Housing & Dining) may be appealed by the accused student/appellant to an administrative review within five (5) business days of the date the decision notice is delivered to the student's mailbox or e-mail account (documentation for proof of delivery is required). The appeal must be in writing and be delivered to the Executive Director of Housing & Dining or designee. The written appeal request must include what is being appealed (decision and/or sanctions). Additionally the written appeal request must include the reasons for the appeal.

2. **Grounds for Appeal**
   Appeals shall be limited to the following:

   a. Did the administrative hearing officer or conduct board follow the procedure outlined in the *Student Code of Conduct* and provide a fair hearing for all parties?

   b. Did the administrative hearing officer or conduct board apply the standard of preponderance of the evidence correctly to the evidence and ultimately reach an appropriate decision?

   c. Was the sanction(s) imposed appropriate for the violation of the *Student Code of Conduct?*

   d. Is there new information sufficient to alter a decision or other relevant facts not brought out in the original hearing because such information and/or facts were not known to the person appealing at the time of the original administrative or conduct board hearing?

   e. No sanction may be appealed solely on the basis that minimum sanctions imposed were not appropriate.

3. **Preliminary Determination of Sufficiency of Merit of Appeal**
   Once Student Conduct receives a written appeal request, the following process occurs:

   The Director of Student Conduct or designee will consider all information related to the appeal request and make a determination about whether or not the appeal request

contains sufficient merit for an appeal hearing. If the Director or designee does not find sufficient merit to grant the appeal, the Director or designee shall notify all parties of that decision.

If the Director or designee determines the appeal request has sufficient merit, the Director or designee shall forward the appeal request to an appropriate appeal agent for determination of the appeal. The appeal agent shall have the authority to order the case be reheard, the finding be reversed, and/or the sanction(s) be modified.

For a sanction of Suspension, Expulsion, or Loss of Recognized Student Organization Status, where merit for appeal is found/granted, the appeal agent will be the Vice President for Student Affairs & Enrollment Management or designee. In all other instances, the appeal agent will be the Director of Student Conduct or designee.

For appeal requests submitted to the Executive Director of Housing & Dining or designee, the Executive Director or designee will decide whether the request has sufficient merit.

## G. Incidents Falling Under Title IX of the Higher Education Amendments of 1972 (Title IX/Sexual Misconduct Policy)

1. General Information

   a. Investigation and Adjudication of incidents covered under Title IX of the Higher Education Amendments of 1972: Incidents covered under Title IX of the Higher Education Amendments of 1972 will be investigated and adjudicated according to the Northern Illinois University Title IX Policy and Procedures document/Sexual Misconduct Policy.

   b. All Administrative Hearing Officers who conduct Administrative Hearing Officer hearings for incidents falling under Title IX of the Higher Education Amendments of 1972 will receive annual training on issues related to the Violence Against Women Act offenses.

   c. Student Conduct will attempt to resolve incidents covered under Title IX of the Higher Education Amendments of 1972 first via "Sanction by Agreement." If this resolution type is unsuccessful, an Administrative Hearing Officer hearing shall be scheduled within 15 calendar days.

2. Resolution Procedures:

   a. The following outlines the resolution procedures from the Northern Illinois University Title IX Policy and Procedures regarding resolution of incidents covered Under Title IX of the Higher Education Amendments of 1972 for student respondents.

   b. Upon completion of the investigation and if there is a finding of sexual misconduct, in cases involving student **Respondents**, a Final Report of Findings will be

forwarded to the Director of Student Conduct (Director) or designee to determine the appropriate sanction(s). Both the **Claimant** and **Respondent** will receive a Final Report of Findings simultaneously. Witness(es) will receive a Final Closure Memorandum.

3. **Sanction by Agreement (students):** The Director of Student Conduct, or designee, will consult with the participating **Claimant**, **Respondent**, **Title IX Coordinator** (or designee), and other affected parties, as appropriate, to gather input on potential sanctions. Depending on the circumstances, the Director may ask to meet with each party separately or invite them to submit statements for consideration. If a **Claimant** or a **Respondent** meets with the Director they may be accompanied by a support person.

   a. The Director will then prepare a proposed resolution agreement between the University and the **Respondent**, informed by input from the **Respondent**, the **Claimant** (if participating), and the University. The proposed agreement will be shared with the **Respondent** and the participating **Claimant** in a manner that honors due process and privacy considerations.

   b. If the Respondent accepts the proposed agreement and the Claimant does not object to it, the agreement will become binding, the Respondent will be required to fulfill the sanctions included therein, and neither the Claimant nor the Respondent will be permitted to appeal the sanction.

4. **Sanction by Hearing (for student Respondents only):** If the **Respondent** is a student and unwilling to enter into an agreement and/or fails to appear for the preliminary conference required by the Sanction by Agreement process, or if the **Claimant** objects to the proposed agreement, the sanctions will be decided by a Student Conduct hearing before a Hearing Officer in accordance with the hearing procedures of Student Conduct. The hearing officer will determine appropriate sanctions after a hearing. The hearing officer will not modify the findings of the investigative report and will address only what sanctions are appropriate at the hearing. The hearing officer's review will consist solely of (1) reviewing the investigative report, the proposed resolution agreement, and any written or verbal objections to the proposed resolution agreement submitted by the **Claimant** or **Respondent**; (2) consulting with appropriate University officials, including the Title IX Coordinator or designee; and (3) any witnesses or documents presented by **Respondent** or a participating **Claimant**. Witnesses & documents may be presented to the hearing officer as it relates to sanctions *only*

5. The following rules will be followed during any hearing

   • Respondent and a participating Claimant shall receive notice of the identity of the hearing officer, and shall have the opportunity to challenge for cause if such challenge is delivered within two (2) academic days of such notice

- Respondent and a participating Claimant may each have another person present at any hearing to provide support. Support persons may act in an advisory capacity only and may not speak on behalf of the party during the hearing.

- A hearing may be held regardless of whether Respondent or Claimant has withdrawn from the University;

- Claimant is not required to attend any hearing;

- Respondent and Claimant will each receive three (3) academic days' notice prior to the hearing of the other's evidence, including witnesses and documents, to be used at said hearing. Failure to provide a witness list and copies of documentary evidence three (3) academic days prior to the hearing may result in the inability to present said witness or evidence;

- All questions directed to the Claimant or Respondent will only be asked by the hearing officer;

- Claimant and Respondent may be allowed to testify or answer questions outside the direct physical presence of the other (e.g. via telephone or behind a screen, etc.); and

- All hearings conducted under this Policy shall be closed to the public

### Title IX/Sexual Misconduct Procedure





**H. Amnesty:** Northern Illinois University maintains a policy of amnesty for students who attempt to seek help for themselves and/or other students or non-students in need of medical attention due to alcohol or drug use. The Director of Student Conduct or designee shall determine if a student or Recognized Student Organization is eligible for amnesty under this provision.

## ARTICLE V: RECORDS MANAGEMENT

A. All official records of academic and non-academic student conduct shall be maintained in Student Conduct. Grade appeals conducted in accordance with academic department policies and procedures shall not be considered part of the student conduct record, and shall not be maintained in Student Conduct.

B. All units, departments, and entities of Northern Illinois University that conduct student conduct matters, with the exception of grade appeals shall forward all official documents, forms, other evidence, records, and any other materials to Student Conduct upon final resolution of a case.

C. In situations involving an accused student(s), the records of the process and of the sanctions imposed (if any), shall be considered to be education records.

D. Records shall be considered confidential to the extent permitted by law.

E. All student conduct case related records will be retained indefinitely.

## ARTICLE VI: INTERPRETATION AND REVISION OF THE *STUDENT CODE OF CONDUCT*

### A. Establishment of the Student Conduct Advisory Board

1. The Student Conduct Advisory Board shall be established to advise Student Conduct.

2. The membership of the Student Conduct Advisory Board shall include the following:

   a. The Director and Associate Director of Student Conduct;

   b. Two faculty members appointed by the President of the Faculty Senate;

   c. One representative appointed by the President of the Operating Staff Council;

   d. One representative appointed by the President of the Supportive Professional Staff Council;

   e. One student appointed by the President of the Residence Hall Association;

   f. One student appointed by the President of the Student Association representing the Student Association;

   g. One student appointed by the President of the Student Association representing the Fraternity and Sorority community;

   h. One student appointed by the Director of Off-Campus & Non-Traditional Student Services representing Off-Campus & Non-Traditional Students;

   i. One representative from the NIU Department of Police & Public Safety;

   j. One representative from Housing & Dining;

   k. One representative from the Division of University Legal Services;

   l. One representative from Intercollegiate Athletics.

### B. Term of Appointment to Student Conduct Advisory Board and Voting Privileges

1. The term of appointment for the Director and Associate Director of Student Conduct shall be for the term of employment at Northern Illinois University.

