**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 17-cv-07991 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| THE BOARD OF TRUSTEES OF | ) | |
| NORTHERN ILLINOIS UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff, proceeding pseudonymously as John Doe, is a former student at Northern Illinois University ("NIU") who was accused of sexually assaulting a woman in April 2016. Based on the accusation, NIU initiated an investigation of Plaintiff and, in the interim, imposed certain restrictions on his on-campus activities. In the midst of proceedings related to the sexual assault accusation, NIU notified Plaintiff that he would be suspended while it investigated a second misconduct allegation against him. Ultimately, NIU deemed Plaintiff responsible for sexual assault. However, Plaintiff contends that NIU's investigation and adjudication of the sexual assault accusation was tilted against him as a man being accused of rape by a woman. And when he resisted that unlawful bias, NIU purportedly retaliated by using a baseless charge of misconduct as grounds for suspending him. Plaintiff therefore brought the present action against NIU, through its Board of Trustees, setting forth claims of sex discrimination and retaliation under Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681 *et seq.*, and breach of contract, and seeking a declaratory judgment. Now, NIU moves to dismiss Plaintiff's First Amended Complaint ("FAC") pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 71.) For the reasons that follow, NIU's motion is granted.

## BACKGROUND

For the purposes of the motion to dismiss, the Court accepts all well-pleaded facts in the FAC as true and views those facts in the light most favorable to Plaintiff as the non-moving party. *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007). The FAC alleges as follows.

Plaintiff was a student at NIU, a public university in Illinois that accepts federal financial assistance. (FAC ¶¶ 1, 7 Dkt. No. 66.) Even before the alleged sexual assault giving rise to this action, Plaintiff had a contentious history with NIU's administration. (*Id.* ¶ 10.) Specifically, Plaintiff was a member of a fraternity at NIU and, in 2012, a member of Plaintiff's pledge class passed away after drinking excessively at a hazing event. (*Id.*) While Plaintiff was not responsible for the hazing that led to his pledge brother's death, his fraternity received significant scrutiny from NIU afterwards. (*Id.* ¶¶ 11, 14–16.) Thus, when Plaintiff took over as president of his fraternity, he dealt with numerous accusatory communications from NIU's administration concerning allegations of wrongdoing made against his fraternity and its brothers. (*Id.* ¶¶ 14–15.) According to Plaintiff, NIU's scrutiny of his fraternity and other fraternities was unfounded, and sororities were not treated similarly. (*Id.* ¶ 17.)

The present litigation arises out of a sexual encounter between Plaintiff and a woman who is identified by the pseudonym Jane Roe. On April 16, 2016, Roe, who was not enrolled as a student at NIU, accompanied a friend to an event hosted by NIU at a local bar. (*Id.* ¶¶ 1, 20–21.) Prior to the event, Roe and her friend had already been drinking at an NIU fraternity house. (*Id.* ¶¶ 22–23.) Then, at the event itself, Roe recalled drinking about five vodka tonics. (*Id.* ¶ 25.) At about 11:30 p.m., Roe met Plaintiff, who had also been drinking alcohol. (*Id.* ¶¶ 26–28.) While at the bar, Plaintiff and Roe kissed consensually. (*Id.* ¶ 26.) Shortly thereafter, the two took a bus back to NIU's campus and, during the ride, they again shared a consensual kiss. (*Id.* ¶ 29.)

Once back on campus, Plaintiff took Roe and two other friends to his room at his fraternity house to continue drinking. (*Id.* ¶ 30.) Eventually, Plaintiff and Roe were left alone in Plaintiff's room, and the two resumed consensually kissing each other. (*Id.* ¶¶ 31–32.) Ultimately, the encounter resulted in Plaintiff having sexual intercourse with Roe. (*Id.* ¶ 33.) Plaintiff believed the sexual intercourse was consensual and claims that he never received any indication otherwise from Roe. (*Id.* ¶¶ 33–35.) Nonetheless, after leaving Plaintiff's fraternity house in the early morning hours of April 17, 2016, Roe told some friends about the encounter and those friends told Roe that it sounded like Plaintiff had raped her. (*Id.* ¶ 36.) Initially, Roe declined to go to the hospital for a rape kit examination. (*Id.* ¶ 37.) However, that evening, Roe went with her mom to a police station where she reported being sexually assaulted by Plaintiff. (*Id.* ¶ 38.)