2. The term of appointment for the faculty members shall be three (3) years and may be renewed.

3. The term of appointment for the students shall be one (1) year and may be renewed.

4. The term of appointment for staff from the Department of Police & Public Safety, Housing & Dining, University Legal Services, Educational Services and Programs, and Intercollegiate Athletics shall be at the discretion of administrators of those respective areas.

5. All members of Student Conduct may participate and vote in the Advisory Board meeting.

6. The term of appointment for appointees of the Operating Staff Council shall be for three (3) years.

7. The term of appointment for appointees of the Supportive Staff Council shall be for three (3) years.

**C. Attendance at Advisory Board Meetings**
All members of the Student Conduct Advisory Board are expected to attend all scheduled meetings.

**D. Chair of the Student Conduct Advisory Board**
The Director of Student Conduct shall chair the Student Conduct Advisory Board.

**E. Role of the Student Conduct Advisory Board**
The role of the Student Conduct Advisory Board shall be to assist with review and recommendations for changes to the *Student Code of Conduct*.

**F. Any Question of Interpretation or Application of the *Student Code of Conduct***
Any question of interpretation or application of the *Student Code of Conduct* shall be referred to the Office of the Vice President for Student Affairs & Enrollment Management for determination.

**G. The *Student Code of Conduct* May Be Reviewed Annually**
The *Student Code of Conduct* may be reviewed annually under the direction of the Student Conduct Advisory Board.

## GLOSSARY OF DEFINITIONS FOR THE STUDENT CONDUCT PROCESS

**Academic Day:** Any day during the calendar year in which regularly scheduled classes are in session, including fall, spring, and summer semesters.

**Accused Student:** A current student of Northern Illinois University who is facing allegations of violating Northern Illinois University policy.

**Administrative Hearing Officer:** A Northern Illinois University staff member who is trained in the Student Conduct Process and is authorized by the Vice President for Student Affairs & Enrollment Management, or designee, to determine if a violation of University policy has occurred and to issue sanctions accordingly.

**Advisor:** Any person who may assist an Accused student, Recognized Student Organization, or Complainant through the Student Conduct Process. The advisor need not be affiliated with the Northern Illinois University Community. A list of advisors who have received training in the Northern Illinois University Student Conduct System shall be available from Student Conduct. An advisor will only be allowed to confer with his/her advisee. The advisor will not be allowed to participate in the Student Conduct Process on behalf of his/her advisee.

**Business Day:** Any day the university is in operation. This is not intended to cover Saturday, Sunday, university observed holidays and administrative closures.

**Claimant:** The student, employee, or third party who suffers sex-based misconduct by the conduct of another.

**Complainant:** A Northern Illinois University Community member who completes an Incident Report about a particular incident or set of incidents and alleges that a current Student or Recognized Student Organization violated Northern Illinois University policy.

**Consent:** A clear, unambiguous, informed and voluntary agreement between all participants to knowingly engage in sexual activity. Consent must be mutually understandable by words or actions (i.e. a reasonable person would consider the words or actions to indicate mutual agreement to engage in the sexual activity). Consent is active, and cannot be based on the absence of an affirmative statement or act of denial. Silence or lack of resistance does not constitute consent.

Seeking and receiving consent is the responsibility of the person(s) initiating the sexual act or acts regardless of whether the person initiating the act is under the influence of drugs and/or alcohol.

Consent to any sexual act or prior consensual sexual activity between or with any party does not in and of itself constitute consent to any other sexual act.

Consent may be initially given, but withdrawn at any time. Consent cannot be given when a person is incapacitated (including, but not limited to, a person or someone with a physical or mental disability that causes impairment resulting in incapacitation) or a person who is intoxicated. Consent cannot be given when it is the result of coercion, intimidation, force or threat of harm. The University prohibits any sexual activity that does not involve the consent of each individual.

Consent must be given to engage in the act of sexual activity, and consent should also be given to any person who records or photographs any aspect of the sexual encounter as well as third parties who wish to view the sexual activity either in person or via any electronic equipment, methods or devices. Any of these acts will be deemed to be sexual exploitation. Sexual exploitation includes, but is not limited to, the following acts:

-Sexual voyeurism or allowing others to witness or observe the sexual or intimate activity of another person without that person's full knowledge and consent;

-Indecent or lewd exposure or inducing another person to expose themselves when consent is not present;

-Recording any person engaged in sexual or intimate activity in a private space without that person's full knowledge and consent, even if the person recording the sexual or intimate activity is also engaged in the consented to sexual activity;

-Distributing sexual or intimate information, images or recordings about another person without that person's full knowledge and consent;

-Recruiting, harboring, transporting, providing, or obtaining another person for the purpose of sexual exploitation;

-Inducing incapacitation in another person with the intent to engage in sexual conduct, regardless of whether prohibited sexual conduct actually occurs.

The definition of consent does not vary based upon a participant's sex, sexual orientation, gender identity or gender expression.

**Constructive Possession:** A person has constructive possession of property if s/he has power to control and intent to control such item. (Com v. Stephens, 231 Pa.Super.481, 331 A.2d 719, 723) Exists where one does not have physical custody or possession, but is in a position to exercise dominion or control over a thing. (U.S. v. DiNovo, C.A. Ind., 523 F.2d 197,201)

**Faculty Member**: Any person hired by the University to conduct classroom or teaching activities or who is otherwise considered by the University to be a member of its faculty.

**May:** A term that provides a choice for an Accused student, Recognized Student Organization, or Complainant as to how to proceed in the *Student Code of Conduct*.

**Member of the University Community**: Any person who is a student, faculty member, or staff member of Northern Illinois University. A person's status in a particular situation shall be determined by the Director of the Student Conduct or designee.

**No Contest**: Response to a violation when an Accused student or Recognized Student Organization does not challenge the information contained in the written incident report, but accepts the sanctions recommended by the Student Conduct Administrator. **The option for No Contest is only available to Accused students who are facing concurrent criminal charge(s) at the time of their preliminary conference.**

**Observer:** A person who attends a Student Conduct Board hearing at the request of either a Complainant, Accused student, or Recognized Student Organization. The observer shall not participate in the hearing in any manner.

**Organizational Conduct Board**: Any persons authorized by the Vice President for Student Affairs & Enrollment Management or designee to determine whether a Recognized Student Organization is responsible for violating the *Student Code of Conduct* and appropriate policies, and to impose sanctions when a violation has been committed, specific to certain cases originating and pertaining to Recognized Student Organizations.

**Policy**: The written regulations of Northern Illinois University.

**Preponderance of the Evidence**: The standard of evidence used in all hearings whereby it is determined that it is more likely than not that the Accused student or Recognized Student Organization committed the alleged violation of the *Student Code of Conduct* based on all of the evidence and testimony presented in the case.

**Proceeding:** All activities related to a non-criminal resolution of an institutional disciplinary complaint, including, but not limited to, fact-finding investigations, formal or informal meetings, and hearings.

**Recognized Student Organization**: Any entity that has complied with the requirements set forth in Part III of the Northern Illinois University Student Association Bylaws, or that is recognized by any department of Northern Illinois University.

**Residence Hall Conduct Board**: Any persons authorized by the Vice President for Student Affairs & Enrollment Management or designee to determine whether an Accused student is "responsible" for violating the *Student Code of Conduct* and appropriate policies, and to impose sanctions when a rules violation has been committed, specific to certain cases originating and pertaining to the Department of Housing & Dining.

**Residence Hall Conduct Board Advisor**: A Housing & Dining staff member who is present at each Residence Hall Conduct Board hearing and available to the Board for consultation during the hearing and during deliberations. The Residence Hall Conduct Board Advisor will not vote in deliberations. The Residence Hall Conduct Board Advisor is ultimately responsible for ensuring that proper procedure is followed during a Residence Hall Conduct Board hearing.

**Residence Hall Conduct Board Chair**: A student from the pool of Residence Hall Conduct Board members who has received training and will facilitate the Residence Hall Conduct Board hearing.

**Respondent:** The alleged offender/accused; a person alleged to have engaged in any of the conduct prohibited by the Title IX Policy and Procedures

**Self Defense:** A person uses only sufficient force to repel or stop an attack by another person. When presented with an opportunity to remove oneself from the situation, the person engaging in self defense shall take advantage of said opportunity. Engaging in further physical contact with a person after an opportunity to remove oneself from the physical altercation shall invalidate a claim of self defense.

**Shall or Will**: Terms in the *Student Code of Conduct* that do not provide for a choice for an Accused student, Recognized Student Organization, or Complainant as to how to proceed.

**Student:** All persons admitted to Northern Illinois University and/or enrolled in any course (for credit or not for credit), or who are on campus for the purpose of enrolling in any course. Persons who withdraw from the institution after allegedly violating the *Student Code of Conduct* shall be subject to the *Student Code of Conduct*.

**Student Conduct Administrator**: A University official authorized by the Vice President for Student Affairs & Enrollment Management or designee to investigate an incident(s) upon receipt of an Incident Report, and to meet and discuss the incident with an Accused student or Recognized Student Organization. The official may recommend sanctions against an Accused student or Recognized Student Organization who admits responsibility for violating the *Student Code of Conduct*.