In that initial April 17, 2016 police report, Roe claimed, among other things, that she had rebuffed Plaintiff when he attempted to kiss her at the bar and again refused Plaintiff's attempts to kiss her when they were alone in his room, and that Plaintiff forced himself on her when she was on her back. (*Id.* ¶ 38.) Yet, during a follow-up interview with the police on April 20, 2016,[1] Roe acknowledged consensually kissing Plaintiff multiple times before they had sex. (*Id.* ¶ 39.) Further, Roe reported that, in Plaintiff's bedroom, she kissed Plaintiff while he was in his underwear and she was straddled on top of him wearing no underwear. (*Id.*) Finally, she claimed that sexual penetration occurred first while she was on top of him and then again while she was on all-fours in the "doggy style" position—but not on her back, as initially reported. (*Id.*) On May 9, 2016, Plaintiff spoke with the police. (*Id.* ¶ 41.) During the interview, Plaintiff admitted

---

[1] Although the FAC alleges that Roe's second interview with the police occurred on May 12, 2016, the exhibits attached to the FAC reveal that the interview actually occurred on April 20, 2016. (FAC, Ex. B, Dkt. No. 66.)

to having sex with Roe but insisted that it was consensual. (*Id.*) At the same time, Plaintiff was unable to recall many details about the encounter because of the drinking that had occurred beforehand. (*Id.*)

About two weeks after her second police report, Roe was contacted by Sarah Adamski, NIU's Associate Director of Investigations, Affirmative Action and Equity Compliance. (*Id.* ¶ 40.) Roe told Adamski that the police advised her not to speak with NIU until the police had completed their investigation. (*Id.*) When Adamski again reached out to Roe on June 6, 2016 and June 30, 2016, Roe stated that she did not wish to file a Title IX claim against Plaintiff. (*Id.* ¶ 42.) Meanwhile, local prosecutors filed criminal charges against Plaintiff based on Roe's sexual assault accusation. (*Id.* ¶ 44.)

By July 1, 2016, Roe had changed her mind and opted to proceed with the filing of a Title IX complaint against Plaintiff. (*Id.* ¶ 43.) Shortly thereafter, Roe contacted Adamski to insist that Plaintiff immediately be barred from attending fraternity functions. (*Id.* ¶ 55.) Although Adamski initially responded to Roe's demand by stating that any punishment would have to wait until a finding of Plaintiff's responsibility, on July 15, 2016, NIU imposed interim measures against Plaintiff while the Title IX investigation remained ongoing. (*Id.* ¶¶ 54–55.) Those measures included a prohibition on Plaintiff's participation in all student organizations and extracurricular activities, and his removal from his student leadership positions. (*Id.* ¶ 54.) NIU subsequently added an additional interim measure banning Plaintiff from residing in school residence halls or buildings. (*Id.* ¶¶ 56–57.) On August 1, 2016, Roe independently decided to bring her accusation against Plaintiff to the attention of the broader NIU community by sending an email to NIU administrators, faculty, alumni, and staff. (*Id.* ¶¶ 45–46.) Her email identified Plaintiff by first and last name as her rapist. (*Id.* ¶ 45.) NIU did not publicly respond to Roe's email, nor did it

inform recipients that the account described in the email was the subject of an official investigation. (*Id.* ¶ 47.)

Plaintiff met with Adamski on August 4, 2016 and was given the opportunity to provide his side of the story. (*Id.* ¶ 51.) Due to the pending criminal charges, Plaintiff declined to speak about his encounter with Roe and asserted his Fifth Amendment rights. (*Id.*) Yet Adamski disagreed that the criminal proceeding was a basis for delaying the Title IX process, and she informed Plaintiff that she would proceed with her investigation notwithstanding his inability to participate fully. (*Id.* ¶¶ 52–53.) Adamski asked Plaintiff whether he would like to adopt the statement he provided to the police on May 9, 2016 regarding Roe's accusations in connection with the Title IX investigation, but Plaintiff declined to do so. (*Id.* ¶ 60.)

On August 16, 2016, Adamski issued her preliminary report of her Title IX investigation ("Preliminary Report"). (*Id.* ¶ 60.) In the Preliminary Report, Adamski detailed the witness statements she had obtained as part of her investigation. (*Id.*) To present Plaintiff's position, the Preliminary Report relied upon Plaintiff's May 9, 2016 statement to the police, notwithstanding his refusal to adopt it for his defense to the Title IX claim. (*Id.*) Plaintiff then provided his rebuttal to the Preliminary Report, in which he argued that there was a lack of evidence against him and highlighted the inconsistencies between the two statements that Roe gave to the police. (*Id.* ¶ 62.) Adamski, however, was unpersuaded, and in her final report issued on September 14, 2016 ("Final Report"), she concluded that Plaintiff was responsible for sexually assaulting Roe. (*Id.* ¶ 66.) While the Final Report acknowledged Roe's inconsistent statements to the police, it nonetheless adopted as Roe's official story her second statement from April 20, 2016. (*Id.* ¶ 68.) At no point prior to issuing the Final Report did Adamski meet with Roe in person; their communications occurred only through phone calls and emails. (*Id.* ¶ 69.)