**Student Conduct Board**: Any persons authorized by the Vice President for Student Affairs & Enrollment Management or designee to determine whether an Accused student has violated the *Student Code of Conduct* and other policies, and who may impose sanctions when an Accused student is found to be responsible for misconduct under the *Student Code of Conduct*.

**Student Conduct Board Facilitator**: A University staff member who is present at each Student Conduct Board hearing and who will facilitate the Student Conduct Board hearing. The Facilitator will not vote during deliberations, but will be available to the Board for consultation during the hearing and during deliberations. The Student Conduct Board Facilitator is ultimately responsible for ensuring that proper procedure is followed during a Student Conduct Board Hearing.

**University Official**: Any person employed by Northern Illinois University who performs assigned administrative or professional responsibilities.

**University Premises**: All land, buildings, facilities, and other property in the possession of or owned, used, or controlled by Northern Illinois University (including streets and sidewalks therein).

**University Presenter**: The Student Conduct staff member who will be at all Student Conduct Board hearings and at all Administrative hearings held in the Student Conduct. This staff member will assist the Complainant in presenting his/her case to the Student Conduct Board or Administrative Hearing Officer.

**Victim/Survivor**: A person who is allegedly harmed by a *Student Code of Conduct* violation.

**Violation of the Student Code of Conduct:** A student who is found responsible for not being in compliance with a provision outlined in Article III of the NIU *Student Code of Conduct*.

**Violence:** Cases involving violence shall include, but are not limited to: Physical Abuse, Sexual Misconduct, Stalking, and Weapons (used in a threatening manner)

## TEMPORARY SANCTION/INTERIM MEASURE ADMINISTRATIVE REVIEW
### REQUEST FORM

I, Jonathan Davila, request an administrative review of the temporary sanction(s) imposed against me for the following reasons:

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Signature of Student: _____     Contact Phone Number: _____

Please attach additional sheets if necessary

Please submit completed form to Altgeld Hall, Room 208, Attn: Dr. Michael Stang

_____

FOR OFFICE USE ONLY: Date Received: _____

Maxient ID: 2015104602

REQUEST FOR AN ADMINISTRATIVE REVIEW OF A TEMPORARY
SANCTION/INTERIM MEASURE TO THE VICE PRESIDENT FOR STUDENT AFFAIRS &
ENROLLMENT MANAGEMENT

**Request Process**
Requests for an administrative review of a temporary sanction must be made to the Office of the Vice
President for Student Affairs & Enrollment Management, Altgeld Hall 208, (815) 753-1573, in
writing within TWO (2) CLASS DAYS of receipt of the temporary sanction letter and shall set forth
the grounds for appeal.

Temporary sanctions issued by Student Conduct should be made attention to: Dr. Michael Stang.

Temporary sanctions issued by the Department of Housing & Residential Services should be made
attention to: Ms. Patricia A.R. Martinez.

**The Administrative Review**
The administrative review will normally be held within two class days of receipt of the request for
appeal and will be conducted by the Vice President or a member of his or her staff. The purpose of
the review is to determine the continuing appropriateness of the temporary sanctions imposed. No
judgment of responsibility will be made on the charges. Responsibility will be decided through a
subsequent student conduct process.

The student will be given the opportunity to present and justify his/her grounds for appeal. The Vice
President or designee may then ask questions regarding the situation.

**Rendering of the Decision**
The Vice President or designee will issue a decision in writing, normally within two (2) class days of
the completion of the administrative review. The decision will be to sustain, lessen (but not increase)
or remove the sanctions and will be based on the material from the review and other germane
information (e.g. the student's conduct file). There is no appeal for this decision.

NOTE: Complete details concerning temporary sanctions may be found in The Student Code of
Conduct, on page 32 and 33.

Modified 04/2016

**Minimum Sanctions for Violations Relating to Alcohol, Drugs, or Violence**

| Violation | First Time Offender | Second Time Offender | Third Time Offender |
|---|---|---|---|
| Abuse (Physical) | University Suspension for one (1) academic semester<br><br>Banishment from NIU Campus Property during period of suspension | University Suspension for one (1) academic year<br><br>Banishment from NIU Campus Property during period of suspension | University Expulsion<br><br>Banishment from NIU Campus Property |
| Alcohol<br><br>(No Harm to Self, Others, Property) | Referral to BASICS<br><br>$50 Student Conduct Fine | Completion of Substance Use Assessment<br><br>Completion of Alcohol Edu<br><br>$75 Student Conduct Fine<br><br>Probation for one (1) academic year<br><br>Parental Notification<br><br>Referral to Office of Student Academic Success | University Suspension for one (1) academic semester<br><br>Banishment from NIU Campus Property during period of suspension<br><br>Parental Notification<br><br>$125 Student Conduct Fine<br><br>Probation for at least one (1) year upon return to NIU |
| Alcohol<br><br>(Harm to Self, Others, Property) | Substance Use Assessment<br><br>Completion of Alcohol Edu<br><br>$50 Student Conduct Fine<br><br>Probation for one (1) academic year<br><br>Parental Notification | University Suspension for one (1) academic semester<br><br>Parental Notification<br><br>$75 Student Conduct Fine<br><br>Probation for at least one (1) year upon return to NIU | University Suspension for one (1) academic year<br><br>Banishment from NIU Campus Property during period of suspension<br><br>Parental Notification<br><br>$125 Student Conduct Fine |

|  |  |  | Probation for at least one (1) year upon return to NIU |
|---|---|---|---|
|  | Referral to Office of Student Academic Success |  |  |
| Cannabis/Drugs | Substance Use Assessment<br><br>$75 Student Conduct Fine<br><br>Probation for one (1) academic year<br><br>Parental Notification<br><br>Referral to Office of Student Academic Success | University Suspension for one (1) academic semester<br><br>Banishment from NIU Campus Property during period of suspension<br><br>Parental Notification<br><br>$75 Student Conduct Fine<br><br>Probation for at least one (1) year upon return to NIU | University Suspension for one (1) academic year<br><br>Banishment from NIU Campus Property during period of suspension<br><br>Parental Notification<br><br>$125 Student Conduct Fine<br><br>Probation for at least one (1) year upon return to NIU |
| Hazing (No Harm) | University disciplinary probation for at least one (1) calendar year<br><br>Educational Program<br><br>$100 Student Conduct Fine | Suspension from NIU for one (1) year<br><br>Banishment from NIU campus property for period of suspension | University expulsion<br><br>Banishment from NIU campus property |

| Violation | First Time Offender | Second Time Offender | Third Time Offender |
|---|---|---|---|
| Hazing (Harm) | University suspension for at least one (1) academic year<br><br>Banishment from NIU campus property during period of suspension<br><br>Completion of off campus counseling prior to returning to NIU | University expulsion<br><br>Banishment from NIU campus property | |
| Weapons (Used in a threatening manner) | University Suspension for one (1) academic semester<br><br>Banishment from NIU Campus Property during period of suspension | University Suspension for one (1) academic year<br><br>Banishment from NIU Campus Property during period of suspension | University Expulsion<br><br>Banishment from NIU Campus Property |

| Student Code of Conduct Violation | First Time Offender (Student Organizations) | Second Time Offender* (Student Organizations) | Third Time Offender* (Student Organizations) |
|---|---|---|---|
| ALCOHOL (No Harm to Self, Others or Property) | Loss of social privileges for one semester<br><br>Notification of incident made to National/International Office ( if applicable)<br><br>$100 fine assessed and distributed to the university Student Involvement & Leadership Development for Alcohol Education/ Social Policy Training<br><br>Educational Sanction | Loss of social and university privileges for one calendar year<br><br>Notification of incident made to National/International Office (if applicable)<br><br>$300 fine assessed and distributed to the university Student Involvement & Leadership Development for Alcohol Education/ Social Policy Training<br><br>Organization required to propose an alcohol awareness program/speaker for their organization and/ or campus | Loss of Recognized Student Organization status for five (5) years<br><br>Notification of incident made to National/ International Office (if applicable) |
| ALCOHOL (Harm to Self, Others or Property) | Loss of social privileges for one calendar year<br><br>Notification of incident made to National/ International Office (if applicable)<br><br>$100 fine assessed and distributed to the university Student Involvement & Leadership Development for Alcohol Education/Social Policy Training | Loss of Recognized Student Organization Status for five (5) years<br><br>Notification of incident made to National/ International Office( if applicable)<br><br>$300 fine assessed and distributed to the university Student Involvement & Leadership Development for Alcohol Education/Social Policy Training | |

| | Restitution for damages (if applicable) | Restitution for damages (if applicable) | |
|---|---|---|---|
| CANNABIS/DRUGS | Loss of social and university privileges for one calendar year<br><br>Notification of incident made to National/ International Office if applicable<br><br>$250 fine assessed and distributed to Student Involvement & Leadership Development for Alcohol-Drug Education/ Social Policy Training<br><br>Educational Sanction | Loss of Recognized Student Organization Status for five (5) years<br><br>Notification of incident made to National/ International Office if applicable<br><br>$500 fine assessed and distributed to Student Involvement & Leadership Development for Alcohol-Drug Education/Social Policy Training | |