Plaintiff quickly appealed the Final Report's finding that he was responsible for sexual assault. (*Id.* ¶ 72.) While his appeal was pending, Plaintiff received a new notice alleging his violation of school rules on September 26, 2016. (*Id.* ¶ 98.) In particular, the notice informed Plaintiff that NIU had received a report that Plaintiff had violated the Student Code of Conduct by using cocaine at his fraternity house on September 24, 2016, while the interim measures banning him from being present in the fraternity house were in place. (*Id.* ¶¶ 97–98.) Attached to the notice was an incident report, which revealed that the accusation originated from an unidentified woman who heard about Plaintiff's illicit conduct from a friend and told her ex-boyfriend about it, and the ex-boyfriend then conveyed the account to a fraternity advisor who ultimately reported it to NIU's administration. (*Id.* ¶ 99.) Notwithstanding this attenuated sourcing, NIU temporarily suspended Plaintiff and banned him from campus pending its investigation of the second allegation. (*Id.* ¶ 101.) As a result, Plaintiff was unable to attend class beginning on September 27, 2016. (*Id.* ¶ 104.) On October 14, 2016, with the second investigation ongoing such that Plaintiff's suspension remained in effect, Plaintiff elected to withdraw from NIU to avoid further damage to his academic record from incomplete or failing grades. (*Id.* ¶ 124.)

After Plaintiff's appeal of the finding of his responsibility for sexual assault was denied, a sanctions hearing was scheduled for October 28, 2016. (*Id.* ¶¶ 73–75.) Roe attended the sanctions hearing via videoconference. (*Id.* ¶ 76.) In her testimony, Roe failed to mention that she had been drinking heavily on the night of her encounter with Plaintiff. (*Id.* ¶ 78.) Plaintiff was not permitted to question Roe directly and instead was required to submit a list of questions to the presiding hearing officer who would then decide which questions to ask. (*Id.* ¶ 79.) Of the 38 questions that Plaintiff submitted, the hearing officer selected only 6 to ask Roe. (*Id.* ¶ 80.)

Adamski also testified at the hearing. (*Id.* ¶ 77.) During her testimony, Adamski conceded that she did not produce to Plaintiff or his counsel all the text messages she exchanged with Roe or his counsel, despite relying on those text messages in connection with her Final Report. (*Id.* ¶ 82.) In addition, Adamski acknowledged that there were inconsistencies in Roe's two statements to the police but explained that she found Roe's second statement to be believable. (*Id.* ¶ 85.) On the other hand, Adamski testified that she did not find Plaintiff's statement to the police believable. (*Id.* ¶ 86.)

At the conclusion of the sanctions hearing, the hearing officer ruled that Plaintiff should be expelled. (*Id.* ¶ 91.) Plaintiff's subsequent appeal of the sanctions ruling was denied. (*Id.* ¶ 95.) On November 4, 2016, Plaintiff received notice of the dismissal of the allegation of his violation of the Student Code of Conduct due to on-campus cocaine use. (*Id.* ¶ 125.) Ultimately, a jury trial was held on the criminal charges against Plaintiff for his alleged sexual assault of Roe, and the jury returned a verdict of not guilty on December 1, 2022. (*Id.* ¶ 96.)

## DISCUSSION

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This pleading standard does not necessarily require a complaint to contain detailed factual allegations. *Twombly*, 550 U.S. at 555. Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678).

Plaintiff's FAC asserts two Title IX claims against NIU—one for sex discrimination and one for retaliation. In addition, the FAC also requests a declaratory judgment reversing NIU's

Title IX findings from the Final Report and the associated sanctions. NIU moves to dismiss all claims.[2]

## I.     Title IX—Sex Discrimination

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). "The Supreme Court has interpreted Title IX to provide individual plaintiffs with an implied private right of action to pursue claims of gender discrimination in federal court and has recognized a number of claims that constitute discrimination." *Doe v. Columbia Coll. Chi.*, 933 F.3d 849, 854 (7th Cir. 2019) (citing *Cannon v. Univ. of Chi.*, 441 U.S. 677, 689 (1979)). To state a sex[3] discrimination claim under Title IX, a plaintiff must allege "(1) the educational institution received federal funding, (2) plaintiff was excluded from participation in or denied the benefits of an educational program, and (3) the educational institution in question discriminated against plaintiff based on gender." *Id.* Here, NIU does not dispute that Plaintiff has pleaded the first two elements. It focuses its arguments for dismissal on its contention that Plaintiff has failed to allege facts from which it can be reasonably inferred that he was discriminated against based on his sex.