| Student Code of Conduct Violation | First Time Offender (Student Organizations) | Second Time Offender* (Student Organizations) | Third Time Offender* (Student Organizations) |
|---|---|---|---|
| HAZING | University Disciplinary Probation for three (3) calendar years<br><br>$300 fine to be given to Student Involvement & Leadership Development for Hazing Prevention Education<br><br>Mandatory attendance by all members at an educational program (to be determined in the sanction letter)<br><br>Notification of incident made to National/International Office (if applicable)<br><br>Required to provide a report detailing how the organization will educate the entire organization as well as new members about hazing<br>Restriction of social and university activities for one academic year<br><br>Restitution (if applicable)<br><br>A detailed review of the new member program with a member of the SILD staff, prior to | Loss of Recognized Student Organization Status for five (5) years<br><br>$500 fine to be given to Student Involvement & Leadership Development for Hazing Prevention Education<br><br>Mandatory attendance by all members at an education program created by the organization (to be determined in the sanction letter)<br><br>Notification of incident made to National/International Office if applicable<br><br>Required to provide a report detailing how the organization will educate the new members about hazing and the organization as a whole<br><br>A detailed review of the new member program with a member of the SILD and CSSC staff, prior to any recognition<br><br>No current member may rejoin organization ... recognition | |

| | conducting any membership process<br><br>Monthly meetings with a member of the SILD staff to provide an update on progress | | |
|---|---|---|---|
| ON-CAMPUS SOCIAL POLICY | University Disciplinary Probation for one (1) year<br><br>12 hours of community service per member<br><br>Deferred Loss of Recognized Student Organization Status<br><br>Loss of ability to hold events on or off campus for one (1) semester<br><br>Notification of incident is made to National/International Office (if applicable) | University Disciplinary Probation for one (1) year upon reinstatement as organization<br><br>Loss of Recognized Student Organization Status for one (1) semester<br><br>Loss of ability to hold events with alcohol for one (1) year<br><br>Notification of incident is made to National/International Office (if applicable) | Loss of Recognized Student Organization Status for five (5) years<br><br>Notification of incident is made to National/International Office (if applicable) |
| Weapons found at an organization facility or meeting space | Loss of Recognized Student Organization Status for one (1) year | | |

**OFF CAMPUS SOCIAL POLICY VIOLATION CHART**

| Violation | First Time Offense (Level I Violation) | Second Time Offense (Level I Violation) | Third Time Offense (Level I Violation) |
|---|---|---|---|
| Off Campus Social Policy Violation | 1. Loss of ability to hold social events for two (2) academic weeks<br>2. Executive Board must meet with SILD staff to review Off Campus Social Events Policy | 1. Loss of ability to hold off-campus social events for four (4) academic weeks<br>2. Educational Sanction<br>3. Notification made to National/International office | 1. Loss of ability to hold off-campus social events for sixteen (16) academic weeks<br>2. Educational Sanction<br>3. Notification made to National/International office |

| Violation | First Time Offense (Level II Violation) | Second Time Offense (Level II Violation) | Third Time Offense (Level II Violation) |
|---|---|---|---|
| Off Campus Social Policy Violation | 1. Loss of ability to hold off-campus social events for four (4) academic weeks<br>2. Executive Board must meet with SILD staff to review Off Campus Social Events Policy<br>3. Provide a program on "Safe Partying" for the NIU campus community<br>4. Notification made to National/International office | 1. Loss of ability to hold off-campus social events for eight (8) academic weeks<br>2. Educational Sanction<br>3. Notification made to National/International office<br>4. Deferred Loss of Recognized Student Organization Status<br>5. Organizational Disciplinary Probation for one (1) calendar year | 1. Loss of Recognized Student Organization status for one (1) semester<br>2. Notification made to National/International office<br>3. Organizational Disciplinary Probation for one (1) calendar year upon reinstatement |

| Violation | First Time Offense (Level III Violation) | Second Time Offense (Level III Violation) | Third Time Offense (Level III Violation) |
|---|---|---|---|
| Off Campus Social Policy Violation | 1. Loss of ability to hold off-campus social events for sixteen (16) academic weeks<br>2. Executive Board must meet with SILD staff to review Off Campus Social Events Policy<br>3. Loss of ability to co-host social events for eight (8) academic weeks<br>4. Notification made to National/International office<br>5. Mandatory attendance by 90% of the chapter at a Bystander Intervention training<br>6. Develop and implement a marketing campaign about safe partying for the NIU campus community | 1. Notification made to National/International office<br>2. Organizational Disciplinary Probation for one (1) calendar year upon reinstatement<br>3. Loss of Recognized Student Organization Status for one (1) semester | 1. Loss of Recognized Student Organization status for one (1) calendar year<br>2. Notification made to National/International office<br>3. Organizational Disciplinary Probation for one (1) calendar year upon reinstatement |

If you do sign the complaint, it will be filed with the circuit clerk, and the DeKalb County State's Attorney will become involved in the matter. A warrant for the Respondent's arrest may be issued. Once the DeKalb County State's Attorney is involved, your continued cooperation in the matter will be between you and the State's Attorney's Office.

You may obtain assistance making any report or complaint with any **Title IX Coordinator, Advocacy Coordinator at Counseling and Consultation Services,** (815) 753-1206, or **Safe Passage designee,** (815) 756-5228. See *Confidential Resources* section for more information.

### File an Anonymous/Confidential Complaint
***Who Can Seek Confidential Counseling and Assistance***
Any employee or student may request that the matter involving sexual misconduct remain confidential and/or anonymous as defined by this policy. Additionally, any student and/or employee may obtain assistance with filing a Title IX/Sexual Misconduct Complaint, Police Report, and/or information regarding available counseling resources on campus and in the surrounding community.

***What Confidential Resources are Available***
The University and DeKalb community provide confidential resources if you have suffered sexual misconduct. Services include confidential counseling and medical services, if needed. If you desire the act of sexual misconduct be kept completely confidential, but need assistance, you can speak with any of the following persons or offices. **These resources will not provide notice to the University of the alleged sexual misconduct, an investigation into the matter will not result, and the matter will remain confidential to the extent permissible at law.**

A report or complaint is not necessary to utilize these resources.

**NIU Advocacy Coordinator**
**Counseling & Consultation Services**
200 Campus Life Building
(815) 753-1206
www.niu.edu/counseling/advocacy

**NIU Health Services**
Wirtz Drive & Lucinda Avenue
(815) 753-1311
www.niu.edu/healthservices

**NIU Office of the Ombudsperson**
601 Holmes Student Center
(815) 753-1414
www.niu.edu/ombuds

**Employee Assistance Program**
700 Holmes Student Center
www.hr.niu.edu/ServiceAreas/EmployeeAssistance

**NIU Psychological Services Center**
Psychology/Math Building 86
(815) 753-0591
www.niu.edu/PSYC/psc

**NIU Couple & Family Therapy Clinic**
Wirtz Hall 146
(815) 753-1684
www.chhs.niu.edu/familytherapyclinic

**Kishwaukee Community Hospital\*\***
One Kishwaukee Hospital Drive
DeKalb, IL 60115
(815) 756-1521
www.kishhealth.org
\*\*The Hospital can provide evidence collection in cases of sexual violence, which is an important step towards pursuing a complaint or criminal charges.

**Safe Passage, DeKalb**
(815) 758-7922
safepassagedv.org

**Ben Gordon Counseling Center**
12 Health Services Drive
Sycamore, IL 60178
(815) 756-4875
Crisis Line: (866)-242-0111
bengordoncenter.org

**Depression Crisis Hotline**
(630) 482-9696

**Suicide Hotline**
(800) 784-2433

11

*What to Expect When Confidentiality is Requested*

If a Claimant chooses to remain completely anonymous and utilizes resources listed above, no complaint will be filed. If a Claimant chooses to report an incident to any reporting entity on campus, but requests to remain confidential the Title IX Coordinator will determine if confidentiality should be maintained. Where there is a likelihood of further harm to the Claimant and/or the campus community, confidentiality may be revoked.

When confidentiality of the Claimant is maintained or the Claimant's identity is unknown, the University's ability to respond and take appropriate disciplinary action may be impeded. Nevertheless, the University will attempt to provide resources as provided herein and to take steps addressed to remedy the effects of the alleged sexual misconduct and to prevent its recurrence.

Nothing in this provision prohibits the Title IX Coordinator from determining whether or not to maintain the request for confidentiality and/or from consulting with appropriate university officials is warranted by the facts of the case.