According to Plaintiff, NIU approached its investigation and prosecution of the sexual assault accusation against him with an anti-male bias. In the context of an educational

---

[2] The FAC also asserts a breach of contract claim against NIU. After NIU moved to dismiss that claim on Eleventh Amendment immunity grounds, Plaintiff conceded that the breach of contract claim was barred given that NIU is a public university. *See Osteen v. Henley*, 13 F.3d 221, 223 (7th Cir. 1993) (holding that claims for damages against NIU were barred by the Eleventh Amendment because NIU is an Illinois state university). Accordingly, the breach of contract claim is dismissed with prejudice.

[3] Title IX caselaw tends to use sex and gender interchangeably.

institution's handling of disciplinary proceedings against students, the Seventh Circuit has eschewed the use of "formal doctrinal tests" that some Circuits have employed[4] to ferret out bias, and instead asks simply whether "the alleged facts, if true, raise a plausible inference that the university discriminated against [the plaintiff] 'on the basis of sex.'" *Doe v. Purdue Univ.*, 928 F.3d 652, 667–68 (7th Cir. 2019).

First, Plaintiff contends that NIU has a systemic anti-male bias in evaluating Title IX complaints alleging sexual misconduct. He argues that such inherent bias is a product of a "Dear Colleague" letter regarding Title IX enforcement issued by the U.S. Department of Education's Office of Civil Rights ("OCR"). (FAC ¶ 139.) In that letter, the OCR set forth guidance to NIU and other universities for investigating and evaluating Title IX complaints regarding sexual misconduct, which Plaintiff contends disadvantages male students by favoring female accusers. (*Id.* ¶¶ 139–41.) In addition, the Dear Colleague letter threatened schools with a loss of federal funding. (*Id.* ¶ 140.) As the Seventh Circuit has explained, that threat sent a message that "a school's federal funding was at risk if it could not show that it was vigorously investigating and punishing sexual misconduct." *Purdue*, 928 F.3d at 668.

To further allege NIU's systemic anti-male bias, Plaintiff points to its membership in Pact5, a coalition of universities and colleges that have pledged to fight sexual assault on their campuses. (FAC ¶ 128.) In connection with its membership, NIU submitted two films for

---

[4] In his opposition brief, Plaintiff argues that this Court should evaluate the sufficiency of his allegations under the two-category framework employed in the Second Circuit. Specifically, the Second Circuit has explained that claims "attacking a university proceeding on the grounds of gender bias can be expected to fall generally within two categories." *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994). First is the "erroneous outcome" category, where the plaintiff claims that he "was innocent and wrongly found to have committed an offense." *Id.* Second is the "selective enforcement" category, where the claim is that, "regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." *Id.* The Seventh Circuit has acknowledged the Second Circuit's framework and its use in other Circuits but nonetheless has declined "to superimpose doctrinal tests" on the Title IX statute. *Doe v. Purdue Univ.*, 928 F.3d 652, 667 (7th Cir. 2019).

screening at a Pact5 film festival, both of which portrayed only men as perpetrators of sexual assault and stereotyped men as aggressors in sexual encounters with women. (*Id.* ¶¶ 129–31.) Similarly, Plaintiff highlights NIU's promotion of a "Rape Aggression Defense" program, which taught women how to defend themselves against men's sexual aggression while teaching men how to avoid that behavior. (*Id.* ¶¶ 132–33.)

Plaintiff is not the first male student to allege that the OCR's Dear Colleague letter "caused universities to take an overzealous approach to investigating and punishing sexual misconduct among students and to implement policies that discriminated against men." *Gash v. Rosalind Franklin Univ.*, 691 F. Supp. 3d 858, 862 (N.D. Ill. 2023) (collecting cases). And the Seventh Circuit has held that the letter is relevant in providing a backdrop about why a university "might have been motivated to discriminate against males accused of sexual assault." *Purdue*, 928 F.3d at 669; *see also Doe v. Univ. of S. Ind.*, 43 F.4th 784, 792 (7th Cir. 2022) ("Evidence of public pressure on a university can be relevant in assessing sex discrimination claims under Title IX."). Likewise, a court may consider a school's promotion of films and other events raising awareness of sexual assault on campus. *Columbia Coll.*, 933 F.3d at 855. However, while such background allegations contribute to the plausibility of a sex discrimination claim, they do not, by themselves, suffice to state a claim. *Id.* Rather, a plaintiff must also "allege facts raising the inference that [the university] acted at least partly on the basis of sex in his particular case." *Purdue*, 928 F.3d at 669. Put another way, a plaintiff must "allege [a] particularized 'something more'" concerning the facts surrounding his case to survive a motion to dismiss. *Columbia Coll.*, 933 F.3d at 855–56.