## Title IX Investigation Process and Procedures

The procedures outlined in this document may proceed independent of any other University grievance or disciplinary procedure provided for elsewhere by the University including, but not limited to, Faculty/Staff University Grievance Process, Affirmative Action Complaint Process, Grade Appeal Process, Student Conduct Process, Student Complaint Process, and Collective Bargaining Grievance Processes. The procedures herein will also proceed independent of any police investigation.

If the University knows (through the filing of a Title IX/Sexual Misconduct Complaint) or reasonably should know of possible sexual misconduct, a fair and equitable investigation will be conducted in as prompt a manner as possible to determine if there has been a violation of this Policy.

Where an act in violation of this Policy is undertaken for independently unlawful reasons (for example, because of the Claimant's race or religion), both bases for violation of University Policy will be investigated and disciplined accordingly.

In all cases, the final decision on whether, how, and to what extent the University will conduct an investigation, and whether other measures will be taken in connection with any allegation of sexual misconduct, rests primarily within the discretion of the Title IX Coordinator, or designee.

**Investigative Procedure and Timeline**

The Title IX/Sexual Misconduct Complaint or report of sexual misconduct will be investigated by the Title IX Investigator(s), generally, in accordance with the following timeline:

**Day 1**:         Title IX Complaint or report of sexual misconduct is received by the Title IX Coordinator or designee;

**Day 2-5:**      Title IX Coordinator, or designee, determines extent of Title IX investigation (may be with assistance of a Title IX Committee). A preliminary investigation may be necessary, and interim measures may be implemented;

**Day 6-15**:    The Title IX Investigator(s) will (1) provide notice to the Respondent of the Complaint/Report; (2) meet with the Claimant (if participating), the Respondent, and any identified witnesses. This *Policy* and the *Procedure* will be explained to Claimant and Respondent, and each will have the opportunity to share their version of events and suggest other witnesses during the meeting with the Title IX Investigator(s);

**Day 16-22**:  The Title IX Investigator(s) will write a *preliminary report* containing a summary of the information obtained to date and will deliver this *report* to the Claimant and Respondent;

**Day 23-28**:  Claimant and Respondent may provide a rebuttal to information in the *preliminary report* or suggest additional witnesses;

**Day 29-35**:  The Title IX Investigator(s) will consider additional information provided by Claimant and Respondent, conduct any necessary additional interviews or investigation, and write a *final report* which contains: (1) conclusions of fact and (2) a finding or findings;

**Day 36-38**:  The Title IX Coordinator, or designee, reviews and approves the *final report*;

**Day 38-40**:  The Title IX Investigator sends notice of the finding(s) to Claimant and Respondent. Email is deemed an acceptable form of delivery. The Claimant and the Respondent will have five (5) days to appeal the finding(s) contained within the final report to the Executive Vice President and Provost (if the Respondent is an employee) or the Vice President for Student Affairs and Enrollment Management (if the Respondent is a student) and/or designee for review;

**Day 41-45**:  Absent an appeal of the findings by either party, a Resolution Officer will be appointed by the Office of Student Conduct, and will receive a copy of the *final report from the* Title IX Investigator;

**Day 46-55**:  If an appeal of the findings is submitted, the Executive Vice President and Provost or designee will render a decision with next steps communicated and implemented accordingly;

13

**Day 41-45:**   The Resolution Officer attempts to resolve the sanction by agreement;

**Day 45-55:**   If no agreement on sanction(s) is reached, the Resolution Officer will impose a sanction by decision on an employee. For students, a hearing shall occur, and a hearing officer will impose a sanction by hearing. Notice will be sent to Claimant and Respondent as provided herein. Email is an acceptable method of delivery;

**Day 56-61**:   Five (5) day period to Appeal the finding(s) and/or any sanction imposed by decision/hearing;

**Day 62-82**:   Appeal, if any, is processed.

## Interim Measures

The University reserves the right to take whatever interim measures deemed necessary to protect the rights and personal safety of the Claimant, Respondent, and/or community members. Such measures include, but are not limited to, providing a police escort between classes and/or related to the workplace, no-contact orders, modification of class schedules and/or locations, employment and/or living arrangements, and interim suspension/administrative paid leave from campus pending an investigation. The remedies provided in the *Remedies* section herein are also available as interim measures. The individual receiving an interim measure may appeal the interim measure to the Office of Student Conduct or the Title IX Coordinator.

## Voluntary Informal Resolution Mechanisms

If the investigator(s) believe the matter may be resolved by informal means, the investigator(s) may undertake to obtain such a result with the assistance of a third party (mediator or counselor) for as long as both Claimant and Respondent consent to such methods. The Claimant or Respondent may end informal resolution mechanisms and initiate a formal investigation at any point. The University reserves the right to ensure that any resolution is designed to stop problematic behavior. **\*\*NOTE\*\*** *Informal means of resolution are* **not** *available in cases of alleged sexual violence*.

## Investigation Rules

The following rules apply to all Sexual Misconduct Investigations, resulting from the filing of a Sexual Misconduct Complaint as a result of sexual misconduct:

- Any investigation will proceed independent of any criminal or other legal proceedings. Further, the University reserves the right to forward any Sexual Misconduct Complaint to the appropriate law enforcement agency for criminal investigation and/or charges.

- Fairness to all individuals involved with a Sexual Misconduct Complaint is a priority. Both the Claimant and Respondent to a Sexual Misconduct Complaint will be given a copy of these procedures and will have the opportunity to respond to all allegations.

14

- The Claimant and Respondent may each have another person present at any meeting to provide support. Support persons may act in an ***advisory capacity only*** and may not speak on behalf of the party in any proceeding.

- Every Title IX Complaint of sexual misconduct will be investigated to the maximum extent practicable.

- The investigation and the imposition of any sanction will be completed within 45-60 calendar days unless circumstances require a longer time period for completion of the investigation process (to be determined by the Title IX Coordinator or designee).

- Any and all of the procedures outlined in this Policy will proceed regardless of whether the Claimant or Respondent has withdrawn from and/or has otherwise been separated from the University, including the imposition of sanctions related to suspensions (for proven conduct).

- The Claimant and Respondent shall each have access to a meeting with the Title IX Investigator(s) during which: (1) the proceedings under this Policy will be explained; (2) any questions of either party will be answered; and (3) each party will be given the opportunity to provide their version of events.

- The Claimant will receive periodic information on the status of the investigation, including when the Respondent receives notice of the Title IX/Sexual Misconduct Complaint. Email is an acceptable form of delivery.

- Claimant and Respondent shall receive notice of the identity of any investigator(s) or Resolution Officer and shall have the opportunity to challenge each for cause if such challenge is delivered within two (2) business days of such notice.

- The use of alcohol or drugs by Claimant at the time of the incident will be considered for purposes of determining consent or memory *only* and will not form the basis for independent proceedings or discipline.

- The sexual history or sexual character of Claimant shall not be presented in any investigation or hearing and may be considered as to Respondent *only* if it establishes a pattern of complaints or behavior.

- At the conclusion of the investigation, the investigator(s) will weigh all evidence received throughout the course of the investigation and will issue findings on the basis of a preponderance of the evidence (*i.e.*, it is more likely than not that an act in violation of this Policy has or has not occurred.)

15

- If it is determined that a violation of this Policy has occurred, appropriate sanctions will be imposed by the Office of Student Conduct as outlined herein.

- Respondents found to have violated this Policy will be given the opportunity to agree to an appropriate sanction ("sanction by agreement.") or to request a hearing by a Resolution Officer.

- Claimant and Respondent will concurrently be notified in writing about the outcome of both the Complaint and any appeal.  Email is an acceptable form of delivery.

- Claimant will also receive notice of individual remedies available to the Claimant, any sanctions imposed that directly relate to the Claimant, and other steps the University has or will take to eliminate the hostile environment.  In sexual violence cases, the Claimant will receive notice of any disciplinary sanction imposed on the responsible Respondent, and whether or not those sanctions directly relate to the Claimant.

- The Respondent will not be notified of the individual remedies offered or provided to the Claimant.

- Claimant and Respondent have the right to appeal the finding of the investigator(s) and/or Resolution Officer regarding sanctions as provided herein. (See *Appeals*, below).

- At the conclusion of an investigation, regardless of the outcome, a Title IX Coordinator, or designee, shall review all evidence to determine whether Claimant is entitled to any remedy under Title IX that may not have been provided for under the University's procedures.

## Sanctions

Upon completion of the investigation, in cases involving student Respondents, if there is a finding of sexual misconduct, a Final Report of Findings will be forwarded to the Office of Student Conduct to determine the appropriate sanction(s).  The Title IX Coordinator reserves the right to schedule individualized training and/or similar educational opportunities, including, but not limited to, acts of community service, for either party when there is no finding of sexual misconduct.  Both the Claimant and Respondent will receive a Final Report of Findings simultaneously. Witness(es) will receive a Final Closure Memorandum.

In matters involving an NIU employee or third parties, a Final Report of Findings and Recommendations will be forwarded to the Division Head, or designee, for review and implementation upon their discretion.