Often, the "something more" that makes a sex discrimination claim plausible will be procedural irregularities in the disciplinary process from which an anti-male bias can be inferred.

*Univ. of S. Ind.*, 43 F.4th at 793. But it is not enough for a plaintiff to "merely identify[] mistakes and imperfections in the process." *Id.* What is required are allegations supporting a reasonable inference "that the defendant deviated from proper procedures not because of human error but by design, to achieve covertly what it could not do openly: discriminate against the plaintiff on the basis of sex." *Id.* Under this analysis, "[a]s the number of irregularities increases, or the irregularities become more serious, it begins to look less likely that the errors were made due to benign reasons." *Id.* (internal quotation marks omitted). At the same time, a court should be mindful that errors demonstrating only a "'pro-victim bias' . . . do[] not support a claim for sex discrimination because 'both women and men can be victims of sexual assault.'" *Gash*, 691 F. Supp. 3d at 864 (quoting *Johnson v. Marian Univ.*, 829 F. App'x 731, 733 (7th Cir. 2020)).

Although Plaintiff asserts that NIU's investigation and adjudication of the Title IX complaint against him was rife with procedural errors, upon careful examination, the Court concludes that none of the purported errors that Plaintiff identifies represent unambiguous deviations from NIU's written procedures for Title IX proceedings. First, Plaintiff faults NIU for refusing to delay proceedings during the pendency of his criminal charges, thereby putting him to the unpalatable choice between giving up his Fifth Amendment rights or being precluded from effectively defending himself in the Title IX investigation. Regardless of the fairness of presenting Plaintiff with such a choice, NIU's Title IX policies and procedures make clear that "[a]ny investigation will proceed independent of any criminal or other legal proceedings." (FAC, Ex. J, Title IX Policies and Procedures at 14, Dkt. No. 66.) Notably, Plaintiff's criminal prosecution was not resolved until his acquittal on December 1, 2022, nearly six years after he would have graduated. Thus, NIU's policy of proceeding with Title IX investigations notwithstanding the pendency of criminal charges would appear to make good sense. Otherwise,

NIU would be unable to discipline many students facing criminal charges while they were still under its jurisdiction.

After Plaintiff invoked the Fifth Amendment and declined to give NIU a statement, he contends that Adamski improperly adopted Plaintiff's statement to the police over his objection. Despite Plaintiff's assertion of impropriety, he fails to point to any policy or procedure that Adamski violated by adopting his statement. On the contrary, NIU's policies and procedures make clear that police reports accusing students of sexual misconduct will be reported to the Title IX coordinator. (*Id.* at 9–10.) And Plaintiff did, in fact, provide a statement to the police (presumably, after having been advised of his Fifth Amendment rights). The Court sees no reason why Adamski was required to ignore that statement, especially once Plaintiff declined to submit a separate statement for purposes of the Title IX investigation. Further, Plaintiff did avail himself of the opportunity to submit his rebuttal to the Preliminary Report, which he used to draw attention to the inconsistencies in Roe's two statements to the police. Contrary to Plaintiff's claim that NIU made no effort to resolve the inconsistencies, the Final Report explained its decision to credit Roe's second statement. It noted that Roe's second statement was "consistent with the recalled details, albeit limited, that [Plaintiff] provided about the night in question" and was "consistent with a version of events that [Roe] shared with friends shortly after the incident occurred." (FAC, Ex. F, Final Report at 2, Dkt. No. 66.)

Relatedly, Plaintiff claims that NIU hindered his defense at the sanctions hearing by refusing to allow him to cross-examine Roe and asking her only 6 of the 38 questions he had submitted. However, nowhere in NIU's Title IX policies and procedures is the accused given a right to cross-examine his accuser—the accuser is not even required to attend the hearing. (Title IX Policies and Procedures at 17.) Moreover, the policies and procedures expressly allow only

the hearing officer to ask questions at a sanctions hearing. (*Id.*) There is no additional requirement that the hearing officer ask any or all questions submitted by the accused.

Plaintiff also argues that NIU's anti-male bias can be inferred from its rush to impose punitive measures against him before even the Preliminary Report had been issued. Once again, NIU's policies and procedures expressly authorized those interim measures. NIU's Title IX policies and procedures make clear that NIU "reserves the right to take whatever interim measures deemed necessary to protect the rights and personal safety of the Claimant, Respondent, and/or community members," including, but not limited to, "modification of class schedules . . . or living arrangements" and "interim suspension . . . pending an investigation." (*Id.* at 14.) Next, Plaintiff believes that NIU's bias is evidenced by its failure to respond to Roe's email publicly accusing Plaintiff of sexual assault. But he points to no policy or procedure addressing how NIU should handle that unusual situation. And given its ongoing investigation, the Court believes NIU could reasonably have determined that any official response to Roe's unsolicited email might compromise the community's confidence in the impartiality of NIU's investigation.