## Sanction by Agreement *(students)*

The Director of Student Conduct, or designee, will consult with the participating Claimant, Respondent, Title IX Coordinator (or designee), and other affected parties, as appropriate, to gather input on potential sanctions. Depending on the circumstances, the Director may ask to meet with each party separately or invite them to submit statements for consideration. If a Claimant or a Respondent meets with the Director, they may be accompanied by a Support Person.

16

The Director will then prepare a proposed resolution agreement between the University and the Respondent, informed by input from the Respondent, the Claimant (if participating), and the University. The proposed agreement will be shared with the Respondent and the participating Claimant in a manner that honors due process and privacy considerations.

If the Respondent accepts the proposed agreement and the Claimant does not object to it, the agreement will become binding, the Respondent will be required to fulfill the sanctions included therein, and neither the Claimant nor the Respondent will be permitted to appeal the finding(s) or sanction.

**Sanction by Hearing** *(for student Respondents only)*
If the Respondent is a student and unwilling to enter into an agreement and/or fails to appear for the preliminary conference required by the Sanction by Agreement process, or if the Claimant objects to the proposed agreement, the sanctions will be decided by a Resolution Officer in accordance with the hearing procedures of the Office of Student Conduct. The Resolution Officer will determine appropriate sanctions after a hearing. The Resolution Officer will not modify the findings of the investigative report and will address only what sanctions are appropriate at the hearing. The Resolution Officer's review will consist solely of (1) reviewing the investigative report, the proposed resolution agreement, and any written objections to the proposed resolution agreement submitted by the Claimant or Respondent; (2) consulting with appropriate University officials, including the Title IX Coordinator or designee; and (3) any witnesses or documents presented by Respondent or a participating Claimant. Witnesses and documents may be presented to the hearing officer as it relates to sanctions *only*.

The following rules will be followed during any hearing:
- Respondent and a participating Claimant shall receive notice of the identity of the Resolution Officer, and shall have the opportunity to challenge for cause if such challenge is delivered within two (2) academic days of such notice;

- Respondent and a participating Claimant may each have another person present at any hearing to provide support. Support persons may act in an *advisory capacity* only and may not speak on behalf of the party during the hearing;

- A hearing may be held regardless of whether Respondent or Claimant has withdrawn from the University;

- Claimant is not required to attend any hearing;

- Respondent and Claimant will each receive three (3) academic days' notice prior to the hearing of the other's evidence, including witnesses and documents, to be used at said hearing. Failure to provide a witness list and copies of documentary evidence three (3) academic days prior to the hearing may result in the inability to present said witness or evidence;

- All questions directed to the Claimant or Respondent will only be asked by the hearing officer;

17

- Claimant and Respondent may be allowed to testify or answer questions outside the direct physical presence of the other (*e.g.* via telephone or behind a screen, etc.); and

- All hearings conducted under this Policy shall be closed to the public.

**Sanction by Decision** *(for employees and third party Respondents)*

The Division Head must review the Final Report of Findings and Recommendations to determine the appropriate level of corrective action. The Title IX Coordinator also reserves the right to consult with appropriate University officials regarding imposition of corrective action. To ensure fairness and consistency, as well as compliance with the University's Title IX obligations, the Division Head and/or appropriate University official, should consult with the Title IX Coordinator (or designee) regarding the facts of the case, proposed resolution and recommendations, and any written objections to the report of findings and recommendations. The Division Head or University Official will then either adopt the proposed resolution agreement or modify the recommendations as needed.

Once a decision has been reached, reviewed and approved by the Title IX Coordinator, or designee, the Division Head will issue a letter to the Respondent and Claimant sharing, in a manner appropriate to honor due process and privacy considerations, the corrective action that will be implemented. Any imposition of corrective action may be appealed in accordance with the Appeals section herein.

**Possible Sanctions**

Not all forms of sexual misconduct will be deemed to be equally serious offenses, and the University reserves the right to impose different sanctions depending on the severity of the offense and/or offender history.

Any <u>student</u> found responsible for violating this Policy may receive sanctions including, but not limited to, the following:

- Anger Intervention Assessment;
- Abuse Intervention Program;
- Banishment from all NIU property, functions, etc.;
- Community Service to NIU or the DeKalb community;
- Discretionary Sanction-required work assignments, written assignments, service to NIU or other related discretionary assignments;
- Educational Sanctions-includes, but is not limited, to the completion of an educational assignment (e.g., research paper, program presentation, etc.);
- Fines;
- Formal Written Warning;
- Loss of Privileges (e.g., inability to have visitors/guests, etc.);
- No Contact (direct or indirect) with the victim;
- Parental Notification;
- Probation;
- Residence Hall Expulsion;
- Residence Hall Suspension;

- Restitution;
- Revocation of Admission and/or Degree;
- Substance Abuse Assessment;
- Training on Sexual Misconduct;
- University Expulsion;
- University Suspension;
- Withholding Degree;

Any <u>employee</u> found responsible for violating this Policy may receive corrective action including, but not limited to, the following:

- Letter of warning;
- Official Reprimand;
- Referral to a required counseling program;
- Suspension from employment with pay;
- Suspension from employment without pay;
- Termination from employment;
- Training on Sexual Misconduct;
- Community Service;
- Any other sanction deemed appropriate by the Title IX Coordinator.

Any <u>third party</u> (visitor, guest, contractor, subcontractor, vendor, partner, or business affiliate) found responsible for violating this Policy will receive a sanction ranging from a written warning to being banned from any University property, activities, and/or programs, including the termination of any business contract with the University.

## Remedies

In addition to the interim measures described in this document, the following remedies may be available at the conclusion of an investigation whether or not a Respondent is found to be responsible:

- Providing an effective escort to ensure that the Claimant can move safely between classes and activities;

- Ensuring the Claimant and Respondent do not share classes, extracurricular activities, or work space;

- Moving the Respondent or Claimant (if the Claimant requests to be moved) to a different residence hall;

- Providing comprehensive, holistic victim services including medical, counseling, and academic support services, such as tutoring;

- Arranging for the Claimant to have extra time to complete or re-take a class or withdraw from a class without an academic or financial penalty;

19

- Reviewing any disciplinary actions taken against the Claimant to see if there is a causal connection between the sexual misconduct and the disciplinary action that Claimant may have received;

- Training or retraining University employees on responsibilities to address allegations of sexual misconduct and how to conduct Title IX Investigations;

- Developing and distributing materials on sexual misconduct;

- Conducting bystander intervention and sexual violence prevention programs with students and employees;

- Issuing policy statements or taking other steps that clearly communicate that the University does not tolerate sexual misconduct and will respond to any incidents and to any student/employee who reports such incidents;

- Conducting, in conjunction with student leaders, a campus climate survey to assess the effectiveness of efforts to ensure that the University is free from sexual misconduct and using that information to inform future proactive steps that the school will take;

- Targeted training for a group of students, if, for example, the sexual misconduct created a hostile environment in a residence hall, fraternity or sorority, or on an athletic team; and

- Any other remedy that the Title IX Coordinator may consider appropriate.

**Appeals**

Sanction(s) will be implemented and in effect during the appeal process.

Appeals may be made *only* on the following grounds and *only* within five (5) business days of receipt of the decision regarding sanction(s):

- A material deviation from these procedures affected the outcome of the case;

- New and relevant information is available that was not available, with reasonable diligence and effort, at the time of the investigation that could reasonably affect the investigation finding(s);

- The sanction(s) is/are inappropriate or disproportionate to the determined finding(s); or

- A review of all available and relevant information indicates that the evidence does not clearly support the finding(s) and provides clear and definite support for modifying the original finding(s).

20

***If the Respondent is an NIU Student***

In cases where the Respondent is a student, the finding(s) and/or sanction(s) may be appealed by either the Claimant or Respondent on the grounds listed above to the Vice President of Student Affairs & Enrollment Management, or designee. The appealing party should submit a copy of the investigator's decision and/or any sanction to the Vice President within five (5) business days of receipt of the decision regarding sanction(s).

***If the Respondent is an Employee of NIU or a Third Party***

In cases where the Respondent is an employee or third party, the finding(s) of the investigators and/or any sanction(s)/corrective action may be appealed by either the Claimant or Respondent on the grounds listed above by submitting a copy of the investigator's decision and/or any sanction/corrective action to the Executive Vice President and Provost, or designee, within five (5) business days of receipt of the decision regarding sanction(s).

If no appeal is received within the five (5) day period, the investigator's finding(s) and/or any sanction(s) or corrective action(s) will be final. If the appeal is received within the five (5) day period, the Executive Vice President and/or applicable Vice President, or designee, will review the investigator's finding(s) and/or any sanction(s) imposed by decision/hearing and obtain any additional information deemed necessary for resolution of the appeal. Within twenty one (21) calendar days of the date of the filing of the appeal, the Claimant and Respondent will receive notice of the Executive Vice President and/or Vice President's decision in writing. Email is an acceptable method of delivery.