Finally, Plaintiff asserts that NIU hamstrung his defense by failing to disclose fully all relevant materials in its possession. In particular, he alleges that Adamski admitted that she had not produced to Plaintiff all her text messages with Roe, which Plaintiff claims undermined his ability to defend himself. (FAC ¶¶ 82–85, 93–94.) Yet Plaintiff's allegations as to those withheld text messages are vague, providing no detail as to what they discussed or how their production would have bolstered his defense. Nor can he claim that such elaboration was not possible due to the nonproduction of the text messages since he also alleges that the subject "text messages are mentioned in the Title IX report." (*Id.* ¶ 94.) Moreover, it is not apparent that Plaintiff had any

right to obtain the text messages, as he cites no NIU policy or procedure affording students a right to discovery in Title IX proceedings. Even accepting NIU's lack of full production as a procedural irregularity, this one failing on the part of NIU would not suffice to support a reasonable inference of sex discrimination because there is no apparent connection between NIU's nonproduction and Plaintiff's sex. *See Columbia Coll.*, 933 F.3d at 856 (finding that the university's refusal to provide the plaintiff with relevant documents was "divorced from gender" since he did not allege "that females accused of sexual assault were allowed to review materials or that only female victims were allowed to review them"); *see also Doe v. Samford Univ.*, 29 F.4th 675, 688 (11th Cir. 2022) ("A deviation from a Title IX policy is not, in and of itself, a violation of Title IX.").

In short, none of the supposed procedural irregularities that Plaintiff alleges were actually irregular. Rather, it appears that NIU adhered closely to its Title IX policies and procedures and Plaintiff is simply dissatisfied with its conclusion finding him responsible for Roe's sexual assault. Still, Plaintiff maintains that, even in the absence of procedural irregularities, NIU prosecuted his Title IX complaint more aggressively than it would have for a similarly situated female. To support this contention, Plaintiff highlights NIU's supposedly more lenient investigation of sexual misconduct complaints lodged against a female professor. That professor had been accused of making unwanted sexual advances toward a male graduate student and, when she was rebuffed, threatened to retaliate against him. (FAC ¶ 144.)

While Plaintiff claims that the accusation against the female professor was a sex-reversed mirror of the circumstances here, the Court finds significant differences between the two cases. Unlike Plaintiff, the female professor was not accused of making any sexual contact with her alleged victim. Moreover, the subject of the female professor's unwanted advances ultimately

14

declined to cooperate with NIU's investigation, thus leading to the dismissal of the complaints. (*Id.* ¶¶ 145–46.) Plaintiff attempts to cast suspicion on NIU's motives by contrasting its quick acceptance of the decision by the female professor's victim not to proceed with a Title IX complaint and Adamski's continued outreach to Roe despite her initial disinclination to file a complaint against Plaintiff. But it is hard to accept Plaintiff's implication that Adamski badgered Roe into filing a Title IX complaint given that Roe had already elected to pursue the more serious measure of filing criminal charges based on the incident.[5] And any reservations Roe might initially have had about the Title IX process seem to have dissipated entirely, as evidenced by her subsequent contacts with NIU advocating for disciplinary measures to be taken against Plaintiff. Thus, the circumstances surrounding the female professor are not sufficiently comparable to those faced by Plaintiff. That NIU handled different cases differently does nothing to plausibly plead that sex discrimination in Plaintiff's case.

Plaintiff also cites NIU's handling of a 2011 sexual assault accusation against a school police officer as illustrative of its history of anti-male bias. In that case, a student accused an NIU police officer of sexual assault, which led to criminal charges. (*Id.* ¶¶ 134–36.) During the criminal case, the presiding judge ruled that NIU's police department intentionally withheld exculpatory evidence. (*Id.* ¶ 136.) But the Court does not see how allegations regarding the conduct of NIU's police department in a criminal case reflects potential bias on the part of NIU administrators in charge of Title IX enforcement.

---

[5] Plaintiff argues that Adamski's continued outreach to Roe violated NIU's Title IX policies and procedures but again fails to cite any specific prohibition. Indeed, the policies and procedures provide that, where a criminal complaint is filed, the police "will forward the report to the Title IX Coordinator," who will then proceed in accordance with the investigation procedures. (Title IX Policies and Procedures at 9.) Thus, it does not appear that Roe's cooperation was even required for Adamski to proceed against Plaintiff.