If appropriate, copies of the final decision may be delivered to department or division heads in an identifiable line of supervisory or administrative responsibility in relation to the parties and subjects involved in the Complaint. Other persons and witnesses will receive no specific notification or information regarding the Complaint or investigation absent a request made by subpoena or court order.

## V.  EXTERNAL AGENCIES

At any time during the pendency of the above-described investigation, hearing, and/or appeal, students and employees with questions about Title IX or those who believe they have been subjected to sexual misconduct or retaliation may file a complaint with the **Office for Civil Rights (OCR):**

**Office for Civil Rights (Chicago Office)**
U.S. Department of Education
Citigroup Center
500 W. Madison Street, Suite 1475
Chicago, IL 60661-4544
Telephone: 312-730-1560
FAX: 312-730-1576; TDD: 877-521-2172
Email: OCR.Chicago@ed.gov
www.ed.gov/

At any time during the pendency of the above-described investigation and/or appeal, employees who believe they have been subjected to sexual misconduct or retaliation based thereon in violation of *Title VII of the Civil Rights Act*, 42 U.S.C. § 2000e *et seq.*, may file a complaint with the **Illinois Department of Human Rights (IDHR)** or the **Equal Employment Opportunity Commission (EEOC):**

**Illinois Department of Human Rights**
James R. Thompson Center
100 W. Randolph Street, Suite 10-100
Chicago, Illinois 60601
(312) 814-6200
TDD: (12) 263-1579
www.state.il.us/dhr

**Equal Employment Opportunity Commission**
Chicago District Office
500 West Madison Street, Suite 2000
Chicago, Illinois 60661
(312) 353-2713
TTY: (312) 353-2421
www.eeoc.gov

## VI.    DEFINITIONS

- **Active**: consent must take the form of clearly understandable words or actions that reveal one's expectations and agreement to engage in specific sexual activity. This means that silence, passivity, submission or the lack of verbal or physical resistance (including the lack of a "no") should not- in and of themselves- be understood as consent. Consent cannot be inferred by an individual's manner of dress, the giving or acceptance of gifts, the extension or acceptance of an invitation to go to a private room or location, or going on a date.

- **Anonymous Complaint**: is one where the identity of the Claimant is not known.

- **Claimant**: refers to the alleged victim; a person who alleges to have been subjected to any of the conduct prohibited by this Policy and/or person who files a formal complaint.

- **Confidential Complaint**: is one where the name of the Claimant is known, but does not want to file a complaint, pursue an investigation or to have their identity known.

- **Consent**: a clear, unambiguous, informed and voluntary agreement between all participants to knowingly engage in sexual activity. Consent must be mutually understandable by words or actions (i.e. a reasonable person would consider the words or actions to indicate mutual agreement to engage in the sexual activity). Consent is active and cannot be based on the absence of an affirmative statement or act of denial. Silence or lack of resistance does not constitute consent.

  Seeking and receiving consent is the responsibility of the person(s) initiating the sexual act or acts regardless of whether the person initiating the act is under the influence of drugs and/or alcohol.

  Consent to any sexual act or prior consensual sexual activity between or with any party does not in and of itself constitute consent to any other sexual act.

  Consent may be initially given but withdrawn at any time. Consent cannot be given when a person is incapacitated (including, but not limited to, a person or someone with a physical or mental disability and/or level of intoxication that causes impairment resulting in incapacitation. Consent cannot be given when it is the result of coercion, intimidation, force, or threat of harm. The University prohibits any sexual activity that does not involve the consent of each individual.

  Consent must be given to engage in the act of sexual activity, and consent should also be given to any person who records or photographs any aspect of the sexual encounter as well as third parties who wish to view the sexual activity either in person or via any electronic equipment, methods, or devices. Any of these acts will be deemed to be sexual exploitation. Sexual exploitation includes, but is not limited to, the following acts:
  - Sexual voyeurism or allowing others to witness or observe the sexual or intimate activity of another person without that person's full knowledge and consent;
  - Indecent or lewd exposure or inducing another person to expose themselves when consent is not present;
  - Recording any person engaged in sexual or intimate activity in a private space without that person's full knowledge and consent, even if the person recording the sexual or intimate activity is also engaged in the consented to sexual activity;
  - Distributing sexual or intimate information, images, or recordings about another person without that person's full knowledge and consent;
  - Recruiting, harboring, transporting, providing, or obtaining another person for the purpose of sexual exploitation;
  - Inducing incapacitation in another person with the intent to engage in sexual conduct, regardless of whether prohibited sexual conduct actually occurs.

The definition of consent does not vary based upon a participant's sex, sexual orientation, gender identity, or gender expression.

23

- **Dating Violence**: (1) Violence committed by a person who is or has been in a social relationship of a romantic or intimate nature with the victim. For the purposes of this definition, dating violence includes, but is not limited to, sexual or physical abuse or the threat of such abuse. Dating violence does not include acts covered under the definition of domestic violence. Any incident meeting this definition is considered a crime for the purposes of Clery Act reporting (42 U.S. Code Section 13925 (a)(9)and(10)); or (2) Threatening to use physical, mental, or emotional abuse to control another person who is in a dating relationship with the person (See 105 ILCS 110/3.10).  (3) The existence of a dating relationship in 1 or 2 above shall be determined based on the reporting party's statement and with consideration of the length of the relationship, the type of relationship, and the frequency of interaction between the persons involved in the relationship.

- **Domestic Violence**: (1): A felony or misdemeanor crime of violence committed by a current or former spouse or intimate partner of the victim; by a person with whom the victim shares a child in common; by a person who is cohabitating with, or has cohabitated with, the victim as a spouse or intimate partner; by a person similarly situated to a spouse of the victim under the domestic or family violence laws of the jurisdiction in which the crime of violence occurred; by any other person against an adult or youth victim who is protected from that person's acts under the domestic or family violence laws of the jurisdiction in which the crime of violence occurred (42 U.S. Code Section 13925 (a)(8)); or (2) Physical abuse, harassment, intimidation of a dependent, interference with personal liberty or willful deprivation of a family or household member, which includes spouses, former spouses, parents, children, stepchildren and other persons related by blood or by present or prior marriage, persons who share or formerly shared a common dwelling, persons who have or allegedly have a child in common, and persons who share or allegedly share a blood relationship through a child. (725 ILCS 5/112A-3; 750 ILCS 60/103).

- **Force:** the use of physical violence and/or otherwise physically imposing on another person to gain sexual access. Also includes threats, intimidation, implied threats, and coercion that overcome resistance or produce consent.

- **Gender-based Harassment or Discrimination**: acts of a verbal or nonverbal nature or physical aggression, intimidation, or hostility based upon sex/gender or sex/gender-stereotyping (even if those acts do not involve conduct of a sexual nature) that is sufficiently serious to limit or deny the ability to participate in or benefit from the University's programs and activities or the terms and conditions of employment. *Example: the repeated sabotaging of female graduate students' laboratory experiments by male students in the class.*

- **Incapacitation**: physical or mental impairment due to drugs or alcohol (whether such use is voluntary or involuntary); the lack of consciousness or being asleep; being involuntarily restrained; if any of the parties are under the age of 17; or if an individual otherwise cannot consent. Generally, an incapacitated individual is incapable of recognizing what is occurring and is not able to recognize the nature of sexual activity or the extent of a sexual situation;

24

- **Intoxication**: when alcohol is involved, a person can be incapacitated due to intoxication. Some ways in which a person can be incapacitated as a result of alcohol use may include, but are not limited to, lack of control over physical movements, lack of awareness of circumstances or surroundings, or the inability to communicate for any reason. The individual may experience a blackout state in which they appear to be giving consent but does not actually have conscious awareness or the ability to consent. Therefore, individuals who engage in sexual activity of any kind must be aware of the other person's level of intoxication;

- **Knowingly**: Consent must demonstrate that all individuals understand, are aware of, and agree to the "who" (same partners), "what" (same acts), "where" (same location), "when" (same time), and "how" (the same way and under the same conditions) of the sexual activity.

- **Physical and Mental Disability**: "a physical or mental impairment that substantially limits one or more life activities of an individual, such as caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working. This also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." (Americans with Disabilities Act).

- **Proceeding**: all activities related to a non-criminal resolution of an institutional disciplinary complaint, including, but not limited to, fact finding investigations, formal or informal meetings, and hearings. Proceeding does not include communications and meetings between officials and victims concerning accommodations or protective measures to be provided to a victim.

- **Rape**: the penetration, no matter how slight, of the vagina or anus with any body part or object, or oral penetration by a sex organ of another person, without the consent of the victim.

- **Resolution Officer**: a representative from the Office of Student Conduct or Human Resource Services who will be appointed to administer sanctions.

- **Respondent**: the alleged offender/ accused; a person alleged to have engaged in any of the conduct prohibited by this Policy.

- **Responsible Employee**: is any employee who:
  - Has the authority to take action to redress sexual violence;

  - Has been given the duty of reporting incidents of sexual violence or any other misconduct by students; or

  - Anyone a student could reasonably believe has this authority or duty.