One last way Plaintiff attempts to show NIU's tendency to discipline males more harshly than females is by highlighting his interactions with the administration in his capacity as the president of his fraternity. According to Plaintiff, his fraternity and fraternities in general were subject to more extensive oversight than sororities, which he claims evidences NIU's discriminatory intent. That NIU subjected Plaintiff's fraternity, in particular, to heightened scrutiny is hardly surprising given that just a few years earlier, one of the fraternity's pledge brothers died at a hazing event. To the extent fraternities in general were subject to greater oversight than sororities is not necessarily indicative of NIU's anti-male bias, as the school may have concluded from experience that the kind of excessive drinking that led to the pledge's death was more common at fraternities. *Cf. Doe v. Univ. of Denver*, 1 F.4th 822, 834 (10th Cir. 2021) (declining to infer anti-male bias from the disparities between the gender makeup of sexual assault complaints where "such disparities can readily be explained by an array of nondiscriminatory possibilities," such as "that male students commit more sexual assaults" (internal quotation marks omitted)).

Viewing the FAC's allegations as a whole, the Court cannot reasonably infer that an anti-male bias influenced NIU's determination that Plaintiff was responsible for Roe's sexual assault. Consequently, Plaintiff fails to state a claim for sex discrimination under Title IX.

## II.      Title IX—Retaliation

Plaintiff further alleges that, in retaliation for his active defense against Roe's sexual assault accusation, NIU imposed further punitive measures against him based on a thinly sourced report accusing him of using an illegal drug at his fraternity house. Plaintiff therefore asserts a separate Title IX retaliation claim. Unlike Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-3(a), Title IX does not contain an express prohibition of retaliation. Nonetheless, the Supreme Court has recognized the availability of a retaliation claim under Title

IX, explaining that "[r]etaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 183 (2005). To state a Title IX retaliation claim, a plaintiff must plead that: (1) he engaged in a protected activity under Title IX; (2) his school took a materially adverse action against him; and (3) there was a causal but-for connection between the two. *Columbia Coll.*, 933 F.3d at 857.

NIU disputes that Plaintiff's conduct in defending himself against Roe's allegation of sexual assault constituted a protected activity under Title IX. Title IX protects individuals from being retaliated against for complaining of sex discrimination. *Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 388 (7th Cir. 2012). This Court, however, is dubious that Plaintiff's allegations concerning his defense against Roe's sexual assault accusation can be construed as him complaining of sex discrimination. Had Plaintiff alleged that, in the course of NIU's investigation, he communicated that the investigation was tainted by an anti-male bias, he would be on firmer ground for purposes of his retaliation claim. Certainly, denying an allegation of sexual assault does not imply that the allegation itself is an act of sex-based discrimination—both men and women commit sexual assault. *Samford Univ.*, 29 F.4th at 690.

Moreover, there is reason to believe that Title IX's antiretaliation protections do not encompass mere participation in a Title IX proceeding. Whereas Title VII contains antiretaliation language that protects any person who has "***participated in any manner*** in an investigation, proceeding, or hearing," 42 U.S.C. § 2000e-3(a) (emphasis added), the Supreme Court in *Jackson* simply found that Title IX prohibits retaliation because it is a form of sex discrimination. As the Supreme Court later emphasized, "the holding in *Jackson* was based on an interpretation of the 'text of Title IX.'" *Gomez-Perez v. Potter*, 553 U.S. 474, 484 (2008)

(quoting *Jackson*, 544 U.S. at 173). That Title IX's antiretaliation prohibition is rooted in a text that is narrower than Title VII's express antiretaliation language seems to weigh in favor of taking literally *Jackson*'s articulation of the protected activity as complaining of sex discrimination. *See Jackson*, 544 U.S. at 178 n.2 ("We agree . . . that plaintiffs may not assert claims under Title IX for conduct not prohibited by that statute.").