25

- **Result**: any initial, interim, and final decision by any official or entity authorized to resolve disciplinary matters within the institution. The result must include any sanctions imposed by the institution.

- **Retaliation**: taking any adverse or hostile act, engaging in harassment and/or making an adverse employment/academic decision because an employee/student/third party has opposed violations of this Policy or other unlawful employment/academic practices by filing a complaint, testifying, assisting, or participating in an investigation, proceeding, or hearing. Respondents are also protected from Retaliation.

- **Sanction by Agreement**: a proposed resolution agreement between the University and the Respondent, informed by input from the Respondent, the Claimant (if participating), and the University. There shall be no appeal of a Sanction by Agreement.

- **Sanction by Decision**: (for employees & third parties only). the Resolution Officer will either adopt the proposed resolution agreement and impose the sanctions therein or modify the sanctions as needed.

- **Sanction by Hearing**: (for students only) a hearing officer shall, at the conclusion of a hearing as to sanctions only, impose appropriate sanction(s) as provided herein.

- **Sexual Assault**: (1) any nonconsensual sexual act proscribed by Federal or Illinois law, including when the victim lacks capacity to consent. An offense that meets the definition of rape, fondling, incest, or statutory rape as used in the FBI's UCR program. (42 U.S. Code Section 13925 (a)(29)) or (2) an act of sexual penetration by the use of force or threat of force; or (3) an act of sexual penetration and the respondent knew that the claimant was unable to understand the nature of the act or was unable to give knowing consent; or (4) an act of sexual penetration with a claimant who was under 18 years of age when the act was committed and the respondent was a family member; or (5) an act of sexual penetration with a claimant who was at least 13 years of age but less than 18 years of age when the act was committed and the respondent was 17 years of age or over and held a position of trust, authority or supervision in relation to the claimant.

- **Sex Discrimination**: treating a person differently because of their sex in the terms and conditions of educational programs, activities, and/or employment; *Example: A professor requires all male students in a class to do an extra assignment that is not required of female students*.

- **Sexual Exploitation**: taking non-consensual or abusive sexual advantage of another for your own benefit.

26

- **Sexual Harassment**: unwelcome, verbal, or physical conduct of a sexual nature (such as sexual advances or requests for sexual favors) sufficiently serious that it unreasonably interferes with or limits a person's ability to participate in or benefit from the University's educational programs, activities, and/or employment. Sexual harassment may be based on a power differential, the creation of a hostile environment (reasonably severe conduct that is sufficiently pervasive to have the purpose or effect of unreasonably interfering with work or educational performance, or creating an intimidating, hostile or offensive working or educational environment) , or retaliation.

The two types of sexual harassment are known as Quid Pro Quo and Hostile Environment. Quid Pro Quo is the Latin term for "this for that" and occurs when there is a demand for a sexual favor in exchange for some employment/academic benefit. Sexual harassment in the form of a hostile work and/or academic environment occurs when the harassing behavior unreasonably interferes with the employee/student work/academic performance and/or creates a hostile, intimidating, or offensive work/academic environment.

In order for the conduct to be considered sexual harassment, the behavior must be:
- Unwanted and/or unwelcome;

- Sexual in nature and/or related to the sex or gender of the employee/student;

- Sufficiently severe or pervasive enough to alter the conditions of the employee/student employment or academic environment (when describing sexual harassment resulting from a hostile work/academic environment).

Examples of sexual harassment include, but are not limited to, the following:
- A professor insists that a student have sex with him/her in exchange for a good grade;

- A student repeatedly sends sexually oriented jokes in an email list they created, even when asked to stop, causing one recipient to avoid the sender on campus and in the residence hall in which they both live;

- A professor demands that students discuss their past sexual experiences, yet the conversation is not in any way germane to the class;

- A staff member repeatedly touches and makes sexually suggestive remarks to a student while the two are waiting at a stop for the school's shuttle bus, causing the student to walk long distances instead of taking the shuttle bus;

- One instance of rape and/or other acts of Sexual Violence;

27

Sexual Harassment also includes harassment of a sexual nature directed at gay or lesbian persons that is sufficiently serious to limit or deny the ability to participate in or benefit from the University's educational and employment programs. Likewise, sexual harassment can occur where Claimant and Respondent are members of the same sex. *Example: a male student or a group of male students target a gay student for physical sexual advances*.

For purposes of this Policy, stalking may also be a form of sexual harassment. For more information regarding sexual harassment, please consult the Non-Discrimination Policy and Complaint Procedures for Employees and Students.

- **Sexual Misconduct**: one or more acts of sex discrimination, sexual harassment, sexual violence, dating violence, domestic violence, stalking or gender-based harassment or discrimination. Sexual misconduct can occur among, between or to heterosexual, lesbian, gay, bisexual and transgender individuals.

- **Sexual Penetration**: any contact, however slight, between the sex organ or anus of one person by an object, the sex organ, mouth, or anus of another person, or any intrusion, however slight, of any part of the body of one person or of any animal or object into the sex organ or anus of another person. Includes, but not limited to, cunnilingus, fellatio, or anal penetration.

- **Sexual Violence**: nonconsensual sexual acts: physical sexual acts perpetrated against a person's will or where a person is incapable of giving consent (*e.g.*, due to the Claimant's age, use of drugs or alcohol, or a disability that prevents the Claimant from having the capacity to give consent). Conduct will be deemed sexual violence whether obtained by force or threat of force and whether completed or attempted. Sexual exploitation (taking non-consensual or abusive sexual advantage of another for your own benefit) may also be considered a form of sexual violence, depending on the circumstances. *Examples: Rape, Sexual Assault, Sexual Abuse*

- **Stalking**: (1) engaging in a course of conduct directed at a specific person that would cause a reasonable person to (A) fear for the person's safety or the safety of others; or (B) suffer substantial emotional distress. For the purposes of this definition: (i) Course of conduct means two or more acts, including, but not limited to, acts in which the stalker directly, indirectly, or through third parties, by any action, method, device, or means, follows, monitors, observes, surveils, threatens, or communicates to or about a person, or interferes with a person's property; (ii) Reasonable person means a reasonable person under similar circumstances and with similar identities to the victim; (iii) Substantial emotional distress means significant mental suffering or anguish that may, but does not necessarily, require medical or other professional treatment or counseling; (iv) Any incident meeting this definition is considered a crime for the purposes of Clery Act reporting (42 U.S. Code Section 13925 (a)(30)) or (2) (A) Knowingly and without lawful justification, on at least 2 separate occasions, following another person or placing the person under surveillance or any combination thereof and (i) at any time transmitting a threat of immediate or future bodily harm, sexual assault, confinement or restraint and the threat is directed towards that person or a family member of that person, or (ii) places that person in reasonable apprehension of immediate or future bodily harm, sexual assault, confinement or restraint to or of

28

that person or a family member of that person; or (B) when, having been previously convicted of stalking another person, knowingly and without lawful justification on one occasion, (i) follows that same person or places that same person under surveillance; and (ii) transmits a threat of immediate or future bodily harm, sexual assault, confinement or restraint to that person or a family member of that person. (720 ILCS 5/12-7.3). (3) Stalking may be accomplished by physical act or electronic means, such as computer or cell phone.

- **Title IX Coordinator**:  Karen L. Baker, Lowden Hall 101, DeKalb, IL 60115, (815) 753-6017, klbaker@niu.edu;

- **Voluntary**: Consent must be freely given and cannot be the result of force (violence, physical restraint, or the presence of a weapon), threats (indications of intent to harm, whether direct or indirect), intimidation (extortion, menacing behavior, bullying), coercion (undue pressure) or fraud (misrepresentation or material omission about oneself or the situation in order to gain permission for sexual or intimate activity).

- **Voyeurism**: the condition of one who derives sexual satisfaction from observing the sexual organs or acts of others, generally from a secret vantage point.

[1]Portions of this Policy and Procedures have been provided by *Revised Sexual Harassment Guidance*, U.S. Dept. of Educ., Office for Civil Rights (January, 2001); *Dear Colleague Letter*, U.S. Dept. of Educ., Office for Civil Rights (April 4, 2011); the *Atixa Gender-Based and Sexual Misconduct Model Policy*, Sokolow, Lewis and Schuster, NCHERM & ATIXA, 2011; *Navigating Sexual Violence Issues Under OCR's 2011 Dear Colleague Letter*, Margolis Healy, 2011; *Questions and Answers on Title IX and Sexual Violence*, U.S. Dept. of Educ., Office for Civil Rights (2014); and the University of Michigan *Student Sexual Misconduct Policy* (August, 2013).

[2]*The Family Educational Rights and Privacy Act* (FERPA) (20 U.S.C. § 1232g) is a Federal law that protects the privacy of student education records.

[3]This does not prevent the presentation and consideration of evidence regarding whether conduct was welcome or unwelcome.