Although the Seventh Circuit has not squarely addressed the scope of a Title IX retaliation claim, several courts outside of this Circuit have concluded that "[n]o part of Title IX designates participation in a sexual harassment investigation on the side of the accused as protected activity." *Du Bois v. Bd. of Regents of Univ. of Minn.*, 987 F.3d 1199, 1205 (8th Cir. 2021); *see also Schrader v. Emporia State Univ.*, No. 19-2387-DDC-TJJ, 2021 WL 4284543, at *24 (D. Kan. Sept. 21, 2021) ("[T]he court concludes that plaintiff fails to state a claim for retaliation under Title IX. Plaintiff's argument relies on his participation in the Title IX proceedings, not opposing discrimination."); *Doe v. Belmont Univ.*, 367 F. Supp. 3d 732, 757 (M.D. Tenn. 2019) ("Doe has offered no authority for the novel proposition that defending himself against allegations of sexual misconduct, in and of itself, is the legal equivalent of opposing or complaining of unlawful practices under Title IX."). On the other hand, Plaintiff does note that at least two courts have allowed a plaintiff to proceed with a retaliation claim based upon their defense against sexual misconduct allegations. *Crowther v. Bd. of Regents of Univ. Sys. of Ga.*, 661 F. Supp. 3d 1342, 1356 (N.D. Ga. 2023), *vacated*, 2023 WL 4915078 (N.D. Ga. May 12, 2023); *Wilkerson v. Univ. of N. Tex.*, 223 F. Supp. 3d 592, 602–03 (E.D. Tex. 2016). The Court does not find either of those cases persuasive. The subsequently vacated *Crowther* decision contains only a cursory analysis of the issue. And *Wilkerson* relied on a regulation, 34 C.F.R. § 100.7(e), to find that a Title IX retaliation claim covered participation in

18

a proceeding. The Eighth Circuit rejected a similar argument as foreclosed by Supreme Court precedent. *Du Bois*, 987 F.3d at 1205 (citing *Jackson*, 544 U.S. at 178 & n.2; *Alexander v. Sandoval*, 532 U.S. 275, 285 (2001)).

Even if Plaintiff's participation in the Title IX proceeding could be treated as a protected activity, his retaliation claim would still fail because he does not adequately allege that retaliatory animus motivated NIU's investigation of Plaintiff's reported on-campus cocaine use and the accompanying interim suspension. While the FAC contains multiple allegations concerning Plaintiff's efforts to prove to NIU that he never used cocaine, it never addresses whether he also denied being present at his fraternity house during a time when interim measures were in place barring him from being there. Plaintiff's noncompliance with existing interim measures prohibiting him from being present in student housing, by itself, would be sanctionable under NIU's Student Code of Conduct, regardless of whether or not he also used cocaine there. (FAC, Ex. K, Student Code of Conduct at PageID #576, Dkt. No. 66.) With nothing in the FAC disputing that aspect of the allegation against Plaintiff, the Court cannot find that Plaintiff has plausibly alleged that NIU's initiation of a separate disciplinary proceeding was pretext for retaliation. *See Doe v. Columbia Coll. Chi.*, 299 F. Supp. 3d 939, 959 (N.D. Ill. 2017) ("[A]n entity may not be held liable for retaliation if it had a legitimate non-retaliatory reason for taking the action alleged to be retaliatory."), *aff'd*, 933 F.3d 849 (7th Cir. 2019). And similar to the Title IX policies and procedures, the Student Code of Conduct allows the imposition of interim measures such as Plaintiff's suspension pending completion of an investigation. (Student Code of Conduct at PageID #595–96.)

In short, the Court concludes that Plaintiff's retaliation claim fails because he did not engage in a protected activity by merely defending himself against Roe's sexual assault

allegation. Moreover, to the extent that Plaintiff's defense against Roe's Title IX complaint was a protected activity, he would still be unable to state a retaliation claim because the credible allegation that Plaintiff violated the interim measures against him gave NIU a legitimate non-retaliatory reason to open a separate investigation. For these reasons, the Court dismisses Plaintiff's Title IX retaliation claim.

### III. Declaratory Judgment

Plaintiff's FAC also seeks a declaratory judgment that, in effect, would clear the disciplinary proceedings at issue in this case from Plaintiff's record at NIU. Under the federal Declaratory Judgment Act, a federal district court, "[i]n a case of actual controversy within its jurisdiction . . . may declare the rights and other legal relations of any interested party." 28 U.S.C. § 2201(a). "It is well-established that the Declaratory Judgment Act does not create an independent cause of action. It provides only an additional form of relief." *Sieving v. Cont'l Cas. Co.*, 535 F. Supp. 3d 762, 774 (N.D. Ill. 2021) (internal quotation marks omitted). Consequently, "a court may only enter a declaratory judgment in favor of a party who has a substantive claim of right to such relief." *Elward v. Electrolux Home Prods., Inc.*, 214 F. Supp. 3d 701, 708 (N.D. Ill. 2016) (internal quotation marks omitted).

Plaintiff is unclear as to what legal right he is asking this Court to declare. If he is asking for a declaration of his Title IX rights, his declaratory judgment claim necessarily fails given the Court's dismissal of the substantive Title IX claims. And because there is no other discernable case or controversy pleaded in the FAC, the declaratory judgment claim is dismissed.

## CONCLUSION

For the foregoing reasons, NIU's motion to dismiss (Dkt. No. 71) is granted. Plaintiff's FAC is dismissed.

ENTERED:

Dated:  September 30, 2024

Andrea R. Wood
United States District Judge

21